**2015-1575, -1577, -1578, -1579**
**(INTERFERENCE NOS. 105,956, 105,957, 105,958 and 105,959)**

In The
# United States Court of Appeals
For The Federal Circuit

# C. DOUGLASS THOMAS, ALAN E. THOMAS,

*Appellants,*

## v.

# JACK D. PIPPIN,

*Appellee.*

## APPEALS FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD

————————————

## BRIEF OF APPELLANTS

————————————

C. Douglass Thomas
IPVENTURE, INC.
5150 El Camino Real, Suite A-22
Los Altos, California  94022
(650) 903-9200

*Counsel for Appellants*                    *Dated: July 21, 2015*

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Thomas _____ v. Pippin _____

No. 15-1575

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

C. Douglass Thomas & Alan E. Thomas certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

C. Douglass Thomas
Alan E. Thomas

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

IpVenture, Inc.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

_____

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

C. Douglass Thomas; Neifeld IP Law; Rick Niefeld; Robert Hahl; Irell & Manella; Richard Birnholz

_____

4-30-2015
_____          /s/ C. Douglass Thomas
Date                           _____
                                Signature of counsel

                                C. Douglass Thomas
                                _____
                                Printed name of counsel

Please Note: All questions must be answered
cc: _____

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF RELATED CASES ....................................................x

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE..................................................................3

STATEMENT OF FACTS ........................................................................5

    I.    THE THOMAS PATENTS.................................................5

    II.    THE PRE-INTERFERENCE PROCEEDINGS ..................7

    III.    THE INTERFERENCE PROCEEDINGS ..........................8

SUMMARY OF THE ARGUMENT ......................................................10

ARGUMENT ..........................................................................................14

    I.    STANDARD OF REVIEW................................................14

    II.    BOARD COMMITTED LEGAL ERRORS IN APPLYING
          PRESUMPTION OF INVALIDITY AGAINST PATENTEES'
          PATENTED CLAIMS ......................................................15

          A.    BOARD'S DECISION AS TO PRESUMPTION OF INVALIDITY ..........15

          B.    PATENTS ARE PRESUMED VALID - EVEN IN AN
              INTERFERENCE ........................................................17

C.    BOARD'S ANALYSIS WAS LEGALLY WRONG ..............................20

D.    CONCLUSION .............................................................................23

III.    BOARD ERRED IN NOT DISSOLVING THE
        INTERFERENCES GIVEN THAT THERE IS NO
        INTERFERENCE-IN-FACT .............................................................24

A.    INTRODUCTION ...........................................................................24

B.    BOARD COMMITTED LEGAL ERROR IN FAILING TO
       CONSIDER OR EVEN IDENTIFY A RATIONALE FOR
       COMBINING PRIOR ART WITH THOMAS CLAIMS WHEN
       FINDING PIPPIN'S SOLE CLAIM OBVIOUS ....................................25

        (i)    THE LAW ON OBVIOUSNESS REQUIRES AN
               ARTICULATED RATIONALE ...............................................25

        (ii)   BOARD'S DECISION OFFERED NO ARTICULATED
               RATIONALE FOR THE COMBINATION OF REFERENCES ......25

        (iii)  BOARD'S OBVIOUSNESS DETERMINATION WAS
               NECESSARILY LEGAL ERROR ...........................................27

C.    BOARD COMMITTED LEGAL ERROR IN BASING ITS
       ANALYSIS ON THOMAS' SPECIFICATION WHEN
       CONCLUDING THAT PIPPIN'S SOLE CLAIM WAS OBVIOUS
       OVER THOMAS' CLAIMS .............................................................27

        (i)    BOARD RELIED ON THOMAS' SPECIFICATION IN
               CONCLUDING THAT AN INTERFERENCE-IN-FACT
               EXISTED ..........................................................................27

        (ii)   INTERFERENCE-IN-FACT REQUIRES A CLAIM TO
               CLAIM ANALYSIS, BUT BOARD IMPROPERLY
               FOCUSED ON THE SPECIFICATION ....................................28

        (iii)  BOARD'S FACTUAL ASSERTIONS OF ITS
               OBVIOUSNESS ANALYSIS ARE ERRONEOUS AND
               LACK SUBSTANTIAL EVIDENCE ........................................30

(iv)   Conclusion.................................................32

D.   Board Committed Legal Error in Failing to
Consider Claims as a Whole, Relying on Incorrect
and Inadequate Factual Assertions, and
Erroneously Concluding Pippin's Sole Claim
Obvious from Thomas' Claims ............................33

(i)   Introduction .................................................33

(ii)   The Law .......................................................33

(iii)   Board Failed to Fully Consider the *Graham*
Differences ..................................................35

(a)   Board's Features Not Commensurate with
*Graham* Differences..............................36

(b)   Board Failed to Consider Limitations of
*Graham* Difference (2)........................37

(iv)   Several of the Board's Factual Assertions
were Erroneous, Prejudicial and Lack
Substantial Evidence ................................41

(a)   Board's Factual Assertions for feature 2 are
Erroneous and Unsupported................41

(b)   Board's Factual Assertions for feature 3 are
Erroneous and Unsupported................41

(c)   Conclusion .........................................45

IV.   BOARD'S CONCLUSION THAT THOMAS CLAIMS 10
AND 18-26 OF THE THOMAS '190 PATENT ARE
OBVIOUS OVER THE COUNT (PIPPIN'S SOLE CLAIM)
WAS LEGAL ERROR........................................46

A.   Introduction.........................................46

B.   BOARD REQUIRING THOMAS TO CARRY THE BURDEN OF PROOF AS TO NONOBVIOUSNESS OF ITS PATENTED CLAIMS WAS LEGAL ERROR .................................................................46

C.   BOARD COMMITTED LEGAL ERROR IN FAILING TO PROVIDE A RATIONALE FOR COMBINING PRIOR ART WITH THE COUNT WHEN FINDING THOMAS' CLAIMS OBVIOUS ..........47

D.   RELIANCE ON ARAI AND ATKINSON WAS LEGAL ERROR............48

E.   THOMAS' CLAIMS HAVE NOT AND CANNOT BE PROVEN OBVIOUS OVER THE COUNT IN VIEW OF YAMAKI AND CANOVA.......................................................................................49

F.   CONCLUSION .............................................................................53

V.   BOARD'S CONCLUSION THAT THOMAS CLAIMS 1-28 OF THE THOMAS '599 PATENT ARE OBVIOUS OVER THE COUNT (PIPPIN'S SOLE CLAIM) WAS LEGAL ERROR .................................................................................... 54

VI.  BOARD'S CONCLUSION THAT THOMAS CLAIMS 26-27 OF THE THOMAS '798 APPLICATION ARE OBVIOUS OVER THE COUNT (PIPPIN'S SOLE CLAIM) WAS LEGAL ERROR.........................................................................................55

A.   INTRODUCTION...........................................................................55

B.   BOARD COMMITTED LEGAL ERROR IN FAILING TO PROVIDE A RATIONALE FOR COMBINING PRIOR ART WITH THE COUNT WHEN FINDING THOMAS' CLAIMS OBVIOUS ..........56

C.   RELIANCE ON ARAI AND ATKINSON WAS LEGAL ERROR............57

D.   THOMAS' CLAIMS HAVE NOT AND CANNOT BE PROVEN OBVIOUS OVER THE COUNT IN VIEW OF YAMAKI ET AL. AND CANOVA ET AL. ................................................................58

E.   CONCLUSION .............................................................................61

CONCLUSION ...................................................................................................62

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*Advance Transformer Co. v. Levinson*,
  837 F.2d 1081 (Fed. Cir. 1988) ....................................................29

*Apotex v. Merck*,
  254 F.3d 1031, 59 USPQ.2d 1139 (Fed. Cir. 2001)...............................22, 23

*Bilski v. Kappos*,
  561 U.S. 593, 130 S. Ct. 3218, 177 L. Ed. 2d 792 (2010) ...........................34

*Bruning v. Hirose*,
  161 F.3d 681 (Fed. Cir. 1998) ..............................................*passim*

*Diamond v. Diehr*,
  450 U.S. 175, 209 USPQ 1 (1981) ................................................34

*Dickinson v. Zurko*,
  527 U.S. 150, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) ...........................14

*Graham v. John Deere Co.*,
  383 U.S. 1, 148 USPQ 459 (1966) .........................................*passim*

*Hughes Aircraft Co. v. United States*,
  717 F.2d 1351, 219 USPQ 473 (Fed. Cir. 1983)..........................................40

*In re Applied Materials*,
  692 F.3d 1289 (Fed. Cir. 2012) ..................................................14

*In re Berger*,
  279 F.3d 975 (Fed. Cir. 2002) ...................................................14

*In re Etter*,
  756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985)..............................................20

*In re Kahn*,
   441 F.3d 977, 78 USPQ.2d 1329 (Fed. Cir. 2006)......................25, 27, 48, 57

*In re Klein*,
   647 F.3d 1343 (Fed. Cir. 2011) ....................................................................14

*Kimberly-Clark Corp. v. Johnson & Johnson*,
   745 F.2d 1437 (Fed. Cir. 1984) ....................................................................34

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398, 82 USPQ.2d 1385 (2007) .................................................*passim*

*Kubota v. Shibuya*,
   999 F.2d 517, 27 USPQ.2d 1418 (Fed. Cir. 1993)..................................20, 21

*Loctite Corp. v. Ultraseal Ltd.*,
   781 F.2d 861, 228 USPQ 90 (Fed. Cir. 1985)................................................40

*Microsoft Corp. v. i4i L.P.*,
   564 U.S. ___, 131 S. Ct. 2238, 180 L. Ed. 2d 131 (2011) ..........17, 18, 19, 21

*Pioneer Hi-Bred Int'l. Inc. v. Monsanto Technology, LLC*,
   671 F.3d 1324 (Fed. Cir. 2012) ....................................................................14

*Plantronics, Inc. v. Aliph, Inc.*,
   724 F.3d 1343 (Fed. Cir. 2013) ....................................................................27

*Stamps v. Endicia*,
   No. 10-1328 (Fed. Cir. 2011) ...............................................................22, 23

*Thompson v. Thompson et al.*,
   13 Fed. Appx. 925, 2001 WL 333816 (Fed. Cir. 2001) ................................19

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*,
   721 F.2d 1540 (Fed. Cir. 1983), *cert. denied*,
   469 U.S. 851 (1984)......................................................................................34

*Winter v. Fujita*,
   53 USPQ.2d 1234 (BPAI 1999) ....................................................................29

*Yorkey v. Diab*,
    605 F.3d 1297 (Fed. Cir. 2010) ...................................................................29

## **STATUTES**

35 U.S.C. § 102(g) ......................................................................................... 22-23

35 U.S.C. § 103 ...............................................................................................25, 34

35 U.S.C. § 103(a) ................................................................................................33

35 U.S.C. § 135 .......................................................................................................1

35 U.S.C. § 141 .......................................................................................................1

35 U.S.C. § 142 .......................................................................................................1

35 U.S.C. § 282 ...............................................................................................*passim*

35 U.S.C. § 291 .....................................................................................................30

## **RULES**

Fed. Cir. R. 15(a) ...................................................................................................1

Fed. R. App. P. 15(a) ..............................................................................................1

## **REGULATIONS**

37 C.F.R. § 41.121(b) ...........................................................................................12

37 C.F.R. § 41.201 ................................................................................................28

37 C.F.R. § 41.203(a).............................................................................................28

37 C.F.R. § 41.207(a).......................................................................................15, 17

37 C.F.R. § 41.207(b) .......................................................................................16, 17

37 C.F.R. § 41.207(b)(2)........................................................................................12

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this court or any appellate court. However, an appeal involving related patents was before this court, *see* Appeal No. 2013-1142, judgment dated October 15, 2013, panel including Circuit Judges Prost, Plager and Taranto, nonprecedential opinion.

Further, other than potentially the two district court actions listed below, there is no case known by counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal.

(1)    IpVenture, Inc. v. Lenovo Group Ltd., et al., Case No. 1:11-cv-00588-RGA (D. Del.) (consolidated), matter stayed

(2)    IpVenture, Inc. v. ASUSTek Computer Inc. and ASUS Computer International, Case No. 3:12-cv-04143-JSW (N.D. Cal.), matter dismissed without prejudice

# **JURISDICTIONAL STATEMENT**

The Patent Trial and Appeal Board invoked and assumed jurisdiction over the patent interference proceedings involved herein pursuant to 35 U.S.C. § 135.

The United States Court of Appeals for the Federal Circuit has jurisdiction over this appeal pursuant to 35 U.S.C. § 141.

The notices of appeal in Appeal Nos. 15-1575, 15-1577, 15-1578 and 15-1579, from the Board's corresponding final judgments and decisions issued on January 26, 2015 in Patent Interference Nos. 105,956, 105,957, 105,958 and 105,959, respectively, were timely filed by Appellants on March 24, 2015 in accordance with 35 U.S.C. § 142, Rule 15(a) of the Federal Rules of Appellate Procedure, and Rule 15(a) of the Federal Circuit Rules.  These appeals have since been since consolidated in Appeal No. 15-1575.

## <u>STATEMENT OF THE ISSUES</u>

1.   Whether the Patent Trial and Appeal Board erred in placing presumption(s) and/or burden on proof against Thomas and thereby requiring Thomas to prove nonobviousness of claims of their own patent claims?

2.   Whether the Patent Trial and Appeal Board erred in holding that there was an Interference-In-Fact between Thomas' claims and Pippin's claim?

3.   Whether the Patent Trial and Appeal Board erred in holding that none of Thomas' claims were patentably distinct from the count?

## STATEMENT OF THE CASE

This case is an appeal from four separate patent interference proceedings before the Patent Trial and Appeal Board ("Board").  The four interference proceedings involve two patents and two patent applications of Thomas and one patent application of Pippin.  These patent interference proceedings were instituted at the urging of Pippin in a belated effort to attack validity of the Thomas patents and applications.

The Thomas patents and applications generally concern power and/or thermal management for computers.  On the other hand, Pippin's patent application pertains to an integrated circuit, namely a microprocessor, having an integral programmable thermal sensor that internally triggers and generates an interrupt based on temperature of the microprocessor.

Thomas was deemed the junior party and Pippin was deemed the senior party in the interference proceedings.  Although priority of invention (defined by the count) was not disputed by the parties, the Board exercised their discretion and elected to continue the patent interference proceedings to consider patentable distinctness.   During the interference proceedings, the Board procedurally and substantively disadvantaged Thomas and required Thomas to file motions to avoid presumptive losing all of the Thomas patent and applications.

Accordingly, Thomas filed motions to have the interferences declared improper, and filed motions to designate claims of the Thomas patents as not corresponding to the count (i.e., nonobvious from the count). Specifically, Thomas filed motions, including (i) Thomas Motions 5.1, 5.2 (first portion), 5.3 and 5.4 to show that there is no interference-in-fact and (ii) Thomas Motions 5.2 (second portion), 6 and 7 to show that at least certain Thomas claims are patentably distinct from the count. Subsequently, the Board denied all of Thomas' motions, entered judgment against Thomas, and ordered that all of Thomas' claims be canceled.

Thomas has timely filed appeals with this court to seek justice. The Board committed numerous errors that will cause, unless corrected, loss of substantial patent rights that have been many times examined, reexamined and litigated. Now, by this appeal brief, Thomas requests that the Board's decisions be reversed and that the Board's judgments be vacated because justice so requires.

## STATEMENT OF FACTS

**I.    THE THOMAS PATENTS**

C. Douglass Thomas and his father Alan E. Thomas (hereafter "Thomas"), as inventors, obtained various patents pertaining to innovations concerning power and/or thermal management of computers. Two of these patents and two allowed patent applications are involved in the four interference proceedings now on appeal. The U.S. Patents ("Thomas Patents") include: 7,506,190 (JA 73-90) and 7,937,599 (JA 91-109) and Thomas' patent applications include: 12/321,798 (JA 110-125) and 13/727,433 (JA 126-141). All the involved Thomas patents and applications claim priority to an original Thomas patent application filed in June 1994.

In the early 1990's, when Thomas conceived of the inventions claimed in the Thomas' patents and patent applications, the computer industry focused on delivering computers with processors (*e.g.*, CPUs) operating at ever-higher processor speeds. But as computer processors got faster and smaller, they ran hotter, resulting in an ever increasing need to prevent the processors from overheating while maintaining performance. If a processor overheated, its computer would shut down, not function as intended, or suffer damage. Slowing down the frequency at which a processor operates (referred to as "throttling") reduces both power consumption and heat, but by itself hinders performance.

Speeding up a fan could increase cooling of the processor, but also would increase power consumption and noise.

The Thomas' patents/applications concern thermal and/or power management for computers. The Thomas patents/applications address the overheating problems by providing advanced techniques for managing thermal conditions. Various approaches described in the Thomas' patents and patent applications facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computer. For example, in certain embodiments, Thomas teaches that thermal management can involve lowering the processor's clock frequency when the processor's temperature reaches certain thresholds and activating a fan (or increasing its speed) at other thresholds, and to use these concepts together in a coordinated manner.[1] Thomas teaches that the thermal management can be provided differently depending on whether operating in a first operational mode or in a second operational mode. In other certain embodiments, which pertain to a computer system including a microprocessor, one or more temperature sensors, a variable speed fan, and a power management module, the power management module can operate the microprocessor according to a first or second power management

---

[1] *E.g.*, Thomas '190 patent, column 1, lines 36-39; column 3, lines 48-49; column 4, line 66 to column 5, line 3; column 5, lines 22-26; column 7, line 20 to column 8, line 49. (JA 85-88)

policy based on the temperature of the processor. The system can also control the

operational speed of the fan based on the power management policy in use.

Regardless of the embodiment, these advanced techniques "facilitate intelligent

control of a processor's clock frequency and/or a fan's speed so as to provide

thermal and/or power management for the computing device."[2] The intelligent and

efficient control of the microprocessor and fan can prevent overheating of the

microprocessor while maximizing microprocessor performance. This is especially

useful in portable computers because energy conservation is an important factor for

such computers.[3] Intelligently "throttling" the processor and adjusting the fan

speed based on temperature to maintain performance are now common in

computers.

## II.    THE PRE-INTERFERENCE PROCEEDINGS

On March 5, 2013, Pippin filed an expedited Track I continuation patent

application, which was assigned U.S. patent application 13/786,274. That newly

filed application contain by a single claim that was identical to the single claim in

its pending parent application, U.S. patent application 10/464,482. (JA 928, 1033)

At the same time, Pippin requested that the application be treated as a Statutory

Invention Registration (SIR) application, just like its parent application. (JA 1004-

---

[2] Thomas '190 patent, Abstract. (JA 73)

[3] *E.g.*, Thomas '190 patent, column 2, lines 24-54; column 3, lines 41-60; column 8, lines 6-40. (JA 85, 86, 88)

1010) This new expedited filing thus offered nothing by a vehicle to entice the USPTO to invoke additional interferences so that Pippin could attack the validity of the Thomas patents/applications in a more favorable forum to Pippin.

On June 6, 2013, Pippin initially sought to provoke one or more interferences with several of the Thomas patents/application by filing a Request for Interference. (JA 930-1003)  In view of various *ex parte* arguments and a self-serving declaration filed with the interference request, on July 2013, the patent examiner found Pippin's sole claim allowable and accepted Pippin's interference allegations and thus forwarded Pippin's patent application to the Board for review. (JA 266, 267, 278, 279, 290, 290, 302)  The Board declared the interferences on August 16, 2013.  (JA 256-303)

Although Pippin obtained various patents from its original patent filing more than twenty (20) years ago, simply for purposes of maintaining interferences, Pippin has relied on its two pending SIR applications, U.S. patent application 13/786,274 and its parent U.S. patent application 10/464,482, to pursue its belated validity attack using interference proceedings.

## III.    THE INTERFERENCE PROCEEDINGS

The involved interferences declared by the Board include Interference Nos. 105,956, 105,957, 105,958 and 105,959, though the Board consolidated proceedings into Interference No. 105,956.  (JA 586-596)  At the preliminary

motion phase, the Board approved various proposed motions by the parties.

Specifically, of relevance to this appeal were the proposed motions for:

(1) judgment that there is no interference-in-fact between Pippin's sole claim 1 and

any of Thomas claims; and (2) motion to designate certain Thomas' claims as not

corresponding to the count (*i.e.*, as pertaining to a different invention).  Thomas

subsequently filed motions Thomas Motions 5.1, 5.2 (first portion), 5.3 and 5.4 for

establishing no interference-in-fact, and Thomas Motions 5.2 (second portion), 6

and 7 for establishing nonobviousness of various Thomas claims over the count.

(JA 367-409, 428-538; 820-895, 911-927)  The Board denied all of Thomas'

motions, entered judgment against Thomas, and ordered that all of Thomas' claims

be canceled.  (JA 1-59, 69-72; JA 1-55, 69-72)

# SUMMARY OF THE ARGUMENT

At the *ex parte* insistence of Pippin, the Board placed the involved Thomas patents and applications into interferences with Pippin's patent application. Once such declarations were declared, in the Board's eyes it became the burden of Thomas to "move mountains." That is, sitting comfortably behind its own rules imposing presumptions and burdens, the Board required Thomas to file motions to change the presumed unpatentability of all of Thomas' involved claims. These presumptions and burdens as applied by the Board are not normal procedural allocations of burdens but instead tantamount to substantive assumptions that carry a strong resistance to being overcome.

Thomas filed motions proving that each of the interferences was improperly declared and thus should have been dissolved. In these motions, it was shown that the mandatory two-way test for an interference is not, and cannot, be satisfied. Specifically, it was clearly demonstrated by Thomas that Pippin's sole claim is *nonobvious* from any of the Thomas claims. Pippin conveniently responded that its sole claim is obvious from the prior art. In other words, despite the fact that Pippin had proclaimed patentability of its invention for some twenty years, Pippin did an abrupt "about-face" in these interferences and now argues that its invention (already in the public domain) was obvious all along.

The Board considered the Thomas motions asserting that the interferences were improperly declared, *i.e.*, no interference-in-fact, but the Board's analysis and conclusions contain legal and factual errors. Although the Board recognized that it was evaluating nonobviousness, the Board failed to articulate any reason for combining references to reach a conclusion of obviousness. For example, the Board failed to articulate any reason why the prior art references would be used to modify the Thomas claims to overcome the various differences between the Thomas claims and Pippin's sole claim. That is clearly a legal error. The Board's analysis also expressly and improperly relied on teachings from the Thomas *specification*, which is not prior art to Pippin and thus is not to be considered. That is also clearly another legal error. Further, the Board failed to consider the claims as a whole and instead separately evaluate three abstracted features. For instance, the Board failed to consider that it is Pippin's programmable thermal sensor that generates its interrupt signal, and that the programmable thermal sensor, as well as the interrupt signal generation, are internal to the programmable thermal sensor. That too is yet another legal error. Further still, the Board made various factual assertions in support of its decision but these factual assertions are not supported by substantial evidence and are indeed clearly erroneous. For example, the Board's factual assertions pertaining to "interrupt signal" are not only incorrect but

also not commensurate with the limitations of Pippin's sole claim. Reliance on

such incorrect factual assertions is also another legal error.

In addition, the Board committed legal error in requiring Thomas to carry

the burden to prove that Thomas' claims are nonobvious from the count, *i.e.*,

Pippin's sole claim, and other applicable prior art. In interference proceedings,

where the junior party concedes priority and has involved patents, the Board's

procedural rules 37 C.F.R. § 41.121(b) and 37 C.F.R. § 41.207(b)(2) cannot be

used to disadvantage a patentee with respect to patentability. That is, the

presumption of validity provided by 35 U.S.C. § 282 causes at least these rules to

be inapplicable to validity challenges to patents, even if those patents are held by a

junior party (particularly where the junior party has conceded priority and the

validity challenge is obviousness). The burden of proof must be placed on the

challenger of the validity of the patents, and any presumption regarding

obviousness in an interference proceeding must benefit the patent holder.

Therefore, the Board's imposition of the burden of proof on Thomas, and its

consequential presumption of *invalidity* of all of Thomas' claims, is legal error.

Further still, Thomas filed motions proving that claims of the Thomas

patents and applications do not correspond to the count, that is, such claims are

nonobvious from the count. The Board's analysis not only improperly shifted the

burden to patentee and failed to provide an articulated rationale for combining

references with the count (Pippin's sole claim), but also relied on references that are not prior art and made various incorrect factual assertions.  At a minimum, the Thomas claims are nonobvious over the count at least in view of (i) the limitations concerning fan speed control and more particularly controlling fan speed based on power management policy/configuration in use, and/or (ii) the different power management policies/configurations use of different conditions based on temperature of a processor/processing unit, which limitations are in combination with various other limitations of the Thomas claims.  The Board's conclusions to the contrary are improper as the Board ignored the statutory presumption of validity of patents, failed to follow *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), and relied on clearly erroneous factual assertions.

In view of these errors, Thomas requests this court to reverse the Board's decisions and vacate of the Board's judgments.

## ARGUMENT

## I.    STANDARD OF REVIEW

The court reviews the Board's legal conclusions without deference, or de novo.  *In re Applied Materials*, 692 F.3d 1289 (Fed. Cir. 2012).  This appeal involves issues concerning interferences, statutory construction, and obviousness. The Board's understanding of 35 U.S.C. § 282 is reviewed de novo, as statutory interpretation is a question of law.  *In re Berger*, 279 F.3d 975, 980 (Fed. Cir. 2002).  The Board's ultimate obviousness decision is also reviewed de novo but review of the Board's underlying factual findings are reviewed for substantial evidence.  *In re Klein*, 647 F.3d 1343, 1347 (Fed. Cir. 2011).

Additionally, when reviewing an action of the Patent Trial and Appeal Board (PTAB) (hereafter the "Board"), the action of the Board will be set aside if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and factual findings of the Board will be set aside if unsupported by substantial evidence.  *Dickinson v. Zurko*, 527 U.S. 150, 152, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999); *Pioneer Hi-Bred Int'l. Inc. v. Monsanto Technology, LLC*, 671 F.3d 1324, 1327 (Fed. Cir. 2012).

## II. BOARD COMMITTED LEGAL ERRORS IN APPLYING PRESUMPTION OF INVALIDITY AGAINST PATENTEES' PATENTED CLAIMS

### A. BOARD'S DECISION AS TO PRESUMPTION OF INVALIDITY

The Board committed legal error in making Thomas carry the burden to prove that "the subject matter of all claims of Thomas … would not have been obvious in view of the subject matter of Pippin claim 1." Decision on Motions, p. 38, l. 1-3. (JA 38) Likewise, the Board stated Thomas "bears the burden to prove that the subject matter of the Count, treated as prior art, would not have anticipated or rendered obvious the subject matter of Thomas claims…." Decision on Motions, p. 49, l. 17-19. (JA 49) The Board also placed the burden on Thomas to show that the Thomas' claims "would not have been obvious when considered in view of the subject matter of the count (Pippin's claim 1) and any other applicable art." Decision on Motions, p. 40, l. 26 – p. 41, l. 2. (JA 40-41)

In these interference proceedings, Pippin is the senior party and Thomas is the junior party. Consequently, once the interferences were declared, which occurred in an *ex parte* manner, the senior party was given substantial procedural advantages. Specifically, USPTO rules grant a senior party a presumption in which the senior party is presumed to be the first inventor of the interfering subject matter (*i.e.*, the count). 37 C.F.R. § 41.207(a). There is also a presumption of

claim correspondence under 37 C.F.R. § 41.207(b).[4]  Together these presumptions established by Board rules provide the senior party with substantial procedural advantages.  Consequently, with these Board rules, it becomes the burden of the junior party to rebut these presumptions.

In the present interference proceedings, even though priority was conceded, the above noted presumptions were applied against Thomas, the junior party.  As a result, the Thomas patents involved in the interference proceedings were presumed obvious from Pippin's claimed invention.  As a result, Thomas was required to file motions to dedesignate claims from the count.  The Board authorized Thomas to file Thomas Motions 5.2, 6 and 7 for the purpose of dedesignation of certain claims.  (JA 213, 214, 220, 221, 225-227)

An important issue decided by the Board in deciding Thomas Motions 5.2, 6 and 7 was whether the claims of the Thomas patents were proven by Thomas to be patently distinct from the count, which is also Pippin's sole claim, so that such claims could be designated as *not* corresponding to the count.  Thus, Thomas was placed in the position of having the burden to prove patentability of their own already patented claims.  Indeed, in the Board's decision on Thomas' motions to

---

[4] 37 C.F.R. § 41.207(b), states: "For the purposes of determining priority and derivation, all claims of a party corresponding to the count are presumed to stand or fall together.  To challenge this presumption, a party must file a timely substantive motion to have a corresponding claim designated as not corresponding to the count."

dedesignate claims, the Board place the burden of proof on Thomas.  Decision on

Motions, p. 40, l. 22 – p. 41, l. 17.  (JA 40)  *See also* Decision on Motions, p. 38, l.

21 – p. 39, l. 10; p. 49, l. 20-25.  (JA 38, 39, 49)

Consequently, relying on existing Board rules,[5] the Board applied a

presumption of *invalidity*.  In other words, the Board unlawfully switched the

burden of persuasion to Thomas – the patentee – to prove that his previously

patented claims were valid.  Given this presumption, Thomas requested and was

authorized by the Board to file Thomas Motions 5.2, 6 and 7 to dedesignate claims

of the Thomas '599 patent, the Thomas '190 patent, and the Thomas '798

application, respectively.  (JA 213, 214, 220, 221, 225-227)

Thomas submits that the Board's placement of the burden of proof as to

validity on patentees, even in an interference proceeding, is an error in law.  This

error in law is reviewed without deference to the Board's decision.  *Bruning v.*

*Hirose*, 161 F.3d 681, 684 (1998).

### B.    PATENTS ARE PRESUMED VALID - EVEN IN AN INTERFERENCE

The patent act indicates that issued patents are "presumed valid."  35 U.S.C.

§ 282.  This presumption was recently affirmed by the Supreme Court as requiring

a clear and convincing standard for proving an invalidity defense.  *Microsoft Corp.*

*v. i4i L.P.*, 564 U.S. ___, 131 S. Ct. 2238, 2252-53 (2011).

---

[5]  37 C.F.R. §§ 41.207(a), 41.207(b).

The presumption of validity codified in § 282 of the Patent Act applies and at the very least should prevent the burden of proof from being placed on a patentee to prove patentable distinctness of his own patents.  The reason that these Board rules provide a senior party with substantial procedural benefits over a junior party in a typical interference proceeding is because the senior party has an earlier filing date.  That makes sense when there is a dispute over who invented first, which would be a priority dispute.  Here, however, there is no priority dispute.  Consequently, this interference proceeding is simply a masked "patentability" proceeding.  Even worse, when priority of invention is not an issue, using an interference proceeding for a patentability challenge against a patent unfairly and unlawfully places the burden on a patentee to prove patentability.

Accordingly, the Board's presumptions and burden of proof as applied against Thomas were erroneous and a violation of § 282.  In *Microsoft Corp. v. i4i L.P.*, the Supreme Court recently highlighted the presumption of validity, stating:

> [T]he first paragraph of § 282 provides that "[a] patent shall be presumed valid" and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."  Thus, by its express terms, § 282 establishes a presumption of patent validity, and it provides that a challenger must overcome that presumption to prevail on an invalidity defense.  But, while the statute explicitly specifies the burden of proof, it includes no express articulation of the standard of proof.

*Id.*, 564 U.S. at __, 131 S. Ct. at 2245.

The Court explained that as a result of the presumption the appropriate "burden of proof" (also known as the "burden of persuasion") serves to identify the party who must persuade the factfinder of a conclusion in its favor. *Id.* at note 4.

Despite the Court's clear explanation of the presumption of validity provided by § 282, there remains on-going confusion as to what the presumption of validity provided by § 282 actually means. Fundamentally, and without exception, the presumption of validity means that the challenger of patents must bear the burden of proof. Separate from the *burden of proof* is the *standard of proof* that the challenger must meet. The presumption of validity provided by § 282 does not specify the required standard of proof, but case law has attempted to provide guidance on the appropriate standard of proof. *E.g.*, *Microsoft Corp. v. i4i L.P.*, 564 U.S. at __, 131 S. Ct. at 2242 (clear and convincing standard used for proving an invalidity defense); *Thompson v. Thompson et al.*, 13 Fed. Appx. 925, 2001 WL 333816 (Fed. Cir. 2001) (non-precedential) ("The party challenging the validity of a patent in an interference must prove facts showing invalidity by a preponderance of the evidence." (citing *Bruning v. Hirose*, 161 F.3d 681, 686-87 (Fed. Cir. 1998))).

Although the presumption of validity might not impose a clear and convincing standard of proof in certain proceedings before the USPTO, such as reexaminations or reissues, interferences are not procedures for examination or

correction of patents before an examiner. *See*, *e.g.*, *In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985) (presumption of patent validity not applicable in reexamination proceedings). Instead, interferences are disputes between inventors about who was first to invent a particular subject matter, that is, a priority dispute. Regardless of the extent to which the presumption of validity applies during an interference trial, nothing in law or equity supports imposing a **presumption of invalidity** against patents being attacked on validity grounds, even if such attack done is within the confines of an interference.

### C.   BOARD'S ANALYSIS WAS LEGALLY WRONG

The Board did not understand that their legal analysis was legally improper. The Board understood that Thomas was asserting that Pippin, not Thomas, should bear the burden of proof as to at least Thomas Motions 5.2, 6 and 7. However, the Board turned a blind eye to the Patent Act and instead relied on its own "procedural" rules to conclude that Thomas bore the burden of proof as to nonobvious of Thomas' claims. The Board's analysis was principally just a recitation that "[t]he § 282 presumption of validity does not apply to patents involved interference proceedings" and a citation to *Bruning v. Hirose* for support. (JA 41)

First, thanks to Pippin's assertions in its oppositions to the Thomas motions, the Board was confused into thinking that Thomas was relying on *Kubota v.*

*Shibuya*. That is incorrect. Thomas relied on 35 U.S.C. § 282 and *Microsoft Corp. v. i4i.*, not *Kubota v. Shibuya*. *E.g.*, Thomas Reply 6, p. 9, l. 14 – p. 12, l. 12. (JA 890-893)

Second, the Board's reliance on *Bruning v. Hirose* for support of its legal position that "[t]he § 282 presumption of validity does not apply to its patents involved [in] interference proceedings" is also incorrect. The holding in *Bruning v. Hirose* was expressly limited to an interference involving a patent issued from an application that was co-pending with the interfering application. In contrast, in the present interferences, the involved Thomas patents ('190 patent and '599 patent) were granted long before Pippin filed its involved patent application,[6] and Pippin's sole claim was not pursued by Pippin until May 24, 2010 in its parent U.S. patent application 10/464,482, which is after the Thomas '190 patent was granted, and thus lacks copendency with at least the Thomas '190 patent. Hence, factually, *Bruning v. Hirose* has not been established as a useful precedent to the present interferences.

Third, *Bruning v. Hirose* has no holding concerning burden of proof because it is referring to the standard of proof, not the burden of proof. Despite the Board's assertion to the contrary, *Bruning v. Hirose* never stated that "presumption of

---

[6] Pippin's involved patent application was filed March 5, 2013, whereas Thomas' '190 patent was granted March 17, 2009 and Thomas' '599 patent was granted May 3, 2011.

validity is inapplicable" in interference proceedings. Instead, the holding in *Bruning v. Hirose* was that "the appropriate standard of proof for validity challenges is preponderance of the evidence standard." Hence, *Bruning v. Hirose* only concludes that a preponderance of evidence standard of proof, as opposed to the clear and convincing standard which is sometimes called for by the presumption of validity, is to be used in a validity challenge if the involved patents being challenged were copending with the interfering application.

In this appeal, unlike *Bruning v. Hirose*, the issue concerns the burden of proof, not the standard of proof. Even if *Bruning v. Hirose* were relevant, the burden of proof was placed on the challenger of the patent, not the patentee. *Bruning v. Hirose*, 161 F.3d at 684. As such, *Bruning v. Hirose* fails to support Pippin's assertions that the Board's actions (which placed the burden of proof on Thomas to overcome a presumption of invalidity of its own patents) were proper and not unusual. (JA 727-728) Notably, *Bruning v. Hirose* did not discuss or decide anything concerning a presumption of invalidity or requiring a patentee to carry the burden of proof.

Moreover, the other cases referenced by the Board, namely, *Apotex v. Merck* and *Stamps v. Endicia*, as being somehow consistent with its conclusion, also lack meaningful reasoning or any relevant holding. *Apotex v. Merck* did not concern an interference. Instead, *Apotex v. Merck* concerned a defense under 35 U.S.C.

§ 102(g) presented in a district court litigation. *Apotex v. Merck* is merely citing *Bruning v. Hirose* in a footnote for the proposition that a preponderance of the evidence standard generally applies in an interference. *Apotex v. Merck*, 254 F.3d at 1037 n.1.

*Stamps v. Endicia* is also not a case pertaining to an interference and is not a case that applied the burden of proof on a patentee. The panel in *Stamps v. Endicia* merely noted in *dicta* that "Patent applications, unlike patents that have been reviewed and issued by the PTO, deserve no presumption of validity in interference proceedings. *See* 35 U.S.C. § 282." Hence, neither *Apotex v. Merck* nor *Stamps v. Endicia* address the issue presented in this appeal and certainly offer no support for the Board's conclusions regarding the Thomas patents. Consequently, these additional citations by the Board offer no precedential value and no meaningful analysis that would support the Board's assertions.

### D.    CONCLUSION

When the Board, under the guise of Board rules, incorrectly placed the *burden of proof* on Thomas – the patent holder, the Board violated § 282 of the Patent Act and took a legal position in opposition to Supreme Court's precedent. The burden of proof must be on the patent challenger, not the patentee. Consequently, the Board's decisions with respect to at least Thomas Motions 5.2, 6 and 7 are in violation of law and must be reversed. However, even beyond such

motions, the mere fact that the Board imposed the presumption of invalidity at the outset of the interference proceeding taints this entire proceeding.[7]

## III.  BOARD ERRED IN NOT DISSOLVING THE INTERFERENCES GIVEN THAT THERE IS NO INTERFERENCE-IN-FACT

### A.  INTRODUCTION

Thomas Motions 5.1-5.4 were filed to dissolve the interferences because they were improperly declared and because the two-way test for an interference was not satisfied.  (JA 428-538)  Specifically, it was demonstrated that Pippin's sole claim was nonobvious from any of Thomas' claims.  Notwithstanding, the Board decided these motions in Pippin's favor (finding Pippin's sole claim obvious) and refused to acknowledge that the interferences were incorrectly instituted.[8]  Sadly, the Board's analysis was both factually and legally erroneous.

---

[7] Incidentally, the interference proceeding should never have been declared because the legal theory Pippin argued to the examiner was blatantly legally flawed, simply asserting that the Thomas claims are similar to Thomas claims in prior interferences.  *See* Thomas Motion 6, p. 10, l. 1 – p. 17, l. 11.  (JA 376-383); Thomas Motion 5.2, p. 15, l. 12 – p. 17, l. 22.  (JA 467-470)

[8] Inexplicitly, the Board failed to consider Thomas Replies 5.2-5.4, which were timely filed.  Decision on Motions, p. 4, lines 15-30.  (JA 837-870, 911-927)

### B.    BOARD COMMITTED LEGAL ERROR IN FAILING TO CONSIDER OR EVEN IDENTIFY A RATIONALE FOR COMBINING PRIOR ART WITH THOMAS CLAIMS WHEN FINDING PIPPIN'S SOLE CLAIM OBVIOUS

#### (i)    THE LAW ON OBVIOUSNESS REQUIRES AN ARTICULATED RATIONALE

The Supreme Court in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418, 82 USPQ.2d 1385, 1396 (2007) noted that the analysis supporting a rejection under 35 U.S.C. § 103 must be made explicit.  The Federal Circuit has likewise stated that "rejections on obviousness cannot be sustained with mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *In re Kahn*, 441 F.3d 977, 988, 78 USPQ.2d 1329, 1336 (Fed. Cir. 2006); *see also KSR*, 550 U.S. at 418, 82 USPQ.2d at 1396.

#### (ii)    BOARD'S DECISION OFFERED NO ARTICULATED RATIONALE FOR THE COMBINATION OF REFERENCES

In its analysis of Thomas Motions 5.1-5.4, the Board provided no articulated reason for combining references to reach a conclusion of obviousness.  More particularly, the Board failed to articulate any reason why the prior art references would be used to modify the Thomas claims to overcome the various differences between the Thomas claims and Pippin's sole claim.

In particular, as to feature 3 (interrupt signal) of Pippin's sole claim which is explained below, the Board's analysis was:

A person having ordinary skill in the art is presumed to know all the relevant art, including, for example: (1) the generation of an interrupt signal when a microprocessor/computer's temperature exceeds a certain threshold, as described by Dao (Ex. 1051), Canova (Ex. 1026), and Kannan (Ex. 1053), and (2) the use of such an interrupt signal to control the operational speed (clock frequency) of a processor as described by Hwang (Ex. 1052) and/or to control the speed of a fan as disclosed by Dinh (Ex. 1027). *In re GPAC*, 57 F.3d at 1579. If these techniques have been used to improve a processor, using these techniques to improve a similar process in the same way would have been obvious unless its actual application is beyond the skill of an artisan. *See KSR*, 550 U.S. at 417.

Based on these teachings and the knowledge of those skilled in the art, we agree with Pippin that it would have been obvious to an artisan of ordinary skill to generate an interrupt signal if a processor temperature exceeds a threshold in order to control the fan speed and/or the operational speed of the processor. Paper 226, pp. 10-11 (citing Ex. 1005, p. 20:7-11; Ex. 1061 at ¶ 77)

Decision on Motions, p. 33, l. 19 – p. 34, 9.  (JA 33- 34)

Hence, the Board's conclusion that feature 3 would have been obvious is premised on teachings in Dao (JA 1615-1626), Canova (JA 1157-1170), Kannan (JA 1634-1680), Hwang (JA 1627-1633) and Dinh (JA 1171-1176).  However, nowhere does the Board's analysis ever consider that these prior art references must be combined with one of the Thomas claims.  Thus, there was no attempt by the Board to provide an articulated reasoning for how the alleged relied upon teachings from these prior art references would be used in combination with any of

the Thomas claims.  Therefore, the Board's conclusory analysis is inadequate and

not sufficient to support a determination of obviousness.  *In re Kahn*, at 988, 78

USPQ.2d at 1336.[9]

### (iii) BOARD'S OBVIOUSNESS DETERMINATION WAS NECESSARILY LEGAL ERROR

Based on the foregoing, the Board's conclusion of obviousness of Pippin's

sole claim and its resulting conclusion of an interference-in-fact was legally

erroneous.  Consequently, the Board's decisions as to Thomas Motions 5.1-5.4

were incorrectly decided and must be reversed.

### C. BOARD COMMITTED LEGAL ERROR IN BASING ITS ANALYSIS ON THOMAS' SPECIFICATION WHEN CONCLUDING THAT PIPPIN'S SOLE CLAIM WAS OBVIOUS OVER THOMAS' CLAIMS

### (i) BOARD RELIED ON THOMAS' SPECIFICATION IN CONCLUDING THAT AN INTERFERENCE-IN-FACT EXISTED

As for feature 2 (programmable thermal sensor) of Pippin's sole claim which

is explained below, the Board considered the feature in isolation.  In fact, with

regard to feature 2, the Board stated its conclusion as follows:

> Based on the relevant prior art teachings, we agree
> with Pippin that it would have been obvious to use a
> programmable thermal sensor (instead of a thermal
> sensor) to monitor a processor temperature in connection

---

[9] Likewise, in *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343 (Fed. Cir. 2013), this
court pointed out that even an obviousness finding grounded in common sense
"must contain explicit and clear reasoning providing some rational underpinning
why common sense compels a finding of obviousness," which aids in protecting
against the impermissible hindsight.  *Id.* at 1354.

> with the subject matter of Thomas claim 25.  Why?
> Because (1) Thomas' "temperature sensing circuitry is
> well-known and therefore [need] not further described"
> and (2) Dr. Renau's testimony shows that temperature
> sensor at least suggests use of a programmable sensor
> that can be programmed with thresholds. *Id*. at 7 (citing
> Ex. 1013, col. 4:10-11; and Ex. 2078, p. 34:8- p. 35:12).

Decision on Motion, p. 30, lines 1-9.  (JA 30)

The Board thus relied on two factual assertions to reach its conclusion that feature 2 (programmable thermal sensor) of Pippin's sole claim would have been obvious from Thomas claim 25.[10]  Unfortunately, both factual assertions are legally irrelevant and/or false.

### (ii)   INTERFERENCE-IN-FACT REQUIRES A CLAIM TO CLAIM ANALYSIS, BUT BOARD IMPROPERLY FOCUSED ON THE SPECIFICATION

The relevant rule for determining whether an interference is proper clearly indicates that it is the *claims* that matter.  That rule states: "An interference exists if the subject matter of a claim of one party would, if prior art, have anticipated or rendered obvious the subject matter of a claim of the opposing party and vice versa." 37 C.F.R. § 41.203(a).  Whether an interference exists is a threshold issue, and if no interference exists, the opponent has no standing.  37 C.F.R. § 41.201.  In this case, no interference-in-fact exists if either Thomas' claims would neither have anticipated, nor have rendered obvious, the subject matter of Pippin's sole claim or

---

[10] It is not clear why the Board referenced claim 25.  Pippin argued for consideration of claim 26.

vice versa. *Yorkey v. Diab*, 605 F.3d 1297, 1300 (Fed. Cir. 2010); *Winter v. Fujita*, 53 USPQ.2d 1234 (BPAI 1999) (expanded panel).

Relying on the Thomas specification, the Board made a first factual assertion that "temperature sensing circuitry" is well known, and a second factual assertion that "Dr. Renau's testimony shows that temperature sensor at least suggests use of a programmable sensor that can be programmed with thresholds." Decision on Motion, p. 30, l. 1-9.  (JA 30)  These factual assertions concerning the Thomas specification were fundamental to the Board's conclusion (concerning feature 2) that it "would have been obvious to use a programmable thermal sensor (instead of a thermal sensor) to monitor a processor temperature in connection with the subject matter of Thomas claim 25."  Decision on Motion, p. 30, l. 2-4.  (JA 30)

The obviousness analysis that should have been performed by the Board for evaluation of an Interference-In-Fact is to evaluate whether Pippin's sole claim is obvious from Thomas *claims* and vice versa.  The Board's analysis instead expressly relied on teachings from the Thomas *specification*, which is not properly part of the analysis.  The Thomas specification (apart from the claims) is not deemed prior art to Pippin and thus is not to be considered.  *See Advance Transformer Co. v. Levinson*, 837 F.2d 1081, 1083 (Fed. Cir. 1988) ("It is thus

correct, and necessary, to compare claims, not disclosures, when comparing issued patents under section 291.").  Thus, it is legal error for the Board to base its obviousness conclusion on teachings from the Thomas specification.

### (iii)   BOARD'S FACTUAL ASSERTIONS OF ITS OBVIOUSNESS ANALYSIS ARE ERRONEOUS AND LACK SUBSTANTIAL EVIDENCE

Relying on select statements of Dr. Renau, Thomas' expert, the Board made its second factual assertion regarding feature 2, namely, that "Dr. Renau's testimony shows that temperature sensor at least suggests use of a programmable sensor that can be programmed with thresholds."  Decision on Motions, p. 30, l. 6-9.[11]  (JA 30)  The Board relied on this second factual assertion to support the Board's conclusion as to obviousness of feature 2.  The factual assertion, however, is not only unsupported by substantial evidence but also improperly pertains to the Thomas specification.  The Board's reliance on this asserted fact renders the Board's conclusion as to obviousness of feature 2 is clearly erroneous.

Notably, the second factual assertion, as alleged by the Board, is completely premised on testimony of Dr. Renau.  However, the Board's second factual assertion is not commensurate with or supported by Dr. Renau's testimony.  What Dr. Renau stated was that from the Thomas *specification,* one skilled in the art

---

[11] The Board apparently adopted Pippin's argument from its opposition to Thomas Motion 5.1.  (JA 3359-3360)  These allegations in Pippin's opposition were rebuked by our reply.  *E.g.*, Thomas Reply 5.1, p. 3, l. 8 – p. 4, l. 7. (JA 820)

would understand temperature comparisons with thresholds, programmable or non-programmable.  Ex 2078, p. 34, l. 18 – p. 35, l. 12.[12]  (JA 3359-3360)

In contrast to the Board's second factual assertion as to feature 2, there is *no* evidence to support a factual assertion that Dr. Renau was talking about a "programmable thermal sensor" as used in Pippin's sole claim.  Programming of thresholds is also not the same as, or alleged to be the same as, a "programmable

---

[12] For convenience, the relevant portion (Ex 2078, p. 34, l. 18 – p. 35, l. 12) (JA 3359-3360) of the deposition of Dr. Renau, where the '011 patent mentioned therein is the priority document (initial Thomas patent filing) containing the Thomas specification, is as follows:

> [page 34]
> 18          Q. Okay. I want you to look at the 011 patent
> 19    again.
> 20          A. Right.
> 21          Q. And I want you to look specifically at figure
> 22    4. And you see in there it has temperature sensor 4 in
> 23    the figure?
> 24          A. Yes.
> 25          Q. Okay. And you will see that same temperature
> [page 35]
> 1    sensor appears in figures 5, 7 and 10.
> 2          A. 5, 7 and 10. Yes.
> 3          Q. Okay. In all of those cases, the output of
> 4    that temperature sensor would be a digital 1 or 0
> 5    output, right?
> 6          A. Yes. In those figures, yes.
> 7          Q. And those would compare different programmable
> 8    thresholds against a temperature reading, right?
> 9          A. Different thresholds programmable, not
> 10    programmable.
> 11          Q. So both programmable and not programmable?
> 12          A. Yes, potentially can be either way.

thermal sensor" as in Pippin's sole claim.[13]  The second factual assertion is thus

not supported by substantial evidence since the testimony relied upon does not

pertain to or discuss Pippin's "programmable thermal sensor."  Beyond that

evidentiary failure, the testimony referenced by the Board is clearly discussing and

relying on the Thomas specification, which is both irrelevant and legal error.[14]

### (iv)    CONCLUSION

Consequently, the Board's first and second factual assertions are

impermissibly premised on the Thomas specification.  Furthermore, there is no

substantial evidence of record to support the Board's second factual assertion.  The

Board's essential reliance on these two factual assertions renders the Board's

conclusion as to obviousness of feature 2 clearly erroneous.

---

[13] Surely, Pippin represented patentability of its "programmable thermal sensor" to the Patent Office and had the Patent Office agree many times in its various related patent filings over many years.  Merely having a thermal sensor and using thresholds does not yield a "*programmable* thermal sensor" as defined by Pippin's sole claim.  Pippin is on record as understanding this distinction. *See*, *e.g.*, Ex 2089, p. 10-12 (arguing that a programmable thermal sensor as being claimed by Pippin claim 1 distinguished over the prior art) (JA 3884-3886); Ex 2090, p. 12, lines 13-25 (JA 3906); Ex 1061, ¶52 (JA 1755).  The "*programmable* thermal sensor" as defined by Pippin claim 1 also receives "programmable inputs" so that the sensor can be programmed. Ex 2090, p. 17, line 17 – p. 18, line 18 (JA 3911-3912); Ex 2090, p. 26, line 25 – p. 27, line 4 (JA 3920-3921).  None of Thomas claims (or any of the prior art) indicate a programmable thermal sensor would receive programmable inputs so as to program the programmable thermal sensor. Ex 2090, p. 11, lines 12-14; p. 28, lines 1-8.  (JA 3905, 3922)

[14] *Supra* p. 28-30.

### D.    BOARD COMMITTED LEGAL ERROR IN FAILING TO CONSIDER CLAIMS AS A WHOLE, RELYING ON INCORRECT AND INADEQUATE FACTUAL ASSERTIONS, AND ERRONEOUSLY CONCLUDING PIPPIN'S SOLE CLAIM OBVIOUS FROM THOMAS' CLAIMS

#### (i)    INTRODUCTION

The Board separately evaluated three abstracted features in considering Thomas Motions for No Interference-In-Fact.[15]  The Board concluded that such abstracted features were separately known in the art and then leaped to the conclusion that Pippin's sole claim would be obvious from Thomas claims.  The Board committed legal error in failing to properly consider the "differences" between Pippin's sole claim and Thomas claims and also in failing to consider such "differences," and thus Pippin's sole claim, as a whole.[16]  The Board's obviousness analysis was further defective due to reliance on incorrect factual assertions.

#### (ii)    THE LAW

A claim represents a specific combination of features.  In order to consider the patentability of a claim, all of its features as so combined in the claim must be considered if one is to properly evaluate patentability.  35 U.S.C. § 103(a).  In other words, claims must be considered as a whole.

---

[15] Thomas Motions 5.1-5.4.  (JA 428-538)

[16] Also, as noted above, the Board failed to provide a reasonable rationale for combining any of the prior art references relied upon with any of Thomas' claims. *Supra* p. 25-27.

An obviousness analysis must "start with the claimed invention *as a whole*." *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1448 (Fed. Cir. 1984). The Supreme Court has also stated the need to consider the invention as a whole when determining patentability, underlining the "need to consider the invention as a whole, rather than 'dissect[ing] the claims into old and new elements and then ... ignor[ing] the presence of the old elements in the analysis.' " *Bilski v. Kappos*, 130 S. Ct. 3218 (2010) (citing *Diamond v. Diehr*, 450 U.S. 175, 188 (1981)). Also, this court has similarly noted that distilling an invention down to the "gist" or "thrust" of an invention disregards the requirement of analyzing the subject matter "as a whole." *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed. Cir. 1983), *cert. denied*, 469 U.S. 851 (1984).

The Supreme Court in *KSR* has also recently confirmed the framework as stated in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966) for determining obviousness under 35 U.S.C. § 103. Obviousness is a question of law based on underlying factual inquiries. The factual inquiries, so called *Graham* factors, enunciated by the Court are as follows: (a) determining the scope and content of the prior art; (b) ascertaining the differences between the claimed invention and the prior art; and (c) resolving the level of ordinary skill in the pertinent art. *Id.* at 17-18, 148 USPQ at 467. The *Graham* factors continue to

define the inquiry that controls obviousness determinations. *KSR*, 550 U.S. at 407, 82 USPQ.2d at 1391.

### (iii)    BOARD FAILED TO FULLY CONSIDER THE *GRAHAM* DIFFERENCES

The Board committed legal error by failing to fully and properly consider Pippin's sole claim as a whole. The Board, in deciding Thomas Motion 5.1, concluded that the three potentially distinguishing features of Pippin's sole claim were each independently obvious. (JA 23-34) The three features that the board did consider were abstracted from actual limitations of the claims. Consequently, the Board never did fully consider the differences as required by *Graham*. Additionally, the Board never considered these three features *in combination* as they appear in Pippin's sole claim. Instead, with minimal analysis, the Board simply "hid" behind its distorted understanding of "burden of proof" and choose to unlawfully deny Thomas Motions 5.1, stating: "we conclude that Thomas has failed to meet its burden of proof and provide credible evidence to show that there is no interference-in-fact between Thomas claims and Pippin's claim 1." Decision on Motion, p. 34, lines 10-13. (JA 43) The Board reached the same conclusions for Thomas Motions 5.2-5.4. Decision on Motion, p. 35, lines 6-11; p. 40, l. 8-11. (JA 35, 40)

**(a)     Board's Features Not Commensurate with *Graham* Differences**

Thomas Motion 5.1 succinctly identified several differences between Pippin's sole claims and Thomas' claims.  Those differences, referred to herein as the *Graham* differences, were clearly denoted as being included *within a microprocessor* and were identified as follows:

> (1) "a register storing a register value corresponding to a threshold temperature," and (2) "a programmable thermal sensor receiving the register value, wherein the programmable thermal sensor generates a first interrupt signal if a microprocessor temperature exceeds the threshold temperature." Ex 2019 ¶11

Thomas Motion 5.1, p. 4.  (JA 431)

Since these missing Pippin claim elements are intertwined in Pippin's sole claim, Thomas also summarized the foregoing missing Pippin claim limitations for the Board as follows:

> A programmable thermal sensor internal to a microprocessor that receives a threshold temperature (from a register value internal to the microprocessor) and that generates an interrupt signal, and where the generated interrupt signal is used to not only activate an active cooling device (fan) but also reduce clock frequency of a clock signal for the microprocessor.

Thomas Motion 5.1, p. 7-8.[17]  (JA 434-435)

---

[17] Interestingly, one should note the *Graham* differences relative to the Thomas claims are essentially the entirety of Pippin's sole claim, which begs the question – how is it that this matter is an interference proceeding?  See claims charts showing very little similarity.  (JA 387-389, 405-408, 449-451, 475-485, 509-511, 534-537)

Unfortunately, the three features the Board did consider were <u>not</u> commensurate with the *Graham* differences pertaining to Pippin's sole claim and were only evaluated in isolation.  Specifically, the Board considered the following three features:

> (1) "a register storing a register value corresponding to a threshold temperature,"
> (2) "a programmable thermal sensor receiving the register value" and
> (3) "wherein the programmable thermal sensor generates a first interrupt signal if a microprocessor temperature exceeds the threshold temperature."

Decision on Motions, p. 26-27.  (JA 26-27)

Hence, in formulating the three features that the Board considered, the Board conveniently "lost" some limitations, which is fatal to its obviousness analysis.  Furthermore, as noted below, the Board isolated and further abstracted the features during its analysis.

Accordingly, the features the Board did consider were <u>not</u> commensurate with the *Graham* differences pertaining to Pippin's sole claim.  Certain ones of such deviations from the *Graham* differences are discussed below.

### (b)    Board Failed to Consider Limitations of *Graham* Difference (2)

The *Graham* difference (2) is, among other things, an interrupt signal generated by a programmable thermal sensor, which is internal to the microprocessor of Pippin's sole claim.  The Board neglected to consider such

limitations as part of its feature 3 (or feature 2). Instead, the Board further abstracted the feature and considered simply "generation of interrupt signal" used to "control [of] the operational speed … of a processor … and/or to control the speed of a fan…." Decision on Motions, p. 33, l. 11-26. (JA 33)

Indeed, as quoted above, the Board's conclusion as to feature 3 was simply that: "Based on these teachings and the knowledge of those skilled in the art, we agree with Pippin that it would have been obvious to an artisan of ordinary skill to generate an interrupt signal if a processor temperature exceeds a threshold in order to control the fan speed and/or the operational speed of the processor." Decision on Motions, p. 34, lines 4-9. (JA 34)

Accordingly, there can be no doubt that the Board not only considered the three features in isolation of each other, but also overlooked important aspects of the associated *Graham* difference (2). Namely, the Board's conclusion ignored (i) generation of the interrupt signal by a programmable thermal sensor, and (ii) the location of both the generation of the interrupt signal and the programmable thermal sensor. Both of these unconsidered claim limitations further render Pippin's sole claim nonobvious from Thomas' claims because the prior art relied on by the Board does not teach or suggest an interrupt signal generated by a programmable thermal sensor, let alone a programmable thermal sensor internal to a microprocessor.

The Board conveniently ignored limitations in Pippin's sole claim regarding generation of an interrupt signal by a programmable thermal sensor. The essence of Pippin's invention was a "programmable thermal sensor" that was not only internal to a microprocessor but also operational to generate an interrupt signal with reference to a threshold stored in a register. None of the prior art relied on by the Board discloses or suggests an interrupt signal generated by a programmable thermal sensor, let alone a programmable thermal sensor that is internal to a microprocessor and that generates an interrupt signal.

The Board made no findings as to a programmable thermal sensor generating an interrupt signal, and made no findings as to a location where an interrupt signal is generated. Also, as to using an interrupt signal to control speed of a fan, the Board relied on Dinh, but as noted below, Dinh has no teaching or suggestion for an interrupt.[18]

Furthermore, the locational aspect of the programmable thermal sensor and its generation of an interrupt signal are of special significance in Pippin's claimed invention. First, Pippin's sole claim specifically recites the location limitation as applicable to its recited elements as being internal to a microprocessor.[19] Second, Pippin's specification stressed the objective of its invention as being "incorporated

---

[18] *Infra* p. 44-45.

[19] Pippin's sole claim states "a microprocessor comprising: a register ...; a programmable thermal sensor ...."  (JA 36)

into the integrated circuit."[20]  Third, in prosecuting its family of patents, Pippin

stressed the intra-microprocessor design of its invention, which amounts to

prosecution history estoppel.[21]  Positions taken in order to obtain allowance of an

applicant's claims are pertinent to an understanding and interpretation of the claims

that are granted by the USPTO, *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870-

71, 228 USPQ 90, 96 (Fed. Cir. 1985), and may work an estoppel as against a

subsequent different or broader interpretation, *Hughes Aircraft Co.  v. United*

*States*, 717 F.2d 1351, 1362, 219 USPQ 473, 481 (Fed. Cir. 1983) (court can place

controlling reliance on patent owner's interpretation to the PTO of his invention).

    Consequently, the Board failed to consider that it is the programmable

thermal sensor that generates the interrupt signal, and that the programmable

thermal sensor and thus the interrupt signal generation are internal to the

programmable thermal sensor.  Moreover, as discussed below, the Board's factual

assertions pertaining to "interrupt signal" were incorrect and were not

commensurate with *Graham* difference (2).  Bearing this in mind, none of the prior

---

[20] "Therefore, it is desirable to provide a thermal sensor which is incorporated into the integrated circuit."  Pippin's '652 appln., p. 2 ¶[0007]  (JA 2752)

[21] Thomas pointed out to the Board that Pippin, and even Pippin's current expert, (while prosecuting its family of patents) touted the programmability and interrupt generation as patentability distinct features of its programmable thermal sensor, as well as such features being intra-microprocessor.  Thomas Motion 5.1, p. 11-14 (JA 438-441); Thomas Reply 5.1, p. 2-3 (JA 822-823)  Now after its patents have expired, Pippin conveniently "flipped" its position before the USPTO so that the dubious interferences Pippin initiated can remain ongoing.  *Supra* n.14.

art references that the Board relied upon teach or suggest the *Graham* difference

(2).

### (iv)    SEVERAL OF THE BOARD'S FACTUAL ASSERTIONS WERE ERRONEOUS, PREJUDICIAL AND LACK SUBSTANTIAL EVIDENCE

### (a)    Board's Factual Assertions for feature 2 are Erroneous and Unsupported

As noted above,[22] the Board's factual assertions as to at least feature 2 are

not supported by substantial evidence.  Even if the court were to conclude that

substantial evidence exists to support the Board's factual assertions as to feature 2,

the Board committed legal error in considering the Thomas specification.[23]

### (b)    Board's Factual Assertions for feature 3 are Erroneous and Unsupported

As for feature 3, the Board concluded that prior art references teach

generating an interrupt signal.  Decision on Motions, p. 32, l. 1 – p. 34, l. 9.  (JA

32-34)  The Board's analysis with respect to feature 3 relied on various prior art

references to make first and second factual assertions to support its decision that

Pippin's sole claim is obvious over the Thomas claims.  Specifically, the Board

relied on (i) on one or more of Dao, Canova and Kannan, and (ii) Hwang and/or

Dinh.  Decision on Motions, p. 33, lines 19-26.  (JA 33)  As noted above, the

Board offered no commentary on a rationale or reason for combining any prior art

---

[22] *Supra* p. 30-32.

[23] *Supra* p. 28-30.

reference, let alone providing a rationale or reason for combining Hwang and/or

Dinh with any of Dao, Canova and Kannan, and with any of the Thomas clams.[24]

The Board's decision as to feature 3 relied on teachings from prior art

references Dao, Canova and Kannan to support its *first* factual assertion.  But the

Board's first factual assertion is nonetheless unsupported by substantial evidence.

Specifically, the Board's first factual assertion concerning the prior art stated:

> (1) the generation of an interrupt signal when a
> microprocessor/computer's temperature exceeds a certain
> threshold, as described by Dao (Ex. 1051), Canova (Ex.
> 1026), and Kannan (Ex. 1053).

Decision on Motions, p. 33, l. 20-22.  (JA 33)

The Board's first factual assertion is incorrect when it references "a

microprocessor/computer's temperature" as a trigger for an interrupt signal

because the references Dao, Canova and Kannan disclose only disk drive

temperature or ambient computer temperature, and thus fail to disclose or suggest

use of microprocessor temperature to generate an interrupt signal.  Additionally,

the Board's reliance on Dao, Canova and Kannan does so ignoring the context and

teachings of these references and their various differences from the manner with

which Pippin's sole claim makes use of an interrupt signal.

In particular, as to "interrupt signal," the Board's statements concerning

Dao's teachings are overstated.  Dao (JA 1615-1626) merely discloses altering an

---

[24] *Supra* 25-27.

operator that a disk drive is hot. An interrupt is used to signal a microprocessor that the disk drive is hot. Hence, the interrupt in Dao is signaling an operator that the disk drive is hot. The interrupt used by Dao is not only an external interrupt, but also merely used to alert an operator with a flashing LED or beeper when the disk drive is hot. Ex 1051, col. 1, line 66 to col. 2, line 6; Fig. 4 (interrupt controller 156 external to microprocessor 158). (JA 1622) Thus, in contrast to the Board's assertion, Dao has *no* teaching of generating an interrupt signal "when a microprocessor/computer's temperature exceeds a certain threshold." Dao monitors a temperature of a disk drive, not a temperature of a microprocessor or a computer.[25]

Therefore, in contrast to Pippin's sole claim, Dao offers no teaching or suggesting for using an interrupt that is internally generated by a microprocessor (let alone by a programmable thermal sensor within the microprocessor), and then using the internally generated interrupt to both activate a fan and reduce frequency of a clock signal for a microprocessor. Consequently, there is no substantial evidence to support the Board's assertion as to Dao.

The Board's assertions as to Canova (JA 1157-1170) and Kannan (JA 1634-1680) are also overstated. Although the Board recognized that Canova and Kannan can monitor a "computer's ambient temperature" (Decision on Motion, p.

---

[25] Neither Thomas nor Pippin argued that Dao taught what the Board alleges. *See* Background on Prior Art. (JA 827-828, 631)

33, l. 12-18 (JA 33)), the Board surprisingly concluded that Canova and Kannan are supportive of its factual assertion that such references teach "the generation of an interrupt signal when a microprocessor/computer's temperature exceeds a certain threshold." (Decision on Motion, p. 33, l. 20-22 (JA 33))  Substantial evidence does not support such a statement.  The Board's statement exceeds the scope of teachings because Canova and Kannan do not measure or monitor microprocessor temperature; instead, such references only measure or monitor ambient temperature at a computer.[26]  Therefore, there is no substantial evidence to support the Board's assertion as to Canova and Kannan.

Moreover, the Board's *second* factual assertion pertaining to feature 3 is also unsupported by substantial evidence.  Specifically, the Board's second factual assertion concerning the prior art stated:

> (2) the use of such an interrupt signal to control the operational speed (clock frequency) of a processor as described by Hwang (Ex. 1052) and/or to control the speed of a fan as disclosed by Dinh (Ex. 1027).

Decision on Motions, p. 33, l. 22-25.  (JA 33)

With respect to Dinh (JA 1171-1176), the second factual assertion states that Dinh discloses use of an interrupt signal to control the speed of a fan.  This assertion is clearly incorrect.  While Dinh discloses a fan cooling system with

---

[26] Neither Thomas nor Pippin argued that Canova or Kannan taught what the Board alleges.  *See* Background on Prior Art.  (JA 414-415, 632-633)

adjustable fan speed based on housing temperature, nothing in Dinh teaches any use of an interrupt signal. Neither Thomas nor Pippin asserted otherwise. (JA 416, 634-635) Furthermore, contrary to Pippin's sole claim, Dinh has no teaching or suggestion for generation or use of an interrupt, let alone a programmable thermal sensor that is internal to a microprocessor that generates an interrupt signal which is output from the programmable thermal sensor and provided externally to control both activation of an active cooling device (fan) and reduction in clock frequency of a clock signal for the microprocessor.

Therefore, the Board's second factual assertion that "the user of such an interrupt signal … to control the speed of a fan as disclosed by Dinh" is unsupported by substantial evidence. The correctness of these factual assertions are significant as Pippin's sole claim expressly recites that its programmable thermal sensor and its interrupt generation are intra-microprocessor, and that the interrupt generated is for activating a fan.[27]

### (c)   CONCLUSION

Consequently, the Board legally erred in not adequately considering the *Graham* differences pertaining to Pippin's sole claim. The Board failed to

---

[27] Although the Board relied on Hwang (JA 1627-1633) for other teachings, Hwang likewise offers no teaching or suggesting for using an interrupt that is internally generated within a microprocessor (let alone by a programmable thermal sensor within the microprocessor), or for using an internally generated interrupt to both activate a fan and reduce frequency of a clock signal for a microprocessor. (JA 632, 828)

consider that it is the programmable thermal sensor of Pippin's sole claim that generates the interrupt signal, and the programmable thermal sensor and thus the interrupt signal generation are internal to the microprocessor of Pippin's sole claim. The Board also erred in reliance on factual assertions regarding features 2 and 3 that were incorrect and not supported by substantial evidence.

## IV.   BOARD'S CONCLUSION THAT THOMAS CLAIMS 10 AND 18-26 OF THE THOMAS '190 PATENT ARE OBVIOUS OVER THE COUNT (PIPPIN'S SOLE CLAIM) WAS LEGAL ERROR

### A.   INTRODUCTION

Thomas filed Thomas Motion 6 to have claims 10 and 18-26 of USP 7,506,190 (Thomas '190 patent) designated as not corresponding to the count (*i.e.*, nonobvious from the count). The Board presumed that the claims of the Thomas '190 patent were obvious and placed the burden on Thomas to prove otherwise. The Board then proceeded to decide Thomas Motion 6 in Pippin's favor, stating "we conclude that Thomas has failed to meet its burden of proof." Decision on Motions, p. 49, l. 12-13. (JA 49) In considering Thomas Motion 6, the Board committed numerous errors, some of which are examined below.

### B.   BOARD REQUIRING THOMAS TO CARRY THE BURDEN OF PROOF AS TO NONOBVIOUSNESS OF ITS PATENTED CLAIMS WAS LEGAL ERROR

As discussed above, the burden of proof must be placed on the challenger to the validity of any claims of the Thomas '190 patent, and any presumption regarding obviousness in an interference proceeding must benefit the patent holder,

not the patent challenger.[28]  Therefore, the Board's imposition of the burden of

proof on Thomas – the patent holder, and thus its consequential presumption of

*invalidity*, was legal error and requires reversal.

### C. BOARD COMMITTED LEGAL ERROR IN FAILING TO PROVIDE A RATIONALE FOR COMBINING PRIOR ART WITH THE COUNT WHEN FINDING THOMAS' CLAIMS OBVIOUS

In resolving Thomas Motion 6, the Board provided no articulated reason for

combining references to reach a conclusion of obviousness.  Specifically, the

Board failed to articulate any reason why or how prior art references would be

used to modify the count (Pippin's sole claim) to overcome the various differences

between the Thomas claims and the count.

As to Thomas Motion 6, the Board's obviousness analysis included a

discussion of the teachings of Yamaki, Canova, Arai and Atkinson followed by a

conclusory statement on obviousness.  Decision on Motions, p. 47, l. 16 – p. 48, l.

2.  (JA 47-48)

Nowhere does the Board's analysis ever offer any explanation as to how any

references the Board relied on would be combined with the count.[29]  There was

therefore no attempt by the Board to provide a meaningful rationale or

---

[28] *Supra* p. 15-24.

[29] While the Board provided some boilerplate discussion that does make passing
reference to the count and prior art, nowhere is there a reasoned rationale for a
specific combination of prior art references with the count.  Decision on Motion, p.
48, l. 3 – p. 49, l. 11.  (JA 48-49)

underpinning for how the alleged relied upon teachings from these prior art references would be used in combination with the count. There is certainly no articulated reasoning with rational underpinning to support the legal conclusion of obviousness. *KSR*, 550 U.S. at 418, 82 USPQ.2d at 1396; *In re Kahn*, 441 F.3d at 988, 78 USPQ.2d at 1336.[30] Therefore, the Board's conclusory analysis was inadequate and not sufficient to support a determination of obviousness.

Based on the foregoing, the Board's conclusion of obviousness was legally deficient. Consequently, the Board's decision as to Thomas Motion 6 was incorrectly decided and must be reversed.

### D.    RELIANCE ON ARAI AND ATKINSON WAS LEGAL ERROR

As noted above, the Board's decision on Thomas Motion 6 relied on Yamaki, Canova, Arai and Atkinson, albeit in a conclusory manner. However, the Board nevertheless recognized that the Thomas patents and applications all have a priority date of June 20, 1994. (JA 262) The CRU also agreed that Thomas' claims are entitled to their earliest claimed priority data. Ex 2085, p. 3-14 (JA 3800-3811); Ex 2083 (JA 3468-3471). Although Pippin argued for a claim construction in an effort to limit Thomas' priority date, such effort was neither

---

[30] *See* law on obviousness, *supra* p. 25.

accepted nor specifically authorized by the Board.[31]  Given that Thomas' priority date of June 20, 1994 is many years *prior to* the effective dates of Arai and Atkinson (May 28, 1996 and January 16, 1996, respectively), Arai and Atkinson are not "prior art" to the Thomas '190 patent.[32]  Hence, the Board legally erred in relying on Arai and Atkinson in its decision on Thomas Motion 6.  Therefore, the Board's obviousness analysis was legally flawed and, in fact, dead on arrival.  As such, the Board's decision as to Thomas Motion 6 was incorrectly decided and must be reversed.

### E.    THOMAS' CLAIMS HAVE NOT AND CANNOT BE PROVEN OBVIOUS OVER THE COUNT IN VIEW OF YAMAKI AND CANOVA

The Board erred in relying on Yamaki and Canova to conclude that Thomas claims 10, 20 and 22-26 are obvious over the count (i.e., Pippin's sole claim). Compared to Thomas' claims, these references are clearly inadequate.

The Board's factual assertions as to Yamaki and Canova were specifically provided in the Board's decision.  Decision on Motions, p. 45, l. 16 – 25.  (JA 45)

---

[31] Decision on Motions, p. 43 n.16 ("For purposes of this decision, we need not address Pippin's contentions and will consider the plain reading of Thomas claim 10 as reciting a single computer as having two power management policies, including: 'a first power management policy when the computer is powered by a battery' and 'a second power management policy when the computer is not powered by a battery.' ").  (JA 43)  Incidentally, Pippin's claim construction contentions were also rebuked by the CRU in a recent reexamination involving the Thomas '190 patent.  (JA 3459)

[32] Pippin never asserted that Arai or Atkinson were prior art to Thomas' claims if parties are entitled to their declared priority dates.

However, the Board's reasoning fails to provide a legitimate basis for concluding that Thomas claims 10, 20 and 22-26 are obvious over the count in view of Yamaki and Canova. Excluding Arai and Atkinson as not prior art, there is *no* teaching or suggestion in Yamaki or Canova of fan speed control of any sort, let alone fan speed control based on an appropriate power management policy as recited in Thomas' claims. In fact, with respect to fan speed control of a fan, there are no factual assertions of any such teachings from Yamaki or Canova.[33] Neither the Board nor Pippin make any allegations as to any teaching or suggestion for fan speed control from Yamaki or Canova, and certainly no allegations of fan speed control based on power management policy in use. Decision on Motions, p. 45, l. 16-25 (JA 45); Pippin Opposition 6, p. 12, l. 14 – p. 14, l. 12 (JA 790-792); Pippin Background Paper – Description of the Prior Art, p. 6, 1. 11-20 (JA 636); p. 2, l. 8-21 (JA 632). This is not surprising because there is no disclosure of a fan in either Yamaki or Canova. Even Pippin's expert agrees that neither Yamaki nor Canova describe a fan let alone control of fan speed. Ex 2090, p. 82, l. 20-25; p. 83, l. 9-25; p. 84, l. 1-4. (JA 3976-3978)

Also, in a recent reexamination carried out by the Central Reexamination Unit (CRU) of the USPTO, the reexamination panel of examiners considered the same issue – obviousness of the Thomas '190 claims over Pippin, Yamaki and

---

[33] The Board's decision re Thomas Motion 6 discussed fan speed control using Arai and Atkinson, but neither of which is prior art.

Canova (and others).  The CRU confirmed the claims 1-17, 20 and 22-26 of the

Thomas '190 patent as nonobvious over the prior art, including Pippin, Yamaki

and Canova.[34]  Ex 2082, p. 4, l. 4-6 (JA 3457); Ex 2085, p. 13 (JA 3810)  In

confirming claims of the Thomas '190 patent, the CRU stated:

> ### STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION
> The following is an examiner's statement of reasons for patentability and/or confirmation of the claims found patentable in this reexamination proceeding:
> Claim 1 states in part:
> *" ... setting an operational speed of the fan based on the appropriate one of the first and second power management policies; ... "*
> …
> Claim 25 states in part:
> *"... controlling an operational speed of the fan based on the appropriate one of the first and second power management policies and based on the temperature of the processor."*

Ex 2082, p. 4-5 (italics in original) (JA 3457-3458)

Therefore, the CRU's reasoning is directly applicable and contrary to

Pippin's assertions.  Surprisingly, the Board, suggesting they know better,

summarily dismissed the contrary judgment of the examiner as well as the

reexamination panel of the CRU.  See Decision on Motions, p. 44, l. 10-15.  (See

JA 44).  While an examiner's or reexamination panel's findings and conclusions

---

[34] Thomas' Reply Brief for Thomas Motion 6 explicitly pointed this out to the Board.  Thomas Reply 6, p. 8, l. 20 – p. 9, l. 13.  (JA 889-890)

are not themselves controlling, they are opinions and findings of experts in their field and are entitled to consideration. *Cf. KSR*, 550 U.S. at 426 (rationale underlying presumption of validity of patents is that PTO in its expertise approved the claims).  The Board was somewhat correct in stating "(1) the Examiner did not have the benefit of Pippin's additional evidence and explanations of obviousness" but such is always the case. (JA 44)  It must then also be true that the Examiner likewise did not have the benefit of Thomas' additional evidence and explanations of nonobvious.

Furthermore, the Board's understanding of what "the Examiner" did is incorrect.  The Board stated that "(2) the Examiner was later convinced that an interference was warranted, and an interference was declared based on the Examiner's recommendation."  (JA 44)  That is not the case.  The examiner of the Thomas '190 patent concluded that the Thomas '190 patent was allowable and thus approved grant of the patent.  The Reexamination panel of examiners recently confirmed patentability of the involved claims of the Thomas '190 patent over Pippin, Yamaki and Canova.  (JA 3457-3459)  Those examiners were not "later convinced that an interference was warranted;" instead, it was the examiner of Pippin's application that was prodded to support an interference.

Hence, the Board's factual assertions not only emasculate the examiner's and reexamination panel's opinions but also are not supported by substantial

evidence. The Board's dismissal of the examiner's and reexamination panel's opinions is also legal error.

Besides the complete failure to provide any factual basis for a conclusion of obviousness for fan speed control based on power management policy in use, the Board also neglected to consider other differences between Thomas' claims and the count. As one example, the Thomas' claims recite that different power management policies use different conditions based on temperature of the processor so that computer system response differs depending on which of the power management policies is in use. The Board relied only on the teachings of Arai for teaching conditions based on temperature. Decision on Motions, p. 46, l. 3-21. (JA 46) However, as noted above, Arai is *not* prior art to Thomas' claims. Thus, the Board then has no factual assertions to support a conclusion as to obviousness of having different power management policies using different conditions based on temperature of the processor.[35]

## F.    CONCLUSION

Accordingly, the Board's analysis improperly shifted the burden to patentee, failed to provide an articulated rationale for combining references with the count (Pippin's sole claim), relied on references that are not prior art, and made various

---

[35] Pippin's assertions as to obviousness in its Request for Interference also failed to consider that the different power management policies have different conditions based on the temperature of the processor. *See* Ex 1003, p. 21-25 (JA 950-954); Ex 1011 (Appendix J) (JA 991-996)

factual assertions that were incorrect. At a minimum, the Thomas' claims are nonobvious over the count at least in view of the limitations concerning fan speed control and more particularly controlling fan speed based on power management policy in use, and in view of different power management policies usage of different conditions based on temperature of a processor, which limitations are in combination with various other limitations of the Thomas claims. As a result, the Board's conclusion of obviousness was clear legal error as there was no supporting legal or factual basis to draw such a legal conclusion of obviousness.

## V.  BOARD'S CONCLUSION THAT THOMAS CLAIMS 1-28 OF THE THOMAS '599 PATENT ARE OBVIOUS OVER THE COUNT (PIPPIN'S SOLE CLAIM) WAS LEGAL ERROR

In its analysis of Thomas Motion 5.2, the Board briefly commented on the second portion of the Thomas Motion 5.2 which argued for the patentability of claim 1-28 of the Thomas '599 patent. Decision on Motions, p. 37, l. 7 – p. 39, l. 11. (JA 37-39) Akin to the Board's resolution of Thomas Motion 6, the Board's analysis was merely to hide behind its rules placing the burden on Thomas and to toss aside the opinions of nonobviousness of the examiner and the Reexamination panel.[36]

---

[36] The Board also stated that Thomas argued for the nonobviousness of claims 1-28 of the Thomas '599 patent "solely in view of the examiner's reasons for allowance …." (JA 37) This is another material factual error. The Thomas Motion 5.2 defused the assertions in the Request for Interference and also expressly asserted patentability over Yamaki, Canova, Swamy and Pippin. Thomas Motion 5.2, p. 17, l. 16-22. (JA 17) Had the Board considered the Thomas Reply 5.2 (*supra* n.10), the Board may have better appreciated that its assertion of "solely" as to Thomas' arguments in Thomas Motion 5.2 is clearly incorrect. *See*, *e.g.*, Thomas Motion 5.2, p. 8, l. 4 – p. 11, l. 13. (JA 8-11)

The Board's errors in law and fact as to these assertions are discussed above in Thomas Motion 6, which contains the same errors (improper burden of proof, no articulation of rationale for combining prior art references with count, presumably reliance on references that are not prior art, and various incorrect material factual assertions). Worse still, as to this motion, the Board's analysis was so deficient that it does not even clearly identify what references were relied on, what claim language was considered, or even make any factual assertion as to *Graham* differences.

Hence, at a minimum, the errors in Board's analysis for Thomas Motion 5.2 (second portion) are the same or similar errors as present in Thomas Motion 6. As a result, the Board's conclusion of obviousness was clear legal error as there was no supporting legal or factual basis to draw such a legal conclusion of obviousness.

## VI.  BOARD'S CONCLUSION THAT THOMAS CLAIMS 26-27 OF THE THOMAS '798 APPLICATION ARE OBVIOUS OVER THE COUNT (PIPPIN'S SOLE CLAIM) WAS LEGAL ERROR

### A.  INTRODUCTION

Thomas filed Thomas Motion 7 to have claims 26-27 of US Patent Application 12/321,798 (Thomas '798 application) designated as not corresponding to the count (*i.e.*, nonobvious from the count). The Board presumed the claims of the Thomas '798 application were obvious and placed the burden on Thomas to prove otherwise. The Board decided Thomas Motion 7 in Pippin's favor, stating "we conclude that Thomas has failed to meet its burden of proof."

Decision on Motions, p. 54, l. 4-5.  (JA 54)  In considering Thomas Motion 7, the Board committed numerous errors, some of which are examined below.  Generally speaking, the Board's analysis and errors therewith are similar to those discussed above regarding Thomas Motion 6.

### B.    BOARD COMMITTED LEGAL ERROR IN FAILING TO PROVIDE A RATIONALE FOR COMBINING PRIOR ART WITH THE COUNT WHEN FINDING THOMAS' CLAIMS OBVIOUS

In resolving Thomas Motion 7, the Board provided no articulated reason for combining references to reach a conclusion of obviousness.  Specifically, the Board failed to articulate any reason why or how prior art references would be used to modify the count (Pippin's sole claim) to overcome the various differences between the Thomas claims and the count.

As to Thomas Motion 7, the Board's obviousness analysis included a discussion of the teachings of Yamaki, Canova, Arai and Atkinson followed by a conclusory statement on obviousness.  Decision on Motions, p. 52, l. 17 – p. 53, l. 8.  (JA 52-53)

Nowhere does the Board's analysis ever offer any explanation as to how any references the Board relied on would be combined with the count.[37]  There was therefore no attempt by the Board to provide a meaningful rationale or

---

[37] While the Board provided some boilerplate discussion that does make passing reference to the count and prior art, nowhere is there a reasoned rationale for a specific combination of prior art references with the count.  Decision on Motion, p. 53, l. 9 – p. 54, l. 3.  (JA 53-54)

underpinning for how the alleged relied upon teachings from these prior art references would be used in combination with the count. There is therefore no articulated reasoning with rational underpinning to support the legal conclusion of obviousness. *KSR*, 550 U.S. at 418, 82 USPQ.2d at 1396; *In re Kahn*, 441 F.3d at 988, 78 USPQ.2d at 1336. Therefore, the Board's conclusory analysis was inadequate and not sufficient to support a determination on obviousness.

Based on the foregoing, the Board's conclusion of obviousness was legally erroneous. Consequently, the Board's decision as to Thomas Motion 7 was incorrectly decided and must be reversed.

### C.    RELIANCE ON ARAI AND ATKINSON WAS LEGAL ERROR

For the same reasons as noted above concerning Thomas Motion 6, Arai and Atkinson are not "prior art" to the Thomas '798 application.[38] Hence, the Board legally erred in relying on Arai and Atkinson in its decision on Thomas Motion 7. As such, the Board's decision as to Thomas Motion 7 was incorrectly decided and must be reversed.

---

[38] Pippin never asserted that Arai or Atkinson were prior art to Thomas' claims if parties are entitled to their declared priority dates.

**D.    THOMAS' CLAIMS HAVE NOT AND CANNOT BE PROVEN OBVIOUS OVER THE COUNT IN VIEW OF YAMAKI ET AL. AND CANOVA ET AL.**

The Board erred in relying on Yamaki and Canova to conclude that Thomas claims 26-27 of the Thomas '798 application are obvious over the count (i.e., Pippin's sole claim).  The Board's factual assertions as to Yamaki and Canova were relied on from its discussion of Thomas Motion 6, which was discussed above.  Decision on Motions, p. 45, l. 16-25.[39]  (JA 45)  Again, and for similar reasons, these references are clearly inadequate compared to the Thomas' claims.

The Board's reasoning fails to provide a legitimate basis for concluding that Thomas claims 26-27 are obvious over the count in view of Yamaki and Canova. Excluding Arai and Atkinson as not prior art, there is *no* teaching or suggestion of fan speed control of any sort, let alone fan speed control based on an appropriate power management configuration as recited in Thomas claim 26.  In fact, with respect to fan speed control of a fan, there are no factual assertions of any such teachings from Yamaki or Canova.[40]  Neither the Board nor Pippin make any allegations as to any teaching or suggestion for fan speed control from Yamaki or Canova, and certainly no allegations of fan speed control based on power management configuration in use.  Decision on Motions, p. 45, l. 16-25 (JA 45); Pippin Opposition 6, p. 12, l. 14 – p. 14, l. 12 (JA 790-792); Pippin Background

---

[39] *Supra* p. 49-52.

[40] The Board's decision re Thomas Motion 6 discussed fan speed control using Arai and Atkinson, but neither is prior art.

Paper – Description of the Prior Art, p. 6, 1. 11-20 (JA 636); p. 2, l. 8-21 (JA 632).

As noted above, there is no disclosure of a fan in either Yamaki or Canova.  Even

Pippin's expert also agrees that neither Yamaki nor Canova describe a fan let alone

control of fan speed.  Ex 2090, p. 82, l. 20-25; p. 83, l. 9-25; p. 84, l. 1-4.  (JA

3976-3978)

Also, in a recent reexamination carried out by the Central Reexamination

Unit (CRU) of the USPTO, the reexamination panel of examiners considered a

similar issue – obviousness of the Thomas' '190 claims over Pippin, Yamaki and

Canova (and others).  As explained above, with respect to Thomas Motion 6, the

CRU confirmed claims 1-17, 20 and 22-26 of the Thomas '190 patent as

nonobvious over the prior art, including Pippin, Yamaki and Canova due to its

recitation of fan speed control based on an appropriate power management

policy.[41]  Ex 2082, p. 4, l. 4-6 (JA 3457); Ex 2085, p. 13. (JA 3810)

Therefore, the CRU's reasoning is applicable to the Thomas '798 application

and contrary to Pippin's assertions.  As was done in its analysis of Thomas Motion

6, the Board summarily dismissed the contrary judgment of the examiner as well as

the reexamination panel of the CRU.  *See* Decision on Motions, p. 52, l. 3-8; p. 44,

l. 10-15.  (JA 44)  While examiner's or reexamination panel's findings and

conclusions are not themselves controlling, they are opinions and findings of

---

[41] Thomas' Reply Brief for Thomas Motion 7 explicitly pointed this out to the
Board.  Thomas Reply 7, p. 5, l. 5-28.  (JA 876)

experts in their field and are entitled to consideration. *Cf. KSR*, 550 U.S. at 426 (rationale underlying presumption of validity of patents is that PTO in its expertise approved the claims). The error in the Board's treatment of the examiner's and the reexamination panel's findings and conclusion was discussed above concerning Thomas Motion 6. As before, the Board's factual assertions which disregarded the examiner's and reexamination panel's opinions are not supported by substantial evidence, and the Board's dismissal of the examiner's and reexamination panel's opinions was legal error.[42]

Besides the complete failure to provide any factual basis for a conclusion of obviousness for fan speed control based on power management configuration in use, the Board also neglected to consider other differences between Thomas' claims and the count. As one example, the Thomas' claims recite that different power management configurations use conditions based on temperature of the processing unit so that computing apparatus response differs depending on which of the power management configurations is in use. The Board relied only on the teachings of Arai for teaching conditions based on temperature. Decision on Motions, p. 46. l. 3-21. (JA 46) However, as noted above, Arai is not prior art to Thomas' claims. Thus, the Board then has no factual assertions to support a conclusion as to obviousness of having different power management

---

[42] *Supra* p. 50-53.

configurations using different conditions for speed of processing unit and for speed of fan based on temperature of the processing unit.

### E.   CONCLUSION

Accordingly, the Board's analysis failed to provide an articulated rationale for combining references with the count (Pippin's sole claim), relied on references that are not prior art, and made various factual assertions that were incorrect.  At a minimum, the Thomas' claims are nonobvious over the count at least in view of the limitations concerning fan speed control and more particularly controlling fan speed based on power management configuration in use, and in view of different power management configurations' usage of different conditions for speed of processing unit and for speed of fan based on temperature of the processing unit, which limitations are in combination with various other limitations of the Thomas claims.  As a result, the Board's conclusion of obviousness was clear legal error as there was no supporting legal or factual basis to draw such a legal conclusion of obviousness.

## <u>CONCLUSION</u>

The Board made several serious errors in the interference proceedings to the detriment of Thomas.  The Board's decisions and judgments must therefore be reversed and the Board's orders regarding its judgments must be vacated.


Dated:  July 21, 2015                    Respectfully Submitted,

                                        By:
                                            /s/ C. Douglass Thomas
                                            C. Douglass Thomas
                                            Counsel for Appellants

C. Douglass Thomas
IPVENTURE, INC.
5150 El Camino Real
Los Altos, California  94022
(650) 903-9200
doug@ipventure.com

# **ADDENDUM**

# <u>TABLE OF CONTENTS</u>

<u>**Addendum Page**</u>

Decision on Motions of
The United States Patent and Trademark Office
Patent Trial and Appeal Board
    filed January 26, 2015 ...................................................................................................Add. 1

Judgment
    filed January 26, 2015 ...........................................................................................Add. 56

U.S. Patent No. 7,506,190.................................................................................................Add. 60

U.S. Patent No. 7,937,599 B1 ...........................................................................................Add. 78

U.S. Patent Application No. 2013/0086401 A1.................................................................Add. 97

U.S. Patent Application No. 2013/0117594 A1...............................................................Add. 113

BoxInterferences@uspto.gov                                    Paper 295
Telephone:  571-272-4683                        Entered: January 26, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD

_____

Patent Interference 105,956 McK
Patent Interference 105,957 McK
Patent Interference 105,958 McK
Patent Interference 105,959 McK
Technology Center 2100

_____

C. DOUGLASS **THOMAS** and ALAN E. THOMAS

Patent 7,506,190 C1
Patent 7,937,599
Application 12/321,798
Application 13/727,433
Junior Party

v.

JACK D. **PIPPIN**

Application 13/786,274
Senior Party

_____

*Before* FRED E. McKELVEY, RICHARD E. SCHAFER, and
HUNG H. BUI, *Administrative Patent Judges.*

PER CURIAM.

DECISION ON MOTIONS
*37 C.F.R. §41.125*

Interferences 105,956 through 105,959
Decision on Motions

## I. Introduction

1    The case before us relates to four consolidated interferences involving

2    (1) two Junior Party[1] Thomas patents and two Junior Party Thomas

3    applications versus (2) Senior Party[2] Pippin application 13/786,274[3] (Pippin

4    '274):

5        (1) Interference 105,956 between claims 1-17, 20, 22-26[4] of
6        Thomas Patent 7,506,190[5] (Thomas '190) and claim 1 of Pippin
7        '274 (Paper 1, pp. 6-8);

8

9        (2) Interference 105,957 between claims 1–28 of Thomas
10       Patent 7,937,599[6] (Thomas '599) and claim 1 of Pippin '274
11       (Paper 1, pp. 6-8);

12

---

[1]  Real Party in Interest is Ip Venture, Inc.

[2]  Real Party in Interest is Intel Corporation.

[3]  US Application 13/786,274 filed 5 March 2013, entitled "Method and Apparatus for Programmable Thermal Sensor for an Integrated Circuit."

[4]  When initially declared, Claims 1-26 of Thomas '190 were designated as corresponding to the Count.  Claims 18, 19, and 21 have since been cancelled as a result of a reexamination involving Thomas '190.  *See* also n.9, *infra*.

[5]  US Patent 7,506,190 issued 17 March 2009 based on application 11/821,142 filed 22 June 2007, entitled "Thermal and Power Management for Computer Systems."

[6]  US Patent 7,937,599 issued 3 May 2011 based on application 12/229,637 filed 25 August 2008, entitled "Thermal and Power Management for Computer Systems."

2

Interferences 105,956 through 105,959
Decision on Motions

            (3) Interference 105,958 between claims 1–27 of Thomas application 12/321,798[7] (Thomas '798) and claim 1 of Pippin '274 (Paper 1, pp. 6-8); and

            (4) Interference 105,959 between claims 1–24 of Thomas application 13/727,433[8] (Thomas '433) and claim 1 of Pippin '274 (Paper 1, pp. 6-8).

The terminology "this interference" as used in this opinion should be construed as referring collectively to Interferences 105,956 through 105,959.

All post-declaration papers in this interference have been filed in administrative record of Interference 105,956.  Order (Paper 3); First Redeclaration[9] (Paper 215).

Pending are the following motions:

(1)    Thomas Motion 1 (Paper 177) seeks entry of judgment against claim 1 of Pippin '274 based on:

        (i) an alleged lack of written description under 35 U.S.C. § 112, first paragraph, and

---

[7] US Application 12/321,798 filed 25 January 2009 entitled "Configurable Thermal and Power Management for Portable Computer."

[8] US Application 13/727,433 filed 26 December 2012 entitled "Configurable Thermal and Power Management for Portable Computer."

[9] Interference 105,956 was redeclared (Paper 215) to take into account a result of a Reexamination Certificate (**Ex. 2077**) issued in connection with reexamination of Thomas '190:
    (1)  Claims 1-17—patentability confirmed;
    (2)  Claims 18, 19, and 21—cancelled;
    (3)  Claims 20, 22, and 25—patentable as amended; and
    (4)  Claims 23, 24, and 26—dependent on an amended claim and patentability confirmed.

3

Interferences 105,956 through 105,959
Decision on Motions

1            (ii) an alleged indefiniteness under 35 U.S.C. § 112, second

2            paragraph.

3  Paper 177, pp. 1-17.

4      Pippin opposes (Paper 197).

5      Thomas did not file a reply.

6      (2)    Thomas Motions 5.1 through 5.4 (Papers 193-196) seek entry

7  of judgments of no interference-in-fact between the subject matter of certain

8  Thomas claims and the subject matter of claim 1 of Pippin '274:

9            (i)    Thomas Motion 5.1 (Paper 193) seeks
10      entry of judgment of no interference-in-fact between
11      claims 1-17, 20, 22-26 of Thomas '190 (all the remaining
12      claims) and claim 1 of Pippin '274.  Pippin opposes
13      (Paper 226).  Thomas has replied (Paper 274).
14

15            (ii)    Thomas Motion 5.2 (Paper 194) seeks entry
16      of judgment of no interference-in-fact between 1–28 of
17      Thomas '599 (all the claims) and claim 1 of Pippin '274.
18      Pippin opposes (Paper 227).  Thomas did not reply.
19

20            (iii)    Thomas Motion 5.3 (Paper 195) seeks
21      entry of judgment of no interference-in-fact between
22      claims 1-27 of Thomas '798 (all the claims) and claim 1
23      of Pippin '274.  Pippin opposes (Paper 228).  Thomas did
24      not reply.
25

26            (iv)    Thomas Motion 5.4 (Paper 196) seeks entry
27      of judgment of no interference-in-fact between claims
28      1-24 of Thomas '433 (all the claims) and claim 1 of
29      Pippin '274.  Pippin opposes (Paper 229).  Thomas did
30      not reply.
31

4

Interferences 105,956 through 105,959
Decision on Motions

1    (3)    Thomas Motion 6 (Paper 178) seeks to designate claims 10

2    and 18–26 of Thomas '190 as not corresponding to the Count.  Pippin

3    opposes (Paper 230).  Thomas has replied (Paper 278).

4    (4)    Thomas Motion 7 (Paper 179) seeks to designate claims 26-27

5    of Thomas '798 as not corresponding to the Count.  Pippin opposes

6    (Paper 231).  Thomas has replied (Paper 277).

7    (5)    Pippin Miscellaneous Motion 4 (Paper 96) seeks entry of an

8    order vacating authorization for Thomas to file Motion 1 and Motions

9    5.1-5.4.  Thomas opposes (Paper 98).  Pippin has replied (Paper 100).  An

10   opinion in support of our decision with respect to Pippin Motion 4 has been

11   entered as a separate paper (Paper 296).

12                           II. Background

13   Pippin requested an interference between (1) claim 1 of Pippin '274

14   and (2) claims of the Thomas patents and applications.  Interference Request

15   (Ex. 1003, pp. 8–60).  37 C.F.R. § 41.202(a)

16   The involved Thomas patents and applications are part of a family of

17   related patents and pending continuation applications ("the Thomas

18   family").

19   All the claims of seven patents[10] of the Thomas family have been

20   canceled as a result of adverse final decisions in Interferences 105,801,

21   105,802 and 105,803.

_____

[10]  The seven patents are:

(1) Patent 5,752,011 (May 12, 1998) ("Thomas '011") (Ex. 1018);
(2) Patent 5,974,557 (Oct. 26, 1999) ("Thomas '557") (Ex. 1019);
(3) Patent 6,216,235 (Apr. 10, 2001) ("Thomas '235") (Ex. 1020);
(4) Patent 6,487,668 (Nov. 26, 2002) ("Thomas '668") (Ex. 1021);

5

Interferences 105,956 through 105,959
Decision on Motions

1    The interfering subject matter is directed to methods and systems

2    for power and thermal management in computer systems including a

3    microprocessor having a clock speed.

4    During operation of the system, the microprocessor temperature is

5    sensed.

6    If a predetermined temperature is reached, an active cooling device

7    (fan) is activated and the clock speed of the microprocessor is reduced to

8    decrease the heat generated.

9    The interfering subject matter is represented by Count 1, which is the

10   same as claim 1 of Pippin '274.

11   Claim 1 of Pippin '274 is (1) identical to claim 34 of Pippin's parent

12   application 10/464,482 ("Pippin '482") filed on June 19, 2003 and (2) was

13   the Count in each of the three prior interferences: 105,801, 105,802, and

14   105,803.

15   Count 1 (identical to Pippin claim 1) reads [matter in brackets added]:

16   A computer system comprising:

17   [1]    an active cooling device;

18   [2]    a microprocessor comprising:

19   [2.1]  a register storing a register value
20          corresponding to a threshold temperature;
21
22   [2.2]  a programmable thermal sensor receiving
23          the register value, wherein the programmable

---

(5) Patent 7,167,993 (Jan. 23, 2007) ("Thomas '993") (Ex. 1022);
(6) Patent 7,293,186 (Nov. 6, 2007) ("Thomas '186") (Ex. 1023); and
(7) Patent 7,418,611 (Aug. 26, 2008) ("Thomas '611") (Ex. 1024).

6

Interferences 105,956 through 105,959
Decision on Motions

1                           thermal sensor generates a first interrupt signal if a
2                           microprocessor temperature exceeds the threshold
3                           temperature,

4

5          wherein the active cooling device is activated in response
6   to the first interrupt signal, and

7          wherein the active cooling device comprises a fan, and

8   [3]    clock circuitry for providing a clock signal for the
9   microprocessor,

10         wherein a frequency of the clock signal is reduced in
11   response to the first interrupt signal.

12   Paper 215, pp. 3-4 (Count 1); Paper 15, p. 3 (clean copy of Pippin Claim 1).

13       All Thomas claims have been designated as corresponding to the

14   Count:

15          (1) claims 1–17, 20, and 22–26 of Thomas '190

16          (2) claims 1–28 of Thomas '599,

17          (3) claims 1–27 of Thomas '798, and

18          (4) claims 1–24 of Thomas '433.

19   Paper 215, pp. 4–10.

20       With respect to Count 1, the parties have been accorded an earlier

21   constructive reduction to practice date (*i.e.*, benefit for the purpose of

22   priority) of:

23   Earliest Thomas date:   20 June 1994
24   Earliest Pippin date:    21 September 1993

25

26       Thomas has not contested the September 21, 1993 benefit date

27   accorded to Pippin.  Paper 64, p. 19.

7

Interferences 105,956 through 105,959
Decision on Motions

1    Moreover, Thomas does not allege a date of invention prior to the

2    earliest date accorded to Pippin (21 September 1993).

3    Accordingly, there was no need to authorize motions based on

4    priority.  Paper 64, p. 19.

5    Assuming that Thomas does not prevail on its motions, Pippin

6    prevails on the issue of priority and all Thomas claims designated to

7    corresponding to the Count would be unpatentable.

8                              A.  Witnesses

9    Thomas relies on the testimony of Dr. Jose Renau.  *See*

10       (1) First Declaration of Jose Renau, Ph.D., in support of

11   Thomas Motion 1 (Paper 177).  Ex. 2009 (Renau CV), Ex. 2010.

12       (2) Second Declaration of Jose Renau, Ph.D., in support of

13   Thomas Motion 5.1 (Paper 193), Ex. 2019.

14       (3) Third Declaration of Jose Renau, Ph.D., in support of

15   Thomas Motion 5.2 (Paper 194), Ex. 2020.

16       (4)  Declaration of Jose Renau, Ph.D., in support of Thomas

17   Motion 5.3 (Paper 195), 37 C.F.R. § 41.202(a).

18       (5)  Fifth Declaration of Jose Renau, Ph.D., in support of

19   Thomas Motion 5.4 (Paper 196), Ex. 2023.

20       (6)  Sixth Declaration of Jose Renau, Ph.D., in support of

21   Thomas Motion 6 (Paper 178), Ex. 2047.

22       (7)  Seventh Declaration of Jose Renau, Ph.D., in support of

23   Thomas Motion 7 (Paper 179), Ex. 2050.

24

25   Pippin relies on the testimony of Dr. John H. F. Scott-Thomas.  *See*

26   (1) Ex. 1061:  Declaration of John H. F. Scott-Thomas, Ph.D., in support of

8

Interferences 105,956 through 105,959
Decision on Motions

1   Pippin Background, (2) Paper 222—Invention Background, (3) Paper 223—

2   Level of Skill Background, (4) Paper 224—Prior Art Background, and

3   (5) Ex. 1060 Scott-Thomas CV.

4                              1.  Dr. Jose Renau

5          Dr. Renau is an Assistant Professor at the University of California and

6   has a Ph.D. degree in computer science as well as master degrees in

7   computer science and computer engineering from University of Illinois at

8   Urbana Champaign.

9          He has over 14 years of experience in research pertaining to computer

10  systems, including thermal and power management of computers.

11         Dr. Renau has published many papers in the field of design of

12  integrated circuits for computers, including power and thermal management

13  aspects of such circuits.

14         Dr. Renau is qualified to express opinions regarding the technology

15  involved in this case.

16                         2. Dr. John H. F. Scott-Thomas

17         Dr. Scott-Thomas is an architect at TechInsights.

18         He has a Ph.D. degree in Physics and Electrical Engineering from

19  Massachusetts Institute of Technology (MIT).

20         Dr. Scott-Thomas has 24 years of experience in device research and

21  integrated circuit (IC) design.

22         Dr. Scott-Thomas is qualified to express opinions regarding the

23  technology involved in this case.

9

Interferences 105,956 through 105,959
Decision on Motions

1                          3.  Witness credibility

2          To the extent that there is a conflict between the testimony of

3   Dr. Renau and Dr. Scott-Thomas, we credit the testimony of Dr. Scott-

4   Thomas over that of Dr. Renau.

5          In our view, the testimony of Dr. Scott-Thomas is more consistent

6   with the teachings of the prior art and the information contained in the

7   respective specifications of the parties.

8                          III. Thomas Motion 1

9          Thomas Motion 1 (Paper 177) moves for judgment as to claim 1 of

10  Pippin '274 based on:

11          (1) lack of a written description under 35 U.S.C. § 112, first

12          paragraph, and

13          (2) indefiniteness under 35 U.S.C. § 112, second paragraph.

14         Specifically, Thomas argues: (1) Pippin's involved application does

15  not provide an adequate written description for "*clock circuitry for providing*

16  *a clock signal for the microprocessor*" recited in Pippin claim 1 and

17  (2) Pippin claim 1 is indefinite.  Paper 177, pp. 1–19 (emphasis added).

18                          A. Analysis

19                          1.

20         Whether the descriptive portion of a specification contains a written

21  description of claimed subject matter is an issue of fact.  *Chen v. Bouchard*,

22  347 F.3d 1299, 1304 (Fed. Cir. 2003); *In re Alton*, 76 F.3d 1168, 1171-72

23  (Fed. Cir. 1996).

24          In order to satisfy the adequate written description requirement, an

25  applicant does not have to utilize any particular form of disclosure to

26  describe the subject matter claimed, but "the description [in the descriptive

10

Interferences 105,956 through 105,959
Decision on Motions

1  portion of the specification] must clearly allow persons of ordinary skill in

2  the art to recognize that [the applicant] invented what is claimed." *In re*

3  *Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989)(citation omitted); *In re Alton*,

4  at 1172.

5      The language in the written description portion of a specification does

6  not have to be *in ipsis verbis* as the language of a claim. *In re Wertheim*,

7  541 F.2d 257, 265 (CCPA 1976); *In re Lukach*, 442 F.2d 967, 969 (CCPA

8  1971).

9                                          2.

10     Whether a claim is indefinite is an issue of law. *Credle v. Bond*,

11  25 F.3d 1566, 1576 (Fed. Cir. 1994).

12     The second paragraph of 35 U.S.C. § 112 requires that a patent's

13  claims, viewed in light of the specification and prosecution history, inform

14  those skilled in the art about the scope of the invention with reasonable

15  certainty. *See Nautilus, Inc. v. Biosig, Insts., Inc.*, 134 S. Ct. 2120, 2129-30

16  (2014):

17              The standard we adopt accords with opinions of this
18              Court stating that "the certainty which the law requires in
19              patents is not greater than is reasonable, having regard to
20              their subject-matter." *Minerals Separation, Ltd. v. Hyde,*
21              242 U.S. 261, 270 (1916). *See also United Carbon,* 317
22              U.S., at 236 ("claims must be reasonably clear-cut");
23              *Markman,* 517 U.S., at 389 (claim construction calls for
24              "the necessarily sophisticated analysis of the whole
25              document," and may turn on evaluations of expert
26              testimony").
27

11

Interferences 105,956 through 105,959
Decision on Motions

1     Indefiniteness is to be evaluated from the perspective of a person with

2    ordinary skill in the relevant art at the time of the invention—when the

3    patent application was filed. *Id.*

4                               3.

5     An action taken in an interference, including declaration of the

6    interference, is presumed correct and represents the status quo in the

7    interference.

8     A party wishing to change the status quo must seek authorization to

9    file, and thereafter file, a motion. 37 C.F.R. §§ 41.120(a) and 41.121(a).

10     A moving party has the burden of proof to demonstrate entitlement to

11    the relief requested. 37 C.F.R. § 41.121(b).

12     In general, the applicable standard of proof is a preponderance of the

13    evidence. *See, e.g., Bilstad v. Wakalopulos*, 386 F.3d 1116, 1129 (Fed. Cir.

14    2004); *Bruning v. Hirose*, 161 F.3d 681, 685 (Fed. Cir. 1998).

15                               4.

16     Thomas has identified a limitation of Pippin claim 1 said not to be

17    described: "*clock circuitry for providing a clock signal for the*

18    *microprocessor.*" Paper 177, pp. 1–15.

19     In an interference, as part of mandatory discovery, a party is required

20    to file an annotated copy of its claims. 37 C.F.R. § 41.110(b).

21     Pippin filed the required annotated copy of its involved claim 1.

22    Paper 22.

23     Pippin's annotated copy of its claim 1 sets out the basis for Pippin's

24    belief that its claim 1 is supported by the descriptive portion of Pippin's

25    specification.

12

Interferences 105,956 through 105,959
Decision on Motions

1    An opponent's annotated claim document should be the starting point

2    for a party's motion for judgment based on an alleged lack of a written

3    description, *i.e.*, the opponent should make out a case why the information in

4    the party's annotated claims are not correct.

5    Instead of addressing Pippin's explanation why Pippin believes it has

6    support to the "*clock circuitry for providing a clock signal for the*

7    *microprocessor*" limitation, Thomas bases its "written description"

8    arguments on (1) a proffered narrow claim construction, and (2) a selective

9    reading of Pippin's disclosure, all the while ignoring what Pippin set out in

10    its annotated claim paper.

11    Thomas requests the Board to construe the limitation: "clock circuitry

12    for providing a clock signal for the microprocessor" narrowly and require

13    any "clock circuitry" to be structural distinct from the microprocessor, *i.e.*,

14    not within the microprocessor.  Paper 177, pp. 3-5.

15    Based on the proffered narrow claim construction, Thomas argues that

16    (1) Pippin's claimed "clock circuitry" constitutes new matter that cannot

17    provide written description, and (2) Pippin's claimed "clock circuitry" is not

18    consistent with Pippin's disclosure that is said to expressly limit "clock

19    circuitry for providing a clock signal for the microprocessor" to mean part of

20    its microprocessor.  Paper 177, pp. 5-15.

21    As part of its case, Thomas relies on the disclosures of numerous

22    parent cases.

23    We reject Thomas' approach to challenging Pippin's claim 1 on

24    written description grounds based on disclosure in Pippin's earlier

25    applications.

13

Interferences 105,956 through 105,959
Decision on Motions

1      Thomas argues:

2             (1) "Pippin's involved application 13/786,274 claims to be a:

3      continuation of 10/464,482, and that 10/464,482 is a continuation of

4      08/636,024, and that 08/636,024 is a continuation of application

5      08/401,473, and that the 08/401,473 application is a division of the

6      08/124,980 application,"

7             (2) the 08/124,980 [Pippin] application does not describe the

8      concept of the "clock circuitry" residing outside the microprocessor,[11]

9      and

10            (3) the claims of the 10/464,482 applications do not recite such

11      "clock circuitry,"

12      According to Thomas, Pippin's claimed "clock circuitry" constitutes "new

13      matter" and therefore lacks written description support in the specification of

14      the involved Pippin application.  Paper 177, pp. 5-7.

15      However, the only appropriate specification for the determination of

16      adequate written descriptive support is the specification of which the

17      involved claims form a part, i.e., Pippin '274.  *See Reiffin v. Microsoft*

18      *Corp.*, 214 F.3d 1342, 1346 (Fed. Cir. 2000).

19      Claims should be construed consistent with the written description

20      portion of the specification.  Claim terms are to be accorded their ordinary

21      and accustomed meaning as those terms would be understood by one of

22      ordinary skill in the art.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13

23      (Fed. Cir. 2005) (en banc).

---

[11]  Thomas has not file a motion seeking entry of an order vacating benefit
accorded to Pippin for its earlier applications.

Interferences 105,956 through 105,959
Decision on Motions

1    Pippin's claim 1 requires "clock circuitry" to provide a clock signal

2    for the "microprocessor."  The plain language of Pippin's claim 1 does not

3    require the "clock circuitry" be structurally distinct from the

4    "microprocessor."  Rather, the plain language of Pippin's claim 1 only

5    requires "clock circuitry" to provide a clock signal for the "microprocessor."

6    An interpretation of Pippin's claim 1 to cover various embodiments is

7    consistent with Pippin's written description portion of the specification

8    describing different embodiments of "clock circuitry" vis-à-vis the

9    "microprocessor" as shown in Fig. 7, Fig. 9, Fig. 10, and Fig. 11 of Pippin's

10   drawing.  Ex. 2051.

11   For example, Pippin Fig. 7, reproduced below, shows an example

12   embodiment of "clock circuitry for providing a clock signal for the

13   microprocessor."



14

15                        Pippin Fig. 7

16

17            Depicted is a block diagram of a first embodiment of a
18      microprocessor incorporating a programmable thermal sensor.

15

Interferences 105,956 through 105,959
Decision on Motions

1

2       Pippin, in describing FIG. 7, states:

3               External to the microprocessor **700** is an external clock
4               **710**. *The external clock 710 provides a clock signal to*
5               *the PLL [phase lock loop] circuit 720.* The PLL circuit
6               **720** permits fine tuning and variable frequency
7               adjustment of the input clock signal. Specifically, the
8               PLL circuit **720** receives a value, and increases or
9               decreases the frequency based on the value received. The
10              PLL circuit **720** is intended to represent a broad category
11              of frequency adjustment circuits, which are well known
12              in the art and will not be described further. *The output of*
13              *the PLL circuit 720 is the microprocessor system clock,*
14              *and is input to the processor unit 705*.

15

16      Ex. 2051, ¶ 47 (emphasis added).

17          An external clock **710**, as shown in Fig. 7, can serve as the claimed

18      "clock circuitry for providing a clock signal for the microprocessor," as

19      recited in Pippin's claim 1.

20          Similarly, Pippin Fig. 9, reproduced below, shows another example

21      embodiment of "clock circuitry for providing a clock signal for the

22      microprocessor" — which is either inside or outside a microprocessor.

16

Interferences 105,956 through 105,959
Decision on Motions



1
2                              Pippin Fig. 9

3          Fig. 9 depicts a block diagram of a second embodiment
4    of a microprocessor incorporating a programmable thermal sensor.
5
6        Pippin's disclosure, in describing FIG. 9, states:

7        [A]n external clock **945** is input to a counter **950**, and the output
8        of the counter **950** is input to a clock circuit **930**.  *The clock*
9        *circuit **930** buffers the input clock frequency to generate the*
10       *microprocessor clock for the processor unit **905***.
11

12   Ex. 2051, ¶ 53 (emphasis added).

13       Either a clock circuit **930** inside the microprocessor **900** or a

14   combination of an external clock **945**, a counter **950** and a clock circuit **930**

15   can serve as the claimed "clock circuitry for providing a clock signal for the

16   microprocessor" as recited in Pippin's claim 1.

17       Pippin Fig. 10 and Pippin Fig. 11, both reproduced below, show yet

18   another example embodiment of "clock circuitry for providing a clock signal

19   for the microprocessor" — which is external to a microprocessor.

17

Interferences 105,956 through 105,959
Decision on Motions



FIG. 10

1
2       Pippin Fig. 10 depicts a block diagram of a microprocessor
3                   incorporating a fail-safe thermal sensor
4



FIG. 11

5
6       Pippin Fig. 11 depicts a computer system incorporating
7               a microprocessor comprising thermal sensing
8
9       Either a clock circuit **1020** shown in Pippin Fig. 10 or a clock circuit

10   **1107** shown in Pippin Fig. 11 can serve as the claimed "clock circuitry for

11   providing a clock signal for the microprocessor" as recited in Pippin's

18

Interferences 105,956 through 105,959
Decision on Motions

1   claim 1.  Both clock circuit **1020** and clock circuit **1107** are external to a

2   microprocessor.  Ex. 2051.

3       The Pippin disclosure does not indicate that the location of the "clock

4   circuitry" relative to the "microprocessor" is considered an essential element

5   of the invention.  *Cf. Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473,

6   1479 (Fed. Cir. 1998).

7       Pippin's disclosure does not limit "clock circuitry for providing a

8   clock signal for the microprocessor" to mean part of its microprocessor.

9       Rather, the "clock circuitry" can cover circuitry: (1) in the

10  microprocessor, (2) partially in the microprocessor, as shown in Pippin

11  Fig. 7 and Pippin Fig. 9, and (3) not in the microprocessor, as shown in

12  Pippin Fig. 10 and Pippin Fig. 11.

13      For the reasons given, we decline to confine the claimed "clock

14  circuitry" of Pippin claim 1 to any specific Pippin embodiment.  *Phillips*,

15  415 F.3d at 1323.  Consequently, we reject the proffered Thomas claim

16  construction maintaining that the "clock circuitry" must be structural distinct

17  from the microprocessor, i.e., not within the microprocessor.

18      Thomas relies on testimony of Dr. Renau in support of its no written

19  description argument.  Ex. 2010.

20      Dr. Renau testified that:

21          (1) clock circuitry for providing a clock signal for the

22          microprocessor is part of its microprocessor;

23          (2) an artisan of ordinary skill would understand from Pippin's

24          disclosure that Pippin's specification defines "clock circuitry" as only

25          the "PLL Circuit 720" of Fig. 7 and the "Clock Circuit 930" of Fig. 9;

26          and

19

1      (3) the existence of "Clock Circuit 1020" of Fig. 10 would not

2      have suggested to an artisan of ordinary skill that "clock circuitry"

3      means "Clock Circuit 1020."

4  Ex. 2010, ¶¶22, 40, 58-69.

5      We decline to accord Dr. Renau's testimony much weight because it

6  overlooks other embodiments.

7      Dr. Renau does not present any credible scientific basis why Pippin

8  Fig. 7, Fig. 9, Fig. 10, and Fig. 11 do not provide a written description for

9  "clock circuitry for providing a clock signal for the microprocessor" as

10  broadly recited in Pippin's claim 1.

11      Nor has Dr. Renau provided a credible scientific reason (1) why one

12  having ordinary skill in the art would not have been considered as part of the

13  claimed "clock circuitry" the external clock **710**, shown in Pippin Fig. 7;

14  (2) why the external clock **945** and the counter **950**, shown in Pippin Fig. 9,

15  would not have been considered as part of the claimed "clock circuitry"; or

16  (3) why the existence of "Clock Circuit **1020**" shown in Pippin Fig. 10

17  would not have been considered as the claimed "clock circuitry."

18      Dr. Renau has not satisfactorily explained why Pippin's written

19  description, especially when considered in light of Pippin Fig. 7, Fig 9,

20  Fig. 10, and Fig. 11 would be viewed by one skilled in the art as being

21  insufficient to convey disclosure of the limitation: "clock circuitry for

22  providing a clock signal for the microprocessor."

23      Thomas has not satisfied its burden of establishing that the written

24  description portion of Pippin does not describe the "clock circuitry for

25  providing a clock signal for the microprocessor" within the meaning of

26  Pippin's claim 1.

Interferences 105,956 through 105,959
Decision on Motions

1                                    5.

2                            *Indefiniteness*

3          Thomas asserts that Pippin Claim 1 is unpatentable under 35 U.S.C.

4   § 112, second paragraph, as being indefinite.  Paper 177, pp. 15-17.

5          Thomas' assertion of indefiniteness is predicated on *Ex parte*

6   *Miyazaki*, Appeal 2007-3300 (BPAI 2008) (precedential) (a claim may be

7   indefinite if the claim is amenable to two or more plausible claim

8   constructions).

9          Thomas argues because the "clock circuitry for providing a clock

10  signal for the microprocessor" is amenable to a claim construction that

11  permits the "clock circuitry" to be (1) inside of, (2) partly inside and partly

12  outside of, or (3) not inside of the microprocessor, Pippin claim 1 must

13  therefore be indefinite under 35 U.S.C. § 112, second paragraph.

14         Thomas' argument confuses breadth with indefiniteness.

15         First, the plain meaning of "clock circuitry for providing a clock

16  signal for the microprocessor" does not require such circuitry to be

17  (1) external to, (2) internal to, or (3) partially external and internal to a

18  microprocessor.

19         Rather, the plain meaning of the claimed clock circuitry covers all

20  possible locations ((1) external to, (2) internal to, or (3) partially external

21  and internal to a microprocessor) as shown, for example in Pippin Fig. 7,

22  Fig. 9, Fig. 10, and Fig. 11.

23         We find no plausible basis for narrowly construing the claim

24  limitation to read on one particular embodiment to the exclusion of other

25  embodiments in Pippin's disclosure.

21

Interferences 105,956 through 105,959
Decision on Motions

1    Pippin claim 1 is broadly worded to encompass multiple

2    embodiments, but that does not make its scope indefinite. *Cf. In re Miller*,

3    441 F.2d 689, 693 (CCPA 1971).

4    Second, *Nautilus, Inc. v. Biosig, Insts., Inc.,* 134 S. Ct. 2120 (2014),

5    held that a claim is indefinite if, read in light of the written description

6    portion of the specification and prosecution history fails to reasonably

7    inform with reasonable certainty those skilled in the art with respect to the

8    scope of the invention. *Id*. at 2129-30.

9    When "clock circuitry for providing a clock signal for the

10    microprocessor" of Pippin Claim 1 is read in light of Pippin Fig. 7, Fig. 9,

11    Fig. 10, and Fig. 11, we see no reason why a person having ordinary skill

12    would not understand the scope and meaning of the disputed limitation with

13    reasonable certainty.

14    Thomas has not satisfied its burden of establishing that Pippin claim 1

15    is indefinite under 35 U.S.C. § 112, second paragraph.

16                              B. Decision

17    Thomas has failed to prove that Pippin claim 1 lacks a written

18    description support.  35 U.S.C. § 112, first paragraph.

19    Thomas also has failed to prove that Pippin claim 1 is indefinite.

20    35 U.S.C. § 112, second paragraph.

21    Therefore, Thomas Motion 1 is *denied*.

22                     IV.  Thomas Motions 5.1–5.4

23                        A.  Introduction

24    Thomas Motions 5.1–5.4 (Papers 193-196) seek entry of judgment for

25    no interference-in-fact between (1) the subject matter of the claims of the

22

Interferences 105,956 through 105,959
Decision on Motions

1    Thomas involved patents and applications and (2) the subject matter of

2    Pippin '274 claim 1.

3                    B.  Thomas Motion 5.1

4        Thomas Motion 5.1 (Paper 193) moves for judgment that there is

5    no interference-in-fact between the subject matter of claims 1-17, 20, and

6    22-26 of Thomas '190 [12] and the subject matter of claim 1 of Pippin '274.

7    Paper 193, pp. 1-19.

8        Thomas contends that (1) the subject matter of its claims (*i.e.*,

9    independent claims 1 and 11) differ in scope from Pippin claim 1, and

10   (2) the subject matter of the Thomas claims does not anticipate or render

11   obvious the subject matter of Pippin claim 1.  *Id.*

12                           1.

13           An interference exists if the subject matter of a claim of
14           one party would, if prior art, have anticipated or rendered
15           obvious the subject matter of a claim of the opposing
16           party and vice versa.
17
18   37 C.F.R. § 41.203(a).

19       When an interference is declared, an interference-in-fact is presumed

20   to exist.

21       The "test" for determining whether there exists an interference-in-fact

22   is a "two-way" test.  *Id.*

23       Thomas must show that the "two-way" test is not satisfied in order to

24   establish that there is no interference-in-fact.

---

[12]  As noted earlier, claims 18, 19, and 21 of Thomas '190 were cancelled in
Reexamination No. 90/012,909.  Ex. 2077.

23

Interferences 105,956 through 105,959
Decision on Motions

1    Thomas has elected to base its no interference-in-fact case

2    maintaining *only* that the subject matter of the subject matter of Thomas

3    '190 claims 1 and 11 would not have rendered obvious the subject matter of

4    Pippin claim 1.  Accordingly, Thomas has waived any argument based on

5    the subject matter of Thomas claim 1 would not have anticipated or rendered

6    obvious the subject matter of the Thomas '190 claims.

7                                    2.

8    Relying on Dr. Renau's testimony (Ex. 2019), Thomas acknowledges

9    Pippin's claim 1 recites a computer system comprising a microprocessor and

10   that microprocessor includes: (1) "a register storing a register value

11   corresponding to a threshold temperature," (2) "a programmable thermal

12   sensor receiving the register value," and (3) "wherein the programmable

13   thermal sensor generates a first interrupt signal if a microprocessor

14   temperatures exceeds the threshold temperature."  Paper 193, p. 4 (citing

15   Ex. 2019 ¶ 11).

16   The first interrupt signal is then used to activate an active cooling

17   device (*e.g.*, a fan), as well as to reduce the frequency of a clock signal for

18   the microprocessor.  *Id*. (citing Ex. 2019 ¶ 11).

19   Thomas then argues its independent claims 1 and 11 do not claim the

20   computer system of Pippin claim 1, a system which is said to include

21   Pippin's microprocessor containing: (1) "a register storing a register value

22   corresponding to a threshold temperature, (2) "a programmable thermal

23   sensor receiving the register value" and (3) "wherein the programmable

24   thermal sensor generates a first interrupt signal if a microprocessor

25   temperature exceeds the threshold temperature."  *Id*. at 5 (citing Ex. 2019

26   ¶¶ 12-15).  Thomas further contends that the subject matter of Thomas

24

Interferences 105,956 through 105,959
Decision on Motions

1    independent claims 1 and 11 do not describe, suggest, or claim Pippin's

2    claimed "interrupt … to activate an active cooling device (fan) and reduce

3    the frequency of a clock signal for the microprocessor. *Id*. at 6.

4         According to Thomas, these Pippin features are the differences

5    between the subject matter of the claims of Thomas '190 and the subject

6    matter of Pippin '274 claim 1. *Id*.  Further according to Thomas nothing in

7    the prior art[13] suggests modifying the subject matter of any of the Thomas

8    claims to define Pippin missing features. *Id*. at 7.  Still further according to

9    Thomas, none of the art teaches or suggests any of Pippin missing features,

10    including:

11              (1) Morikawa, U.S. Patent 5,379,230 (Ex. 2033);

12              (2) Kenny, U.S. Patent 5,287,292 (Ex. 2035);

13              (3) Swamy, U.S. Patent 5,623,594 (Ex. 1029);

14              (4) Dinh, U.S. Patent 5,526,298 (Ex. 1027); and

15              (5) Pippin's prosecution history (Ex. 2064-2068).

16    *Id*. at 8–17 (citing Ex. 2019 ¶¶ 20-40).

17         Thomas acknowledges that Morikawa (Ex. 2033) and Kenny

18    (Ex. 2035) describe a temperature sensor provided internal to an integrated

19    circuit (IC) to monitor a temperature of the integrated circuit. *Id*. at 8-10

20    (citing Ex. 2033, col. 2:19-31, col. 3:11-35, Figs. 1-3; and Ex. 2035,

21    col. 1:51-56, col. 2:5-7, col. 9:38-45).

22         However, Thomas argues that Morikawa (Ex. 2033) and Kenny

23    (Ex. 2035) do not teach or suggest a programmable thermal sensor that

24    (1) receives a threshold temperature from a register as a register value,

---

[13] Prior art cited by Pippin in support of the Request for an Interference.
Ex. 1003.

25

Interferences 105,956 through 105,959
Decision on Motions

1   (2) generates an interrupt signal (all internal to a microprocessor), and

2   (3) uses the generated interrupt signal to not only activate an active cooling

3   device (fan) but also reduce clock frequency for the microprocessor.

4   *Id*. at 11 (citing Ex. 2019 ¶ 29).

5   Thomas also acknowledges that (1) Swamy (Ex. 1029) describes a

6   computing a temperature and then controlling a fan to provide cooling as

7   well as CPU clock, and (2) Dinh (Ex. 1027) describes a fan cooling

8   subsystem for a personal computer (PC) to provide fan control based on the

9   computer housing temperature. *Id*. at 15-16 (citing Ex. 1029, col. 7:29-37,

10  Fig. 2; and Ex. 1027, col. 1:10-13, 29-35, 44-51). However, Thomas argues

11  none of these references teaches or suggests to person having ordinary skill

12  the use of a generated interrupt signal not only to activate an active cooling

13  device (fan) but also reduce clock frequency of a clock signal for the

14  microprocessor. *Id*. at 17 (citing Ex. 2019 ¶ 37). Based on these features,

15  Thomas argues there is no reason for one skilled in the art to combine

16  Thomas claims with the teachings of Morikawa (Ex. 2033), Kenny

17  (Ex. 2035), Swamy (Ex. 1029) or Dinh (Ex. 1027), let alone any other art, in

18  order to arrive at the subject matter of Pippin claim 1. *Id*. (citing Ex. 2019

19  ¶¶ 38-40).

20  Based on the record before us, we are not persuaded that the subject

21  matter of Pippin claim 1, as a whole, would not have been obvious over the

22  subject matter of the Thomas '190 claims (presumed to be prior art for the

23  purpose of an interference-in-fact analysis) and other prior art.

24  Thomas has identified the following differences:

25  (1) "a register storing a register value corresponding to a

26  threshold temperature,

Interferences 105,956 through 105,959
Decision on Motions

1    (2) "a programmable thermal sensor receiving the register

2    value" and

3    (3) "wherein the programmable thermal sensor generates a first

4    interrupt signal if a microprocessor temperature exceeds the threshold

5    temperature."

6    (a) Feature 1

7    Pippin claim 1 recites a "programmable thermal sensor." Ex. 1001.

8    None of the Thomas '190 claims recite a "programmable thermal

9    sensor" as in Pippin's claim 1. Ex. 1013.

10    Thomas concedes that (1) thermal sensors were known in the art, and

11    (2) are described by Morikawa (Ex. 2033) and Kenny (Ex. 2035), both of

12    describing a temperature sensor provided internal to an integrated circuit

13    (IC) to monitor a temperature of the integrated circuit. Paper 193, p. 8-10

14    (Ex. 2033, col. 2:19-31, col. 3:11-35, Figs. 1-3; and Ex. 2035, col. 1:51-56,

15    col. 2:5-7, col. 9:38-45).

16    Thomas argues that thermal sensors described by Morikawa

17    (Ex. 2033) and Kenny (Ex. 2035) are not a programmable thermal sensor

18    and, as such, would not have been obvious to those skilled in the art. *Id.* at

19    10–11 (citing Ex. 2019 ¶ 29).

20    However, the prior art cited by Pippin is more relevant to Pippin's

21    claim 1, and better reflects the level of ordinary skill in the art at the time.

22    *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

23    For example, Thomas '190 claim 25 recites a method for controlling

24    an operational speed for a processor of a computing device [including a fan

25    for cooling at least the microprocessor] comprising "monitoring a

26    temperature of [a] processor" and "controlling an operational speed of the

27

Interferences 105,956 through 105,959
Decision on Motions

1    processor based on [an] appropriate one of [a] first power management

2    policy [including at least a first condition based on a temperature of the

3    processor], [and a] second power management policy [including at least a

4    second condition based on a temperature of the processor]."  Ex. 2077.

5         According to the Thomas '190 specification, the limitation

6    "monitoring a temperature of [a] processor" refers to "accurate temperature

7    monitoring of a microprocessor, via a temperature sensor that is integrated

8    with the microprocessor" and such "[t]emperature sensing circuitry is well

9    known and therefore not further described."  Paper 226, p. 4:12-16 (citing

10   Ex. 1013, col. 4:1-11; col. 8:11-13; and Ex. 1061, ¶ 52).

11        The limitation is further described in Fig. 9 of Thomas '190,

12   reproduced below, as a temperature sensor integrated within a

13   microprocessor to sense a temperature of the microprocessor.



14

15                        Thomas '190 Fig. 9

16

17        Thomas '190 Fig. 9 depicts a diagram describing the use

18        of a temperature sensor integrated in a microprocessor

19                   for sensing processor temperature.

28

Interferences 105,956 through 105,959
Decision on Motions

As shown in Fig. 9 of Thomas '190, temperature sensor **4** is integrated within a microprocessor **2** and generates a digital output (i.e., "1" or "0") in response to temperature changes of the microprocessor 2. Ex. 1013, Fig. 14, col. 5:47-50.

With respect to "monitoring a temperature of [a] processor," according to Dr. Renau one of ordinary skill in the art would have understood that the processor temperature is monitored using threshold temperatures to carry out certain "conditions:" *Id.* at 5 (citing Ex. 1061, ¶ 53):

> the specification discloses to . . . [(*a person having ordinary skill in the art*)] * * * different modes of operation, whose *conditions at a given temperature of the microprocessor* differ from one another. The example in the * * * paragraph [at Ex 1013, page 16, col. 8, lines 24-40] is, that *at a given temperature*: one mode *activates the fan* (in the desk-top case), and another mode *reduces the fast clock* (in the portable case).

Paper 178, p. 7:10-14 (emphasis added); *also see* (1) claim 21 of Thomas '433 (Ex. 2004); (2) claims 1, 13, and 18 of Thomas '599 (Ex. 2002); (3) claims 26 and 32 of Thomas '557 (Ex. 1019); (4) claims 7, 24, and 37 of Thomas '235 (Ex. 1020); (5) claim 49 of Thomas U.S. Patent No. 6,487,668 (Ex. 1021); and (6) claim 24 of Thomas '611 (Ex. 1024).

Dr. Renau understood that power management policies are the same as operational modes and agreed that programming thresholds for an operational mode "would be a logical way to do it" and what he "would do as an engineer, but there are other possible ways to it." Ex. 2078, p. 33:4-23; Ex. 1061 ¶ 55.

29

Interferences 105,956 through 105,959
Decision on Motions

1    Based on the relevant prior art teachings, we agree with Pippin that it

2    would have been obvious to use a programmable thermal sensor (instead of

3    a thermal sensor) to monitor a processor temperature in connection with the

4    subject matter of Thomas claim 25.  Why?  Because (1) Thomas'

5    "temperature sensing circuitry is well-known and therefore [need] not

6    further described" and (2) Dr. Renau's testimony shows that temperature

7    sensor at least suggests use of a programmable sensor that can be

8    programmed with thresholds.  *Id*. at 7 (citing Ex. 1013, col. 4:10-11; and

9    Ex. 2078, p. 34:8- p. 35:12).  We have not been given a convincing reason

10   why a thermal sensor would not have been recognized by one skilled in the

11   art to be programmed to respond to different temperature thresholds within a

12   microprocessor and why programming of such a thermal sensor based on

13   different temperatures would have been uniquely challenging or otherwise

14   beyond the level of skill of an ordinarily skilled artisan.  *See KSR*, 550 U.S.

15   at 421 (a product would have been obvious if that "product [is] not [one] of

16   innovation but of ordinary skill and common sense"); *Leapfrog Enters., Inc.*

17   *v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161-62 (Fed. Cir. 2007).

18                              (b) Feature 2

19   Pippin's claim 1 recites a "register storing a register value"

20   corresponding to a threshold temperature" and recites the "programmable

21   thermal sensor" as "receiving the register value."  Ex. 1001; Ex 1061 at ¶ 63.

22   None of the claims of Thomas '190 recites a "register storing a

23   register value corresponding to a threshold temperature" as in Pippin's

24   claim 1.  Ex. 1013.

25   Thomas argues such "a register storing a register value corresponding

26   to a threshold temperature" is not disclosed anywhere in Thomas '190 patent

30

Interferences 105,956 through 105,959
Decision on Motions

1  and, as such, would not have been obvious to those skilled in the art.  *Id*. at

2  5–6 (citing Ex. 2019 ¶ 12-15).

3       However, differences alone do not establish non-obviousness.  *Dann*

4  *v. Johnston*, 425 U.S. 219, 230 (1976).  The references cited by Pippin –

5  Dictionary definition of "register" and Dr. Renau's testimony are more

6  relevant to Pippin's claim 1.  For example, "registers" were well-known as

7  defined by Microsoft Dictionary (Ex. 1050) as:

8            A small, named region of high-speed memory
9        located within a microprocessor * * * capable of storing
10       binary data.  A register is usually large enough to hold
11       only a few bytes of information * * *.  It is used as a
12       holding area for specific, sometimes critical, pieces of
13       data or information related to activities going on within
14       the system.
15
16 Paper 226, pp. 7-9 (citing Ex. 1050, p. 3; Ex 1061 at ¶ 66).

17       "The use of registers has been [known] since the '50s" and that it was

18 known at the time of Pippin's application to use thresholds with registers for

19 controlling the output of the temperature sensor, as acknowledged by

20 Dr. Renau.  *Id*. at 8 (citing Ex. 2078, p. 34:6–17; p. 37:10–20; p. 52:20-

21 p. 53:14; Ex. 1061 at ¶ 67).

22       Because these registers are located within a microprocessor, we agree

23 with Pippin that it would have been obvious to an artisan of ordinary skill at

24 the time to use a register to store a threshold temperature for monitoring

25 processor temperature in Thomas claim 25.  *Id*. at 8 (citing Ex. 1013,

26 col. 4:10-11; and Ex. 2078, p. 34:18-p. 35:12).

31

Interferences 105,956 through 105,959
Decision on Motions

1                                   (c)  Feature 3
2
3          Pippin's claim 1 further recites that "the programmable thermal sensor
4    generates a first interrupt signal if a microprocessor temperature exceeds the
5    threshold temperature."  Ex. 1001.  In response to the interrupt signal, an
6    active cooling device (fan) is activated and a frequency of a clock signal for
7    the microprocessor is reduced.  Ex. 1001; Ex. 1061 at ¶ 70.
8          None of the claims of Thomas '190 mention the use of an interrupt
9    signal generated by the programmable thermal sensor to both activate an
10   active cooling device (fan) and reduce clock frequency of a clock signal for
11   the microprocessor as in Pippin's claim 1.  Ex. 1013.
12         Thomas identifies Swamy (Ex. 1029) and Dinh (Ex. 1027) as the
13   closest art teaching or suggesting use of an interrupt signal to provide fan
14   control and CPU clock control.  Paper 193, pp. 15–17.  Thomas then argues
15   that Swamy is *not* prior art to Pippin, and acknowledges Dinh teaches a fan
16   cooling subsystem for a computer system wherein the speed of the fan is
17   adjusted based on the temperature within the housing.  *Id*. at 16 (citing
18   Ex. 1027, col. 1:10-13, 29-35, and 44-51).  Thomas further argues that Dinh
19   (Ex. 2027) provides no teaching or suggestion for controlling a computer
20   system's fan and a clock frequency of a microprocessor, let alone controlling
21   clock frequency via an interrupt signal and, as such, would not have been
22   obvious to those skilled in the art.  *Id*. at 16-17 (citing Ex. 2019 ¶¶ 36–37).
23         However, the references cited by Pippin — Dao, U.S. Patent
24   5,115,225 (Ex. 1051), Hwang, U.S. Patent 5,319,772 (Ex. 1052), Canova,
25   U.S. Patent 5,230,074 (Ex. 1026), and Kannan, U.S. Patent 5,423,045

Interferences 105,956 through 105,959
Decision on Motions

1    (Ex. 1053) —reflect the level of ordinary skill in the art.  *See In re GPAC*

2    *Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

3        For example, Dao describes generation of an interrupt signal to a

4    microprocessor when the temperature of disk drives for a computer system

5    exceeds a threshold.  Ex. 1051, col. 1:49-65.

6        Hwang describes a CPU that executes instructions to lower its clock

7    frequency in response to an interrupt signal.  Ex. 1052, col. 2:55-col. 3:40.

8        Likewise, Canova and Kannan also teach that it was known to

9    generate an interrupt signal when a computer's temperature exceeds a

10   threshold in order to invoke a power management routine.  Ex. 1070, pp.

11   2-3.

12       Canova describes generation of an interrupt to control power

13   consumption when a computer's ambient temperature goes beyond or out of

14   range.  Ex. 1026, Abstract; Fig. 4, elements 170, 174; col. 3:38-47;

15   col. 5:6-11; and col. 7:16-21.

16       Kannan describes generation of a power control unit interrupt power

17   management event when a computer's ambient temperature is excessive.

18   Ex. 1053, col. 11: 62-67.

19       A person having ordinary skill in the art is presumed to know all the

20   relevant art, including, for example: (1) the generation of an interrupt signal

21   when a microprocessor/computer's temperature exceeds a certain threshold,

22   as described by Dao (Ex. 1051), Canova (Ex. 1026), and Kannan (Ex. 1053),

23   and (2) the use of such an interrupt signal to control the operational speed

24   (clock frequency) of a processor as described by Hwang (Ex. 1052) and/or to

25   control the speed of a fan as disclosed by Dinh (Ex. 1027).  *In re GPAC*, 57

26   F.3d at 1579.  If these techniques have been used to improve a processor,

33

Interferences 105,956 through 105,959
Decision on Motions

1  using these techniques to improve a similar process in the same way would

2  have been obvious unless its actual application is beyond the skill of an

3  artisan.  *See KSR*, 550 U.S. at 417.

4      Based on these teachings and the knowledge of those skilled in the art,

5  we agree with Pippin that it would have been obvious to an artisan of

6  ordinary skill to generate an interrupt signal if a processor temperature

7  exceeds a threshold in order to control the fan speed and/or the operational

8  speed of the processor.  Paper 226, pp. 10-11 (citing Ex. 1005, p. 20:7-11;

9  Ex. 1061 at ¶ 77)

10      For these reasons, we conclude that Thomas has failed to meet its

11  burden of proof and provide credible evidence to show that there is no

12  interference-in-fact between Thomas claims and Pippin's claim 1.

13  Accordingly, Thomas Motion 5.1 is *denied*.

14                    C.  Thomas Motion 5.2

15      Thomas Motion 5.2 (Paper 194) moves for judgment that there is

16  no interference-in-fact between the subject matter of claims 1–28 of Thomas

17  '599 and the subject matter of claim 1 of Pippin '274.  Paper 194, pp. 1–20.

18  Thomas also contends its claims (i.e., independent claims 1, 13 and 18) are

19  of different scope than that of Pippin's claim 1.  *Id*. at 4–12.

20                          1.

21      Thomas identifies the differences between the subject matter of all

22  claims 1–28 of Thomas '190 patent (as prior art) and the subject matter of

23  claim 1 of Pippin '274 application as including the same features discussed

24  in connection with Thomas Motion 5.1 (Paper 193).

25      The differences are: (1) "a register storing a register value

26  corresponding to a threshold temperature, (2) "a programmable thermal

34

Interferences 105,956 through 105,959
Decision on Motions

1    sensor receiving the register value" and (3) "wherein the programmable

2    thermal sensor generates a first interrupt signal if a microprocessor

3    temperature exceeds the threshold temperature." Paper 194, pp. 2–5.

4        Thomas argues these differences would have rendered the subject

5    matter of Pippin claim 1 nonobvious to those skilled in the art for the same

6    reasons presented in Thomas Motion 5.1 (Paper 193). *Id*. at 6–12. For the

7    reasons discussed above with respect to that motion, we conclude that

8    Thomas has failed to meet its burden of proof and provide credible evidence

9    to show that there is no interference-in-fact between Thomas claims and

10   Pippin's claim 1.

11                                    2.

12        Taking the subject matter of Pippin claim 1 as presumed prior art,

13   Thomas identifies the following differences: (1) a comparison circuit that

14   produces comparison data (by comparing a temperature indication of the

15   microprocessor with a temperature value) which is then provided via a

16   second electrical connection for managing the temperature of the

17   microprocessor; (2) the temperature value used "differs depending on an

18   operational mode"; (3) "wherein in one operational mode the fan is activated

19   when needed to maintain high processing power, and wherein in another

20   operational mode the fan is activated when necessary to maintain reasonable

21   processing power, which is lower than the high processing power"; and

22   (4) fan control circuitry configured to control the speed of the fan based at

23   least in part on a remote temperature indication pertaining to the temperature

24   of the processor integrated circuit. Paper 194, pp. 13-15.

25        Thomas argues that the claimed subject matter, as a whole, would

26   have been nonobvious notwithstanding those differences. *Id*. at 15–20.

35

Interferences 105,956 through 105,959
Decision on Motions

1    Thomas relies upon Dr. Renau to demonstrate that Thomas is not

2    aware of any other relevant art that would have suggested modifying the

3    subject matter of Pippin's claim 1 to arrive at the subject matter of the

4    Thomas claims as per SO ¶ 208.1.  In particular, Dr. Renau testifies:

5    (1) he has reviewed all of the references cited in the prosecution of
6    Pippin and Thomas file histories, and also conducted an
7    independent search for additional relevant prior art; and
8
9    (2) he knows of no prior art references or teachings that would
10   have suggested modifying the Pippin's claim 1 to provide for
11   different operational modes to manage temperature of the
12   microprocessor/computer system at different temperature values,
13   wherein a fan can be controlled differently depending on
14   operational modes such that fan speed control used to manage
15   temperature of a microprocessor/computer system is dependent on
16   operational mode.
17
18   Paper 194, p. 20 (citing Ex. 2020 ¶ 66).

19   However, Thomas does not convincingly address how the subject

20   matter of claims 1-28 of Thomas '599 would have been nonobvious over the

21   subject matter of Pippin claim 1, alone or in combination with other

22   applicable prior art[14] including, for example: Morikawa (Ex. 2033); Kenny

23   (Ex. 2035); Swamy (Ex. 1029); Dinh (Ex. 1027); Pippin '578 patent

24   (Ex. 1028); Canova (Ex. 1026); Dao (Ex. 1051);  Hwang (Ex. 1052);

25   Kannan (Ex. 1053); Smith (Ex. 2039); Moyal, U.S. Patent 5,442,832

26   (Ex. 2069); Yamaki, EP 0474963 (Ex. 2025); Arai, U.S. Patent 6,014,611

27   (Ex. 1063); and Atkinson, U.S. Patent 6,029,119 (Ex. 1064).  *Id.* at 7-19

28   (citing Ex. 2020 ¶¶ 18-62).

---

[14]  Prior art cited by Pippin in support of the Request for an Interference.
Paper 1003.

Interferences 105,956 through 105,959
Decision on Motions

1    Instead, Thomas lodges an attack of Pippin's interference request

2    (Ex. 1003) for failing to make a *prima facie* showing that Thomas' claims

3    1-28 would have been obvious in view of Pippin's claim 1 and, as such,

4    Pippin should bear the burden of showing why there is an interference-in-

5    fact. *Id.* at 3–4, 6, 15-17 (citing Ex. 1003 at 26-35).

6                                    3.

7    Thomas argues that the subject matter of claims 1–28 of Thomas '599

8    would have been nonobvious over the subject matter of Pippin claim 1

9    solely in view of the Examiner's reasons for allowance (Ex. 2072) of

10   Thomas' involved application.

11   First, the Examiner's reasons for allowance were based on

12   consideration of Pippin and other references of record. *Id.* at 17-18 (citing

13   Ex. 2072, pp. 6–7).

14   Second, the Examiner concluded that all claims of Thomas '599

15   patent were patentable over Pippin's parent patent (which is the same

16   disclosure as Pippin's involved application) in Reexamination Proceeding

17   No. 90/012,911:

18               Pippin and Moyal prior art alone or in combination does
19               not discloses "… at least one of the plurality of
20               temperature values to be utilized by the comparison
21               circuit differs depending on an operational mode,
22               wherein in one operational mode the fan is activated
23               when needed to maintain high processing power, and
24               wherein in another operational mode the fan is activated
25               when necessary to maintain reasonable processing power,
26               which is lower than the high processing power" as in
27               claim independent claim 1….
28
29   *Id.* at 18-19 (citing Ex. 2070, pp. 9-11; Ex. 2071).

37

Interferences 105,956 through 105,959
Decision on Motions

1    Thomas has not met its burden of showing that the subject matter of

2    all claims of Thomas '599 would not have been obvious in view of the

3    subject matter of Pippin claim 1.  The Examiner's reasons for allowance are

4    not dispositive of there being no interference-in-fact.

5    Third, the Examiner did not have the benefit of Pippin's additional

6    evidence and explanations of obviousness as presented in this interference.

7    Fourth, the Examiner was later convinced that an interference was

8    warranted, and the Board declared an interference based on the Examiner's

9    recommendation for an interference.

10    For these reasons, the Examiner's reasons for allowance do not satisfy

11    Thomas' burden of showing all claims of Thomas '599 patent would have

12    been nonobvious in view of Pippin's claim 1.

13    Likewise, we find Thomas' attacks on the deficiencies of Pippin's

14    interference request misplaced.  An interference is declared when the

15    Director, through an APJ on recommendation of a Primary Examiner, is of

16    the opinion that a pending application "would interfere" with another

17    pending application or an unexpired patent.  35 U.S.C. § 135(a); 37 C.F.R.

18    § 41.203(b).  When an interference is declared, an interference-in-fact is

19    presumed to exist—otherwise the interference would not have been

20    declared.  37 C.F.R. § 41.203(a) & (b)(1).

21    A party alleging that there is no interference-in-fact has the burden of

22    proof.  37 C.F.R. § 41.121(b); *see also Case v. CPC International, Inc.*, 730

23    F.2d 745, 750 (Fed. Cir. 1984); *Bilstad v. Wakalopulos*, 386 F.3d 1116,

24    1120-21 (Fed. Cir. 2004); *Kubota v. Shibuya*, 999 F.2d 517, 522 (Fed. Cir.

25    1993) ("[O]nce an interference has been declared and a party seeks to

38

Interferences 105,956 through 105,959
Decision on Motions

1  change the status of the parties by motion, the burden is then on the

2  movant").

3      Thomas—not Pippin—has the burden of showing that there is no

4  interference-in-fact.

5      For these reasons, we conclude that Thomas has failed to meet its

6  burden of proof to establish that there is no interference-in-fact between

7  the subject matter of the Thomas claims and the subject matter of Pippin

8  claim 1.  Moreover, while it was not Pippin's burden to prove obviousness,

9  we agree with Pippin that the art cited by Pippin supports a holding of

10  obviousness.

11      Accordingly, Thomas Motion 5.2 (Paper 194) is *denied*.

12              D.  Thomas Motions 5.3 and 5.4

13      Thomas Motions 5.3–5.4 (Papers 195–196) move for judgment that

14  there is no interference-in-fact between:

15          (1) the subject matter of all of Thomas claims 1-27 and the

16          subject matter of Pippin claim 1, and

17          (2) the subject matter of all of Thomas claims 1-24 of and the

18          subject matter of Pippin claim 1.

19      Thomas contends its claims (*i.e.*, independent claims 1, 13 and 18 of

20  Thomas '798 and independent claims 1, 6, 10, and 21 of Thomas '433)

21  differ in scope from Pippin claim 1, and addresses only one of the two

22  prongs of the two-way test, *i.e.*, Thomas' claimed subject matter, treated as

23  prior art, does not anticipate or render obvious the subject matter of Pippin

24  claim 1—essentially for the same reasons presented in connection with

25  Thomas Motion 5.1 (Paper 193).  Paper 195, pp. 1-19; Paper 196, pp. 1-19.

39

Interferences 105,956 through 105,959
Decision on Motions

1    Thomas identifies the differences between the subject matter of the

2    claims of Thomas '798 and Thomas '433 (as prior art) relative to the subject

3    matter of Pippin '274 claim 1 as including the same features discussed in

4    connection with Thomas Motion 5.1 (Paper 193).

5    Thomas argues that because of these differences the claimed subject

6    matter of Thomas would not have rendered obvious the subject matter of

7    Pippin claim 1.  Paper 193, at 7-19.

8    Thomas has failed to meet its burden of proof with convincing

9    evidence to show that there is no interference-in-fact between Thomas

10    claims and Pippin's claim 1 for the reasons stated in connection with

11    Thomas Motion 5.1.

12                    V.  Thomas Motion 6

13    Thomas Motion 6 (Paper 178) seeks to designate claims 10 and 20,

14    and 22-26 (claims 18, 19, and 21 having been cancelled) of Thomas '190 as

15    *not* corresponding to the Count.  Paper 178, p. 2.

16                A  claim  corresponds  to  a  count  if  the  subject
17            matter  of  the  count,  treated  as  prior  art  to  the  claim,
18            would  have  anticipated  or  rendered  obvious  the  subject
19            matter of the claim.
20
21    37 C.F.R. § 41.207(b)(2).

22    Thomas as the moving party bears the burden of proof to establish

23    entitlement to the relief requested. 37 C.F.R. § 41.121(b).

24    To prevail in its motion, Thomas must demonstrate by a

25    preponderance of the evidence that each of the subject matter of the claims it

26    seeks to designate as not corresponding to the Count would not have been

40

Interferences 105,956 through 105,959
Decision on Motions

1    obvious when considered in view of the subject matter of the Count

2    (Pippin's claim 1) and any other applicable art.

3        Thomas argues that Pippin, as opposed to Thomas, should bear the

4    burden of proof, relying *Kubota v. Shibuya*.  Paper 178, p. 2.  However, as

5    correctly recognized by Pippin, Thomas' reliance on *Kubota* is misplaced.

6    Paper 230, pp. 19-20.  Thomas' argument is directly at odds with the

7    applicable rule.  37 C.F.R. § 41.121(b).

8        In addition according to Thomas, placing the burden of proof on

9    Pippin is said to be "consistent with . . . [35 U.S.C. § 282], as discussed in

10    *Microsoft v. i4iLtd. P'ship*, 131 S.Ct. 2238 (2011)."  Paper 178, p. 2:20.

11        The § 282 presumption of validity does not apply to patents involved

12    interference proceedings.  *Bruning v. Hirose*, 161 F.3d 681, 685-686 (Fed.

13    Cir. 1998) (presumption of validity is inapplicable in an interference

14    involving a patent issued from an application that was co-pending with the

15    interfering application).  *See also Apotex USA, Inc. v. Merck & Co.*, 254

16    F.3d 1031, 1037 n.1 (Fed. Cir. 2001); *Stamps.com, Inc. v. Endicia, Inc.*,

17    437 Fed. Appx. 897, 907 n.2 (Fed. Cir. 2011).

18        With respect to the merits, Thomas identifies several features in its

19    claims[15] that are said to distinguish the subject matter of those claims from

20    the subject matter of the Count in combination with other applicable prior

21    art.

_____

[15]  In Thomas Motion 6 (Paper 178), Thomas did not separately argue claims
19-26 apart from claim 10.  Claims 19-26 stand or fall with Thomas claim
10.  *Cf.  In re Van Geuns*, 988 F.2d 1181, 1186 (Fed. Cir. 1993) (if a party
chooses not to argue the claims separately, the claims stand or fall together).

41

Interferences 105,956 through 105,959
Decision on Motions

1    For example, Thomas claim 10 recites a method for managing

2 operation of a computer including at least a processor and a fan for cooling

3 at least the processor, comprising:

4        configuring the computer to utilize *a first power*
5        *management policy* [including at least a first condition
6        based on a temperature of the processor] *when the*
7        *computer is powered by a battery*;
8
9        configuring the computer to utilize *a second power*
10       *management policy* [including at least a second condition
11       based on a temperature of the processor] *when the*
12       *computer is not powered by a battery*;
13
14       setting an *operational speed of the fan* based on
15       the appropriate one of the first and second power
16       management policies;
17
18       monitoring a temperature of the processor; and
19
20       setting an *operational speed of the processor* based
21       on the appropriate one of the first and second power
22       management policies and based on the temperature of the
23       processor.
24
25 Ex 2001, pp. 1, 3-4 (italics and matter in brackets added).

26       Thomas claim 10 covers configuring a computer to use one (first or

27 second) power management policy based on a temperature of a processor

28 depending on whether the computer is powered by a battery (*i.e.*, when the

29 computer operates in a portable mode as "a portable computer") or not

30 powered by a battery (*i.e.*, when the computer operates in a desktop mode as

31 "a desktop computer").  Ex. 1001, pp. 11-13, 17-20, 23; Ex. 1013, col.

32 8:24-40; Ex. 1061 ¶¶ 94-96.

42

Interferences 105,956 through 105,959
Decision on Motions

1    In contrast, the Count defines a computer system in which a

2    microprocessor includes a register that (1) stores a threshold temperature,

3    (2) a programmable sensor that receives the stored threshold value and

4    generates an interrupt signal if a microprocessor temperature exceeds the

5    threshold temperature, and (3) clock circuitry that provides the

6    microprocessor's clock signal, wherein an active cooling device (fan) is

7    activated and a frequency of the clock signal is reduced in response to the

8    interrupt signal.

9    According to Thomas, the features in claim 10 that distinguish over

10   the Count include operating a computer system having two power

11   management policies[16] and configuring the computer system to utilize one or

12   the other policy, depending upon both: (1) temperature of a microprocessor,

13   and (2) whether or not the computer system is configured to run on battery

14   power (i.e., when the computer system operates in either a portable mode

---

[16] Pippin Opposition 6 (Paper 230) argues that Thomas claim 10 defines a
single computer but, when read in light of Thomas' own Specification, that
single computer is configured to use *only* a first power management policy
when that computer is a portable computer ("is powered by a battery") and is
configured to use *only* a second power management policy when that
computer is a desktop computer ("is not powered by a battery" and *not* both.
As such, Pippin contends: (1) Thomas claim 10 should be interpreted to
cover a computer configured with only one power management policy, and
(2) there is no written description support in Thomas' Specification for a
single computer having two power management policies, as advanced by
Thomas.  Paper 230, pp. 5-11, 14-18.  For purposes of this decision, we need
not address Pippin's contentions and will consider the plain reading of
Thomas claim 10 as reciting a single computer as having two power
management policies, including: "a first power management policy when the
computer is powered by a battery" and "a second power management policy
when the computer is not powered by a battery."

43

Interferences 105,956 through 105,959
Decision on Motions

1    as "a portable computer" or a desktop mode as "a desktop computer").

2    Paper 178, p. 5:6-21; p. 9:3-5.

3        Thomas, however, does not substantively address how these features

4    render the subject matter of Thomas claim 10 nonobvious over the subject

5    matter of the Count, alone or in combination of any other applicable prior

6    art.

7        Instead, Thomas relies primarily on (1) the Examiner's reasons for

8    allowance of Thomas '190 and (2) alleged deficiencies of Pippin's request

9    for interference.  *Id*. at 8-17.

10        Thomas' arguments are not convincing.

11        As previously discussed, the Examiner's reasons for allowance are not

12    controlling because: (1) the Examiner did not have the benefit of Pippin's

13    additional evidence and explanations of obviousness, and (2) the Examiner

14    was later convinced that an interference was warranted, and an interference

15    was declared based on the Examiner's recommendation.

16        The Examiner's reasons for allowance do not satisfy Thomas' burden

17    of showing that the subject matter of Thomas claim 10 would not have been

18    obvious in view of the subject matter of the Count.

19        Likewise, we find Thomas' alleged deficiencies of Pippin's

20    interference request misplaced.  Once an interference is declared, the party

21    can seek relief through a motion to have a claim designated as not

22    corresponding to the Count.

23        We are also not persuaded that features recited in claim 10 of Thomas

24    '190 would have been nonobvious over the subject matter of the Count.

25    Rather, we find Thomas's alleged distinguishing features do not serve to

26    establish non-obviousness in view of the Count and applicable art.

44

1    For example, Thomas admits in its Background Section of the

2  Invention ("Thomas's Admitted Prior Art") that it was known to control

3  temperature of a microprocessor by using a fan or reducing or reducing the

4  clock frequency:

5           Another problem is that with portable computers,
6           manufacturers have to either use a lower clock frequency
7           (lower than would be used in a comparable desk top
8           computer) for processing or provide a fan for cooling. A
9           lower clock frequency is not satisfactory as users want
10          maximum processing power just as they get with a desk
11          top computer.  Requiring a portable computer to use a fan
12          for cooling is also unsatisfactory because it consumes
13          battery energy.
14
15  Ex. 1013, col. 2:35-42.

16    Similarly, Yamaki, EP Publication 0474963 (Ex. 1025), describes a

17  computer having a sleep mode function that can be enabled when the

18  computer is powered by a battery and disabled when the computer is

19  powered by an external power supply such as an AC adapter (*i.e.*, is not

20  powered by a battery).  Ex 1025, col. 1:15-col. 2:24; col. 2:43-48;

21  col. 6:52-col. 7:6; Fig. 6A, steps S5, S9, and S17.  When enabled, the sleep

22  mode function decreases a processing speed of a CPU to prolong battery life

23  by reducing power consumption.  Ex 1025, col. 1:1-24; col. 1:57-col. 2:1.

24  When the sleep mode function is disabled, the high-speed operation of the

25  CPU can be maintained.  Ex. 1025, col. 2:19-24, 43-48; col. 7:55-col. 8:4.

26    Likewise, Canova (Ex. 1026) describes running a processor of a

27  computer at 20 MHz for high speed and at 5 MHz for low speed under a

28  "long battery life" option when the computer is powered by a battery.

29  Ex 1026, col. 5:52-60; col. 7:47-49.  Canova also describes running the

Interferences 105,956 through 105,959
Decision on Motions

1    processor at 20 MHz rate when the computer is powered by an AC power

2    source.  Ex 1026, col. 2:46-48; col. 5:50-52.

3         Arai U.S. Patent No. 6,014,611 (Ex. 1063) describes "a computer

4    wherein an optimal cooling function can be selected according to the

5    environment of use of a computer and overheat of a CPU is efficiently

6    prevented without degrading the environment of use of the computer."

7    Ex. 1063, col. 1:36-40.  According to Arai, the computer uses (1) a

8    performance mode when the main power supply is an external AC power

9    supply and (2) a quiet mode when the main power supply is a battery.

10   Ex. 1063, Fig. 12; col. 8:1-10; col. 12:31-56.  A power supply (PS)

11   microcomputer 16 is used to monitor the temperature of CPU 11, via a

12   temperature sensor 21 on an LSI package of a CPU 11.  Ex. 1063, Fig. 1;

13   col. 6:9-13, 48-50.  In the performance mode, the fan is activated at first,

14   when the CPU temperature reaches a threshold temperature Ta2, and the

15   CPU performance is then reduced when the CPU temperature reaches a

16   higher threshold temperature Tb2.  Ex. 1063, Fig. 12; col. 12:5-18.  In the

17   quiet mode, the CPU performance is reduced at first, when the CPU

18   temperature reaches a threshold temperature Tb2, and the fan is activated

19   when the CPU temperature reaches a threshold temperature Ta2.  Ex. 1063,

20   col. 12:19-23.  The threshold temperature values Ta2 and Tb2 can be freely

21   set.  Ex. 1063, col. 12:24-26; col. 13:16-22.

22        Similarly, Atkinson U.S. Patent No. 6,029,119 (Ex. 1064) teaches that

23   it is advantageous:

24              to use multiple cooling options and to adjust the order of
25              implementing the cooling options depending upon the
26              operating condition of the computer.  For example, since
27              the fan itself requires a significant amount of power, it

46

Interferences 105,956 through 105,959
Decision on Motions

1    can be advantageous to slow down the CPU before
2    activating the fan while on battery power, but request full
3    CPU power with the fan activated while under AC
4    power.
5
6    Ex. 1064, col. 2:17-25.

7    According to Atkinson, indirect inputs 20 include whether the

8    computer is under AC power or battery power.  Ex. 1064, col. 3:25-31.

9    Cooling options include activating a fan, setting the fan speed, and

10    setting the frequency of CPU 12.  Ex. 1064, col. 4:14-18.  Fan speed is

11    controlled using pulse width modulation.  Ex. 1064, col. 2:64-col. 3:1;

12    col. 3:22-24.  CPU frequency is set using a variable speed input clock 14.

13    Ex. 1064, col. 2:50-54.  It can be advantageous to slow down the CPU

14    before activating the fan while on battery power, but request full CPU power

15    with the fan activated while under AC power.  Ex. 1064, col. 2:21-25.

16    Based on these teachings, we conclude that it would have been

17    obvious to a person having ordinary skill to configure a computer system to

18    utilize: (1) a first power management policy including at least a first

19    condition based on processor temperature, when the computer system is

20    powered by a battery, *i.e.*, when in a portable computer as disclosed by

21    Thomas' admitted prior art  (Ex. 1013, col. 1:25-col. 2:23), Yamaki at

22    col. 1:57-col. 2:1; col. 6:52-col. 7:6 (Ex. 1025), Canova at col. 5:52-60;

23    col. 7:47-49 (Ex. 1026), Arai at col. 12:31-56 (Ex. 1063), and Atkinson

24    at col. 2:21-25 (Ex. 1064), and (2) a second power management policy

25    including at least a second condition based on processor temperature, when

26    the computer system is not powered by a battery, *i.e.*, when in a desktop

27    computer as disclosed by Thomas' admitted prior art (Ex. 1013), Yamaki

47

Interferences 105,956 through 105,959
Decision on Motions

1  at col. 2:19-24, 43-48 (Ex. 1025), Canova at col. 5:50-52 (Ex. 1026), Arai

2  at col. 12:31-56 (Ex. 1063), and Atkinson at col. 2:21-25 (Ex. 1064).

3       We find that the subject matter of Thomas claim 10, when considered

4  in light of the subject matter of the Count and the other cited art, is nothing

5  more than "[t]he combination of familiar elements according to known

6  methods" that do "no more than yield predictable results." *KSR*, 550 U.S. at

7  415–16.  In particular:

8          When a work is available in one field of endeavor,
9       design incentives and other market forces can prompt
10      variations of it, either in the same field or a different one.
11      If a person of ordinary skill can implement a predictable
12      variation, § 103 likely bars its patentability.  For the same
13      reason, if a technique has been used to improve one
14      device, and a person of ordinary skill in the art would
15      recognize that it would improve similar devices in the
16      same way, using the technique is obvious unless its
17      actual application is beyond his or her skill.

18  *Id.* at 417.

19       Thomas has not presented convincing evidence that an artisan would

20  not have found these features obvious, in light of the Count, and other

21  applicable art discussed *supra*, to manage operation of a computer system

22  to utilize a first or second management policy depending upon both:

23  (1) temperature of a microprocessor, and (2) whether or not the computer

24  system is configured to run on battery power (*i.e.*, when the computer

25  system operates in either a portable mode as "a portable computer" or a

26  desktop mode as "a desktop computer").  A person of ordinary skill in the art

27  would have appreciated that these features would conserve battery life,

28  reduce heat generation, and maximize performance speed of a computer

48

1  system, as taught, for example, by Morikawa (Ex. 2033); Kenny (Ex. 2035);

2  Swamy (Ex. 1029); Dinh (Ex. 1027); Pippin '578 patent (Ex. 1028); Canova

3  (Ex. 1026); Dao (Ex. 1051);  Hwang (Ex. 1052); Kannan (Ex. 1053);

4  Yamaki (Ex. 1025), Arai (Ex. 1063) or Atkinson (Ex. 1064).

5       Likewise, Thomas has not presented convincing evidence or argument

6  that the alleged distinguishing features of Thomas claim 10 would have been

7  "uniquely challenging or difficult for one of ordinary skill in the art" or

8  otherwise beyond the level of an ordinarily skilled artisan and "represented

9  an unobvious step over the prior art." *See Leapfrog Enters., Inc. v. Fisher-*

10  *Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (citing *KSR*, 550 U.S. at

11  418-19).

12       For these reasons, we conclude that Thomas has failed to meet its

13  burden of proof.  Accordingly, Thomas Motion 6 (Paper 178) is *denied*.

14                          VI. Thomas Motion 7

15       Thomas Motion 7 (Paper 179) seeks to designate claims 26-27 of

16  Thomas '798 application as not corresponding to the Count.  Paper 179, p. 2.

17       Thomas as the moving party bears the burden to prove that the subject

18  matter of the Count, treated as prior art, would not have anticipated or

19  rendered obvious the subject matter of Thomas claims 26-27.

20       To support this motion, Thomas relies on *Kubota* and argues Pippin

21  should bear the burden of proof.  Paper 178, p. 2.  However, as previously

22  discussed, Thomas's reliance on *Kubota* is misplaced.  Paper 230, pp. 19-20.

23  Likewise, Thomas's argument is contrary to the rules.

24       The burden of proof is always on Thomas, as the movant.  37 C.F.R.

25  § 41.121(b).

49

Interferences 105,956 through 105,959
Decision on Motions

1    Thomas' motion identifies features in claims 26–27[17] of Thomas '798

2    that allegedly distinguish the claims from the Count and other applicable art.

3    For example, Thomas claim 26, as incorporated into independent

4    claim 25, recites a computing apparatus comprising:

5    a processing unit configured to operate at an
6    operational speed;
7
8    a temperature sensor configured to monitor a
9    temperature of said processing unit;
10
11    a fan for cooling at least said processing unit; and
12
13    a power management apparatus operatively
14    connected to said processing unit, said temperature
15    sensor and said fan, said power management apparatus
16    being configured to operate in accordance with *at least*
17    *one of a first power management configuration or a*
18    *second power management configuration,* and said power
19    management apparatus being operable to
20    (i) receive the temperature of the processing unit using
21    said temperature sensor,
22
23    (ii) *control a speed of the fan* based on the configured
24    one of the first and second power management
25    configurations and based on the temperature of the
26    processing unit, and
27
28    (iii) *control a speed of the processing unit* based on the
29    configured one of the first and second power
30    management configurations and based on the temperature
31    of the processing unit,
32

---

[17]  In Motion 7 (Paper 179), Thomas did not separately argue claim 27 apart
from claim 26.  Claim 27 stands or falls with claim 26.  *In re van Geuns*,
*supra.*

50

1    wherein each of the first and second power
2    management configurations is associated with at least
3    one condition concerning a speed of the processing unit
4    and at least one condition concerning a speed of the fan,
5
6    wherein the at least one condition concerning the
7    speed of the processing unit is dependent on a
8    temperature of the processing unit, and
9
10   wherein the at least one condition concerning the
11   speed of the fan is dependent on a temperature of the
12   processing unit.
13
14   Ex 2003, pp. 7-8 (some indentation and italics added).

15   According to Thomas, the features of Thomas claim 26 that

16   distinguish over the Count include a power management apparatus

17   configured to have two power management configurations[18] and to operate

18   in accordance with at least one of the first and second power management

19   configurations, as well as to control:  (1) a speed of a fan, and (2) a speed of

20   a processing unit based on the configured power management configuration

21   and a temperature of the processing unit.  Paper 179, p. 3.

_____

[18]  In Pippin Opposition 7 (Paper 231) Pippin argues that Thomas claim 26 defines a single computer but, when read in light of Thomas's own Specification, that single computer is configured to use *only* one power management configuration because the term "at least one" refers to either a first or a second power management configuration.  As such, Pippin contends: (1) Thomas claim 26 should be interpreted to cover a computer configured with only one power management policy, and (2) there is no written description support from Thomas's own Specification for a single computer having two power management policies, as advanced by Thomas.  Paper 231, pp. 2-4, 8-11.  For purposes of this decision, we need not address Pippin's contentions and will consider the plain reading of Thomas claim 26 as reciting a single computer as having two power management configurations.

51

1    Thomas, however, does not convincingly address how these features

2    of Thomas claim 26 render nonobvious the subject matter of the Count,

3    alone or in combination of any other applicable prior art.  Instead, Thomas

4    relies primarily on the Examiner's reasons for allowance of Thomas '190

5    patent and attacks on alleged deficiencies of Pippin's request for

6    interference.  *Id*. at 8-17.

7    As previously discussed, the Examiner's reasons for allowance are not

8    controlling.

9    Likewise, for reasons already given in connection with Thomas

10    Motion 6, we find Thomas' attacks on the deficiencies of Pippin's

11    interference request misplaced.

12    We are not persuaded that distinguishing features recited in claim 26

13    of Thomas '798 render the subject matter of that claim nonobvious over the

14    subject matter of the Count.  Rather, we find the subject matter of Thomas

15    claim 26 would have been obvious notwithstanding the distinguishing

16    features.

17    For example, based on all the teachings discussed, we conclude that it

18    would have been obvious to an artisan of ordinary skill at the time to

19    configure a computer system to operate in accordance with: (1) a first power

20    management configuration [associated with at least one condition

21    concerning a speed of the processing unit and a speed of the fan and

22    dependent on processing unit temperature] when the computer system is

23    powered by a battery in order to prolong battery life, *i.e.*, when in a portable

24    computer as disclosed by Thomas's admitted prior art (Ex. 1013), Yamaki at

25    col. 1:57-col. 2:1; col. 6:52-col. 7:6 (Ex. 1025), Canova at col. 5:52-60;

26    col. 7:47-49 (Ex. 1026), Arai at col. 12:31-56 (Ex. 1063), and Atkinson at

52

Interferences 105,956 through 105,959
Decision on Motions

1    col. 2:1–25 (Ex. 1064), and (2) a second power management configuration

2    [associated with at least one condition concerning a speed of the processing

3    unit and a speed of the fan and dependent on processing unit temperature]

4    when the computer system is not powered by a battery in order to reduce

5    temperature while maintaining high speed operation, *i.e.*, when in a desktop

6    computer as disclosed by Thomas's admitted prior art (Ex. 1013), Yamaki

7    at col. 2:19-24, 43-48 (Ex. 1025), Canova at col. 5:50-52 (Ex. 1026), Arai

8    at col. 12:31-56 (Ex. 1063), and Atkinson at col. 2:21-25 (Ex. 1064).

9    Moreover, Thomas has not presented convincing evidence that an

10    artisan would not have found these features obvious, in light of the Count,

11    and other applicable art to manage operation of a computer system to

12    operate in accordance with either a first or second management

13    configuration and to control: (1) a speed of a fan, and (2) a speed of a

14    processing unit based on the configured power management configuration

15    and a temperature of the processing unit.  A person of ordinary skill in the

16    art would have appreciated that these features would conserve battery life,

17    reduce heat generation, and improve performance speed of a computer

18    system, as disclosed, for example, by Morikawa (Ex. 2033); Kenny

19    (Ex. 2035); Swamy (Ex. 1029); Dinh (Ex. 1027); Pippin '578 patent

20    (Ex. 1028); Canova (Ex. 1026); Dao (Ex. 1051);  Hwang (Ex. 1052);

21    Kannan (Ex. 1053); Yamaki (Ex. 1025), Arai (Ex. 1063) or Atkinson

22    (Ex. 1064).

23    Likewise, Thomas has not presented a convincing case that the

24    alleged distinguishing features of Thomas claims 26-27 would have been

25    "uniquely challenging or difficult for one of ordinary skill in the art" or

26    otherwise beyond the level of an ordinarily skilled artisan and "represented

53

Interferences 105,956 through 105,959
Decision on Motions

1    an unobvious step over the prior art." *See Leapfrog Enters., Inc. v. Fisher-*

2    *Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (citing *KSR*, 550 U.S. at

3    418-19).

4        For these reasons, we conclude that Thomas has failed to meet its

5    burden of proof.

6        Accordingly, Thomas Motion 7 (Paper 179) is *denied*.

7                            VI. ORDER

8        For the reasons discussed above, it is:

9        ORDERED that Thomas Motion 1 (Paper 177); Thomas Motion 5.1

10   (Paper 193); Thomas Motion 5.2 (Paper 194); Thomas Motion 5.3

11   (Paper 195); Thomas Motion 5.4 (Paper 196); Thomas Motion 6

12   (Paper 178); Thomas Motion 7 are *denied*.

13       FURTHER ORDERED that since Thomas does not allege a date of

14   invention prior to Pippin, that judgment on the issue of priority will be

15   awarded against Thomas.

16       FURTHER ORDERED that Judgment is entered as a separate paper

17   (Paper 297).

18

54

Interferences 105,956 through 105,959
Decision on Motions

1    cc (electronic delivery):

2    Attorney for Junior Party – Thomas:

3    Richard Neifeld
4    Robert Hahl
5    Neifeld IP Law, PC
6    neifeld@neifeld.com
7    rhahl@neifeld.com
8
9    C. Douglas Thomas
10   IpVenture, Inc.
11   doug@ipventure.com
12
13   Attorney for Senior Party – Pippin:

14   R. Danny Huntington
15   William N. Hughet
16   Rothwell, Figg, Ernst & Manbeck, PC
17   dhuntington@rfem.com
18   whughet@rfem.com

55

BoxInterferences@uspto.gov                                Paper 297
Telephone:  571-272-4683                      Entered: January 26, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD

_____

Patent Interference 105,956 McK
Patent Interference 105,957 McK
Patent Interference 105,958 McK
Patent Interference 105,959 McK
Technology Center 2100

_____

C. DOUGLASS **THOMAS** and ALAN E. THOMAS

Patent 7,506,190 C1
Patent 7,937,599
Application 12/321,798
Application 13/727,433
Junior Party

v.

JACK D. **PIPPIN**

Application 13/786,274
Senior Party

_____

*Before* FRED E. McKELVEY, RICHARD E. SCHAFER, and
HUNG H. BUI, *Administrative Patent Judges.*

PER CURIAM.

JUDGMENT
*37 C.F.R. §41.127(a)*

Interferences 105,956 through 105,959
Judgment

1      In view of the Decision on Motions (Paper 295), it is

2      ORDERED that judgment on priority as to all Counts be entered

3 against junior party C. Douglass Thomas and Alan E. Thomas, and real

4 party in interest Ip Venture, Inc.;

5      FURTHER ORDERED that with respect to Interference 105,956,

6 claims 1-17, 20, and 22-26 of Thomas involved U.S. Patent 7,506,190 are

7 CANCELLED, 35 U.S.C. 135(a);[1]

8      FURTHER ORDERED that with respect to Interference 105,957,

9 claims 1-28 of Thomas involved U.S. Patent 7,937,599 are CANCELED,

10 35 U.S.C. 135(a);

11      FURTHER ORDERED that with respect to Interference 105,958,

12 claims 1-27 of Thomas involved application 12/321,798 are FINALLY

13 REFUSED; and

14      FURTHER ORDERED that with respect to Interference 105,959,

15 claim 1-24 of Thomas involved application 13/727,433 are FINALLY

16 REFUSED;

17      FURTHER ORDERED that a copy of the Decision on Motions

18 (Paper 295) and this Judgment be entered in the administrative records of

19      (1) involved Thomas U.S. Patent 7,506,190,

20      (2) involved Thomas U.S. Patent 7,937,599,

21      (3) involved Thomas application 12/321,798,

22      (4) involved Thomas application 13/727,433,

23      (5) involved Pippin application 13/786,274,

---

[1]  Claims 18, 19, and 21 were cancelled as a result of a reexamination involving Thomas '190.

2

Interferences 105,956 through 105,959
Judgment

1          (6)  Interference 105,956,

2          (7)  Interference 105, 957,

3          (8)  Interference 105,958, and

4          (9)  Interference 105,959;

5      FURTHER ORDERED that a party seeking judicial review timely

6  serve notice on the Director of the United States Patent and Trademark

7  Office (37 C.F.R. §§ 90.1 and 104.2); and

8      FURTHER ORDERED that attention is directed to *Biogen Idec MA,*

9  *Inc., v. Japanese Foundation for Cancer Research*, 2014 WL 2167677 (D.

10  Mass. 2014).


11  NOTICE: "Any agreement or understanding between parties to an
12  interference, including any collateral agreements referred to therein, made in
13  connection with or in contemplation of the termination of the interference,
14  shall be in writing and a true copy thereof filed in the Patent and Trademark
15  Office before the termination of the interference as between the said parties
16  to the agreement or understanding." 35 U.S.C. 135(c); see also Bd.R. 205
17  (settlement agreements).

3

Interferences 105,956 through 105,959
Judgment

cc (electronic delivery):

Attorney for Junior Party – Thomas:

Richard Neifeld
Robert Hahl
Neifeld IP Law, PC
neifeld@neifeld.com
rhahl@neifeld.com

C. Douglas Thomas
IpVenture, Inc.
doug@ipventure.com

Attorney for Senior Party – Pippin:

R. Danny Huntington
William N. Hughet
Rothwell, Figg, Ernst & Manbeck, PC
dhuntington@rfem.com
whughet@rfem.com

4



US007506190B2

(12) **United States Patent**
Thomas et al.

(10) **Patent No.:**    **US 7,506,190 B2**
(45) **Date of Patent:**    **Mar. 17, 2009**

(54) **THERMAL AND POWER MANAGEMENT FOR COMPUTER SYSTEMS**

(76) Inventors: **C. Douglass Thomas**, 1193 Capri Dr., Campbell, CA (US) 95008; **Alan E. Thomas**, 424 Atlantic Ave., Ocean City, NJ (US) 08226

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/821,142**

(22) Filed: **Jun. 22, 2007**

(65) **Prior Publication Data**

US 2007/0250729 A1    Oct. 25, 2007

**Related U.S. Application Data**

(60) Division of application No. 11/654,337, filed on Jan. 17, 2007, now Pat. No. 7,293,186, which is a continuation of application No. 10/277,630, filed on Oct. 22, 2002, now Pat. No. 7,167,993, which is a continuation of application No. 09/782,680, filed on Feb. 12, 2001, now Pat. No. 6,487,668, which is a continuation of application No. 09/351,051, filed on Jul. 10, 1999, now Pat. No. 6,216,235, which is a continuation of application No. 08/914,299, filed on Aug. 18, 1997, now Pat. No. 5,974,557, which is a continuation of application No. 08/262,754, filed on Jun. 20, 1994, now Pat. No. 5,752,011.

(51) Int. Cl.
*G06F 1/32* (2006.01)
*G06F 1/08* (2006.01)

(52) U.S. Cl. ...................... **713/322**; 713/300; 713/320; 713/340; 713/501

(58) Field of Classification Search ................. 713/300, 713/320, 322, 323, 340, 600, 601, 501
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,453,601 | A | 7/1969 | Bogert et al. |
| 3,941,989 | A | 3/1976 | McLaughlin et al. |
| 4,279,020 | A | 7/1981 | Christian et al. |
| 4,293,927 | A | 10/1981 | Hoshii |
| 4,381,552 | A | 4/1983 | Nocilini et al. |
| 4,409,665 | A | 10/1983 | Tubbs |
| 4,448,543 | A | 5/1984 | Vail |
| 4,670,837 | A | 6/1987 | Sheets |
| 4,672,228 | A | 6/1987 | Swoboda |
| 4,686,386 | A | 8/1987 | Tadao |
| 4,689,659 | A | 8/1987 | Watanabe |

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0 157 507    10/1985

(Continued)

OTHER PUBLICATIONS

"65 Line Notebook Computer Service Manual," First Edition, pp. I-VIII, Chapters 1-5 and Appendices A-D, Aug. 1993.

(Continued)

*Primary Examiner*—Mark Connolly

(57)    **ABSTRACT**

Improved approaches to providing thermal and power management for a computing device are disclosed. These approaches facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device.

**26 Claims, 8 Drawing Sheets**



**PIPPIN EXHIBIT 1013**
**THOMAS v. PIPPIN**
**Interference Nos.  105,956, 105,957,**
**105,958 & 105,959**

# US 7,506,190 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,698,748 | A | 10/1987 | Juzswik et al. |
| 4,722,669 | A | 2/1988 | Kundert |
| 4,734,871 | A | 3/1988 | Tsuneda et al. |
| 4,756,473 | A | 7/1988 | Takemae et al. |
| 4,812,733 | A | 3/1989 | Tobey |
| 4,851,987 | A | 7/1989 | Day |
| 4,893,271 | A | 1/1990 | Davis et al. |
| 4,924,112 | A | 5/1990 | Anderson et al. |
| 4,970,497 | A | 11/1990 | Broadwater et al. |
| 4,980,836 | A | 12/1990 | Carter et al. |
| 5,021,679 | A | 6/1991 | Fairbanks et al. |
| 5,025,387 | A | 6/1991 | Frane |
| 5,036,493 | A | 7/1991 | Nielsen |
| 5,058,389 | A | 10/1991 | Yasuda et al. |
| 5,070,267 | A | 12/1991 | Sano et al. |
| 5,099,181 | A * | 3/1992 | Canon .................. 318/400.08 |
| 5,115,225 | A | 5/1992 | Dao et al. |
| 5,121,291 | A | 6/1992 | Cope et al. |
| 5,125,088 | A | 6/1992 | Culley |
| 5,132,632 | A | 7/1992 | Russell et al. |
| 5,134,703 | A | 7/1992 | Bumbarger |
| 5,142,684 | A | 8/1992 | Perry et al. |
| 5,167,024 | A | 11/1992 | Smith et al. |
| 5,189,314 | A | 2/1993 | Georgiou et al. |
| 5,201,059 | A | 4/1993 | Nguyen |
| 5,218,704 | A | 6/1993 | Watts, Jr. et al. |
| 5,222,239 | A | 6/1993 | Rosch |
| 5,230,055 | A | 7/1993 | Katz et al. |
| 5,230,074 | A | 7/1993 | Canova, Jr. et al. |
| 5,239,652 | A | 8/1993 | Seibert et al. |
| 5,241,680 | A | 8/1993 | Cole et al. |
| 5,249,741 | A | 10/1993 | Bistline et al. |
| 5,254,928 | A | 10/1993 | Young et al. |
| 5,287,244 | A | 2/1994 | Hileman et al. |
| 5,287,292 | A | 2/1994 | Kenny et al. |
| 5,291,607 | A | 3/1994 | Ristic et al. |
| 5,349,688 | A | 9/1994 | Nguyen |
| 5,349,823 | A | 9/1994 | Solomon |
| 5,355,501 | A | 10/1994 | Gross et al. |
| 5,359,234 | A | 10/1994 | Atriss et al. |
| 5,367,638 | A * | 11/1994 | Niessen et al. ................ 710/57 |
| 5,369,771 | A | 11/1994 | Gettel |
| 5,375,230 | A | 12/1994 | Fujimori et al. |
| 5,381,043 | A | 1/1995 | Kohiyama et al. |
| 5,388,265 | A | 2/1995 | Volk |
| 5,392,437 | A | 2/1995 | Matter et al. |
| 5,396,635 | A | 3/1995 | Fung |
| 5,414,860 | A | 5/1995 | Canova, Jr. et al. |
| 5,416,726 | A | 5/1995 | Garcia-Duarte et al. |
| 5,418,751 | A | 5/1995 | Kaiser |
| 5,422,806 | A | 6/1995 | Chen et al. |
| 5,422,832 | A | 6/1995 | Moyal |
| 5,426,755 | A | 6/1995 | Yokouchi et al. |
| 5,428,790 | A | 6/1995 | Harper et al. |
| 5,430,881 | A | 7/1995 | Ikeda |
| 5,457,766 | A | 10/1995 | Ko |
| 5,469,320 | A | 11/1995 | Walker et al. |
| 5,469,561 | A | 11/1995 | Takeda |
| 5,473,767 | A | 12/1995 | Kardach et al. |
| 5,475,847 | A | 12/1995 | Ikeda |
| 5,483,461 | A | 1/1996 | Neal et al. |
| 5,483,656 | A | 1/1996 | Oprescu et al. |
| 5,485,127 | A | 1/1996 | Bertoluzzi et al. |
| 5,498,971 | A | 3/1996 | Turnbull et al. |
| 5,500,509 | A | 3/1996 | Vogt |
| 5,502,838 | A | 3/1996 | Kikinis |
| 5,504,907 | A | 4/1996 | Stewart et al. |
| 5,504,908 | A | 4/1996 | Ikeda |
| 5,504,924 | A | 4/1996 | Ohashi et al. |
| 5,511,203 | A | 4/1996 | Wisor et al. |
| 5,526,289 | A | 6/1996 | Dinh et al. |

| | | | |
|---|---|---|---|
| 5,535,401 | A | 7/1996 | Rawson, III et al. |
| 5,539,681 | A | 7/1996 | Alexander et al. |
| 5,546,568 | A | 8/1996 | Bland et al. |
| 5,546,591 | A | 8/1996 | Wurzburg et al. |
| 5,557,550 | A | 9/1996 | Vigil et al. |
| 5,557,551 | A | 9/1996 | Craft |
| 5,560,001 | A | 9/1996 | Kardach et al. |
| 5,560,002 | A | 9/1996 | Kardach et al. |
| 5,560,020 | A | 9/1996 | Nakatani et al. |
| 5,561,792 | A | 10/1996 | Ganapathy |
| 5,574,667 | A | 11/1996 | Dinh et al. |
| 5,579,524 | A | 11/1996 | Kikinis |
| 5,586,332 | A | 12/1996 | Jain et al. |
| 5,590,061 | A | 12/1996 | Hollowell, II et al. |
| 5,622,789 | A | 4/1997 | Young |
| 5,623,594 | A | 4/1997 | Swamy |
| 5,625,826 | A | 4/1997 | Atkinson |
| 5,630,148 | A | 5/1997 | Norris |
| 5,632,037 | A | 5/1997 | Maher et al. |
| 5,664,118 | A | 9/1997 | Nishigaki et al. |
| 5,664,201 | A | 9/1997 | Ikeda |
| 5,664,205 | A | 9/1997 | O'Brien et al. |
| 5,687,079 | A | 11/1997 | Bauer et al. |
| 5,706,407 | A | 1/1998 | Nakamura et al. |
| 5,719,800 | A | 2/1998 | Mittal et al. |
| 5,721,837 | A | 2/1998 | Kikinis et al. |
| 5,721,937 | A | 2/1998 | Kurihara et al. |
| 5,745,375 | A | 4/1998 | Reinhardt et al. |
| 5,809,336 | A | 9/1998 | Moore et al. |
| 5,812,832 | A | 9/1998 | Horne et al. |
| 5,838,578 | A | 11/1998 | Pippin |
| 5,848,282 | A | 12/1998 | Kang |
| 5,920,264 | A | 7/1999 | Kim et al. |
| 5,930,110 | A | 7/1999 | Nishigaki et al. |
| 5,960,207 | A * | 9/1999 | Brown ........................ 713/300 |
| 6,014,611 | A | 1/2000 | Arai et al. |
| 6,016,548 | A | 1/2000 | Nakamura et al. |
| 6,029,119 | A * | 2/2000 | Atkinson ................... 702/132 |
| 6,243,656 | B1 | 6/2001 | Arai et al. |
| 6,317,841 | B1 | 11/2001 | Nagae et al. |
| 6,463,396 | B1 | 10/2002 | Nishigaki |
| 6,630,754 | B1 | 10/2003 | Pippin |
| 2002/0183973 | A1 | 12/2002 | Nishigaki et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 214 297 A1 | 3/1987 |
| EP | 0363567 | 4/1990 |
| EP | 0364222 | 4/1990 |
| EP | 0368144 | 5/1990 |
| EP | 0381021 | 8/1990 |
| EP | 0 419 908 A2 | 4/1991 |
| EP | 0 426 410 B1 | 5/1991 |
| EP | 0 456 012 B1 | 11/1991 |
| EP | 0474963 | 3/1992 |
| EP | 0496536 | 7/1992 |
| EP | 0540287 | 5/1993 |
| EP | 0 566 395 A1 | 10/1993 |
| EP | 0 683 558 A1 | 11/1995 |
| EP | 0 785 496 A1 | 1/1997 |
| GB | 2235797 | 3/1991 |
| JP | 58-099821 A2 | 6/1983 |
| JP | 58-129524 A2 | 8/1983 |
| JP | 60-150137 A2 | 8/1985 |
| JP | 63-100522 A2 | 5/1988 |
| JP | 63-292313 | 11/1988 |
| JP | 2-054797 A2 | 2/1990 |
| JP | 2-083720 A2 | 3/1990 |
| JP | 2-171813 | 7/1990 |
| JP | 2-299009 A2 | 12/1990 |
| JP | 3-116210 A2 | 5/1991 |
| JP | 4-095109 | 3/1992 |
| JP | 4-093344 | 8/1992 |

| JP | 5-011897 | A2 | 1/1993 |
| JP | 5-053680 | | 3/1993 |
| JP | 5-094229 | | 4/1993 |
| JP | 5-095063 | | 4/1993 |
| JP | 5-100063 | | 4/1993 |
| JP | 5-108193 | | 4/1993 |
| JP | 5-127785 | | 5/1993 |
| JP | 5-189100 | | 7/1993 |
| JP | 5-197460 | | 8/1993 |
| JP | 5-224772 | | 9/1993 |
| JP | 5-224773 | | 9/1993 |
| JP | 5-251884 | | 9/1993 |
| JP | 5-297993 | | 11/1993 |
| JP | 5-313779 | | 11/1993 |
| JP | 5-324867 | | 12/1993 |
| JP | 6-019585 | | 1/1994 |
| JP | 6-042494 | | 2/1994 |
| JP | 6-075654 | | 3/1994 |
| JP | 6-102959 | | 4/1994 |
| WO | WO91/00523 | | 1/1991 |
| WO | WO 91/00566 | | 1/1991 |
| WO | WO 92/10032 | | 6/1992 |

OTHER PUBLICATIONS

"65 Line Notebook Computer User's Manual," Second Edition, pp. I-XIV, Chapters 1-7, Appendices A-D and Glossary, May 1993.
"A Method for Temperature Control in Portable Electronic Equipment", IBM Technical Disclosure Bulletin, May 1987.
"Automatically Controlled Air Cooling System for Small Machines", IBM Technical Disclosure Bulletin, Jan. 1982.
"Charge and Discharge Function in Notebook PC", IBM Technical Disclosure Bulletin, vol. 35, No. 4A, Sep. 1992.
"Computerized Control of Chilled Water System," IBM Technical Disclosure Bulletin, vol. 20, No. 8, pp. 2981-2984, Jan. 1978.
"Cooling Control," IBM Technical Disclosure Bulletin, vol. 18, No. 6, pp. 1705-1706, Nov. 1975.
"Dynamic Power Management By Clock Speed Variation", IBM Technical Disclosure Bulletin, vol. 32, No. 8B, Jan. 1990.
"External Thermo Electric Cooler Integrated Circuit Package", IBM Technical Disclosure Bulletin, vol. 33, No. 11, Apr. 1991.
"Gated Clock", IBM Technical Disclosure Bulletin, vol. 36, No. 5, May 1993.
"High Performance System Clock Generation Within Existing Very Large Scale Integration Chips", IBM Technical Disclosure Bulletin, vol. 35, No. 3, Aug. 1992.
"High Power LSI Performance Optimizer", IBM Technical Disclosure Bulletin, Jan. 1991.
"Highscreen Colani BlueNote Notebook Computer Service Manual," First Edition, pp. I-IX, Chapters 1-5 and Appendices A-D, Nov. 1993.
"Highscreen Colani BlueNote Notebook Computer User's Manual," Second Edition, Sep. 1993.
"Mechanism for Variable Speed Clock Based on an Incrementing Oscillator", IBM Technical Disclosure Bulletin, vol. 36, No. 3, Mar. 1993.
"Note Utilities User's Manual", Highscreen Colani BlueNote Notebook Computers, Second Edition, Sep. 1993.
Processor Option Cooling Kit for Personal Computers, IBM Technical Disclosure Bulletin, vol. 35, No. 6, Nov. 1992.
"Safe Device Power Management", IBM Technical Disclosure Bulletin, vol. 36, No. 5, May 1993.
"System Temperature Monitoring Using On-Chip Thermocouples", IBM Technical Disclosure Bulletin, vol. 36, No. 6B, Jun. 1993.
"Technique for Power Management in Signal Processors", IBM Technical Disclosure Bulletin, vol. 35, No. 5, Oct. 1992.
"Two Speed Fan Control Using Current Sense", IBM Technical Bulletin, vol. 34, No. 8, Jan. 1992.
"Two-Speed Fan Control with Thermal Sensor", IBM Technical Bulletin, Aug. 1994.
"Variable Air Cooling for Computer And/Or Electronic Equipment", IBM Technical Disclosure Bulletin, vol. 32, No. 10A, pp. 196-198, Mar. 1990.

Advanced Power Management (APM), BIOS Interface Specification, Revision 1.1, Sep. 1993.
Bursky, Dave, Energy-Management Chip Supplements PC Power-Control ICs, Electronic Design, vol. 39, No. 12, Jun. 27, 1991.
Cedar Product Bulletin, Embedded Applications System Controller, Pico Power, Dec. 1994.
Cedar PT86C378, Date Book, Pico Power, Version 1.0P, pp. i-86 (+appendixes Cedar Date Book and Redwood Reference Schematics), Mar. 1994.
Evergreen HV, PT86C268, Data Book, Pico Power, Version 1.0.2, pp. i-118, Mar. 1993.
Evergreen HV, PT86C268, System Controller, Data Book, Version 1.0.2, Pico Power, Mar. 1993.
Fir PT86C868 & PT86C818, Data Book, Pico Power, Version 2.3P, System Controller, pp. i=106 (+appendixes A, B and C), Apr. 1994.
Fir, PT86C868 & PT86C818, System Controller, Data Book, Version 2.3P, Pico Power, a Cirrus Logic Company, Apr. 1994.
Gable, Mel, "Designing a laptop computer with power management features", Electronic Engineering, vol. 62, No. 763, Jul. 1990, pp. 43-46.
Gallant, John, "Power Management", EDN, vol. 37, No. 21, Oct. 15, 1992, pp. 114-122.
Golden Gate Product Bulletin, Pentium Processor Bridge Interface Controller, Pico Power, Dec. 1994.
Hilbert, Claude et al., "High Performance Micro-Channel Air Cooling", Sixth Annual IEEE, Semiconductor Thermal and Temperature Measurement Symposium, Feb. 6-8, 1990, pp. 108-113.
Lee, T.Y. Tom et al., "Compact Liquid Cooling System for Small, Moveable Electronic Equipment", IEEE Transactions on Components, Hybrids, and Manufacturing Technology, vol. 15, No. 5, Oct. 1992, pp. 786-793.
Miller, Richard S., et al, "Improve Clock Synthesis In Laptops With a Frequency Generator", Electronic Design, vol. 39, No. 17, Sep. 12, 1991, pp. 111-120.
Nile II, Advance Data Book, Advanced PCI-to-PCI Bridge Interface Controller, Cirrus Logic, pp. 1-4, May 1996.
Nile, Preliminary Product Bulletin, Advanced PCI to PCI Bridge Interface Controller, Cirrus Logic, Feb. 1996.
Onyx System Controller, P6 North Bridge Desktop Solution, Highly Integrated P6 North Bridge Desktop System Controller, Jul. 1996.
PCMCIA Plus, PT82C786, PCMCIA Host Adapter, Data Book, Version 1.1P, Pico Power, Jun. 1994.
Pico Power Descriptive Memorandum, J.P. Morgan, Appendix B: Product Literature re System Controllers, Interface Controllers (Bridge Chips) and Host Adaptor, date unknown.
Pico Power Products, Schedule 1, Pico Power, date unknown.
Pine Product Bulletin, Power-Managed System Controller for '486 CPUs, Pico Power, Dec. 1994.
Pine PT86C368, System Controller, Technical Reference Manual 1.0P, Pico Power, Pine Data Book, 206 Data Book, Product Briefs, pp. 1-151 (+reference schematics), Aug. 1993.
PT82C206F-LV, Integrated Peripheral Controller, Pico Power, date unknown.
Redwood Product Briefs, Pico Power, including Products Alert, dated May 3, 1994, pp. 1-2; Errata Summary, dated Nov. 3, 1994, pp. 1-20; application Note, pp. 1-37, dated Jan. 20, 1993 through May 25, 1994.
Redwood Product Bulletin, Energy-Efficient System Controller for 32-Bit CPUs, Pico Power, Dec. 1994.
Redwood, PT86C668 & PT86C618, Technical Reference Manual, Version 3.0P, System Controller, Pico Power, Jul. 1994.
Redwood, PT86C668 & PT86C618, Technical Reference Manual, Version 3.0P, System Controller, Pico Power, pp. i-149, Jul. 1994.
Sager NP-840 Series Computer Brochure, 1993.
Sequoia Product Bulletin, System Controller for Super-486 Processors, Pico Power, May 1995.
Spruce PT86C388 System Controller, Data Book, Version 1.0P, Pico Power, pp. 1-100, Apr. 21, 1994.
Spruce PT86C388, System Controller, Data Book, Version 1.0P, Pico Power, Apr. 21, 1994.
Steele, Jerry, "ACPI Thermal Sensing and Control in the PC", Wescon Conference, IEEE Sep. 15, 1998, pp. 169-182.

Strassberg, Dan, "Cooling hot microprocessors", EDN, Jan. 20, 1994.

Swager, Anne W., "Methods Converge to Cool Fast and Dense Circuit", EDN, vol. 35, No. 25, Dec. 6, 1990, pp. 162-168.

Tecra™ 510CDS/Tecra™ 510CDT User's Guide, Toshiba, pp. i-547.

The Pico Power "Evergreen" 168, 486/386DX Portable Computer Core Chip, Preliminary Data Book, Version 1.3, Pico Power, Aug. 4, 1992.

Topaz System Controller, P6 North Bridge Notebook Solution, High Integrated P6 North Bridge System Controller, Advance Product Bulletin, Pico Power, pp. 1-4, Jul. 1996.

Vesuvius-LS, Preliminary Product Bulletin, 5-Class Processor PCI System Controller with Power Management, Cirrus Logic, Feb. 1996.

Viper Notebook Chipset for the 3.3V Pentium™, Preliminary Data Book, Version 0.1, pp. 1-158, OPTi Inc., Apr. 1994.

V-Plus, Advance Data Book, 5-Class Processor System Controller with Power Management, Version 1.1, Cirrus Logic, pp. 1-4, May 1996.

Xie, H., et al., "Thermal Solutions to Pentium® Processors in TCP in Notebooks and Sub-Notebooks", 45th Electronic Components & Technology Conference, May 1995, pp. 201-210.

Yuen, Desmond, "Intel's SL Architecture Designing Portable Applications", Intel/McGraw-Hill, i-321, © 1993.

Answer to Complaint re Case No. CV-03-5780 (C.D. CA).

Civil Docket Listing for Case No. CV-03-5780 (C.D. CA).

U.S. Appl. No. 11/524,806, filed Sep. 20, 2006.

U.S. Appl. No. 12/229,637, filed Aug. 25, 2008.

Civil Docket Listing for Case No. 03-CV-05780 (C.D. CA), acquired Nov. 3, 2008.

Notice of Motion and Motion for Leave to File First Amended Answer, etc., filed Aug. 27, 2008, 21 pages, with First Amended Answer, Counterclaims, and Third Party Complaint, filed Aug. 27, 2008, 34 pages.

* cited by examiner



FIG. 1



FIG. 3



FIG. 2



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10

US 7,506,190 B2

1

# THERMAL AND POWER MANAGEMENT FOR COMPUTER SYSTEMS

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a divisional application of U.S. application Ser. No. 11/654,337, filed Jan. 17, 2007, which is a continuation application of U.S. application Ser. No. 10/277, 630, filed Oct. 22, 2002, now U.S. Pat. No. 7,167,993, which is a continuation application of U.S. application Ser. No. 09/782,680, filed Feb. 12, 2001, now U.S. Pat. No. 6,487,668, which is a continuation application of U.S. application Ser. No. 09/351,051 filed on Jul. 10, 1999, now U.S. Pat. No. 6,216,235, which is a continuation application of U.S. application Ser. No. 08/914,299 filed on Aug. 18, 1997, now U.S. Pat. No. 5,974,557, which is a continuation application of U.S. application Ser. No. 08/262,754 filed Jun. 20, 1994, now U.S. Pat. No. 5,752,011, the disclosures of all of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a computing device and, more particularly, to a method and apparatus for controlling a processor's clock frequency.

### 2. Description of the Related Art

It is known that if no user activity has occurred for a period of time that a portable computer can be placed in a suspend or sleep mode. It is also known to suspend or slow a computer's processor (e.g., microprocessor, CPU) when the processor is not actively processing. The following patents and patent publications are representative of the current state of the art:

U.S. Pat. No. 5,201,059 discloses a sleep mode which is activated when control is given to BIOS or alternatively by incorporating some statistical analysis of the frequency of BIOS calls. In this patent, the sleep mode either stops the clock or slows it to 4 MHz.

U.S. Pat. No. 5,167,024 discloses a power management system for a laptop computer. The power management system operates to disconnect power sources and/or clock signals to various peripheral devices to conserve battery power. The slow mode is entered into when no activity has been detected for a predetermined period of time.

U.S. Pat. No. 5,218,704 discloses a technique for power conservation based on real-time sampling of CPU activity. The activity is sampled during interrupts and when it determines that the CPU may rest, a sleep clock is supplied to the CPU. The detection of an interrupt restores the clock to the fast rate prior to processing the interrupt.

U.S. Pat. No. 5,239,652 discloses a technique for power consumption which disconnects the CPU from the power supply when control logic determines the CPU is not actively processing. Thereafter, the CPU is periodically powered-up to perform housekeeping chores as well as to determine if normal processing should be resumed.

European patent publication EP-0474963 discloses a sleep mode controller which lowers the CPU clock speed when no input/output operation (when keyboard control routine of BIOS executed no input key data in key buffer, or when CPU is idle and no input key data in the key buffer) is performed. The system uses a clock generator circuit which produces the low clock (4 MHz), the high clock (32 MHz) and a slightly slower high clock (16 MHz). A keyboard controller is used to determine which of the high clocks is used, with selection

2

being made by the computer user. The sleep mode controller is disabled if the AC adapter is connected.

U.S. Pat. No. 5,230,055 discloses a portable computer wherein the computer is made inoperable when ambient temperature or humidity become too high. Here, ambient temperature and humidity are periodically monitored.

European patent publication EP-0381021 discloses a power saving system for a personal computer. The system operates to allow or stop power to be supplied to an oscillator based on control data set to a control register via a keyboard or software.

U.S. Pat. No. 5,021,679 discloses a power system for a portable computer wherein the supply voltage is varied depending on the current being supplied to the computer by the power system. Further, a variable-frequency clock is provided which varies its frequency based on the supply voltage being produced.

External clocks have been used to provide a computer system with faster clocks. Here, the faster external clock is substituted for the internal clock of the computer system. U.S. Pat. No. 5,134,703 is illustrative of an external clock unit which supplies a faster clock to a computer without requiring any hardware changes within the computer.

The problem with all the prior solutions to energy conservation is that the processors can still overheat. In particular, during prolonged processing or activity by a computer's processor, the processor will not enter its sleep mode (if any) and as a result the processor will become hot and require extensive means to cool the processor to prevent overheating and eventual failure of the processor. Overheating and failure of the processor can also occur when the computer is used in particularly hot environmental temperatures, the computer's cooling fan fails, or when cooling of the processor is otherwise inadequate.

Another problem is that with portable computers, manufacturers have to either use a lower clock frequency (lower than would be used in a comparable desk top computer) for processing or provide a fan for cooling. A lower clock frequency is not satisfactory as users want maximum processing power just as they get with a desk top computer. Requiring a portable computer to use a fan for cooling is also unsatisfactory because it consumes battery energy.

Thus, there is a need for a solution to the above problems which enables a computing device to maximize its processing speed while, at the same time, preventing overheating.

## SUMMARY OF THE INVENTION

Broadly speaking, the invention relates to novel techniques for providing thermal and power management for a computing device. These techniques facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device.

As a method for determining an operational speed for a processor of a computer, one embodiment of the invention includes at least the acts of: configuring the computer to utilize a first power management policy when the computer is powered by a battery; configuring the computer to utilize a second power management policy when the computer is not powered by a battery; and setting an operational speed of the processor based on the appropriate one of the first and second power management policies that have been configured.

As a computer, one embodiment of the invention includes at least: a battery for providing power source; a processor configured to operate at an operational speed; and a power management module. The power management module can be

3

configured (i) to operate the processor in accordance with a first power management policy when the computer is being powered by the battery, and (ii) to operates the processor in accordance with a second power management policy when the computer is not being powered by the battery.

Other aspects and advantages of the invention will become apparent from the following detailed description, taken in conjunction with the accompanying drawings, illustrating by way of example the principles of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein like reference numerals designate like structural elements, and in which:

FIG. 1 is a block diagram of a first embodiment of the invention;

FIG. 2 is a graph of an example of the relationship of chip temperature of a microprocessor and frequency of a clock signal;

FIG. 3 is a block diagram of a second embodiment of the invention;

FIG. 4 is a block diagram of a third embodiment of the invention;

FIG. 5 is a block diagram of a fourth embodiment of the invention;

FIG. 6 is a timing diagram illustrating operation of the fourth embodiment;

FIG. 7 is a block diagram of a fifth embodiment of the invention;

FIG. 8 illustrates a schematic diagram of an embodiment of an activity detector;

FIG. 9 is a block diagram of a sixth embodiment of the invention; and

FIG. 10 is a block diagram of a seventh embodiment of the invention.

DETAILED DESCRIPTION OF THE INVENTION

The invention provides novel techniques for controlling a processor's clock frequency so as to prevent overheating. In addition to preventing overheating, the invention attempts to maximize the processing speed of the processor. The invention also operates to conserve the amount of energy consumed by the processor. Preventing the processor from overheating is important because when a processor overheats it no longer operates properly. Conservation of energy, although of general importance for all computing devices, is particularly important for portable computing devices.

The invention monitors a processor's activity and its temperature. When there is no activity for the processor, a slow clock frequency is used, thereby saving power and lowering the thermal heat produced by the processor. On the other hand, when there is activity for the processor, a fast clock frequency is used. However, when prolonged activity (i.e., sustained fast clock frequency) causes the processor's temperature to become dangerously high for proper operation, the clock frequency is reduced so as to maintain processing speed at a reduced speed while preventing overheating.

Embodiments of the invention are discussed below with reference to FIGS. 1-10. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

FIG. 1 is a block diagram of a first embodiment of the invention. In this embodiment, a microprocessor 2 has a tem-

4

perature sensor 4 which is integral with the microprocessor 2. The temperature sensor 4 is either integrated within the Very Large Scale Integration (VLSI) design of the microprocessor 2 or placed in contact with the housing or package thereof. In either case, the temperature sensor 4 is thermally coupled with the microprocessor 2. Because the temperature sensor 4 is integral or thermally coupled with the microprocessor 2, the temperature sensor 4 is very responsive to the temperature changes of the microprocessor 2. The temperature sensor 4 produces a temperature signal 6. Temperature sensing circuitry is well known and therefore not further described.

The temperature signal 6 is supplied to a voltage-controlled oscillator (VCO) 8. The VCO 8 produces a clock signal 10 which is supplied to a clock input of the microprocessor 2. The VCO 8 operates to produce different frequencies for the clock signal 10 depending on the value of the temperature signal. In this embodiment, the temperature signal 6 is preferably an analog voltage signal and the VCO 8 produces the clock signal 10 based on the value of the analog voltage signal. For example, the temperature signal could be a voltage ranging from zero to five volts. In response to the temperature signal 6, the VCO 8 could produce the clock signal with frequencies ranging from 100 MHz to 1 MHz. The frequency range is a design choice selected in accordance with the specific microprocessor being utilized. VCO's are well known and are not further described.

FIG. 2 is a graph of an example of the relationship of chip temperature of the microprocessor 2 and clock frequency of the clock signal 10. The clock frequency varies between a maximum frequency ($f_{MAX}$) and a minimum frequency ($f_{MIN}$) for given microprocessor. The minimum frequency ($f_{MIN}$) may be zero if the clock signal 10 is not responsible for refreshing dynamic memory; otherwise, it cannot fall below some minimum frequency. Notice that as the chip temperature increases beyond some threshold temperature ($V_{TH}$) (e.g., 120 degrees F.), the frequency of the clock signal 10 will gradually decrease. By decreasing the clock frequency in relation to the chip temperature, processing speed can be maximized for a given temperature without risking processor overheating. As the chip temperature become "hot", the clock frequency is reduced so as to reduce the thermal heat generated by the microprocessor 2. The profile of the curve for the clock frequency shown in FIG. 2 is illustrative as other curves may be used. For example, the frequency of the clock signal 10 could be controlled so that the chip temperature is maintained in a more limited temperature range. In any case, the profiles of the curves decrease the clock frequency as the temperature increases.

FIG. 3 is a block diagram of a second embodiment of the invention. In this embodiment, the microprocessor 2, temperature sensor 4, the temperature signal 6, the VCO 8, and the clock signal 10 are similar to those utilized in the first embodiment. However, this embodiment further includes an activity detector 12, an activity signal 14, a VCO controller 16, and a control signal 18. The activity detector 12 monitors the microprocessor 2 and/or some related peripheral device (e.g., interrupt controller, keyboard buffer, input/output ports, instruction cache, current instruction, program counter) to determine when the microprocessor 2 is actively processing or when processing is needed. In this case, the activity detector 12 notifies the VCO controller 16 that processing is needed with the activity signal 14. On the other hand, when no activity exists, the activity detector 12 notifies the VCO controller 16 that no processing is needed with the activity signal 14. The activity signal is preferably a digital signal having at least one bit. Activity detection is described in more detail in U.S.

Pat. Nos. 5,201,059; 5,167,024; 5,218,704; 5,239,652; and European patent publication EP-0474963, which are hereby incorporated by reference.

The VCO controller **16** receives the activity signal **14** and the temperature signal **6**. In response to these signals, the VCO controller **16** produces the control signal **18** which controls the VCO **8**. The control signal **18** may be analog or digital depending on the design of the VCO **8**. The basic operation of the VCO controller **16** is to cause the VCO **8** to produce the clock signal **10** for the microprocessor **2** in an intelligent manner so as to conserve energy and prevent over-heating. Namely, if the activity detector **12** indicates that no processing is needed at a given point in time, then regardless of the temperature detected by the temperature sensor **4**, the VCO controller **16** will cause the VCO **8** to produce a sleep (or slow) clock. The sleep clock has a frequency near the minimum frequency ($f_{MIN}$). On the other hand, if the activity detector **12** indicates that processing is needed at this point in time, then the VCO controller **16** will cause the VCO **8** to produce a fast clock. The fast clock is the temperature-regulated maximum frequency such as discussed in FIGS. **1** and **2**.

The second embodiment is particularly advantageous for portable computing devices because it conserves battery life by using a sleep clock when no processing is needed. However, even in the case of prolonged processing, the embodiment prevents overheating.

FIG. **4** is a block diagram of a third embodiment of the invention. In this embodiment, the microprocessor **2** includes a clock regulation unit **20** which controls the frequency of the clock used by the microprocessor **2** based on chip temperature of the microprocessor **2**. Preferably, the clock regulation unit **20** is integrated with circuitry of the microprocessor **2**. Alternatively, the clock regulation unit **20** can be separate from the circuitry of the microprocessor **2** but nevertheless coupled thereto.

The clock regulation unit **20** receives an input clock from an oscillator **22** and produces an output clock which is used by the microprocessor **2**. The clock regulation unit **20** includes a temperature sensor **4**, a divider **24**, a first AND gate **26**, a second AND gate **28**, an inverter **30** and an OR gate **32**. The temperature sensor **4** is as previously described. The divider **24** divides the input clock (fast clock) from the oscillator **22** to produce a sleep (or slow) clock. For example, if the oscillator **22** is a 100 MHz fixed-frequency oscillator and the divider **24** divides by 100, then the sleep clock would be 1 MHz.

In this embodiment, the temperature sensor **4** produces a digital output. It is assumed that the digital output is normally "0", but when the microprocessor **2** becomes "hot", the digital output becomes "1". The digital output of the temperature sensor **4** together with the logic gates **26-32** operate to select either the fast clock or the sleep clock as the output clock which is used by the microprocessor **2**. In particular, when the microprocessor **2** is not "hot", AND gate **26** is inactivated and AND gate **28** is activated by inverter **30**. Hence, the output clock is the fast clock via AND gate **28** and OR gate **32**. On the other hand, when the microprocessor **2** is "hot", AND gate **26** is activated and AND gate **28** is inactivated. Accordingly, in this case, the output clock is the sleep (or slow) clock via AND gate **26** and OR gate **32**.

FIG. **5** is a block diagram of a fourth embodiment of the invention. In this embodiment, the microprocessor **2** includes a clock regulation unit **20** which controls the frequency of the clock used by the microprocessor **2** based on chip temperature of the microprocessor **2** and processing activity. The clock regulation unit **20** is preferably integrated with circuitry of the microprocessor **2**.

As with the third embodiment, the clock regulation unit **20** for the fourth embodiment receives the input clock from the oscillator **22** and produces the output clock which is used by the microprocessor **2**. The clock regulation unit **20** includes the temperature sensor **4**, the divider **24**, the first AND gate **26**, the second AND gate **28**, and the OR gate **32** as described above with reference to FIG. **4**. The divider **24** divides the input clock (fast clock) from the oscillator **22** to produce a sleep clock. The temperature sensor **4** produces a digital output. Although the digital output from the temperature sensor **4** is normally "0", when the microprocessor **2** becomes "hot", the digital output becomes "1". The activity detector **12** produces an activity signal as described in the second embodiment. Here, the activity signal is a digital signal which is "high" or "1" when activity is present and "low" or "0" when no activity is present.

The digital output of the temperature sensor **4** together with the activity signal from the activity detector **12** and the logic gates **26**, **28**, **32**, **34**, **36** and **38** operate to select either the fast clock or the sleep clock. In particular, when the microprocessor **2** is not "hot" and activity is present, the AND gate **36** is activated by the inverter **34** and the activity signal. The output of AND gate **36** then activates AND gate **28** and inverter **38** inactivates AND gate **26**. Hence, the output clock is the fast clock via AND gate **28** and OR gate **32**. On the other hand, when the microprocessor **2** is "hot", the AND gate **36** is inactivated by the inverter **34** regardless of the activity signal. The output of AND gate **36** inactivates AND gate **28**, and inverter **38** activates the AND gate **26**. In this case, the output clock is the sleep clock via AND gate **26** and OR gate **32**.

FIG. **6** is a timing diagram illustrating operation of the fourth embodiment. The clock signal (CLK) is a mixture of the fast clock produced by the oscillator **22** and the sleep clock produced by the divider **24**. The temperature signal is the digital output of the temperature sensor **4**. The temperature signal is "0" while the chip temperature is not "hot". However, when the chip temperature becomes "hot", the temperature signal becomes "1", as shown at point A. The activity signal is "1" when activity is present for processing by the microprocessor **2**; otherwise, the activity signal is "0" to indicate no activity is present for processing. As shown in FIG. **6**, the output clock follows the fast clock only when the temperature signal is "0" and the activity signal is "1"; otherwise, the output clock follows the sleep clock. Note that the transitions for the output clock from fast clock to sleep clock and from sleep clock to fast clock are shown as being synchronized with the low or "0" portion of the fast clock. For example, at point B the output clock would produce a partial pulse (from the fast clock) if not synchronized. Hence, it is probably preferred that switching occur only when the fast clock is "low," or when both the fast and sleep clocks are "low" as shown at point C. Note that at point C, the output clock transitions from the sleep clock to the fast clock but because the transition is synchronized with the "low" portion of the fast clock, the first pulse does not occur until point D. Such synchronization can be insured by the addition of known circuitry.

FIG. **7** is a block diagram of a fifth embodiment of the invention. Although only the clock regulation unit **20** is illustrated in FIG. **7**, the fifth embodiment interacts with an oscillator **22** and a microprocessor **2** as did the third and fourth embodiments. In this embodiment, the clock regulation unit **20** includes a first divider **40** which divides the input clock (fast clock) to produce a sleep clock, and a second divider **42** which divides the input clock to produce a normal clock. The three clocks (sleep, normal and fast) are then supplied to a selector **44**. The selector **44** outputs one of the three clocks as

US 7,506,190 B2

7

the output clock for the microprocessor 2 based on first and second select inputs IN1 and IN2. The first select input IN1 is generated by inverting the digital output from the temperature sensor 4 using an inverter 46. The second select input IN2 is generated by an activity detector 48 which functions similarly to the activity detector 12 in previous embodiments.

The activity detector 48 receives a plurality of activity inputs ACT1, . . . ACTn. For example, the activity inputs notify the activity detector 48 whether or not activity exists. Each of the activity inputs may, for example, indicate an interrupt, keyboard activity, modem line activity, I/O port activity, or processor activity. As an example, FIG. 8 illustrates a schematic diagram of an embodiment of the activity detector 48. The activity detector 48 includes a OR gate 50 which outputs a "1" when either the activity input ACT1 or the activity input ACT2 is "1". If neither the activity signals ACT1 and ACT2 are "1", then the OR gate 50 outputs a "1", thereby indicating the presence of activity.

The following Table I illustrates the selection of one of the three clocks by the selector 44 based on the first select input IN1 and the second select input IN2.

TABLE I

| IN1 | IN2 | CLK Mode |
|-----|-----|----------|
| 0 | 0 | Sleep |
| 0 | 1 | Fast |
| 1 | 0 | Sleep |
| 1 | 1 | Normal |

Note that when no activity is detected by the activity detector 48, then the sleep clock is output. However, when activity is detected, then the normal clock is output if the chip temperature is "hot" and the fast clock is output if the chip temperature is not "hot". Like previous embodiments, this embodiment prevents overheating and conserves energy.

Many alternatives can be made to the third, fourth and fifth embodiments discussed above. For example, additional clocks with different clock frequencies could be provided and selected for different temperature ranges to provide a more gradual decrease in frequency. However, if a microprocessor has sufficient thermal heat dissipation, then even the embodiment with only two different clock frequencies (fast and sleep) may provide reasonable processing speeds even when the microprocessor is getting hot because the switching between the clocks would be quite fast as the response of the temperature sensor 4 is very rapid because it is integrated with the microprocessor. Further, although FIGS. 4, 5, and 7 illustrate the temperature sensor 4 as resident within the clock regulation unit 20, the temperature sensor 20 need only be electrically coupled thereto and closely thermally coupled to the microprocessor 2.

FIG. 9 is a block diagram of a sixth embodiment of the invention. In this embodiment, the clock (CLK) received by a microprocessor 2 is either a sleep clock produced by an oscillator 52 or a temperature-regulated fast clock produced by a VCO 8 in accordance with a temperature signal 6 (analog) from a temperature sensor 4. Clock selection is achieved by a selector 54 based on an activity signal 14 provided by an activity detector 12, 48. The VCO 8, the temperature sensor 4 and the activity detector 12, 48 were discussed above with respect to previous embodiments. If activity is present, the temperature-regulated fast clock is supplied to the microprocessor 2. On the other hand, if no activity is detected, then the sleep clock is supplied to the microprocessor 2. The tempera-

8

ture regulation of the fast clock is achieved by the analog temperature signal as discussed above with regard to FIGS. 1 and 2.

Additionally, FIG. 9 illustrates an additional feature of the invention. Namely, FIG. 9 includes an analog-to-digital converter 56, a fan controller 58 and a cooling fan 60. Many conventional computing systems include a fan for circulating air through a computer's cabinet or add-on fans that provide air-flow on or near a microprocessor. Such add-on fans can be activated in accordance with ambient temperature. In contrast, the invention allows more accurate temperature monitoring of the microprocessor 2 because the temperature sensor 4 is integrated with the microprocessor 2. In addition, the invention facilitates more sophisticated energy conservation which is particularly important for portable computing devices. The temperature signal 6 is converted to digital form by the A/D converter 56 and then supplied to the fan controller 58. The fan controller 58 performs a pulse-width modulation operation on a supply voltage (Vcc) so as to control the speed of the fan 60. Pulse-width modulation of the supply voltage allows the speed of the fan to be controlled without wasting energy. Thus, this embodiment further includes a temperature-activated, variable-speed fan.

In the case of a desk-top computing device, it is desirable to activate the fan 60 just prior to the temperature where the fast clock would be regulated downward because of high chip temperature. On the other hand, in the case of a portable computing device, it is desirable to attempt to limit the use of the fan 60 as much as possible by allowing the fast clock to be gradually reduced with increasing temperature before utilizing the fan 60. For example, if the maximum frequency of the fast clock is 100 MHz, the fan 60 could be activated in the desk-top case before the frequency would be regulated (e.g., attempts to maintain 100 MHz). This would eliminate or delay the reduction in the frequency of the fast clock. In the portable case, the fan 60 could be activated after the frequency of the fast clock is already decreased to 25 MHz. The fan 60 would then only be used when necessary to insure reasonable processing power and even then at the lowest effective speed, thereby saving battery energy to the extent possible.

Although not shown but described with reference to FIG. 6, depending on the particular design, synchronization of the switching of the frequency may be needed to prevent partial pulse in the clock signal. Such synchronization is easily implemented using well-known circuitry. Likewise, if the computing device requires a consistent clock period during certain events (e.g., analog-to-digital conversion), then hysteresis or other circuitry can be added to restrict the ability of the frequency of the clock to be changed during certain times.

Prior embodiments operate to decrease the clock frequency of the clock signals supplied to a microprocessor to prevent overheating and to conserve energy. FIG. 10 is a block diagram of a seventh embodiment of the invention. This embodiment operates to provide a burst processing mode for use under certain conditions. During certain types of processing activity, a clock control unit 20 causes an overdrive clock to be supplied to a microprocessor 2. Because the overdrive clock is used only in short bursts, the frequency of the overdrive clock can preferably exceeds the frequency which sustained processing would permit without rapidly overheating.

In this embodiment, the clock control unit 20 includes a first divider 62 which divides the input clock to produce a sleep clock, and a second divider which divides the input clock to produce a fast clock. Because the input clock serves as the overdrive clock, the input clock has a clock frequency that is faster than that necessary for sufficient performance

Add. 75

9

and responsiveness in most cases. The clock control unit **20** also includes a selector **66**, an activity detector **68**, and a temperature sensor **4**. The selector **66** operates to select one of the sleep, fast or overdrive clocks based on select inputs (IN**1**, IN**2**, IN**3**) it receives from the activity detector **68** and the temperature sensor **4**. More particularly, the activity detector **68** receives activity signals ACT**1**, . . . , ACT**n** which cause the activity detector **68** to generate a burst activity signal and a normal activity signal. Certain of the activity signals ACT trigger the burst activity signal and other activity signals trigger the normal activity signal. The temperature sensor **4** is integral with the microprocessor **2** and produces a digital temperature signal which indicates whether or not the microprocessor **2** is "hot".

The following Table II illustrates the selection of one of the three clocks by the selector **66** based on the first select input IN**1**, the second select input IN**2**, and the third select input.

TABLE II

| IN1 | IN2 | IN3 | CLK Mode |
|-----|-----|-----|----------|
| 0 | 0 | 0 | Sleep |
| 0 | 0 | 1 | Sleep |
| 0 | 1 | 0 | Fast |
| 0 | 1 | 1 | Sleep |
| 1 | 0 | 0 | Overdrive |
| 1 | 0 | 1 | Fast/Sleep |
| 1 | 1 | 0 | Overdrive |
| 1 | 1 | 1 | Fast/Sleep |

Note that when no activity (either burst or normal) is detected by the activity detector **68**, then the sleep clock is output. However, when burst activity is detected, then the overdrive clock is output if the chip temperature is not "hot" and either the fast clock or the sleep clock is output if the chip temperature is "hot". The determination of which of the fast or sleep clocks to output in this situation is a design choice depending on the ability of the computing system to dissipate heat. In fact, it may be preferred to make the selection more sophisticated in this case so that selector can make the decision using additional temperature information such as signals indicating particular temperature ranges or rate at which temperature is rising. When only normal activity is detected, then the fast clock is output if the chip temperature is not "hot" and the sleep clock is output if the chip temperature is "hot". As a modification, the second divider **64** could be replaced with a VCO thereby using a temperature-regulated fast clock.

Like previous embodiments, this embodiment prevents overheating and conserves energy. The advantage of this embodiment is that processing will appear more uniform or regular to a user.

There are certain times during normal execution of a program, the computer is caused to execute operations which are beyond or unrequested by the program being executed. Such unrequested operations include interrupt processing, and data transfer to cache memory following a cache miss. Using the overdrive clock in these types of situations is advantageous because such will substantially lessen any delay induced by these unrequested operations. A computer user then perceives that the computer's responsiveness is more regular and uniform. For example, when a cache miss occurs an instruction currently being in process is not allowed to complete until the appropriate data block is loaded into the cache. The loading of the cache following a cache miss causes the microprocessor to execute many operations for memory management that were not requested by the computer program or the user, thereby delaying the execution of the instruction. However,

10

because the invention performs such unrequested operations at higher speeds (overdrive clock), the impact of having to perform the extra unrequested operations is substantially lessened and hopefully invisible.

In fact, a particular computer instruction could be used to indirectly select the desired clock frequency for the instruction. This could be useful for instructions that require more intensive processing than do normal instructions. An example of intensive processing is complex floating point computations. Here, the microprocessor would indicate to the activity detector that the overdrive clock is to be used if the chip temperature is not too "hot".

Yet another embodiment would be to alter processing frequency for extremely cold situations. Namely, if the temperature sensor indicates that the chip temperature (could also use ambient temperature) is less than a predetermined minimum temperature, then the clock frequency could by set regardless of activity to its maximum value to thereby cause the generation of as much heat as possible so that the computing device could operate correctly even in extremely cold conditions. Any cooling fan of the computing device would also be shut-off using a fan controller such as shown in FIG. **9**.

The many features and advantages of the present invention are apparent from the written description and thus it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

What is claimed is:

**1**. A method for managing operation of a computer, the computer including at least a processor and a fan for cooling at least the processor, said method comprising:

configuring the computer to utilize a first power management policy when the computer is powered by a battery;

configuring the computer to utilize a second power management policy when the computer is not powered by a battery;

setting an operational speed of the fan based on the appropriate one of the first and second power management policies;

monitoring a temperature of the processor; and

setting an operational speed of the processor based on the appropriate one of the first and second power management policies and based on the temperature of the processor.

**2**. A method as recited in claim **1**, wherein the first and second power management policies include at least one condition based on a temperature of the processor.

**3**. A method as recited in claim **1**,

wherein the first power management policy pertains to operating the computer in a portable mode, and

wherein the second power management policy pertains to operating the computer in a desktop mode.

**4**. A method as recited in claim **1**, wherein said setting of the operational speed of the fan comprises controlling the operational speed of the fan using pulse width modulation.

**5**. A method as recited in claim **1**, wherein each of the first and second power management policies includes conditions concerning an operational speed of the processor and an operational speed of the fan.

**6**. A method as recited in claim **5**, wherein the first and second power management policies include at least one condition based on a temperature of the processor.

US 7,506,190 B2

11

**7**. A method as recited in claim **1**, wherein said setting of the operational speed of the fan comprises controlling the operational speed of the fan using pulse width modulation.

**8**. A method as recited in claim **7**, wherein the computer is a portable computer.

**9**. A method as recited in claim **1**, wherein the computer is a portable computer.

**10**. A method as recited in claim **1**,

wherein the first power management policy includes at least a first condition based on a temperature of the processor, and

wherein the second power management policy includes at least a second condition based on the temperature of the processor, the second condition being different than the first condition.

**11**. A computing device, comprising:

a battery for providing a power source;

a processor configured to operate at an operational speed;

a temperature sensor configured to monitor a temperature of said processor;

a fan for cooling at least said processor; and

a power management module configured (i) to operate said processor in accordance with a first power management policy and based on the temperature of said processor when said computing device is being powered by said battery, and (ii) to operate said processor in accordance with a second power management policy and based on the temperature of said processor when said computing device is not being powered by said battery;

wherein said computing device is further configured to control an operational speed of said fan based on the appropriate one of the first and second power management policies.

**12**. A computing device as recited in claim **11**, wherein said power management module of said computing device controls the operational speed of said fan based on the appropriate one of the first and second power management policies.

**13**. A computing device as recited in claim **11**,

wherein each of the first and second power management policies includes conditions concerning the operational speed of said processor and the operational speed of said fan, and

wherein the first and second power management policies include at least one condition based on a temperature of said processor.

**14**. A computing device as recited in claim **13**, wherein the operational speed of said fan is controlled using pulse width modulation.

**15**. A computing device as recited in claim **14**, wherein said computing device is a portable computer.

**16**. A computing device as recited in claim **12**,

wherein each of the first and second power management policies includes conditions concerning the operational speed of said processor and the operational speed of said fan, and

wherein the first and second power management policies include at least one condition based on a temperature of said processor.

**17**. A computing device as recited in claim **11**, wherein the operational speed of said fan is controlled using pulse width modulation.

**18**. A method for controlling an operational speed for a processor of a computing device, said method comprising:

configuring the computing device to utilize a first power management policy when the computing device is powered by a battery;

12

configuring the computing device to utilize a second power management policy when the computing device is not powered by a battery; and

controlling an operational speed of the processor based on the appropriate one of the first and second power management policies that have been configured,

wherein the first power management policy includes at least a first condition based on a temperature of the processor, and

wherein the second power management policy includes at least a second condition based on the temperature of the processor, the second condition being different than the first condition.

**19**. A method as recited in claim **18**,

wherein the computing device is or includes a computer,

wherein the first power management policy pertains to operating the computer in a portable mode, and

wherein the second power management policy pertains to operating the computer in a desktop mode.

**20**. A method as recited in claim **18**, wherein each of the first and second power management policies includes conditions concerning an operational speed of the processor and an operational speed of the fan.

**21**. A method as recited in claim **18**, wherein said method comprises:

monitoring a temperature of the processor, and

wherein said controlling the operational speed of the processor comprises setting the operational speed of the processor based on the appropriate one of the first and second power management policies and based on the temperature of the processor.

**22**. A method as recited in claim **18**, wherein the computing device further includes a fan for cooling at least the processor, and

wherein said method further comprises controlling an operational speed of the fan based on the appropriate one of the first and second power management policies.

**23**. A method as recited in claim **22**, wherein said controlling of the operational speed of the fan comprises controlling the operational speed of the fan using pulse width modulation.

**24**. A method as recited in claim **22**, wherein said controlling of the operational speed of the fan comprises setting the operational speed of the fan.

**25**. A method as recited in claim **18**, wherein the computing device further includes a fan for cooling at least the processor, and

wherein said method comprises:

monitoring a temperature of the processor; and

controlling an operational speed of the fan based on the appropriate one of the first and second power management policies and based on the temperature of the processor.

**26**. A method as recited in claim **25**, wherein said controlling of the operational speed of the processor comprises:

setting the operational speed of the processor based on the appropriate one of the first and second power management policies and based on the temperature of the processor.

\*  \*  \*  \*  \*

US007937599B1

(12) **United States Patent**
Thomas et al.

(10) **Patent No.:**      **US 7,937,599 B1**
(45) **Date of Patent:**      ***May 3, 2011**

(54) **THERMAL AND POWER MANAGEMENT FOR COMPUTER SYSTEMS**

(75) Inventors: **C. Douglass Thomas**, Campbell, CA (US); **Alan E. Thomas**, Ocean City, NJ (US)

(73) Assignee: **IpVenture, Inc.**, Los Altos, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 134 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/229,637**

(22) Filed: **Aug. 25, 2008**

**Related U.S. Application Data**

(63) Continuation of application No. 11/524,806, filed on Sep. 20, 2006, now Pat. No. 7,418,611, which is a continuation of application No. 10/277,630, filed on Oct. 22, 2002, now Pat. No. 7,167,993, which is a continuation of application No. 09/782,680, filed on Feb. 12, 2001, now Pat. No. 6,487,668, which is a continuation of application No. 09/351,051, filed on Jul. 10, 1999, now Pat. No. 6,216,235, which is a continuation of application No. 08/914,299, filed on Aug. 18, 1997, now Pat. No. 5,974,557, which is a continuation of application No. 08/262,754, filed on Jun. 20, 1994, now Pat. No. 5,752,011.

(51) **Int. Cl.**
    *G06F 1/32*        (2006.01)
(52) **U.S. Cl.** ................................. **713/321**; 361/679.46
(58) **Field of Classification Search** .......... 713/320–323, 713/501; 361/679.46
    See application file for complete search history.

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,453,601 | A | 7/1969 | Bogert et al. |
| 3,941,989 | A | 3/1976 | McLaughlin et al. |
| 4,137,563 | A | 1/1979 | Tsunoda |
| 4,254,475 | A | 3/1981 | Cooney et al. |
| 4,267,500 | A | 5/1981 | Bourke et al. |
| 4,279,020 | A | 7/1981 | Christian et al. |
| 4,293,927 | A | 10/1981 | Hoshii |
| 4,381,552 | A | 4/1983 | Nocilini et al. |
| 4,409,665 | A | 10/1983 | Tubbs |
| 4,448,543 | A | 5/1984 | Vail |
| 4,670,837 | A | 6/1987 | Sheets |
| 4,672,228 | A | 6/1987 | Swoboda |
| 4,686,386 | A | 8/1987 | Tadao |
| 4,689,659 | A | 8/1987 | Watanabe |
| 4,698,748 | A | 10/1987 | Juzswik et al. |
| 4,722,669 | A | 2/1988 | Kundert |
| 4,734,871 | A | 3/1988 | Tsuneda et al. |
| 4,756,473 | A | 7/1988 | Takemae et al. |
| 4,812,733 | A | 3/1989 | Tobey |
| 4,819,164 | A | 4/1989 | Branson |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | A-0 050 844 | 5/1982 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

Civil Docket Listing for Case No. 03-CV-05780 (C.D. CA), acquired Nov. 3, 2008.

(Continued)

*Primary Examiner* — Thuan N Du

(57)        **ABSTRACT**

Improved approaches to providing thermal and power management for a computing device are disclosed. These approaches facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device.

**28 Claims, 8 Drawing Sheets**



**PIPPIN EXHIBIT 1014**
**THOMAS v. PIPPIN**
**Interference Nos. 105,956, 105,957, 105,958 & 105,959**

US 7,937,599 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,851,987 | A | 7/1989 | Day |
| 4,893,271 | A | 1/1990 | Davis et al. |
| 4,924,112 | A | 5/1990 | Anderson et al. |
| 4,970,497 | A | 11/1990 | Broadwater et al. |
| 4,980,836 | A | 12/1990 | Carter et al. |
| 5,021,679 | A | 6/1991 | Fairbanks et al. |
| 5,025,387 | A | 6/1991 | Frane |
| 5,036,493 | A | 7/1991 | Nielsen |
| 5,058,389 | A | 10/1991 | Yasuda et al. |
| 5,070,267 | A | 12/1991 | Sano et al. |
| 5,099,181 | A | 3/1992 | Canon |
| 5,115,225 | A | 5/1992 | Dao et al. |
| 5,121,291 | A | 6/1992 | Cope et al. |
| 5,125,088 | A | 6/1992 | Culley |
| 5,132,632 | A | 7/1992 | Russell et al. |
| 5,134,703 | A | 7/1992 | Bumbarger |
| 5,142,684 | A | 8/1992 | Perry et al. |
| 5,167,024 | A | 11/1992 | Smith et al. |
| 5,167,031 | A | 11/1992 | Watanabe |
| 5,189,314 | A | 2/1993 | Georgiou et al. |
| 5,189,647 | A | 2/1993 | Suzuki et al. |
| 5,201,059 | A | 4/1993 | Nguyen |
| 5,218,704 | A | 6/1993 | Watts, Jr. et al. |
| 5,222,239 | A | 6/1993 | Rosch |
| 5,230,055 | A | 7/1993 | Katz et al. |
| 5,230,074 | A | 7/1993 | Canova, Jr. et al. |
| 5,239,652 | A | 8/1993 | Seibert et al. |
| 5,241,680 | A | 8/1993 | Cole et al. |
| 5,249,741 | A | 10/1993 | Bistline et al. |
| 5,254,888 | A | 10/1993 | Lee et al. |
| 5,254,928 | A | 10/1993 | Young et al. |
| 5,287,244 | A | 2/1994 | Hileman et al. |
| 5,287,292 | A | 2/1994 | Kenny et al. |
| 5,291,607 | A | 3/1994 | Ristic et al. |
| 5,349,688 | A | 9/1994 | Nguyen |
| 5,349,823 | A | 9/1994 | Solomon |
| 5,355,501 | A | 10/1994 | Gross et al. |
| 5,359,234 | A | 10/1994 | Atriss et al. |
| 5,367,638 | A | 11/1994 | Niessen et al. |
| 5,369,771 | A | 11/1994 | Gettel |
| 5,375,230 | A | 12/1994 | Fujimori |
| 5,381,043 | A | 1/1995 | Kohiyama et al. |
| 5,388,265 | A | 2/1995 | Volk |
| 5,390,350 | A | 2/1995 | Chung et al. |
| 5,392,437 | A | 2/1995 | Matter et al. |
| 5,396,635 | A | 3/1995 | Fung |
| 5,414,860 | A | 5/1995 | Canova, Jr. et al. |
| 5,416,726 | A | 5/1995 | Garcia-Duarte et al. |
| 5,418,751 | A | 5/1995 | Kaiser |
| 5,422,806 | A | 6/1995 | Chen et al. |
| 5,422,832 | A | 6/1995 | Moyal |
| 5,426,755 | A | 6/1995 | Yokouchi et al. |
| 5,428,790 | A | 6/1995 | Harper et al. |
| 5,430,881 | A | 7/1995 | Ikeda |
| 5,457,766 | A | 10/1995 | Ko |
| 5,469,320 | A | 11/1995 | Walker et al. |
| 5,469,561 | A | 11/1995 | Takeda |
| 5,473,767 | A | 12/1995 | Kardach et al. |
| 5,475,847 | A | 12/1995 | Ikeda |
| 5,483,102 | A | 1/1996 | Neal et al. |
| 5,483,656 | A | 1/1996 | Oprescu et al. |
| 5,485,127 | A | 1/1996 | Bertoluzzi et al. |
| 5,498,971 | A | 3/1996 | Turnbull et al. |
| 5,500,509 | A | 3/1996 | Vogt |
| 5,502,838 | A | 3/1996 | Kikinis |
| 5,504,907 | A | 4/1996 | Stewart et al. |
| 5,504,908 | A | 4/1996 | Ikeda |
| 5,504,924 | A | 4/1996 | Ohashi et al. |
| 5,511,203 | A | 4/1996 | Wisor et al. |
| 5,513,361 | A | 4/1996 | Young |
| 5,526,289 | A | 6/1996 | Dinh et al. |
| 5,535,401 | A | 7/1996 | Rawson, III et al. |
| 5,539,681 | A | 7/1996 | Alexander et al. |
| 5,546,568 | A | 8/1996 | Bland et al. |
| 5,546,591 | A | 8/1996 | Wurzburg et al. |
| 5,557,550 | A | 9/1996 | Vigil et al. |
| 5,557,551 | A | 9/1996 | Craft |
| 5,560,001 | A | 9/1996 | Kardach et al. |
| 5,560,002 | A | 9/1996 | Kardach et al. |
| 5,560,017 | A | 9/1996 | Barrett et al. |
| 5,560,020 | A | 9/1996 | Nakatani et al. |
| 5,561,792 | A | 10/1996 | Ganapathy |
| 5,574,667 | A | 11/1996 | Dinh et al. |
| 5,579,524 | A | 11/1996 | Kikinis |
| 5,586,332 | A | 12/1996 | Jain et al. |
| 5,590,061 | A | 12/1996 | Hollowell, II et al. |
| 5,622,789 | A | 4/1997 | Young |
| 5,623,594 | A | 4/1997 | Swamy |
| 5,625,826 | A | 4/1997 | Atkinson |
| 5,630,148 | A | 5/1997 | Norris |
| 5,632,037 | A | 5/1997 | Maher et al. |
| 5,664,118 | A | 9/1997 | Nishigaki et al. |
| 5,664,201 | A | 9/1997 | Ikeda |
| 5,664,205 | A | 9/1997 | O'Brien et al. |
| 5,687,079 | A | 11/1997 | Bauer et al. |
| 5,706,407 | A | 1/1998 | Nakamura et al. |
| 5,719,800 | A | 2/1998 | Mittal et al. |
| 5,721,837 | A | 2/1998 | Kikinis et al. |
| 5,721,937 | A | 2/1998 | Kurihara et al. |
| 5,737,171 | A | 4/1998 | Buller et al. |
| 5,745,375 | A | 4/1998 | Reinhardt et al. |
| 5,752,011 | A | 5/1998 | Thomas et al. |
| 5,809,336 | A | 9/1998 | Moore et al. |
| 5,812,832 | A | 9/1998 | Horne et al. |
| 5,838,578 | A | 11/1998 | Pippin |
| 5,848,282 | A | 12/1998 | Kang |
| 5,920,264 | A | 7/1999 | Kim et al. |
| 5,930,110 | A | 7/1999 | Nishigaki et al. |
| 5,974,557 | A | 10/1999 | Thomas et al. |
| 6,014,611 | A | 1/2000 | Arai et al. |
| 6,016,548 | A | 1/2000 | Nakamura et al. |
| 6,029,249 | A | 2/2000 | Atkinson |
| 6,216,255 | B1 | 4/2001 | Thomas et al. |
| 6,243,656 | B1 | 6/2001 | Arai et al. |
| 6,317,841 | B1 | 11/2001 | Nagae et al. |
| 6,463,396 | B1 | 10/2002 | Nishigaki |
| 6,487,668 | B2 | 11/2002 | Thomas et al. |
| 6,630,754 | B1 | 10/2003 | Pippin |
| 6,848,054 | B1 | 1/2005 | Watts, Jr. |
| 7,167,993 | B1 | 1/2007 | Thomas et al. |
| 7,293,186 | B2 | 11/2007 | Thomas et al. |
| 7,418,611 | B1 | 8/2008 | Thomas |
| 7,506,190 | B2 | 3/2009 | Thomas |
| 2002/0183973 | A1 | 12/2002 | Nishigaki et al. |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 157 507 | | 10/1985 |
| EP | 0 214 297 | A1 | 3/1987 |
| EP | 0363567 | | 4/1990 |
| EP | 0364222 | | 4/1990 |
| EP | 0368144 | | 5/1990 |
| EP | 0381021 | | 8/1990 |
| EP | 0 419 908 | A2 | 4/1991 |
| EP | 0 426 410 | B1 | 5/1991 |
| EP | 0 456 012 | B1 | 11/1991 |
| EP | 0474963 | | 3/1992 |
| EP | 0496536 | | 7/1992 |
| EP | 0540287 | | 5/1993 |
| EP | 0 566 395 | A1 | 10/1993 |
| EP | 573651 | | 12/1993 |
| EP | 0 683 558 | A1 | 11/1995 |
| EP | 0 785 496 | A1 | 1/1997 |
| GB | 2235797 | | 3/1991 |
| JP | 58-099821 | A2 | 6/1983 |
| JP | 58-129524 | A2 | 8/1983 |
| JP | 60-150137 | A2 | 8/1985 |
| JP | 63-41940 | | 2/1988 |
| JP | 63-100522 | A2 | 5/1988 |
| JP | 63-292313 | | 11/1988 |
| JP | 2-054797 | A2 | 2/1990 |
| JP | 2-083720 | | 3/1990 |
| JP | 2-171813 | | 7/1990 |
| JP | 2-299009 | A2 | 12/1990 |
| JP | 1-145063 | | 1/1991 |
| JP | 3-116210 | A2 | 5/1991 |
| JP | 4-095109 | | 3/1992 |
| JP | 4-093344 | | 8/1992 |

| JP | 5-011897 A2 | 1/1993 |
| JP | 5-27849 | 2/1993 |
| JP | 5-053680 | 3/1993 |
| JP | 5-094229 | 4/1993 |
| JP | 5-095063 | 4/1993 |
| JP | 5-100063 | 4/1993 |
| JP | 5-108193 | 4/1993 |
| JP | 5-127785 | 5/1993 |
| JP | 5-189100 | 7/1993 |
| JP | 5-197460 | 8/1993 |
| JP | 5-224772 | 9/1993 |
| JP | 5-224773 | 9/1993 |
| JP | 5-251884 | 9/1993 |
| JP | 5-297993 | 11/1993 |
| JP | 5-313779 | 11/1993 |
| JP | 5-324867 | 12/1993 |
| JP | 6-019585 | 1/1994 |
| JP | 6-042494 | 2/1994 |
| JP | 6-075654 | 3/1994 |
| JP | 6-102959 | 4/1994 |
| WO | WO91/00523 | 1/1991 |
| WO | WO 91/00566 | 1/1991 |
| WO | WO 92/10032 | 6/1992 |

OTHER PUBLICATIONS

Notice of Motion and Motion for Leave to File First Amended Answer, etc., filed Aug. 27, 2008, 21 pages, with First Amended Answer, Counterclaims, and Third Party Complaint, filed Aug. 27, 2008, 34 pages.
U.S. Appl. No. 12/321,798, filed Jan. 25, 2009.
"65 Line Notebook Computer Service Manual," First Edition, pp. I-VIII, Chapters 1-5 and Appendices A-D, Aug. 1993.
"65 Line Notebook Computer User's Manual," Second Edition, pp. I-XIV, Chapters 1-7, Appendices A-D and Glossary, May 1993.
"A Method for Temperature Control in Portable Electronic Equipment", IBM Technical Disclosure Bulletin, May 1987.
"Automatically Controlled Air Cooling System for Small Machines", IBM Technical Disclosure Bulletin, Jan. 1982.
"Charge and Discharge Function in Notebook PC", IBM Technical Disclosure Bulletin, vol. 35, No. 4A, Sep. 1992.
"Computerized Control of Chilled Water System," IBM Technical Disclosure Bulletin, vol. 20, No. 8, pp. 2981-2984, Jan. 1978.
"Cooling Control," IBM Technical Disclosure Bulletin, vol. 18, No. 6, pp. 1705-1706, Nov. 1975.
"Dynamic Power Management by Clock Speed Variation", IBM Technical Disclosure Bulletin, vol. 32, No. 8B, Jan. 1990.
"External Thermo Electric Cooler Integrated Circuit Package", IBM Technical Disclosure Bulletin, vol. 33, No. 11, Apr. 1991.
"Gated Clock", IBM Technical Disclosure Bulletin, vol. 36, No. 5, May 1993.
"High-Performance System Clock Generation Within Existing Very Large Scale Integration Chips", IBM Technical Disclosure Bulletin, vol. 35, No. 3, Aug. 1992.
"High Power LSI Performance Optimizer", IBM Technical Disclosure Bulletin, Jan, 1991.
"HIGHSCREEN Colani BlueNote Notebook Computer Service Manual," First Edition, pp. I-IX, Chapters 1-5 and Appendices A-D, Nov. 1993.
"HIGHSCREEN Colani BlueNote Notebook Computer User's Manual," Second Edition, Sep. 1993.
"Mechanism for Variable Speed Clock Based on an Incrementing Oscillator", IBM Technical Disclosure Bulletin, vol. 36, No. 3, Mar. 1993.
"NOTE Utilities User's Manual", HIGHSCREEN Colani BlueNote Notebook Computers, Second Edition, Sep. 1993.
Processor Option Cooling Kit for Personal Computers, IBM Technical Disclosure Bulletin, vol. 35, No. 6, Nov. 1992.

"Safe Device Power Management", IBM Technical Disclosure Bulletin, vol. 36, No. 5, May 1993.
"System Temperature Monitoring Using On-Chip Thermocouples", IBM Technical Disclosure Bulletin, vol. 36, No. 6B, Jun. 1993.
"Technique for Power Management in Signal Processors", IBM Technical Disclosure Bulletin, vol. 35, No. 5, Oct. 1992.
"Two Speed Fan Control Using Current Sense", IBM Technical Bulletin, vol. 34, No. 8, Jan. 1992.
"Two-Speed Fan Control with Thermal Sensor", IBM Technical Bulletin, Aug. 1994.
"Variable Air Cooling for Computer And/Or Electronic Equipment," IBM Technical Disclosure Bulletin, vol. 32, No. 10A, pp. 196-198, Mar. 1990.
Advanced Power Management (APM), BIOS Interface Specification, Revision 1.1, Sep. 1993.
Bursky, Dave, Energy-Management Chip Supplements PC Power-Control ICs, Electronic Design, vol. 39, No. 12, Jun. 27, 1991.
Cedar Product Bulletin, Embedded Applications System Controller, Pico Power, Dec. 1994.
Cedar PT86C378, Date Book, Pico Power, Version 1.0P, pp. i-86 (+appendixes Cedar Date Book and Redwood Reference Schematics), Mar. 1994.
Evergreen HV, PT86C268, Data Book, Pico Power, Version 1.0.2, pp. i-118, Mar. 1993.
Evergreen HV, PT86C268, System Controller, Data Book, Version 1.0.2, Pico Power, Mar. 1993.
Fir PT86C868 & PT86C818, Data Book, Pico Power, Version 2.3P, System Controller, pp. i=106 (+appendixes A, B and C), Apr. 1994.
Fir, PT86C868 & PT86C818, System Controller, Data Book, Version 2.3P, Pico Power, a Cirrus Logic Company, Apr. 1994.
Gable, Mel, "Designing a laptop computer with power management features", Electronic Engineering, vol. 62, No. 763, Jul. 1990, pp. 43-46.
Gallant, John, "Power Management", EDN, vol. 37, No. 21, Oct. 15, 1992, pp. 114-122.
Golden Gate Product Bulletin, Pentium Processor Bridge Interface Controller, Pico Power, Dec. 1994.
Hilbert, Claude et al., "High Performance Micro-Channel Air Cooling", Sixth Annual IEEE, Semiconductor Thermal and Temperature Measurement Symposium, Feb. 6-8, 1990, pp. 108-113.
Lee, T.Y. Tom et al., "Compact Liquid Cooling System for Small, Moveable Electronic Equipment", IEEE Transactions on Components, Hybrids, and Manufacturing Technology, vol. 15, No. 5, Oct. 1992, pp. 786-793.
Miller, Richard S., et al, "Improve Clock Synthesis in Laptops With a Frequency Generator", Electronic Design, vol. 39, No. 17, Sep. 12, 1991, pp. 111-120.
Nile II, Advance Data Book, Advanced PCI-to-PCI Bridge Interface Controller, Cirrus Logic, pp. 1-4, May 1996.
Nile, Preliminary Product Bulletin, Advanced PCI to PCI Bridge Interface Controller, Cirrus Logic, Feb. 1996.
Onyx System Controller, P6 North Bridge Desktop Solution, Highly Integrated P6 North Bridge Desktop System Controller, Jul. 1996.
PCMCIA Plus, PT82C786, PCMCIA Host Adapter, Data Book, Version 1.1P, Pico Power, Jun. 1994.
Pico Power Descriptive Memorandum, J.P. Morgan, Appendix B: Product Literature re System Controllers, Interface Controllers (Bridge Chips) and Host Adaptor, date unknown.
Pico Power Products, Schedule 1, Pico Power, date unknown.
Pine Product Bulletin, Power-Managed System Controller for '486 CPUs, Pico Power, Dec. 1994.
Pine PT86C368, System Controller, Technical Reference Manual 1.0P, Pico Power, Pine Data Book, 206 Data Book, Product Briefs, pp. 1-151 (+ reference schematics), Aug. 1993.
PT82C206F-LV, Integrated Peripheral Controller, Pico Power, date unknown.
Redwood Product Briefs, Pico Power, including Products Alert, dated May 3, 1994, pp. 1-2; Errata Summary, dated Nov. 3, 1994, pp. 1-20; application Note, pp. 1-37, dated Jan. 20, 1993 through May 25, 1994.
Redwood Product Bulletin, Energy-Efficient System Controller for 32-Bit CPUs, Pico Power, Dec. 1994.
Redwood, PT86C668 & PT86C618, Technical Reference Manual, Version 3.0P, System Controller, Pico Power, Jul. 1994.

Redwood, PT86C668 & PT86C618, Technical Reference Manual, Version 3.0P, System Controller, Pico Power, pp. i-149, Jul. 1994.

Sager NP-840 Series Computer Brochure, 1993.

Sequoia Product Bulletin, System Controller for Super-486 Processors, Pico Power, May 1995.

Spruce PT86C388 System Controller, Data Book, Version 1.0P, Pico Power, pp. 1-100, Apr. 21, 1994.

Spruce PT86C388 System Controller, Data Book, Version 1.0P, Pico Power, Apr. 21, 1994.

Steele, Jerry, "ACPI Thermal Sensing and Control in the PC", Wescon Conference, IEEE Sep. 15, 1998, pp. 169-182.

Strassberg, Dan, "Cooling hot microprocessors", EDN, Jan. 20, 1994.

Swager, Anne W., "Methods Converge to Cool Fast and Dense Circuit", EDN, vol. 35, No. 25, Dec. 6, 1990, pp. 162-168.

Tecra™510CDS/Tecra™510CDT User's Guide, Toshiba, pp. i-547.

The Pico Power "Evergreen" 168, 486/386DX Portable Computer Core Chip, Preliminary Data Book, Version 1.3, Pico Power, Aug. 4, 1992.

Topaz System Controller, P6 North Bridge Notebook Solution, High Integrated P6 North Bridge System Controller, Advance Product Bulletin, Pico Power, pp. 1-4, Jul. 1996.

Vesuvius-LS, Preliminary Product Bulletin, 5-Class Processor PCI System Controller with Power Management, Cirrus Logic, Feb. 1996.

Viper Notebook Chipset for the 3.3V Pentium™, Preliminary Data Book, Version 0.1, pp. 1-158, OPTi Inc., Apr. 1994.

V-Plus, Advance Data Book, 5-Class Processor System Controller with Power Management, Version 1.1, Cirrus Logic, pp. 1-4, May 1996.

Xie, H., et al., "Thermal Solutions to Pentium® Processors in TCP in Notebooks and Sub-Notebooks", 45th Electronic Components & Technology Conference, May 1995, pp. 201-210.

Yuen, Desmond, "Intel's SL Architecture Designing Portable Applications", Intel/McGraw-Hill, i-321, © 1993.

Answer to Complaint re Case No. CV-03-5780 (C.D. CA).

Civil Docket Listing for Case No. CV-03-5780 (C.D. CA).

U.S. Appl. No. 11/821,142, filed Jun. 22, 2007.

Office Action for U.S. Appl. No. 08/262,754, dated Mar. 1, 1996.

Office Action for U.S. Appl. No. 08/262,754, dated Jul. 9, 1996.

Notice of Allowance for U.S. Appl. No. 08/262,754, dated Dec. 2, 1996.

Final Office Action for U.S. Appl. No. 09/351,051, dated Feb. 11, 2000.

Final Office Action for U.S. Appl. No. 09/351,051, dated Jun. 23, 2000.

Office Action for U.S. Appl. No. 09/351,051, dated Aug. 1, 2000.

Notice of Allowance for U.S. Appl. No. 09/351,051, dated Nov. 20, 2000.

Final Office Action for U.S. Appl. No. 09/782,680, dated Aug. 10, 2001.

Final Office Action for U.S. Appl. No. 09/782,680, dated Feb. 28, 2002.

Final Office Action for U.S. Appl. No. 09/782,680, dated Apr. 25, 2002.

Notice of Allowance for U.S. Appl. No. 09/782,680, dated Aug. 7, 2002.

Final Office Action for U.S. Appl. No. 10/277,630, dated Mar. 12, 2003.

Notice of Allowance for U.S. Appl. No. 10/277,630, dated Jan. 26, 2004.

Notice of Allowance for U.S. Appl. No. 10/277,630, dated Jun. 22, 2004.

Notice of Allowance for U.S. Appl. No. 10/277,630, dated May 31, 2005.

Notice of Allowance for U.S. Appl. No. 10/277,630, dated Dec. 22, 2005.

Notice of Allowance for U.S. Appl. No. 10/277,630, dated Sep. 26, 2006.

Office Action for U.S. Appl. No. 11/524,806, dated Jan. 8, 2008.

Notice of Allowance for U.S. Appl. No. 11/524,806, dated Jun. 9, 2008.

Office Action for U.S. Appl. No. 11/654,337, dated Apr. 24, 2007.

Notice of Allowance for U.S. Appl. No. 11/654,337, dated Aug. 24, 2007.

Office Action for U.S. Appl. No. 11/821,142, dated Sep. 19, 2008.

Notice of Allowance for U.S. Appl. No. 11/821,142, dated Nov. 21, 2008.

Final Office Action for U.S. Appl. No. 08/914,299, dated Jun. 8, 1998.

Office Action for U.S. Appl. No. 08/914,299, dated Mar. 5, 1999.

Notice of Allowance for U.S. Appl. No. 08/914,299, dated May 21, 1999.

Bielby, Robert, Notebook Computer Power Management Strategies Employing Programmable Logic Devices (PLDs), IEEE, Proc. Idea '93, Sep. 1993, pp. 1-8.

Circello et al., "The Motorola 68060 Microprocessor", IEEE, Proc. Compcon, Spring 1993, pp. 73-78.

Ellis, S.C., "The Low Power Intel486™ SL Microprocessor", IEEE, Proc. Compcon, Spring 1993, pp. 96-102.

Forman, et al., "The Challenges of Mobile Computing", IEEE Computer, Apr. 1994, 10 pages.

Gary, et al., "PowerPC 603™, A Microprocessor for Portable Computers", IEEE Design and Test of Computers, copyright 1994, pp. 14-23.

Patton, Robert, "Intelligent Power Manager Cools Pentium", Electronics, Sep. 27, 1993, 1 page.

PowerPC™ 604 RISC Microprocessor Technical Summary, IBM Microelectronics, Motorola Inc., copyright 1994 pp. 1-33.

Suessmith et al., Power PC 603 Microprocessor Power Management, Jun. 1994, pp. 43-46.

Tummala et al. "Microelectronics Packaging Handbook," Introduction, Table of Contents, Chapeters 1,4 & 5, 1989, pp. 1-139.

Civil Docket for Case 1:09-cv-00497-MMB, dated Feb. 17, 2011, pp. 1-12.

Complaint for Patent Infringement, 1:09-cv-00497-MMB, filed Jul. 8, 2009, pp. 1-10.

Answer and Counterclaims (Sony), 1:09-cv-00497-MMB, filed Oct. 13, 2009, pp. 1-145 (including Exhibits).

Answer and Counterclaims (Panasonic), 1:09-cv-00497-MMB, filed Aug. 27, 2009, pp. 1-20.

Answer to Counterclaims of Sony, 1:09-cv-00497-MMB, filed Nov. 2, 2009, pp. 1-15.

Answer to Counterclaims of Panasonic, 1:09-cv-00497-MMB, filed Sep. 16, 2009, pp. 1-8.

Preliminary Invalidity Contentions, 1:09-cv-00497-MMB, dated May 14, 2010, pp. 1- 15.

Exhibit A for Preliminary Invalidity Contentions, 1:09-cv-00497-MMB, dated May 14, 2010, pp. 1-5.

Exhibit B for Preliminary Invalidity Contentions, 1:09-cv-00497-MMB, dated May 14, 2010, pp. 1-33.

Exhibit C for Preliminary Invalidity Contentions, 1:09-cv-00497-MMB, dated May 14, 2010, pp. 1-4088. (submitted in two parts).

Exhibit D for Preliminary Invalidity Contentions, 1:09-cv-00497-MMB, dated May 14, 2010, pp. 1-758.

Exhibit E for Preliminary Invalidity Contentions, 1:09-cv-00497-MMB, dated May 14, 2010, pp. 1-1489.

Exhibit F for Preliminary Invalidity Contentions, 1:09-cv-00497-MMB, dated May 14, 2010, pp. 1-833.

First Supplemental Invalidity Contentions, 1:09-cv-00497-MMB, dated Jul. 19, 2010, pp. 1-32.

Office Action for U.S. Appl. No. 12/321,798, dated Feb. 14, 2011.



FIG. 1



FIG. 3



FIG. 2



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10

US 7,937,599 B1

**1**

# THERMAL AND POWER MANAGEMENT FOR COMPUTER SYSTEMS

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation application of U.S. application Ser. No. 11/524,806, filed Sep. 20, 2006, which is a continuation application of U.S. application Ser. No. 10/277, 630, filed Oct. 22, 2002, now U.S. Pat. No. 7,167,993, which is a continuation application of U.S. application Ser. No. 09/782,680, filed Feb. 12, 2001, now U.S. Pat. No. 6,487,668, which is a continuation application of U.S. application Ser. No. 09/351,051 filed on Jul. 10, 1999, now U.S. Pat. No. 6,216,235, which is a continuation application of U.S. application Ser. No. 08/914,299 filed on Aug. 18, 1997, now U.S. Pat. No. 5,974,557, which is a continuation application of U.S. application Ser. No. 08/262,754 filed Jun. 20, 1994, now U.S. Pat. No. 5,752,011, the disclosures of all of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a computing device and, more particularly, to a method and apparatus for controlling a processor's clock frequency.

2. Description of the Related Art

It is known that if no user activity has occurred for a period of time that a portable computer can be placed in a suspend or sleep mode. It is also known to suspend or slow a computer's processor (e.g., microprocessor, CPU) when the processor is not actively processing. The following patents and patent publications are representative of the current state of the art:

U.S. Pat. No. 5,201,059 discloses a sleep mode which is activated when control is given to BIOS or alternatively by incorporating some statistical analysis of the frequency of BIOS calls. In this patent, the sleep mode either stops the clock or slows it to 4 MHz.

U.S. Pat. No. 5,167,024 discloses a power management system for a laptop computer. The power management system operates to disconnect power sources and/or clock signals to various peripheral devices to conserve battery power. The slow mode is entered into when no activity has been detected for a predetermined period of time.

U.S. Pat. No. 5,218,704 discloses a technique for power conservation based on real-time sampling of CPU activity. The activity is sampled during interrupts and when it determines that the CPU may rest, a sleep clock is supplied to the CPU. The detection of an interrupt restores the clock to the fast rate prior to processing the interrupt.

U.S. Pat. No. 5,239,652 discloses a technique for power consumption which disconnects the CPU from the power supply when control logic determines the CPU is not actively processing. Thereafter, the CPU is periodically powered-up to perform housekeeping chores as well as to determine if normal processing should be resumed.

European patent publication EP-0474963 discloses a sleep mode controller which lowers the CPU clock speed when no input/output operation (when keyboard control routine of BIOS executed no input key data in key buffer, or when CPU is idle and no input key data in the key buffer) is performed. The system uses a clock generator circuit which produces the low clock (4 MHz), the high clock (32 MHz) and a slightly slower high clock (16 MHz). A keyboard controller is used to determine which of the high clocks is used, with selection being made by the computer user. The sleep mode controller is disabled if the AC adapter is connected.

U.S. Pat. No. 5,230,055 discloses a portable computer wherein the computer is made inoperable when ambient tem-

**2**

perature or humidity become too high. Here, ambient temperature and humidity are periodically monitored.

European patent publication EP-0381021 discloses a power saving system for a personal computer. The system operates to allow or stop power to be supplied to an oscillator based on control data set to a control register via a keyboard or software.

U.S. Pat. No. 5,021,679 discloses a power system for a portable computer wherein the supply voltage is varied depending on the current being supplied to the computer by the power system. Further, a variable-frequency clock is provided which varies its frequency based on the supply voltage being produced.

External clocks have been used to provide a computer system with faster clocks. Here, the faster external clock is substituted for the internal clock of the computer system. U.S. Pat. No. 5,134,703 is illustrative of an external clock unit which supplies a faster clock to a computer without requiring any hardware changes within the computer.

The problem with all the prior solutions to energy conservation is that the processors can still overheat. In particular, during prolonged processing or activity by a computer's processor, the processor will not enter its sleep mode (if any) and as a result the processor will become hot and require extensive means to cool the processor to prevent overheating and eventual failure of the processor. Overheating and failure of the processor can also occur when the computer is used in particularly hot environmental temperatures, the computer's cooling fan fails, or when cooling of the processor is otherwise inadequate.

Another problem is that with portable computers, manufacturers have to either use a lower clock frequency (lower than would be used in a comparable desk top computer) for processing or provide a fan for cooling. A lower clock frequency is not satisfactory as users want maximum processing power just as they get with a desk top computer. Requiring a portable computer to use a fan for cooling is also unsatisfactory because it consumes battery energy.

Thus, there is a need for a solution to the above problems which enables a computing device to maximize its processing speed while, at the same time, preventing overheating.

## SUMMARY OF THE INVENTION

Broadly speaking, the invention relates to novel techniques for providing thermal and power management for a computing device. These techniques facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device.

As an apparatus for thermally managing temperature of a microprocessor provided within a computer system, where the microprocessor operates in accordance with a clock having a clock frequency, one embodiment of the invention can include at least: a first electrical connection to a temperature sensor provided within the microprocessor; a comparison circuit configured to compare a temperature indication provided by the temperature sensor via the first electrical connection with a temperature range to produce comparison data; and a second electrical connection configured to provide the comparison data to the microprocessor.

As a fan controller integrated circuit for a computer system, the computer system including at least a processor integrated circuit and a multi-speed fan, one embodiment of the invention can include at least: a temperature input for receiving a remote temperature indication pertaining to the temperature of the processor integrated circuit, wherein the remote temperature indication is provided by a temperature sensor that is integrated with the processor integrated circuit; and fan control circuitry configured to control the speed of the

US 7,937,599 B1

3

fan to optimize the speed of the fan based on the remote temperature indication pertaining to the temperature of the processor integrated circuit.

As a fan controller integrated circuit for a computer system, the computer system including at least a processor integrated circuit and a multi-speed fan, another embodiment of the invention can include at least: a temperature input for receiving a temperature indication pertaining to the temperature of the processor integrated circuit, wherein the temperature indication is provided by a temperature sensor that is integrated with the processor integrated circuit; and fan control circuitry configured to control the speed of the fan to vary as the temperature indication pertaining to the temperature of the processor integrated circuit changes.

Other aspects and advantages of the invention will become apparent from the following detailed description, taken in conjunction with the accompanying drawings, illustrating by way of example the principles of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein like reference numerals designate like structural elements, and in which:

FIG. **1** is a block diagram of a first embodiment of the invention;

FIG. **2** is a graph of an example of the relationship of chip temperature of a microprocessor and frequency of a clock signal;

FIG. **3** is a block diagram of a second embodiment of the invention;

FIG. **4** is a block diagram of a third embodiment of the invention;

FIG. **5** is a block diagram of a fourth embodiment of the invention;

FIG. **6** is a timing diagram illustrating operation of the fourth embodiment;

FIG. **7** is a block diagram of a fifth embodiment of the invention;

FIG. **8** illustrates a schematic diagram of an embodiment of an activity detector;

FIG. **9** is a block diagram of a sixth embodiment of the invention; and

FIG. **10** is a block diagram of a seventh embodiment of the invention.

DETAILED DESCRIPTION OF THE INVENTION

The invention provides novel techniques for controlling a processor's clock frequency so as to prevent overheating. In addition to preventing overheating, the invention attempts to maximize the processing speed of the processor. The invention also operates to conserve the amount of energy consumed by the processor. Preventing the processor from overheating is important because when a processor overheats it no longer operates properly. Conservation of energy, although of general importance for all computing devices, is particularly important for portable computing devices.

The invention monitors a processor's activity and its temperature. When there is no activity for the processor, a slow clock frequency is used, thereby saving power and lowering the thermal heat produced by the processor. On the other hand, when there is activity for the processor, a fast clock frequency is used. However, when prolonged activity (i.e., sustained fast clock frequency) causes the processor's temperature to become dangerously high for proper operation, the clock frequency is reduced so as to maintain processing speed at a reduced speed while preventing overheating.

4

Embodiments of the invention are discussed below with reference to FIGS. **1**-**10**. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

FIG. **1** is a block diagram of a first embodiment of the invention. In this embodiment, a microprocessor **2** has a temperature sensor **4** which is integral with the microprocessor **2**. The temperature sensor **4** is either integrated within the Very Large Scale Integration (VLSI) design of the microprocessor **2** or placed in contact with the housing or package thereof. In either case, the temperature sensor **4** is thermally coupled with the microprocessor **2**. Because the temperature sensor **4** is integral or thermally coupled with the microprocessor **2**, the temperature sensor **4** is very responsive to the temperature changes of the microprocessor **2**. The temperature sensor **4** produces a temperature signal **6**. Temperature sensing circuitry is well known and therefore not further described.

The temperature signal **6** is supplied to a voltage-controlled oscillator (VCO) **8**. The VCO **8** produces a clock signal **10** which is supplied to a clock input of the microprocessor **2**. The VCO **8** operates to produce different frequencies for the clock signal **10** depending on the value of the temperature signal. In this embodiment, the temperature signal **6** is preferably an analog voltage signal and the VCO **8** produces the clock signal **10** based on the value of the analog voltage signal. For example, the temperature signal could be a voltage ranging from zero to five volts. In response to the temperature signal **6**, the VCO **8** could produce the clock signal with frequencies ranging from 100 MHz to 1 MHz. The frequency range is a design choice selected in accordance with the specific microprocessor being utilized. VCO's are well known and therefore are not further described.

FIG. **2** is a graph of an example of the relationship of chip temperature of the microprocessor **2** and clock frequency of the clock signal **10**. The clock frequency varies between a maximum frequency ($f_{MAX}$) and a minimum frequency ($f_{MIN}$) for given microprocessor. The minimum frequency ($f_{MIN}$) may be zero if the clock signal **10** is not responsible for refreshing dynamic memory; otherwise, it cannot fall below some minimum frequency. Notice that as the chip temperature increases beyond some threshold temperature (VTH) (e.g., 120 degrees F.), the frequency of the clock signal **10** will gradually decrease. By decreasing the clock frequency in relation to the chip temperature, processing speed can be maximized for a given temperature without risking processor overheating. As the chip temperature become "hot", the clock frequency is reduced so as to reduce the thermal heat generated by the microprocessor **2**. The profile of the curve for the clock frequency shown in FIG. **2** is illustrative as other curves may be used. For example, the frequency of the clock signal **10** could be controlled so that the chip temperature is maintained in a more limited temperature range. In any case, the profiles of the curves decrease the clock frequency as the temperature increases.

FIG. **3** is a block diagram of a second embodiment of the invention. In this embodiment, the microprocessor **2**, temperature sensor **4**, the temperature signal **6**, the VCO **8**, and the clock signal **10** are similar to those utilized in the first embodiment. However, this embodiment further includes an activity detector **12**, an activity signal **14**, a VCO controller **16**, and a control signal **18**. The activity detector **12** monitors the microprocessor **2** and/or some related peripheral device (e.g., interrupt controller, keyboard buffer, input/output ports, instruction cache, current instruction, program counter) to determine when the microprocessor **2** is actively processing or when processing is needed. In this case, the activity detector **12** notifies the VCO controller **16** that processing is needed with the activity signal **14**. On the other hand, when no activity exists, the activity detector **12** notifies the VCO controller **16** that no processing is needed with the activity signal **14**.

US 7,937,599 B1

5

The activity signal is preferably a digital signal having at least one bit. Activity detection is described in more detail in U.S. Pat. No. 5,201,059; U.S. Pat. No. 5,167,024; U.S. Pat. No. 5,218,704; U.S. Pat. No. 5,239,652; and European patent publication EP-0474963, which are hereby incorporated by reference.

The VCO controller **16** receives the activity signal **14** and the temperature signal **6**. In response to these signals, the VCO controller **16** produces the control signal **18** which controls the VCO **8**. The control signal **18** may be analog or digital depending on the design of the VCO **8**. The basic operation of the VCO controller **16** is to cause the VCO **8** to produce the clock signal **10** for the microprocessor **2** in an intelligent manner so as to conserve energy and prevent overheating. Namely, if the activity detector **12** indicates that no processing is needed at a given point in time, then regardless of the temperature detected by the temperature sensor **4**, the VCO controller **16** will cause the VCO **8** to produce a sleep (or slow) clock. The sleep clock has a frequency near the minimum frequency ($f_{MIN}$). On the other hand, if the activity detector **12** indicates that processing is needed at this point in time, then the VCO controller **16** will cause the VCO **8** to produce a fast clock. The fast clock is the temperature-regulated maximum frequency such as discussed in FIGS. **1** and **2**.

The second embodiment is particularly advantageous for portable computing devices because it conserves battery life by using a sleep clock when no processing is needed. However, even in the case of prolonged processing, the embodiment prevents overheating.

FIG. **4** is a block diagram of a third embodiment of the invention. In this embodiment, the microprocessor **2** includes a clock regulation unit **20** which controls the frequency of the clock used by the microprocessor **2** based on chip temperature of the microprocessor **2**. Preferably, the clock regulation unit **20** is integrated with circuitry of the microprocessor **2**. Alternatively, the clock regulation unit **20** can be separate from the circuitry of the microprocessor **2** but nevertheless coupled thereto.

The clock regulation unit **20** receives an input clock from an oscillator **22** and produces an output clock which is used by the microprocessor **2**. The clock regulation unit **20** includes a temperature sensor **4**, a divider **24**, a first AND gate **26**, a second AND gate **28**, an inverter **30** and an OR gate **32**. The temperature sensor **4** is as previously described. The divider **24** divides the input clock (fast clock) from the oscillator **22** to produce a sleep (or slow) clock. For example, if the oscillator **22** is a 100 MHz fixed-frequency oscillator and the divider **24** divides by 100, then the sleep clock would be 1 MHz.

In this embodiment, the temperature sensor **4** produces a digital output. It is assumed that the digital output is normally "0", but when the microprocessor **2** becomes "hot", the digital output becomes "1". The digital output of the temperature sensor **4** together with the logic gates **26-32** operate to select either the fast clock or the sleep clock as the output clock which is used by the microprocessor **2**. In particular, when the microprocessor **2** is not "hot", AND gate **26** is inactivated and AND gate **28** is activated by inverter **30**. Hence, the output clock is the fast clock via AND gate **28** and OR gate **32**. On the other hand, when the microprocessor **2** is "hot", AND gate **26** is activated and AND gate **28** is inactivated. Accordingly, in this case, the output clock is the sleep (or slow) clock via AND gate **26** and OR gate **32**.

FIG. **5** is a block diagram of a fourth embodiment of the invention. In this embodiment, the microprocessor **2** includes a clock regulation unit **20** which controls the frequency of the clock used by the microprocessor **2** based on chip temperature of the microprocessor **2** and processing activity. The clock regulation unit **20** is preferably integrated with circuitry of the microprocessor **2**.

6

As with the third embodiment, the clock regulation unit **20** for the fourth embodiment receives the input clock from the oscillator **22** and produces the output clock which is used by the microprocessor **2**. The clock regulation unit **20** includes the temperature sensor **4**, the divider **24**, the first AND gate **26**, the second AND gate **28**, and the OR gate **32** as described above with reference to FIG. **4**. The divider **24** divides the input clock (fast clock) from the oscillator **22** to produce a sleep clock. The temperature sensor **4** produces a digital output. Although the digital output from the temperature sensor **4** is normally "0", when the microprocessor **2** becomes "hot", the digital output becomes "1". The activity detector **12** produces an activity signal as described in the second embodiment. Here, the activity signal is a digital signal which is "high" or "1" when activity is present and "low" or "0" when no activity is present.

The digital output of the temperature sensor **4** together with the activity signal from the activity detector **12** and the logic gates **26, 28, 32, 34, 36** and **38** operate to select either the fast clock or the sleep clock. In particular, when the microprocessor **2** is not "hot" and activity is present, the AND gate **36** is activated by the inverter **34** and the activity signal. The output of AND gate **36** then activates AND gate **28** and inverter **38** inactivates AND gate **26**. Hence, the output clock is the fast clock via AND gate **28** and OR gate **32**. On the other hand, when the microprocessor **2** is "hot", the AND gate **36** is inactivated by the inverter **34** regardless of the activity signal. The output of AND gate **36** inactivates AND gate **28**, and inverter **38** activates the AND gate **26**. In this case, the output clock is the sleep clock via AND gate **26** and OR gate **32**.

FIG. **6** is a timing diagram illustrating operation of the fourth embodiment. The output clock (CLK) is a mixture of the fast clock produced by the oscillator **22** and the sleep clock produced by the divider **24**. The temperature signal is the digital output of the temperature sensor **4**. The temperature signal is "0" while the chip temperature is not "hot". However, when the chip temperature becomes "hot", the temperature signal becomes "1", as shown at point A. The activity signal is "1" when activity is present for processing by the microprocessor **2**; otherwise, the activity signal is "0" to indicate no activity is present for processing. As shown in FIG. **6**, the output clock follows the fast clock only when the temperature signal is "0" and the activity signal is "1"; otherwise, the output clock follows the sleep clock. Note that the transitions for the output clock from fast clock to sleep clock and from sleep clock to fast clock are shown as being synchronized with the low or "0" portion of the fast clock. For example, at point B the output clock would produce a partial pulse (from the fast clock) if not synchronized. Hence, it is probably preferred that switching occur only when the fast clock is "low", or when both the fast and sleep clocks are "low" as shown at point C. Note that at point C, the output clock transitions from the sleep clock to the fast clock but because the transition is synchronized with the "low" portion of the fast clock, the first pulse does not occur until point D. Such synchronization can be insured by the addition of known circuitry.

FIG. **7** is a block diagram of a fifth embodiment of the invention. Although only the clock regulation unit **20** is illustrated in FIG. **7**, the fifth embodiment interacts with an oscillator **22** and a microprocessor **2** as did the third and fourth embodiments. In this embodiment, the clock regulation unit **20** includes a first divider **40** which divides the input clock (fast clock) to produce a sleep clock, and a second divider **42** which divides the input clock to produce a normal clock. The three clocks (sleep, normal and fast) are then supplied to a selector **44**. The selector **44** outputs one of the three clocks as the output clock for the microprocessor **2** based on first and second select inputs IN**1** and IN**2**. The first select input IN**1** is generated by inverting the digital output from the temperature

US 7,937,599 B1

7

sensor **4** using an inverter **46**. The second select input IN**2** is generated by an activity detector **48** which functions similarly to the activity detector **12** in previous embodiments.

The activity detector **48** receives a plurality of activity inputs ACT**1**, . . . , ACTn. For example, the activity inputs notify the activity detector **48** whether or not activity exists. Each of the activity inputs may, for example, indicate an interrupt, keyboard activity, modem line activity, I/O port activity, or processor activity. As an example, FIG. **8** illustrates a schematic diagram of an embodiment of the activity detector **48**. The activity detector **48** includes a OR gate **50** which outputs a "1" when either the activity input ACT**1** or the activity input ACT**2** is "1". If neither the activity signals ACT**1** and ACT**2** are "1", then the OR gate **50** outputs a "1", thereby indicating the presence of activity.

The following Table I illustrates the selection of one of the three clocks by the selector **44** based on the first select input IN**1** and the second select input IN**2**.

TABLE I

| IN1 | IN2 | CLK Mode |
| --- | --- | --- |
| 0 | 0 | Sleep |
| 0 | 1 | Fast |
| 1 | 0 | Sleep |
| 1 | 1 | Normal |

Note that when no activity is detected by the activity detector **48**, then the sleep clock is output. However, when activity is detected, then the normal clock is output if the chip temperature is "hot" and the fast clock is output if the chip temperature is not "hot". As previous embodiments, this embodiment prevents overheating and conserves energy.

Many alternatives can be made to the third, fourth and fifth embodiments discussed above. For example, additional clocks with different clock frequencies could be provided and selected for different temperature ranges to provide a more gradual decrease in frequency. However, if a microprocessor has sufficient thermal heat dissipation, then even the embodiment with only two different clock frequencies (fast and sleep) may provide reasonable processing speeds even when the microprocessor is getting hot because the switching between the clocks would be quite fast as the response of the temperature sensor **4** is very rapid because it is integrated with the microprocessor **2**. Further, although FIGS. **4**, **5**, and **7** illustrate the temperature sensor **4** as resident within the clock regulation unit **20**, the temperature sensor **20** need only be electrically coupled thereto and closely thermally coupled to the microprocessor **2**.

FIG. **9** is a block diagram of a sixth embodiment of the invention. In this embodiment, the clock (CLK) received by a microprocessor **2** is either a sleep clock produced by an oscillator **52** or a temperature-regulated fast clock produced by a VCO **8** in accordance with a temperature signal **6** (analog) from a temperature sensor **4**. Clock selection is achieved by a selector **54** based on an activity signal **14** provided by an activity detector **12**, **48**. The VCO **8**, the temperature sensor **4** and the activity detector **12**, **48** were discussed above with respect to previous embodiments. If activity is present, the temperature-regulated fast clock is supplied to the microprocessor **2**. On the other hand, if no activity is detected, then the sleep clock is supplied to the microprocessor **2**. The temperature regulation of the fast clock is achieved by the analog temperature signal as discussed above with regard to FIGS. **1** and **2**.

Additionally, FIG. **9** illustrates an additional feature of the invention. Namely, FIG. **9** includes an analog-to-digital converter **56**, a fan controller **58** and a cooling fan **60**. Many conventional computing systems include a fan for circulating air through a computer's cabinet or add-on fans that provide

8

air-flow on or near a microprocessor. Such add-on fans can be activated in accordance with ambient temperature. In contrast, the invention allows more accurate temperature monitoring of the microprocessor **2** because the temperature sensor **4** is integrated with the microprocessor **2**. In addition, the invention facilitates more sophisticated energy conservation which is particularly important for portable computing devices. The temperature signal **6** is converted to digital form by the A/D converter **56** and then supplied to the fan controller **58**. The fan controller **58** performs a pulse-width modulation operation on a supply voltage (Vcc) so as to control the speed of the fan **60**. Pulse-width modulation of the supply voltage allows the speed of the fan to be controlled without wasting energy. Thus, this embodiment further includes a temperature-activated, variable-speed fan.

In the case of a desk-top computing device, it is desirable to activate the fan **60** just prior to the temperature where the fast clock would be regulated downward because of high chip temperature. On the other hand, in the case of a portable computing device, it is desirable to attempt to limit the use of the fan **60** as much as possible by allowing the fast clock to be gradually reduced with increasing temperature before utilizing the fan **60**. For example, if the maximum frequency of the fast clock is 100 MHz, the fan **60** could be activated in the desk-top case before the frequency would be regulated (e.g., attempts to maintain 100 MHz). This would eliminate or delay the reduction in the frequency of the fast clock. In the portable case, the fan **60** could be activated after the frequency of the fast clock is already decreased to 25 MHz. The fan **60** would then only be used when necessary to insure reasonable processing power and even then at the lowest effective speed, thereby saving battery energy to the extent possible.

Although not shown but described with reference to FIG. **6**, depending on the particular design, synchronization of the switching of the frequency may be needed to prevent partial pulse in the clock signal. Such synchronization is easily implemented using well-known circuitry. Likewise, if the computing device requires a consistent clock period during certain events (e.g., analog-to-digital conversion), then hysteresis or other circuitry can be added to restrict the ability of the frequency of the clock to be changed during certain times.

Prior embodiments operate to decrease the clock frequency of the clock signals supplied to a microprocessor to prevent overheating and to conserve energy. FIG. **10** is a block diagram of a seventh embodiment of the invention. This embodiment operates to provide a burst processing mode for use under certain conditions. During certain types of processing activity, a clock control unit **20** causes an overdrive clock to be supplied to a microprocessor **2**. Because the overdrive clock is used only in short bursts, the frequency of the overdrive clock can and preferably exceeds the frequency which sustained processing would permit without rapidly overheating.

In this embodiment, the clock control unit **20** includes a first divider **62** which divides the input clock to produce a sleep clock, and a second divider which divides the input clock to produce a fast clock. Because the input clock serves as the overdrive clock, the input clock has a clock frequency that is faster than necessary for sufficient performance and responsiveness in most cases. The clock control unit **20** also includes a selector **66**, an activity detector **68**, and a temperature sensor **4**. The selector **66** operates to select one of the sleep, fast or overdrive clocks based on select inputs (IN**1**, IN**2**, IN**3**) it receives from the activity detector **68** and the temperature sensor **4**. More particularly, the activity detector **68** receives activity signals ACT**1**, . . . , ACTn which cause the activity detector **68** to generate a burst activity signal and a normal activity signal. Certain of the activity signals ACT trigger the burst activity signal and other activity signals trigger the normal activity signal. The temperature sensor **4** is

US 7,937,599 B1

**9**

integral with the microprocessor **2** and produces a digital temperature signal which indicates whether or not the microprocessor **2** is "hot".

The following Table II illustrates the selection of one of the three clocks by the selector **66** based on the first select input IN**1**, the second select input IN**2**, and the third select input.

TABLE II

| IN1 | IN2 | IN3 | CLK Mode |
|-----|-----|-----|----------|
| 0 | 0 | 0 | Sleep |
| 0 | 0 | 1 | Sleep |
| 0 | 1 | 0 | Fast |
| 0 | 1 | 1 | Sleep |
| 1 | 0 | 0 | Overdrive |
| 1 | 0 | 1 | Fast/Sleep |
| 1 | 1 | 0 | Overdrive |
| 1 | 1 | 1 | Fast/Sleep |

Note that when no activity (either burst or normal) is detected by the activity detector **68**, then the sleep clock is output. However, when burst activity is detected, then the overdrive clock is output if the chip temperature is not "hot" and either the fast clock or the sleep clock is output if the chip temperature is "hot". The determination of which of the fast or sleep clocks to output in this situation is a design choice depending on the ability of the computing system to dissipate heat. In fact, it may be preferred to make the selection more sophisticated in this case so that selector can make the decision using additional temperature information such as signals indicating particular temperature ranges or rate at which temperature is rising. When only normal activity is detected, then the fast clock is output if the chip temperature is not "hot" and the sleep clock is output if the chip temperature is "hot". As a modification, the second divider **64** could be replaced with a VCO thereby using a temperature-regulated fast clock.

Like previous embodiments, this embodiment prevents overheating and conserves energy. The advantage of this embodiment is that processing will appear more uniform or regular to a user.

There are certain times during normal execution of a program, the computer is caused to execute operations which are beyond or unrequested by the program being executed. Such unrequested operations include interrupt processing, and data transfer to cache memory following a cache miss. Using the overdrive clock in these types of situations is advantageous because such will substantially lessen any delay induced by these unrequested operations. A computer user then perceives that the computer's responsiveness is more regular and uniform. For example, when a cache miss occurs an instruction currently being in process is not allowed to complete until the appropriate data block is loaded into the cache. The loading of the cache following a cache miss causes the microprocessor to execute many operations for memory management that were not requested by the computer program or the user, thereby delaying the execution of the instruction. However, because the invention performs such unrequested operations at higher speeds (overdrive clock), the impact of having to perform the extra unrequested operations is substantially lessened and hopefully invisible.

In fact, a particular computer instruction could be used to indirectly select the desired clock frequency for the instruction. This could be useful for instructions that require more intensive processing than do normal instructions. An example of intensive processing is complex floating point computations. Here, the microprocessor would indicate to the activity detector that the overdrive clock is to be used if the chip temperature is not too "hot".

Yet another embodiment would be to alter processing frequency for extremely cold situations. Namely, if the tempera-

**10**

ture sensor indicates that the chip temperature (could also use ambient temperature) is less than a predetermined minimum temperature, then the clock frequency could by set regardless of activity to its maximum value to thereby cause the generation of as much heat as possible so that the computing device could operate correctly even in extremely cold conditions. Any cooling fan of the computing device would also be shut-off using a fan controller such as shown in FIG. **9**.

The many features and advantages of the present invention are apparent from the written description and thus it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

What is claimed is:

**1**. An apparatus for thermally managing temperature of a microprocessor provided within a computer system, the microprocessor operates in accordance with a clock having a clock frequency, the computer system including a fan controllably operable to cool at least a portion of the computer system, said apparatus comprising:

a first electrical connection to a temperature sensor, the temperature sensor being provided within the microprocessor;

a comparison circuit configured to compare a temperature indication provided at least in part by the temperature sensor via said first electrical connection with at least one of a plurality of temperature values to produce comparison data; and

a second electrical connection configured to provide the comparison data for managing the temperature of the microprocessor based at least in part on the temperature indication provided at least in part by the temperature sensor,

wherein the at least one of the plurality of temperature values to be utilized by the comparison circuit differs depending on an operational mode,

wherein in one operational mode the fan is activated when needed to maintain high processing power, and

wherein in another operational mode the fan is activated when necessary to maintain reasonable processing power, which is lower than the high processing power.

**2**. The apparatus as recited in claim **1**, wherein, based on said second electrical connection, the clock frequency used by the microprocessor is capable of being controlled.

**3**. The apparatus as recited in claim **1**, wherein the clock frequency used by the microprocessor is controlled based on the comparison data provided via said second electrical connection.

**4**. The apparatus as recited in claim **1**, wherein the fan can be controlled based on the comparison data provided via said second electrical connection.

**5**. The apparatus as recited in claim **1**, wherein the computer system includes a fan controller, and

wherein, via the second electrical connection, (i) the clock frequency used by the microprocessor is controlled, and (ii) the fan is controlled via the fan controller.

**6**. The apparatus as recited in claim **1**, wherein the one operational mode and the another operational mode are operational modes in which the computer system is operating.

**7**. The apparatus as recited in claim **1**, wherein said apparatus further comprises:

fan control circuitry configured to cause the speed of the fan to be controlled dependent at least in part upon the temperature indication.

US 7,937,599 B1

**11**

**8**. The apparatus as recited in claim **7**, wherein said fan control circuitry controls the speed of the fan using pulse-width modulation (PWM).

**9**. The apparatus as recited in claim **7**, wherein said fan control circuitry controls the speed of the fan by modulating a width of at least one pulse of a supply voltage.

**10**. The apparatus as recited in claim **7**, wherein said fan control circuitry controls the speed of the fan to optimize the speed of the fan based on the temperature indication.

**11**. The apparatus as recited in claim **7**, wherein the computer system operates in accordance with at least two operational modes, the at least two operational modes including the one operational mode and the another operational mode, and

wherein said fan control circuitry controls the speed of the fan differently depending on which of the operational modes the computer system is operating.

**12**. The apparatus as recited in claim **1**, wherein the plurality of temperature values are predetermined for a given operational mode, and wherein at least one of the temperature values for use with the operational mode is different than at least one of the temperature values for use with the another operational mode.

**13**. A fan controller integrated circuit for a computer system, the computer system including at least a processor integrated circuit and a multi-speed fan, said fan controller integrated circuit comprising:

a temperature input for receiving a remote temperature indication pertaining to the temperature of the processor integrated circuit, wherein the remote temperature indication is provided by a temperature sensor that is integrated with the processor integrated circuit;

a digital storage device configured to store a plurality of digital threshold levels; and

fan control circuitry configured to control the speed of the fan based at least in part on the remote temperature indication pertaining to the temperature of the processor integrated circuit,

wherein said fan control circuitry includes at least one comparator,

wherein the computer system supports at least first and second operational modes, and

wherein at least one of the plurality of digital threshold levels utilized by said at least one comparator is dependent upon which of the first and second operational modes the computer system is operating.

**14**. The fan controller integrated circuit as recited in claim **13**,

wherein said fan control circuitry provides a fan control signal to control the speed of the fan, and

wherein the fan control signal uses pulse-width modulation (PWM) to control the speed of the fan.

**15**. The fan controller integrated circuit as recited in claim **13**, wherein said at least one comparator is configured to compare the remote temperature indication provided by the temperature sensor, or a value derived therefrom, with the at least one of the plurality of digital threshold levels.

**16**. The fan controller integrated circuit as recited in claim **15**, wherein said fan control circuitry causes the fan to be on when the remote temperature indication is above the at least one of the plurality of digital threshold levels, with the speed of the fan being optimized based on a fan control signal at least in part dependent on the remote temperature indication.

**17**. The fan controller integrated circuit as recited in claim **16**, wherein said fan control circuitry causes the fan to be off when the remote temperature indication is less than or equal to the at least one digital threshold level.

**18**. An apparatus for thermally managing temperature of a microprocessor provided within a computing system, the microprocessor operates in accordance with a clock having a clock frequency, the computer system including a fan con-

**12**

trollably operable to cool at least a portion of the computing system, said apparatus comprising:

a first electrical connection to a temperature sensor, the temperature sensor being provided within the microprocessor;

a comparison circuit configured to compare a temperature indication provided at least in part by the temperature sensor via said first electrical connection with one or more temperature values to produce comparison data; and

a second electrical connection configured to provide the comparison data for managing the temperature of the microprocessor based at least in part on the temperature indication provided at least in part by the temperature sensor,

wherein the computer system operates in accordance with at least two operational modes, and

wherein said apparatus controls the speed of the fan in a manner that depends on which of the operational modes the computing system is operating.

**19**. The apparatus as recited in claim **18**,

wherein said apparatus provides a fan control signal to control the speed of the fan, and

wherein the fan control signal uses pulse-width modulation (PWM) to control the speed of the fan.

**20**. The apparatus as recited in claim **19**, wherein the speed of the fan is optimized at least in part based on the temperature indication.

**21**. The apparatus as recited in claim **19**,

wherein the comparison circuit is configured to compare the temperature indication with a plurality of the temperature values to produce the comparison data, and

wherein the plurality of the temperature values are predetermined, and at least one of the temperature values for use with a first of the operational modes is different than at least another one of the temperature values for use with a second of the operational modes.

**22**. The apparatus as recited in claim **18**, wherein said apparatus is configured to cause the fan to be on when the temperature indication is above at least one of the temperature values.

**23**. The apparatus as recited in claim **22**, wherein said apparatus is configured to cause the fan to be off when the temperature indication is less than or equal to the at least one of the temperature values.

**24**. The apparatus as recited in claim **18**, wherein, based on said second electrical connection, the clock frequency used by the microprocessor is capable of being controlled.

**25**. The apparatus as recited in claim **18**, wherein the clock frequency used by the microprocessor is controlled based on the comparison data provided via said second electrical connection.

**26**. The apparatus as recited in claim **18**,

wherein said apparatus provides a fan control signal to control the speed of the fan,

wherein the fan control signal uses pulse-width modulation (PWM) to control the speed of the fan,

wherein the comparison circuit is configured to compare the temperature indication with a plurality of the temperature values to produce the comparison data,

wherein the plurality of the temperature values are predetermined, and at least one of the temperature values for use with a first of the operational modes is different than at least another one of the temperature values for use with a second of the operational modes,

wherein said apparatus is configured to cause the fan to be on when the temperature indication is above at least one of the temperature values, and

**13**

wherein, based on said second electrical connection, the clock frequency used by the microprocessor is capable of being controlled.

**27**. The apparatus as recited in claim **26**, wherein the speed of the fan is optimized at least in part based on the temperature indication.

**28**. The apparatus as recited in claim **18**, wherein the one or more temperature values are predetermined, wherein at least

**14**

one of the temperature values is for use with a first of the operational modes, wherein at least another one of the temperature values is for use with a second of the operational modes, and wherein the at least one of the temperature values is different than the at least another one of the temperature values.

* * * * *



US 20130086401A1

(19) **United States**

(12) **Patent Application Publication**     (10) **Pub. No.: US 2013/0086401 A1**

Thomas et al.     (43) **Pub. Date:     Apr. 4, 2013**

(54) **CONFIGURABLE THERMAL AND POWER MANAGEMENT FOR PORTABLE COMPUTERS**

(76) Inventors: **C. Douglass Thomas**, Campbell, CA (US); **Alan E. Thomas**, Ocean City, NJ (US)

(21) Appl. No.: **12/321,798**

(22) Filed:     **Jan. 25, 2009**

**Related U.S. Application Data**

(60) Continuation of application No. 11/821,142, filed on Jun. 22, 2007, now Pat. No. 7,506,190, which is a division of application No. 11/654,337, filed on Jan. 17, 2007, now Pat. No. 7,293,186, which is a continuation of application No. 10/277,630, filed on Oct. 22, 2002, now Pat. No. 7,167,993, which is a continuation of application No. 09/782,680, filed on Feb. 12, 2001, now Pat. No. 6,487,668, which is a continuation of

application No. 09/351,051, filed on Jul. 10, 1999, now Pat. No. 6,216,235, which is a continuation of application No. 08/914,299, filed on Aug. 18, 1997, now Pat. No. 5,974,557, which is a continuation of application No. 08/262,754, filed on Jun. 20, 1994, now Pat. No. 5,752,011.

**Publication Classification**

(51) **Int. Cl.**
    *G06F 1/32*     (2006.01)

(52) **U.S. Cl.**
    USPC ........................................................ **713/322**

(57)     **ABSTRACT**

Improved approaches to providing thermal and power management for a computing device are disclosed. These approaches facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device.



PIPPIN EXHIBIT 1015
THOMAS v. PIPPIN
Interference Nos. 105,956, 105,957, 105,958 & 105,959

Patent Application Publication    Apr. 4, 2013  Sheet 1 of 8    US 2013/0086401 A1



FIG. 1



FIG. 3



CHIP TEMPERATURE   (°C)

FIG. 2



FIG. 4



FIG. 5

FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10

US 2013/0086401 A1

Apr. 4, 2013

1

## CONFIGURABLE THERMAL AND POWER MANAGEMENT FOR PORTABLE COMPUTERS

### CROSS REFERENCE TO RELATED APPLICATIONS

[0001] This application is a continuation application of U.S. application Ser. No. 11/821,142, filed Jun. 22, 2007, which is a divisional application of U.S. application Ser. No. 11/654,337, filed Jan. 17, 2007, which is a continuation application of U.S. application Ser. No. 10/277,630, filed Oct. 22, 2002, now U.S. Pat. No. 7,167,993, which is a continuation application of U.S. application Ser. No. 09/782,680, filed Feb. 12, 2001, now U.S. Pat. No. 6,487,668, which is a continuation application of U.S. application Ser. No. 09/351,051 filed on Jul. 10, 1999, now U.S. Pat. No. 6,216,235, which is a continuation application of U.S. application Ser. No. 08/914, 299 filed on Aug. 18, 1997, now U.S. Pat. No. 5,974,557, which is a continuation application of U.S. application Ser. No. 08/262,754 filed Jun. 20, 1994, now U.S. Pat. No. 5,752, 011, the disclosures of all of which are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

[0002] 1. Field of the Invention
[0003] The present invention relates to a computing device and, more particularly, to a method and apparatus for controlling a processor's clock frequency.
[0004] 2. Description of the Related Art
[0005] It is known that if no user activity has occurred for a period of time that a portable computer can be placed in a suspend or sleep mode. It is also known to suspend or slow a computer's processor (e.g., microprocessor, CPU) when the processor is not actively processing. The following patents and patent publications are representative of the current state of the art:
[0006] U.S. Pat. No. 5,201,059 discloses a sleep mode which is activated when control is given to BIOS or alternatively by incorporating some statistical analysis of the frequency of BIOS calls. In this patent, the sleep mode either stops the clock or slows it to 4 MHz.
[0007] U.S. Pat. No. 5,167,024 discloses a power management system for a laptop computer. The power management system operates to disconnect power sources and/or clock signals to various peripheral devices to conserve battery power. The slow mode is entered into when no activity has been detected for a predetermined period of time.
[0008] U.S. Pat. No. 5,218,704 discloses a technique for power conservation based on real-time sampling of CPU activity. The activity is sampled during interrupts and when it determines that the CPU may rest, a sleep clock is supplied to the CPU. The detection of an interrupt restores the clock to the fast rate prior to processing the interrupt.
[0009] U.S. Pat. No. 5,239,652 discloses a technique for power consumption which disconnects the CPU from the power supply when control logic determines the CPU is not actively processing. Thereafter, the CPU is periodically powered-up to perform housekeeping chores as well as to determine if normal processing should be resumed.
[0010] European patent publication EP-0474963 discloses a sleep mode controller which lowers the CPU clock speed when no input/output operation (when keyboard control routine of BIOS executed no input key data in key buffer, or when CPU is idle and no input key data in the key buffer) is performed. The system uses a clock generator circuit which produces the low clock (4 MHz), the high clock (32 MHz) and a slightly slower high clock (16 MHz). A keyboard controller is used to determine which of the high clocks is used, with selection being made by the computer user. The sleep mode controller is disabled if the AC adapter is connected.
[0011] U.S. Pat. No. 5,230,055 discloses a portable computer wherein the computer is made inoperable when ambient temperature or humidity become too high. Here, ambient temperature and humidity are periodically monitored.
[0012] European patent publication EP-0381021 discloses a power saving system for a personal computer. The system operates to allow or stop power to be supplied to an oscillator based on control data set to a control register via a keyboard or software.
[0013] U.S. Pat. No. 5,021,679 discloses a power system for a portable computer wherein the supply voltage is varied depending on the current being supplied to the computer by the power system. Further, a variable-frequency clock is provided which varies its frequency based on the supply voltage being produced.
[0014] External clocks have been used to provide a computer system with faster clocks. Here, the faster external clock is substituted for the internal clock of the computer system. U.S. Pat. No. 5,134,703 is illustrative of an external clock unit which supplies a faster clock to a computer without requiring any hardware changes within the computer.
[0015] The problem with all the prior solutions to energy conservation is that the processors can still overheat. In particular, during prolonged processing or activity by a computer's processor, the processor will not enter its sleep mode (if any) and as a result the processor will become hot and require extensive means to cool the processor to prevent overheating and eventual failure of the processor. Overheating and failure of the processor can also occur when the computer is used in particularly hot environmental temperatures, the computer's cooling fan fails, or when cooling of the processor is otherwise inadequate.
[0016] Another problem is that with portable computers, manufacturers have to either use a lower clock frequency (lower than would be used in a comparable desk top computer) for processing or provide a fan for cooling. A lower clock frequency is not satisfactory as users want maximum processing power just as they get with a desk top computer. Requiring a portable computer to use a fan for cooling is also unsatisfactory because it consumes battery energy.
[0017] Thus, there is a need for a solution to the above problems which enables a computing device to maximize its processing speed while, at the same time, preventing overheating.

### SUMMARY OF THE INVENTION

[0018] Broadly speaking, the invention relates to novel techniques for providing thermal and power management for a computing device. These techniques facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device.
[0019] As a method for managing operation of a portable computer, the portable computer including at least a processor and a fan, the fan being operable to cool at least the processor, one embodiment of the invention can, for example, include at least: configuring the portable computer to utilize

US 2013/0086401 A1                                                    Apr. 4, 2013

2

at least one of a first power management configuration or a second power management configuration; monitoring a temperature of the processor; setting a speed of the fan based on the configured one of the first and second power management configurations and based on the monitored temperature of the processor; and setting a speed of the processor based on the configured one of the first and second power management configurations and based on the monitored temperature of the processor.

[0020]    As a method for managing operation of a portable computer, the portable computer including at least a processor and a fan, the fan being operable to cool at least the processor, one embodiment of the invention can, for example, include at least: configuring the portable computer for one of a plurality of different power management configurations; monitoring a temperature of the processor; setting a speed of the fan based on the configured power management configuration for the portable computer and based on the monitored temperature of the processor; and setting a speed of the processor based on the configured power management configuration for the portable computer configured and based on the monitored temperature of the processor.

[0021]    Other aspects and advantages of the invention will become apparent from the following detailed description, taken in conjunction with the accompanying drawings, illustrating by way of example the principles of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

[0022]    The present invention will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein like reference numerals designate like structural elements, and in which:

[0023]    FIG. 1 is a block diagram of a first embodiment of the invention;

[0024]    FIG. 2 is a graph of an example of the relationship of chip temperature of a microprocessor and frequency of a clock signal;

[0025]    FIG. 3 is a block diagram of a second embodiment of the invention;

[0026]    FIG. 4 is a block diagram of a third embodiment of the invention;

[0027]    FIG. 5 is a block diagram of a fourth embodiment of the invention;

[0028]    FIG. 6 is a timing diagram illustrating operation of the fourth embodiment;

[0029]    FIG. 7 is a block diagram of a fifth embodiment of the invention;

[0030]    FIG. 8 illustrates a schematic diagram of an embodiment of an activity detector;

[0031]    FIG. 9 is a block diagram of a sixth embodiment of the invention; and

[0032]    FIG. 10 is a block diagram of a seventh embodiment of the invention.

DETAILED DESCRIPTION OF THE INVENTION

[0033]    The invention provides novel techniques for controlling a processor's clock frequency so as to prevent overheating. In addition to preventing overheating, the invention attempts to maximize the processing speed of the processor. The invention also operates to conserve the amount of energy consumed by the processor. Preventing the processor from overheating is important because when a processor overheats it no longer operates properly. Conservation of energy,

although of general importance for all computing devices, is particularly important for portable computing devices.

[0034]    The invention monitors a processor's activity and its temperature. When there is no activity for the processor, a slow clock frequency is used, thereby saving power and lowering the thermal heat produced by the processor. On the other hand, when there is activity for the processor, a fast clock frequency is used. However, when prolonged activity (i.e., sustained fast clock frequency) causes the processor's temperature to become dangerously high for proper operation, the clock frequency is reduced so as to maintain processing speed at a reduced speed while preventing overheating.

[0035]    Embodiments of the invention are discussed below with reference to FIGS. 1-10. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

[0036]    FIG. 1 is a block diagram of a first embodiment of the invention. In this embodiment, a microprocessor 2 has a temperature sensor 4 which is integral with the microprocessor 2. The temperature sensor 4 is either integrated within the Very Large Scale Integration (VLSI) design of the microprocessor 2 or placed in contact with the housing or package thereof. In either case, the temperature sensor 4 is thermally coupled with the microprocessor 2. Because the temperature sensor 4 is integral or thermally coupled with the microprocessor 2, the temperature sensor 4 is very responsive to the temperature changes of the microprocessor 2. The temperature sensor 4 produces a temperature signal 6. Temperature sensing circuitry is well known and therefore not further described.

[0037]    The temperature signal 6 is supplied to a voltage-controlled oscillator (VCO) 8. The VCO 8 produces a clock signal 10 which is supplied to a clock input of the microprocessor 2. The VCO 8 operates to produce different frequencies for the clock signal 10 depending on the value of the temperature signal. In this embodiment, the temperature signal 6 is preferably an analog voltage signal and the VCO 8 produces the clock signal 10 based on the value of the analog voltage signal. For example, the temperature signal could be a voltage ranging from zero to five volts. In response to the temperature signal 6, the VCO 8 could produce the clock signal with frequencies ranging from 100 MHz to 1 MHz. The frequency range is a design choice selected in accordance with the specific microprocessor being utilized. VCO's are well known and therefore are not further described.

[0038]    FIG. 2 is a graph of an example of the relationship of chip temperature of the microprocessor 2 and clock frequency of the clock signal 10. The clock frequency varies between a maximum frequency ($f_{MAX}$) and a minimum frequency ($f_{MIN}$) for given microprocessor. The minimum frequency ($f_{MIN}$) may be zero if the clock signal 10 is not responsible for refreshing dynamic memory; otherwise, it cannot fall below some minimum frequency. Notice that as the chip temperature increases beyond some threshold temperature (VTH) (e.g., 120 degrees F.), the frequency of the clock signal 10 will gradually decrease. By decreasing the clock frequency in relation to the chip temperature, processing speed can be maximized for a given temperature without risking processor overheating. As the chip temperature become "hot", the clock frequency is reduced so as to reduce the thermal heat generated by the microprocessor 2. The profile of the curve for the clock frequency shown in FIG. 2 is

3

illustrative as other curves may be used. For example, the frequency of the clock signal 10 could be controlled so that the chip temperature is maintained in a more limited temperature range. In any case, the profiles of the curves decrease the clock frequency as the temperature increases.

[0039]   FIG. 3 is a block diagram of a second embodiment of the invention. In this embodiment, the microprocessor 2, temperature sensor 4, the temperature signal 6, the VCO 8, and the clock signal 10 are similar to those utilized in the first embodiment. However, this embodiment further includes an activity detector 12, an activity signal 14, a VCO controller 16, and a control signal 18. The activity detector 12 monitors the microprocessor 2 and/or some related peripheral device (e.g., interrupt controller, keyboard buffer, input/output ports, instruction cache, current instruction, program counter) to determine when the microprocessor 2 is actively processing or when processing is needed. In this case, the activity detector 12 notifies the VCO controller 16 that processing is needed with the activity signal 14. On the other hand, when no activity exists, the activity detector 12 notifies the VCO controller 16 that no processing is needed with the activity signal 14. The activity signal is preferably a digital signal having at least one bit. Activity detection is described in more detail in U.S. Pat. No. 5,201,059; U.S. Pat. No. 5,167,024; U.S. Pat. No. 5,218,704; U.S. Pat. No. 5,239,652; and European patent publication EP-0474963, which are hereby incorporated by reference.

[0040]   The VCO controller 16 receives the activity signal 14 and the temperature signal 6. In response to these signals, the VCO controller 16 produces the control signal 18 which controls the VCO 8. The control signal 18 may be analog or digital depending on the design of the VCO 8. The basic operation of the VCO controller 16 is to cause the VCO 8 to produce the clock signal 10 for the microprocessor 2 in an intelligent manner so as to conserve energy and prevent overheating. Namely, if the activity detector 12 indicates that no processing is needed at a given point in time, then regardless of the temperature detected by the temperature sensor 4, the VCO controller 16 will cause the VCO 8 to produce a sleep (or slow) clock. The sleep clock has a frequency near the minimum frequency ($f_{MIN}$). On the other hand, if the activity detector 12 indicates that processing is needed at this point in time, then the VCO controller 16 will cause the VCO 8 to produce a fast clock. The fast clock is the temperature-regulated maximum frequency such as discussed in FIGS. 1 and 2.

[0041]   The second embodiment is particularly advantageous for portable computing devices because it conserves battery life by using a sleep clock when no processing is needed. However, even in the case of prolonged processing, the embodiment prevents overheating.

[0042]   FIG. 4 is a block diagram of a third embodiment of the invention. In this embodiment, the microprocessor 2 includes a clock regulation unit 20 which controls the frequency of the clock used by the microprocessor 2 based on chip temperature of the microprocessor 2. Preferably, the clock regulation unit 20 is integrated with circuitry of the microprocessor 2. Alternatively, the clock regulation unit 20 can be separate from the circuitry of the microprocessor 2 but nevertheless coupled thereto.

[0043]   The clock regulation unit 20 receives an input clock from an oscillator 22 and produces an output clock which is used by the microprocessor 2. The clock regulation unit 20 includes a temperature sensor 4, a divider 24, a first AND gate 26, a second AND gate 28, an inverter 30 and an OR gate 32.

The temperature sensor 4 is as previously described. The divider 24 divides the input clock (fast clock) from the oscillator 22 to produce a sleep (or slow) clock. For example, if the oscillator 22 is a 100 MHz fixed-frequency oscillator and the divider 24 divides by 100, then the sleep clock would be 1 MHz.

[0044]   In this embodiment, the temperature sensor 4 produces a digital output. It is assumed that the digital output is normally "0", but when the microprocessor 2 becomes "hot", the digital output becomes "1". The digital output of the temperature sensor 4 together with the logic gates 26-32 operate to select either the fast clock or the sleep clock as the output clock which is used by the microprocessor 2. In particular, when the microprocessor 2 is not "hot", AND gate 26 is inactivated and AND gate 28 is activated by inverter 30. Hence, the output clock is the fast clock via AND gate 28 and OR gate 32. On the other hand, when the microprocessor 2 is "hot", AND gate 26 is activated and AND gate 28 is inactivated. Accordingly, in this case, the output clock is the sleep (or slow) clock via AND gate 26 and OR gate 32.

[0045]   FIG. 5 is a block diagram of a fourth embodiment of the invention. In this embodiment, the microprocessor 2 includes a clock regulation unit 20 which controls the frequency of the clock used by the microprocessor 2 based on chip temperature of the microprocessor 2 and processing activity. The clock regulation unit 20 is preferably integrated with circuitry of the microprocessor 2.

[0046]   As with the third embodiment, the clock regulation unit 20 for the fourth embodiment receives the input clock from the oscillator 22 and produces the output clock which is used by the microprocessor 2. The clock regulation unit 20 includes the temperature sensor 4, the divider 24, the first AND gate 26, the second AND gate 28, and the OR gate 32 as described above with reference to FIG. 4. The divider 24 divides the input clock (fast clock) from the oscillator 22 to produce a sleep clock. The temperature sensor 4 produces a digital output. Although the digital output from the temperature sensor 4 is normally "0", when the microprocessor 2 becomes "hot", the digital output becomes "1". The activity detector 12 produces an activity signal as described in the second embodiment. Here, the activity signal is a digital signal which is "high" or "1" when activity is present and "low" or "0" when no activity is present.

[0047]   The digital output of the temperature sensor 4 together with the activity signal from the activity detector 12 and the logic gates 26, 28, 32, 34, 36 and 38 operate to select either the fast clock or the sleep clock. In particular, when the microprocessor 2 is not "hot" and activity is present, the AND gate 36 is activated by the inverter 34 and the activity signal. The output of AND gate 36 then activates AND gate 28 and inverter 38 inactivates AND gate 26. Hence, the output clock is the fast clock via AND gate 28 and OR gate 32. On the other hand, when the microprocessor 2 is "hot", the AND gate 36 is inactivated by the inverter 34 regardless of the activity signal. The output of AND gate 36 inactivates AND gate 28, and inverter 38 activates the AND gate 26. In this case, the output clock is the sleep clock via AND gate 26 and OR gate 32.

[0048]   FIG. 6 is a timing diagram illustrating operation of the fourth embodiment. The output clock (CLK) is a mixture of the fast clock produced by the oscillator 22 and the sleep clock produced by the divider 24. The temperature signal is the digital output of the temperature sensor 4. The temperature signal is "0" while the chip temperature is not "hot". However, when the chip temperature becomes "hot", the tem-

perature signal becomes "1", as shown at point A. The activity signal is "1" when activity is present for processing by the microprocessor **2**; otherwise, the activity signal is "0" to indicate no activity is present for processing. As shown in FIG. **6**, the output clock follows the fast clock only when the temperature signal is "0" and the activity signal is "1"; otherwise, the output clock follows the sleep clock. Note that the transitions for the output clock from fast clock to sleep clock and from sleep clock to fast clock are shown as being synchronized with the low or "0" portion of the fast clock. For example, at point B the output clock would produce a partial pulse (from the fast clock) if not synchronized. Hence, it is probably preferred that switching occur only when the fast clock is "low," or when both the fast and sleep clocks are "low" as shown at point C. Note that at point C, the output clock transitions from the sleep clock to the fast clock but because the transition is synchronized with the "low" portion of the fast clock, the first pulse does not occur until point D. Such synchronization can be insured by the addition of known circuitry.

[0049]    FIG. **7** is a block diagram of a fifth embodiment of the invention. Although only the clock regulation unit **20** is illustrated in FIG. **7**, the fifth embodiment interacts with an oscillator **22** and a microprocessor **2** as did the third and fourth embodiments. In this embodiment, the clock regulation unit **20** includes a first divider **40** which divides the input clock (fast clock) to produce a sleep clock, and a second divider **42** which divides the input clock to produce a normal clock. The three clocks (sleep, normal and fast) are then supplied to a selector **44**. The selector **44** outputs one of the three clocks as the output clock for the microprocessor **2** based on first and second select inputs IN**1** and IN**2**. The first select input IN**1** is generated by inverting the digital output from the temperature sensor **4** using an inverter **46**. The second select input IN**2** is generated by an activity detector **48** which functions similarly to the activity detector **12** in previous embodiments.

[0050]    The activity detector **48** receives a plurality of activity inputs ACT1, . . . , ACTn. For example, the activity inputs notify the activity detector **48** whether or not activity exists. Each of the activity inputs may, for example, indicate an interrupt, keyboard activity, modem line activity, I/O port activity, or processor activity. As an example, FIG. **8** illustrates a schematic diagram of an embodiment of the activity detector **48**. The activity detector **48** includes a OR gate **50** which outputs a "1" when either the activity input ACT1 or the activity input ACT2 is "1". If neither the activity signals ACT**1** and ACT**2** are "1", then the OR gate **50** outputs a "1", thereby indicating the presence of activity.

[0051]    The following Table I illustrates the selection of one of the three clocks by the selector **44** based on the first select input IN**1** and the second select input IN**2**.

TABLE I

| IN1 | IN2 | CLK Mode |
|-----|-----|----------|
| 0 | 0 | Sleep |
| 0 | 1 | Fast |
| 1 | 0 | Sleep |
| 1 | 1 | Normal |

[0052]    Note that when no activity is detected by the activity detector **48**, then the sleep clock is output. However, when activity is detected, then the normal clock is output if the chip

temperature is "hot" and the fast clock is output if the chip temperature is not "hot". Like previous embodiments, this embodiment prevents overheating and conserves energy.

[0053]    Many alternatives can be made to the third, fourth and fifth embodiments discussed above. For example, additional clocks with different clock frequencies could be provided and selected for different temperature ranges to provide a more gradual decrease in frequency. However, if a microprocessor has sufficient thermal heat dissipation, then even the embodiment with only two different clock frequencies (fast and sleep) may provide reasonable processing speeds even when the microprocessor is getting hot because the switching between the clocks would be quite fast as the response of the temperature sensor **4** is very rapid because it is integrated with the microprocessor. Further, although FIGS. **4**, **5**, and **7** illustrate the temperature sensor **4** as resident within the clock regulation unit **20**, the temperature sensor **20** need only be electrically coupled thereto and closely thermally coupled to the microprocessor **2**.

[0054]    FIG. **9** is a block diagram of a sixth embodiment of the invention. In this embodiment, the clock (CLK) received by a microprocessor **2** is either a sleep clock produced by an oscillator **52** or a temperature-regulated fast clock produced by a VCO **8** in accordance with a temperature signal **6** (analog) from a temperature sensor **4**. Clock selection is achieved by a selector **54** based on an activity signal **14** provided by an activity detector **12**, **48**. The VCO **8**, the temperature sensor **4** and the activity detector **12**, **48** were discussed above with respect to previous embodiments. If activity is present, the temperature-regulated fast clock is supplied to the microprocessor **2**. On the other hand, if no activity is detected, then the sleep clock is supplied to the microprocessor **2**. The temperature regulation of the fast clock is achieved by the analog temperature signal as discussed above with regard to FIGS. **1** and **2**.

[0055]    Additionally, FIG. **9** illustrates an additional feature of the invention. Namely, FIG. **9** includes an analog-to-digital converter **56**, a fan controller **58** and a cooling fan **60**. Many conventional computing systems include a fan for circulating air through a computer's cabinet or add-on fans that provide air-flow on or near a microprocessor. Such add-on fans can be activated in accordance with ambient temperature. In contrast, the invention allows more accurate temperature monitoring of the microprocessor **2** because the temperature sensor **4** is integrated with the microprocessor **2**. In addition, the invention facilitates more sophisticated energy conservation which is particularly important for portable computing devices. The temperature signal **6** is converted to digital form by the A/D converter **56** and then supplied to the fan controller **58**. The fan controller **58** performs a pulse-width modulation operation on a supply voltage (Vcc) so as to control the speed of the fan **60**. Pulse-width modulation of the supply voltage allows the speed of the fan to be controlled without wasting energy. Thus, this embodiment further includes a temperature-activated, variable-speed fan.

[0056]    In the case of a desk-top computing device, it is desirable to activate the fan **60** just prior to the temperature where the fast clock would be regulated downward because of high chip temperature. On the other hand, in the case of a portable computing device, it is desirable to attempt to limit the use of the fan **60** as much as possible by allowing the fast clock to be gradually reduced with increasing temperature before utilizing the fan **60**. For example, if the maximum frequency of the fast clock is 100 MHz, the fan **60** could be

activated in the desk-top case before the frequency would be regulated (e.g., attempts to maintain 100 MHz). This would eliminate or delay the reduction in the frequency of the fast clock. In the portable case, the fan **60** could be activated after the frequency of the fast clock is already decreased to 25 MHz. The fan **60** would then only be used when necessary to insure reasonable processing power and even then at the lowest effective speed, thereby saving battery energy to the extent possible.

[0057]   Although not shown but described with reference to FIG. **6**, depending on the particular design, synchronization of the switching of the frequency may be needed to prevent partial pulse in the clock signal. Such synchronization is easily implemented using well-known circuitry. Likewise, if the computing device requires a consistent clock period during certain events (e.g., analog-to-digital conversion), then hysteresis or other circuitry can be added to restrict the ability of the frequency of the clock to be changed during certain times.

[0058]   Prior embodiments operate to decrease the clock frequency of the clock signals supplied to a microprocessor to prevent overheating and to conserve energy. FIG. **10** is a block diagram of a seventh embodiment of the invention. This embodiment operates to provide a burst processing mode for use under certain conditions. During certain types of processing activity, a clock control unit **20** causes an overdrive clock to be supplied to a microprocessor **2**. Because the overdrive clock is used only in short bursts, the frequency of the overdrive clock can and preferably exceeds the frequency which sustained processing would permit without rapidly overheating.

[0059]   In this embodiment, the clock control unit **20** includes a first divider **62** which divides the input clock to produce a sleep clock, and a second divider which divides the input clock to produce a fast clock. Because the input clock serves as the overdrive clock, the input clock has a clock frequency that is faster than that necessary for sufficient performance and responsiveness in most cases. The clock control unit **20** also includes a selector **66**, an activity detector **68**, and a temperature sensor **4**. The selector **66** operates to select one of the sleep, fast or overdrive clocks based on select inputs (IN**1**, IN**2**, IN**3**) it receives from the activity detector **68** and the temperature sensor **4**. More particularly, the activity detector **68** receives activity signals ACT**1**, . . . , ACT**n** which cause the activity detector **68** to generate a burst activity signal and a normal activity signal. Certain of the activity signals ACT trigger the burst activity signal and other activity signals trigger the normal activity signal. The temperature sensor **4** is integral with the microprocessor **2** and produces a digital temperature signal which indicates whether or not the microprocessor **2** is "hot".

[0060]   The following Table II illustrates the selection of one of the three clocks by the selector **66** based on the first select input IN**1**, the second select input IN**2**, and the third select input.

TABLE II

| IN1 | IN2 | IN3 | CLK Mode |
|-----|-----|-----|----------|
| 0 | 0 | 0 | Sleep |
| 0 | 0 | 1 | Sleep |
| 0 | 1 | 0 | Fast |
| 0 | 1 | 1 | Sleep |
| 1 | 0 | 0 | Overdrive |

TABLE II-continued

| IN1 | IN2 | IN3 | CLK Mode |
|-----|-----|-----|----------|
| 1 | 0 | 1 | Fast/Sleep |
| 1 | 1 | 0 | Overdrive |
| 1 | 1 | 1 | Fast/Sleep |

[0061]   Note that when no activity (either burst or normal) is detected by the activity detector **68**, then the sleep clock is output. However, when burst activity is detected, then the overdrive clock is output if the chip temperature is not "hot" and either the fast clock or the sleep clock is output if the chip temperature is "hot". The determination of which of the fast or sleep clocks to output in this situation is a design choice depending on the ability of the computing system to dissipate heat. In fact, it may be preferred to make the selection more sophisticated in this case so that selector can make the decision using additional temperature information such as signals indicating particular temperature ranges or rate at which temperature is rising. When only normal activity is detected, then the fast clock is output if the chip temperature is not "hot" and the sleep clock is output if the chip temperature is "hot". As a modification, the second divider **64** could be replaced with a VCO thereby using a temperature-regulated fast clock.

[0062]   Like previous embodiments, this embodiment prevents overheating and conserves energy. The advantage of this embodiment is that processing will appear more uniform or regular to a user.

[0063]   There are certain times during normal execution of a program, the computer is caused to execute operations which are beyond or unrequested by the program being executed. Such unrequested operations include interrupt processing, and data transfer to cache memory following a cache miss. Using the overdrive clock in these types of situations is advantageous because such will substantially lessen any delay induced by these unrequested operations. A computer user then perceives that the computer's responsiveness is more regular and uniform. For example, when a cache miss occurs an instruction currently being in process is not allowed to complete until the appropriate data block is loaded into the cache. The loading of the cache following a cache miss causes the microprocessor to execute many operations for memory management that were not requested by the computer program or the user, thereby delaying the execution of the instruction. However, because the invention performs such unrequested operations at higher speeds (overdrive clock), the impact of having to perform the extra unrequested operations is substantially lessened and hopefully invisible.

[0064]   In fact, a particular computer instruction could be used to indirectly select the desired clock frequency for the instruction. This could be useful for instructions that require more intensive processing than do normal instructions. An example of intensive processing is complex floating point computations. Here, the microprocessor would indicate to the activity detector that the overdrive clock is to be used if the chip temperature is not too "hot".

[0065]   Yet another embodiment would be to alter processing frequency for extremely cold situations. Namely, if the temperature sensor indicates that the chip temperature (could also use ambient temperature) is less than a predetermined minimum temperature, then the clock frequency could by set regardless of activity to its maximum value to thereby cause the generation of as much heat as possible so that the computing device could operate correctly even in extremely cold

conditions. Any cooling fan of the computing device would also be shut-off using a fan controller such as shown in FIG. **9**.

[0066]   The many features and advantages of the present invention are apparent from the written description and thus it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

What is claimed is:

**1**. A method for managing operation of a portable computer, the portable computer including at least a processor and a fan, the fan being operable to cool at least the processor, said method comprising:

configuring the portable computer to utilize at least one of a first power management configuration or a second power management configuration;

monitoring a temperature of the processor;

setting a speed of the fan based on the configured one of the first and second power management configurations and based on the monitored temperature of the processor; and

setting a speed of the processor based on the configured one of the first and second power management configurations and based on the monitored temperature of the processor.

**2**. A method as recited in claim **1**, wherein each of the first and second power management configurations includes at least one condition concerning a speed of the processor and at least one condition concerning a speed of the fan.

**3**. A method as recited in claim **2**, wherein the at least one condition concerning the speed of the processor is dependent on a temperature of the processor.

**4**. A method as recited in claim **2**, wherein the at least one condition concerning the speed of the fan is dependent on a temperature of the processor.

**5**. A method as recited in claim **4**, wherein the at least one condition concerning the speed of the processor is dependent on a temperature of the processor.

**6**. A method as recited in claim **1**,

wherein each of the first and second power management configurations includes at least one condition setting a speed of the processor and at least one condition setting a speed of the fan,

wherein the at least one condition setting the speed of the processor is dependent on a temperature of the processor, and

wherein the at least one condition setting the speed of the fan is dependent on a temperature of the processor.

**7**. A method as recited in claim **1**, wherein each of the first and second power management configurations include at least one condition based on a temperature of the processor.

**8**. A method as recited in claim **1**, wherein said setting of the speed of the fan comprises controlling the speed of the fan using pulse width modulation.

**9**. A method as recited in claim **1**, wherein said method comprises:

configuring the portable computer to utilize the first power management configuration when the portable computer is operating and powered by a battery; and

configuring the portable computer to utilize the second power management configuration when the portable computer is operating but not powered by a battery.

**10**. A method as recited in claim **1**, wherein said method comprises:

configuring the portable computer to utilize the first power management configuration when the portable computer is operated in a portable mode; and

configuring the portable computer to utilize the second power management configuration when the portable computer is operated in a desktop mode.

**11**. A method for managing operation of a portable computer, the portable computer including at least a processor and a fan, the fan being operable to cool at least the processor, said method comprising:

configuring the portable computer for one of a plurality of different power management configurations;

monitoring a temperature of the processor;

setting a speed of the fan based on the configured power management configuration for the portable computer and based on the monitored temperature of the processor; and

setting a speed of the processor based on the configured power management configuration for the portable computer configured and based on the monitored temperature of the processor.

**12**. A method as recited in claim **11**, wherein each of the power management configurations includes at least one condition concerning a speed of the processor and at least one condition concerning a speed of the fan.

**13**. A method as recited in claim **12**, wherein the at least one condition concerning the speed of the processor is dependent on a temperature of the processor.

**14**. A method as recited in claim **12**, wherein the at least one condition concerning the speed of the fan is dependent on a temperature of the processor.

**15**. A method as recited in claim **14**, wherein the at least one condition concerning the speed of the processor is dependent on a temperature of the processor.

**16**. A method as recited in claim **11**, wherein each of the power management configurations includes at least one condition based on a temperature of the processor.

**17**. A method as recited in claim **11**, wherein said setting of the speed of the fan uses pulse width modulation.

**18**. A method as recited in claim **11**, wherein said configuring of the portable computer for one of the plurality of different power management configurations comprises:

configuring the portable computer for a first power management configuration when the portable computer is powered by a DC source; and

configuring the portable computer for a second power management configuration when the portable computer is powered by an AC source.

**19**. A method as recited in claim **18**,

wherein each of the first and second power management configurations is associated with at least one condition concerning a speed of the processor and at least one condition concerning a speed of the fan,

wherein the at least one condition concerning the speed of the fan is dependent on a temperature of the processor, and

wherein the at least one condition concerning the speed of the processor is dependent on a temperature of the processor.

**20**. A method as recited in claim **19**, wherein said setting of the speed of the fan uses pulse width modulation.

**21**. A method as recited in claim **9**, wherein each of the first and second power management configurations is associated with at least one condition based on a temperature of the processor.

**22**. A method as recited in claim **21**, wherein said setting of the speed of the fan comprises controlling the speed of the fan using pulse width modulation.

**23**. A method as recited in claim **10**, wherein each of the first and second power management configurations is associated with at least one condition based on a temperature of the processor.

**24**. A method as recited in claim **23**, wherein said setting of the speed of the fan comprises controlling the speed of the fan using pulse width modulation.

**25**. A computing apparatus, comprising:

a processing unit configured to operate at an operational speed;

a temperature sensor configured to monitor a temperature of said processing unit;

a fan for cooling at least said processing unit; and

a power management apparatus operatively connected to said processing unit, said temperature sensor and said fan, said power management apparatus being configured to operate in accordance with at least one of a first power management configuration or a second power management configuration, and said power management apparatus being operable to (i) receive the temperature of the processing unit using said temperature sensor, (ii) control a speed of the fan based on the configured one of the first and second power management configurations and based on the temperature of the processing unit, and (iii) control a speed of the processing unit based on the configured one of the first and second power management configurations and based on the temperature of the processing unit.

**26**. A computing apparatus as recited in claim **25**,

wherein each of the first and second power management configurations is associated with at least one condition concerning a speed of the processing unit and at least one condition concerning a speed of the fan,

wherein the at least one condition concerning the speed of the processing unit is dependent on a temperature of the processing unit, and

wherein the at least one condition concerning the speed of the fan is dependent on a temperature of the processing unit.

**27**. A computing apparatus as recited in claim **26**, wherein said setting of the speed of the fan uses pulse width modulation.

*     *     *     *     *



US 20130117594A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2013/0117594 A1**

Thomas et al. (43) Pub. Date: **May 9, 2013**

(54) **CONFIGURABLE THERMAL AND POWER MANAGEMENT FOR PORTABLE COMPUTERS**

(71) Applicants: **C. Douglass Thomas**, Saratoga, CA (US); **Alan E. Thomas**, Ocean City, NJ (US)

(72) Inventors: **C. Douglass Thomas**, Saratoga, CA (US); **Alan E. Thomas**, Ocean City, NJ (US)

(21) Appl. No.: **13/727,433**

(22) Filed: **Dec. 26, 2012**

**Related U.S. Application Data**

(60) Continuation of application No. 12/321,798, filed on Jan. 25, 2009, which is a continuation of application No. 11/821,142, filed on Jun. 22, 2007, now Pat. No. 7, 506,190, which is a division of application No. 11/654, 337, filed on Jan. 17, 2007, now Pat. No. 7,293,186, which is a continuation of application No. 10/277,630, filed on Oct. 22, 2002, now Pat. No. 7,167,993, which is a continuation of application No. 09/782,680, filed on Feb. 12, 2001, now Pat. No. 6,487,668, which is a continuation of application No. 09/351,051, filed on Jul. 10, 1999, now Pat. No. 6,216,235, which is a continuation of application No. 08/914,299, filed on Aug. 18, 1997, now Pat. No. 5,974,557, which is a continuation of application No. 08/262,754, filed on Jun. 20, 1994, now Pat. No. 5,752,011.

**Publication Classification**

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 1/32* | (2006.01) |
| *G06F 1/20* | (2006.01) |
| *G06F 1/26* | (2006.01) |

(52) **U.S. Cl.**
CPC ....... *G06F 1/324* (2013.01); *G06F 1/26* (2013.01); *G06F 1/206* (2013.01)
USPC ............................ **713/322**; 713/300; 713/320

(57) **ABSTRACT**

Improved approaches to providing thermal and power management for a computing device are disclosed. These approaches facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device.



**PIPPIN EXHIBIT 1016**
**THOMAS v. PIPPIN**
**Interference Nos. 105,956, 105,957,**
**105,958 & 105,959**



FIG. 1



FIG. 3



FIG. 2



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10

US 2013/0117594 A1

May 9, 2013

1

## CONFIGURABLE THERMAL AND POWER MANAGEMENT FOR PORTABLE COMPUTERS

### CROSS REFERENCE TO RELATED APPLICATIONS

[0001] This application is a continuation application of U.S. application Ser. No. 12/321,798, filed Jan. 25, 2009, which is a continuation application of U.S. application Ser. No. 11/821,142, filed Jun. 22, 2007, which is a divisional application of U.S. application Ser. No. 11/654,337, filed Jan. 17, 2007, which is a continuation application of U.S. application Ser. No. 10/277,630, filed Oct. 22, 2002, now U.S. Pat. No. 7,167,993, which is a continuation application of U.S. application Ser. No. 09/782,680, filed Feb. 12, 2001, now U.S. Pat. No. 6,487,668, which is a continuation application of U.S. application Ser. No. 09/351,051 filed on Jul. 10, 1999, now U.S. Pat. No. 6,216,235, which is a continuation application of U.S. application Ser. No. 08/914,299 filed on Aug. 18, 1997, now U.S. Pat. No. 5,974,557, which is a continuation application of U.S. application Ser. No. 08/262,754 filed Jun. 20, 1994, now U.S. Pat. No. 5,752,011, the disclosures of all of which are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

[0002] 1. Field of the Invention

[0003] The present invention relates to a computing device and, more particularly, to a method and apparatus for controlling a processor's clock frequency.

[0004] 2. Description of the Related Art

[0005] It is known that if no user activity has occurred for a period of time that a portable computer can be placed in a suspend or sleep mode. It is also known to suspend or slow a computer's processor (e.g., microprocessor, CPU) when the processor is not actively processing. The following patents and patent publications are representative of the current state of the art:

[0006] U.S. Pat. No. 5,201,059 discloses a sleep mode which is activated when control is given to BIOS or alternatively by incorporating some statistical analysis of the frequency of BIOS calls. In this patent, the sleep mode either stops the clock or slows it to 4 MHz.

[0007] U.S. Pat. No. 5,167,024 discloses a power management system for a laptop computer. The power management system operates to disconnect power sources and/or clock signals to various peripheral devices to conserve battery power. The slow mode is entered into when no activity has been detected for a predetermined period of time.

[0008] U.S. Pat. No. 5,218,704 discloses a technique for power conservation based on real-time sampling of CPU activity. The activity is sampled during interrupts and when it determines that the CPU may rest, a sleep clock is supplied to the CPU. The detection of an interrupt restores the clock to the fast rate prior to processing the interrupt.

[0009] U.S. Pat. No. 5,239,652 discloses a technique for power consumption which disconnects the CPU from the power supply when control logic determines the CPU is not actively processing. Thereafter, the CPU is periodically powered-up to perform housekeeping chores as well as to determine if normal processing should be resumed.

[0010] European patent publication EP-0474963 discloses a sleep mode controller which lowers the CPU clock speed when no input/output operation (when keyboard control routine of BIOS executed no input key data in key buffer, or when CPU is idle and no input key data in the key buffer) is performed. The system uses a clock generator circuit which produces the low clock (4 MHz), the high clock (32 MHz) and a slightly slower high clock (16 MHz). A keyboard controller is used to determine which of the high clocks is used, with selection being made by the computer user. The sleep mode controller is disabled if the AC adapter is connected.

[0011] U.S. Pat. No. 5,230,055 discloses a portable computer wherein the computer is made inoperable when ambient temperature or humidity become too high. Here, ambient temperature and humidity are periodically monitored.

[0012] European patent publication EP-0381021 discloses a power saving system for a personal computer. The system operates to allow or stop power to be supplied to an oscillator based on control data set to a control register via a keyboard or software.

[0013] U.S. Pat. No. 5,021,679 discloses a power system for a portable computer wherein the supply voltage is varied depending on the current being supplied to the computer by the power system. Further, a variable-frequency clock is provided which varies its frequency based on the supply voltage being produced.

[0014] External clocks have been used to provide a computer system with faster clocks. Here, the faster external clock is substituted for the internal clock of the computer system. U.S. Pat. No. 5,134,703 is illustrative of an external clock unit which supplies a faster clock to a computer without requiring any hardware changes within the computer.

[0015] The problem with all the prior solutions to energy conservation is that the processors can still overheat. In particular, during prolonged processing or activity by a computer's processor, the processor will not enter its sleep mode (if any) and as a result the processor will become hot and require extensive means to cool the processor to prevent overheating and eventual failure of the processor. Overheating and failure of the processor can also occur when the computer is used in particularly hot environmental temperatures, the computer's cooling fan fails, or when cooling of the processor is otherwise inadequate.

[0016] Another problem is that with portable computers, manufacturers have to either use a lower clock frequency (lower than would be used in a comparable desk top computer) for processing or provide a fan for cooling. A lower clock frequency is not satisfactory as users want maximum processing power just as they get with a desk top computer. Requiring a portable computer to use a fan for cooling is also unsatisfactory because it consumes battery energy.

[0017] Thus, there is a need for a solution to the above problems which enables a computing device to maximize its processing speed while, at the same time, preventing overheating.

### SUMMARY

[0018] Broadly speaking, the invention relates to novel techniques for providing thermal and power management for a computing device. These techniques facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device.

[0019] As a method for managing operation of a computing device (e.g., portable computer), where the computing device includes at least a processor and a fan, the fan being operable to cool at least the processor, one embodiment can, for

2

example, include at least: configuring the portable computer for one of a plurality of different power management configurations; monitoring a temperature of the processor; controlling a speed of the fan based on the configured power management configuration for the portable computer and based on the monitored temperature of the processor; and controlling operational performance of the processor based on the configured power management configuration for the portable computer configured and based on the monitored temperature of the processor.

[0020] Other aspects and advantages of the invention will become apparent from the following detailed description, taken in conjunction with the accompanying drawings, illustrating by way of example the principles of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

[0021] The present invention will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein like reference numerals designate like structural elements, and in which:

[0022] FIG. 1 is a block diagram of a first embodiment of the invention;

[0023] FIG. 2 is a graph of an example of the relationship of chip temperature of a microprocessor and frequency of a clock signal;

[0024] FIG. 3 is a block diagram of a second embodiment of the invention;

[0025] FIG. 4 is a block diagram of a third embodiment of the invention;

[0026] FIG. 5 is a block diagram of a fourth embodiment of the invention;

[0027] FIG. 6 is a timing diagram illustrating operation of the fourth embodiment;

[0028] FIG. 7 is a block diagram of a fifth embodiment of the invention;

[0029] FIG. 8 illustrates a schematic diagram of an embodiment of an activity detector;

[0030] FIG. 9 is a block diagram of a sixth embodiment of the invention; and

[0031] FIG. 10 is a block diagram of a seventh embodiment of the invention.

DETAILED DESCRIPTION OF THE INVENTION

[0032] The invention provides novel techniques for controlling a processor's clock frequency so as to prevent overheating. In addition to preventing overheating, the invention attempts to maximize the processing speed of the processor. The invention also operates to conserve the amount of energy consumed by the processor. Preventing the processor from overheating is important because when a processor overheats it no longer operates properly. Conservation of energy, although of general importance for all computing devices, is particularly important for portable computing devices.

[0033] The invention monitors a processor's activity and its temperature. When there is no activity for the processor, a slow clock frequency is used, thereby saving power and lowering the thermal heat produced by the processor. On the other hand, when there is activity for the processor, a fast clock frequency is used. However, when prolonged activity (i.e., sustained fast clock frequency) causes the processor's temperature to become dangerously high for proper operation, the clock frequency is reduced so as to maintain processing speed at a reduced speed while preventing overheating.

[0034] Embodiments of the invention are discussed below with reference to FIGS. 1-10. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

[0035] FIG. 1 is a block diagram of a first embodiment of the invention. In this embodiment, a microprocessor 2 has a temperature sensor 4 which is integral with the microprocessor 2. The temperature sensor 4 is either integrated within the Very Large Scale Integration (VLSI) design of the microprocessor 2 or placed in contact with the housing or package thereof. In either case, the temperature sensor 4 is thermally coupled with the microprocessor 2. Because the temperature sensor 4 is integral or thermally coupled with the microprocessor 2, the temperature sensor 4 is very responsive to the temperature changes of the microprocessor 2. The temperature sensor 4 produces a temperature signal 6. Temperature sensing circuitry is well known and therefore not further described.

[0036] The temperature signal 6 is supplied to a voltage-controlled oscillator (VCO) 8. The VCO 8 produces a clock signal 10 which is supplied to a clock input of the microprocessor 2. The VCO 8 operates to produce different frequencies for the clock signal 10 depending on the value of the temperature signal. In this embodiment, the temperature signal 6 is preferably an analog voltage signal and the VCO 8 produces the clock signal 10 based on the value of the analog voltage signal. For example, the temperature signal could be a voltage ranging from zero to five volts. In response to the temperature signal 6, the VCO 8 could produce the clock signal with frequencies ranging from 100 MHz to 1 MHz. The frequency range is a design choice selected in accordance with the specific microprocessor being utilized. VCO's are well known and therefore are not further described.

[0037] FIG. 2 is a graph of an example of the relationship of chip temperature of the microprocessor 2 and clock frequency of the clock signal 10. The clock frequency varies between a maximum frequency ($f_{MAX}$) and a minimum frequency ($f_{MIN}$) for given microprocessor. The minimum frequency ($f_{MIN}$) may be zero if the clock signal 10 is not responsible for refreshing dynamic memory; otherwise, it cannot fall below some minimum frequency. Notice that as the chip temperature increases beyond some threshold temperature (VTH) (e.g., 120 degrees F.), the frequency of the clock signal 10 will gradually decrease. By decreasing the clock frequency in relation to the chip temperature, processing speed can be maximized for a given temperature without risking processor overheating. As the chip temperature become "hot", the clock frequency is reduced so as to reduce the thermal heat generated by the microprocessor 2. The profile of the curve for the clock frequency shown in FIG. 2 is illustrative as other curves may be used. For example, the frequency of the clock signal 10 could be controlled so that the chip temperature is maintained in a more limited temperature range. In any case, the profiles of the curves decrease the clock frequency as the temperature increases.

[0038] FIG. 3 is a block diagram of a second embodiment of the invention. In this embodiment, the microprocessor 2, temperature sensor 4, the temperature signal 6, the VCO 8, and the clock signal 10 are similar to those utilized in the first embodiment. However, this embodiment further includes an activity detector 12, an activity signal 14, a VCO controller 16, and a control signal 18. The activity detector 12 monitors

3

the microprocessor 2 and/or some related peripheral device (e.g., interrupt controller, keyboard buffer, input/output ports, instruction cache, current instruction, program counter) to determine when the microprocessor 2 is actively processing or when processing is needed. In this case, the activity detector 12 notifies the VCO controller 16 that processing is needed with the activity signal 14. On the other hand, when no activity exists, the activity detector 12 notifies the VCO controller 16 that no processing is needed with the activity signal 14. The activity signal is preferably a digital signal having at least one bit. Activity detection is described in more detail in U.S. Pat. No. 5,201,059; U.S. Pat. No. 5,167,024; U.S. Pat. No. 5,218,704; U.S. Pat. No. 5,239,652; and European patent publication EP-0474963, which are hereby incorporated by reference.

[0039] The VCO controller 16 receives the activity signal 14 and the temperature signal 6. In response to these signals, the VCO controller 16 produces the control signal 18 which controls the VCO 8. The control signal 18 may be analog or digital depending on the design of the VCO 8. The basic operation of the VCO controller 16 is to cause the VCO 8 to produce the clock signal 10 for the microprocessor 2 in an intelligent manner so as to conserve energy and prevent overheating. Namely, if the activity detector 12 indicates that no processing is needed at a given point in time, then regardless of the temperature detected by the temperature sensor 4, the VCO controller 16 will cause the VCO 8 to produce a sleep (or slow) clock. The sleep clock has a frequency near the minimum frequency ($f_{MIN}$). On the other hand, if the activity detector 12 indicates that processing is needed at this point in time, then the VCO controller 16 will cause the VCO 8 to produce a fast clock. The fast clock is the temperature-regulated maximum frequency such as discussed in FIGS. 1 and 2.

[0040] The second embodiment is particularly advantageous for portable computing devices because it conserves battery life by using a sleep clock when no processing is needed. However, even in the case of prolonged processing, the embodiment prevents overheating.

[0041] FIG. 4 is a block diagram of a third embodiment of the invention. In this embodiment, the microprocessor 2 includes a clock regulation unit 20 which controls the frequency of the clock used by the microprocessor 2 based on chip temperature of the microprocessor 2. Preferably, the clock regulation unit 20 is integrated with circuitry of the microprocessor 2. Alternatively, the clock regulation unit 20 can be separate from the circuitry of the microprocessor 2 but nevertheless coupled thereto.

[0042] The clock regulation unit 20 receives an input clock from an oscillator 22 and produces an output clock which is used by the microprocessor 2. The clock regulation unit 20 includes a temperature sensor 4, a divider 24, a first AND gate 26, a second AND gate 28, an inverter 30 and an OR gate 32. The temperature sensor 4 is as previously described. The divider 24 divides the input clock (fast clock) from the oscillator 22 to produce a sleep (or slow) clock. For example, if the oscillator 22 is a 100 MHz fixed-frequency oscillator and the divider 24 divides by 100, then the sleep clock would be 1 MHz.

[0043] In this embodiment, the temperature sensor 4 produces a digital output. It is assumed that the digital output is normally "0", but when the microprocessor 2 becomes "hot", the digital output becomes "1". The digital output of the temperature sensor 4 together with the logic gates 26-32 operate to select either the fast clock or the sleep clock as the

output clock which is used by the microprocessor 2. In particular, when the microprocessor 2 is not "hot", AND gate 26 is inactivated and AND gate 28 is activated by inverter 30. Hence, the output clock is the fast clock via AND gate 28 and OR gate 32. On the other hand, when the microprocessor 2 is "hot", AND gate 26 is activated and AND gate 28 is inactivated. Accordingly, in this case, the output clock is the sleep (or slow) clock via AND gate 26 and OR gate 32.

[0044] FIG. 5 is a block diagram of a fourth embodiment of the invention. In this embodiment, the microprocessor 2 includes a clock regulation unit 20 which controls the frequency of the clock used by the microprocessor 2 based on chip temperature of the microprocessor 2 and processing activity. The clock regulation unit 20 is preferably integrated with circuitry of the microprocessor 2.

[0045] As with the third embodiment, the clock regulation unit 20 for the fourth embodiment receives the input clock from the oscillator 22 and produces the output clock which is used by the microprocessor 2. The clock regulation unit 20 includes the temperature sensor 4, the divider 24, the first AND gate 26, the second AND gate 28, and the OR gate 32 as described above with reference to FIG. 4. The divider 24 divides the input clock (fast clock) from the oscillator 22 to produce a sleep clock. The temperature sensor 4 produces a digital output. Although the digital output from the temperature sensor 4 is normally "0", when the microprocessor 2 becomes "hot", the digital output becomes "1". The activity detector 12 produces an activity signal as described in the second embodiment. Here, the activity signal is a digital signal which is "high" or "1" when activity is present and "low" or "0" when no activity is present.

[0046] The digital output of the temperature sensor 4 together with the activity signal from the activity detector 12 and the logic gates 26, 28, 32, 34, 36 and 38 operate to select either the fast clock or the sleep clock. In particular, when the microprocessor 2 is not "hot" and activity is present, the AND gate 36 is activated by the inverter 34 and the activity signal. The output of AND gate 36 then activates AND gate 28 and inverter 38 inactivates AND gate 26. Hence, the output clock is the fast clock via AND gate 28 and OR gate 32. On the other hand, when the microprocessor 2 is "hot", the AND gate 36 is inactivated by the inverter 34 regardless of the activity signal. The output of AND gate 36 inactivates AND gate 28, and inverter 38 activates the AND gate 26. In this case, the output clock is the sleep clock via AND gate 26 and OR gate 32.

[0047] FIG. 6 is a timing diagram illustrating operation of the fourth embodiment. The output clock (CLK) is a mixture of the fast clock produced by the oscillator 22 and the sleep clock produced by the divider 24. The temperature signal is the digital output of the temperature sensor 4. The temperature signal is "0" while the chip temperature is not "hot". However, when the chip temperature becomes "hot", the temperature signal becomes "1", as shown at point A. The activity signal is "1" when activity is present for processing by the microprocessor 2; otherwise, the activity signal is "0" to indicate no activity is present for processing. As shown in FIG. 6, the output clock follows the fast clock only when the temperature signal is "0" and the activity signal is "1"; otherwise, the output clock follows the sleep clock. Note that the transitions for the output clock from fast clock to sleep clock and from sleep clock to fast clock are shown as being synchronized with the low or "0" portion of the fast clock. For example, at point B the output clock would produce a partial pulse (from the fast clock) if not synchronized. Hence, it is

4

probably preferred that switching occur only when the fast clock is "low," or when both the fast and sleep clocks are "low" as shown at point C. Note that at point C, the output clock transitions from the sleep clock to the fast clock but because the transition is synchronized with the "low" portion of the fast clock, the first pulse does not occur until point D. Such synchronization can be insured by the addition of known circuitry.

[0048] FIG. **7** is a block diagram of a fifth embodiment of the invention. Although only the clock regulation unit **20** is illustrated in FIG. **7**, the fifth embodiment interacts with an oscillator **22** and a microprocessor **2** as did the third and fourth embodiments. In this embodiment, the clock regulation unit **20** includes a first divider **40** which divides the input clock (fast clock) to produce a sleep clock, and a second divider **42** which divides the input clock to produce a normal clock. The three clocks (sleep, normal and fast) are then supplied to a selector **44**. The selector **44** outputs one of the three clocks as the output clock for the microprocessor **2** based on first and second select inputs IN**1** and IN**2**. The first select input IN**1** is generated by inverting the digital output from the temperature sensor **4** using an inverter **46**. The second select input IN**2** is generated by an activity detector **48** which functions similarly to the activity detector **12** in previous embodiments.

[0049] The activity detector **48** receives a plurality of activity inputs ACT**1**, . . . , ACTn. For example, the activity inputs notify the activity detector **48** whether or not activity exists. Each of the activity inputs may, for example, indicate an interrupt, keyboard activity, modem line activity, I/O port activity, or processor activity. As an example, FIG. **8** illustrates a schematic diagram of an embodiment of the activity detector **48**. The activity detector **48** includes a OR gate **50** which outputs a "1" when either the activity input ACT**1** or the activity input ACT**2** is "1". If neither the activity signals ACT**1** and ACT**2** are "1", then the OR gate **50** outputs a "1", thereby indicating the presence of activity.

[0050] The following Table I illustrates the selection of one of the three clocks by the selector **44** based on the first select input IN**1** and the second select input IN**2**.

TABLE I

| IN1 | IN2 | CLK Mode |
|-----|-----|----------|
| 0 | 0 | Sleep |
| 0 | 1 | Fast |
| 1 | 0 | Sleep |
| 1 | 1 | Normal |

[0051] Note that when no activity is detected by the activity detector **48**, then the sleep clock is output. However, when activity is detected, then the normal clock is output if the chip temperature is "hot" and the fast clock is output if the chip temperature is not "hot". Like previous embodiments, this embodiment prevents overheating and conserves energy.

[0052] Many alternatives can be made to the third, fourth and fifth embodiments discussed above. For example, additional clocks with different clock frequencies could be provided and selected for different temperature ranges to provide a more gradual decrease in frequency. However, if a microprocessor has sufficient thermal heat dissipation, then even the embodiment with only two different clock frequencies (fast and sleep) may provide reasonable processing speeds even when the microprocessor is getting hot because the

switching between the clocks would be quite fast as the response of the temperature sensor **4** is very rapid because it is integrated with the microprocessor. Further, although FIGS. **4**, **5**, and **7** illustrate the temperature sensor **4** as resident within the clock regulation unit **20**, the temperature sensor **20** need only be electrically coupled thereto and closely thermally coupled to the microprocessor **2**.

[0053] FIG. **9** is a block diagram of a sixth embodiment of the invention. In this embodiment, the clock (CLK) received by a microprocessor **2** is either a sleep clock produced by an oscillator **52** or a temperature-regulated fast clock produced by a VCO **8** in accordance with a temperature signal **6** (analog) from a temperature sensor **4**. Clock selection is achieved by a selector **54** based on an activity signal **14** provided by an activity detector **12**, **48**. The VCO **8**, the temperature sensor **4** and the activity detector **12**, **48** were discussed above with respect to previous embodiments. If activity is present, then the temperature-regulated fast clock is supplied to the microprocessor **2**. On the other hand, if no activity is detected, then the sleep clock is supplied to the microprocessor **2**. The temperature regulation of the fast clock is achieved by the analog temperature signal as discussed above with regard to FIGS. **1** and **2**.

[0054] Additionally, FIG. **9** illustrates an additional feature of the invention. Namely, FIG. **9** includes an analog-to-digital converter **56**, a fan controller **58** and a cooling fan **60**. Many conventional computing systems include a fan for circulating air through a computer's cabinet or add-on fans that provide air-flow on or near a microprocessor. Such add-on fans can be activated in accordance with ambient temperature. In contrast, the invention allows more accurate temperature monitoring of the microprocessor **2** because the temperature sensor **4** is integrated with the microprocessor **2**. In addition, the invention facilitates more sophisticated energy conservation which is particularly important for portable computing devices. The temperature signal **6** is converted to digital form by the A/D converter **56** and then supplied to the fan controller **58**. The fan controller **58** performs a pulse-width modulation operation on a supply voltage (Vcc) so as to control the speed of the fan **60**. Pulse-width modulation of the supply voltage allows the speed of the fan to be controlled without wasting energy. Thus, this embodiment further includes a temperature-activated, variable-speed fan.

[0055] In the case of a desk-top computing device, it is desirable to activate the fan **60** just prior to the temperature where the fast clock would be regulated downward because of high chip temperature. On the other hand, in the case of a portable computing device, it is desirable to attempt to limit the use of the fan **60** as much as possible by allowing the fast clock to be gradually reduced with increasing temperature before utilizing the fan **60**. For example, if the maximum frequency of the fast clock is 100 MHz, the fan **60** could be activated in the desk-top case before the frequency would be regulated (e.g., attempts to maintain 100 MHz). This would eliminate or delay the reduction in the frequency of the fast clock. In the portable case, the fan **60** could be activated after the frequency of the fast clock is already decreased to 25 MHz. The fan **60** would then only be used when necessary to insure reasonable processing power and even then at the lowest effective speed, thereby saving battery energy to the extent possible.

[0056] Although not shown but described with reference to FIG. **6**, depending on the particular design, synchronization of the switching of the frequency may be needed to prevent

US 2013/0117594 A1

May 9, 2013

5

partial pulse in the clock signal. Such synchronization is easily implemented using well-known circuitry. Likewise, if the computing device requires a consistent clock period during certain events (e.g., analog-to-digital conversion), then hysteresis or other circuitry can be added to restrict the ability of the frequency of the clock to be changed during certain times.

[0057]   Prior embodiments operate to decrease the clock frequency of the clock signals supplied to a microprocessor to prevent overheating and to conserve energy. FIG. 10 is a block diagram of a seventh embodiment of the invention. This embodiment operates to provide a burst processing mode for use under certain conditions. During certain types of processing activity, a clock control unit 20 causes an overdrive clock to be supplied to a microprocessor 2. Because the overdrive clock is used only in short bursts, the frequency of the overdrive clock can and preferably exceeds the frequency which sustained processing would permit without rapidly overheating.

[0058]   In this embodiment, the clock control unit 20 includes a first divider 62 which divides the input clock to produce a sleep clock, and a second divider which divides the input clock to produce a fast clock. Because the input clock serves as the overdrive clock, the input clock has a clock frequency that is faster than that necessary for sufficient performance and responsiveness in most cases. The clock control unit 20 also includes a selector 66, an activity detector 68, and a temperature sensor 4. The selector 66 operates to select one of the sleep, fast or overdrive clocks based on select inputs (IN1, IN2, IN3) it receives from the activity detector 68 and the temperature sensor 4. More particularly, the activity detector 68 receives activity signals ACT1, . . . , ACTn which cause the activity detector 68 to generate a burst activity signal and a normal activity signal. Certain of the activity signals ACT trigger the burst activity signal and other activity signals trigger the normal activity signal. The temperature sensor 4 is integral with the microprocessor 2 and produces a digital temperature signal which indicates whether or not the microprocessor 2 is "hot".

[0059]   The following Table II illustrates the selection of one of the three clocks by the selector 66 based on the first select input IN1, the second select input IN2, and the third select input.

TABLE II

| IN1 | IN2 | IN3 | CLK Mode |
|---|---|---|---|
| 0 | 0 | 0 | Sleep |
| 0 | 0 | 1 | Sleep |
| 0 | 1 | 0 | Fast |
| 0 | 1 | 1 | Sleep |
| 1 | 0 | 0 | Overdrive |
| 1 | 0 | 1 | Fast/Sleep |
| 1 | 1 | 0 | Overdrive |
| 1 | 1 | 1 | Fast/Sleep |

[0060]   Note that when no activity (either burst or normal) is detected by the activity detector 68, then the sleep clock is output. However, when burst activity is detected, then the overdrive clock is output if the chip temperature is not "hot" and either the fast clock or the sleep clock is output if the chip temperature is "hot". The determination of which of the fast or sleep clocks to output in this situation is a design choice depending on the ability of the computing system to dissipate heat. In fact, it may be preferred to make the selection more

sophisticated in this case so that selector can make the decision using additional temperature information such as signals indicating particular temperature ranges or rate at which temperature is rising. When only normal activity is detected, then the fast clock is output if the chip temperature is not "hot" and the sleep clock is output if the chip temperature is "hot". As a modification, the second divider 64 could be replaced with a VCO thereby using a temperature-regulated fast clock.

[0061]   Like previous embodiments, this embodiment prevents overheating and conserves energy. The advantage of this embodiment is that processing will appear more uniform or regular to a user.

[0062]   There are certain times during normal execution of a program, the computer is caused to execute operations which are beyond or unrequested by the program being executed. Such unrequested operations include interrupt processing, and data transfer to cache memory following a cache miss. Using the overdrive clock in these types of situations is advantageous because such will substantially lessen any delay induced by these unrequested operations. A computer user then perceives that the computer's responsiveness is more regular and uniform. For example, when a cache miss occurs an instruction currently being in process is not allowed to complete until the appropriate data block is loaded into the cache. The loading of the cache following a cache miss causes the microprocessor to execute many operations for memory management that were not requested by the computer program or the user, thereby delaying the execution of the instruction. However, because the invention performs such unrequested operations at higher speeds (overdrive clock), the impact of having to perform the extra unrequested operations is substantially lessened and hopefully invisible.

[0063]   In fact, a particular computer instruction could be used to indirectly select the desired clock frequency for the instruction. This could be useful for instructions that require more intensive processing than do normal instructions. An example of intensive processing is complex floating point computations. Here, the microprocessor would indicate to the activity detector that the overdrive clock is to be used if the chip temperature is not too "hot".

[0064]   Yet another embodiment would be to alter processing frequency for extremely cold situations. Namely, if the temperature sensor indicates that the chip temperature (could also use ambient temperature) is less than a predetermined minimum temperature, then the clock frequency could by set regardless of activity to its maximum value to thereby cause the generation of as much heat as possible so that the computing device could operate correctly even in extremely cold conditions. Any cooling fan of the computing device would also be shut-off using a fan controller such as shown in FIG. 9.

[0065]   The many features and advantages of the present invention are apparent from the written description and thus it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

What is claimed is:

1. A method for managing operation of a computing apparatus, the computing apparatus including at least a micropro-

cessor and a fan, the fan being operable to cool at least the microprocessor, said method comprising:

configuring the computing apparatus for one of a plurality of different power management configurations;

monitoring a temperature of the microprocessor;

controlling a speed of the fan based on the configured power management configuration for the computing apparatus and based on the monitored temperature of the microprocessor; and

controlling an operational performance of the microprocessor based on the configured power management configuration for the computing apparatus and based on the monitored temperature of the microprocessor,

wherein said controlling the speed of the fan comprises:

activating the fan to a first speed based on the configured power management configuration when the monitored temperature indicates that primary thermal management is required; and

subsequently increasing the speed of the fan to a second speed based on the configured power management configuration when the monitored temperature indicates that primary thermal management is still required even after the fan has been activated at the first speed, the second speed being greater than the first speed.

**2**. A method as recited in claim **1**, wherein the method comprises:

thereafter limiting operational performance of the microprocessor when the monitored temperature indicates that supplemental thermal management is required even after the fan has been activated to the first speed.

**3**. A method as recited in claim **1**, wherein the method comprises:

thereafter reducing operational performance of the microprocessor when the monitored temperature indicates that supplemental thermal management is required even after the fan has been increased to the second speed.

**4**. A method as recited in claim **1**, wherein the microprocessor can enter a reduced power mode, and

wherein said method further comprises deactivating the fan when the microprocessor enters the reduced power mode.

**5**. A method as recited in claim **1**,

wherein said method further comprises determining an activity indication of the microprocessor, and

wherein the operational performance of the microprocessor is also based on the activity indication of the microprocessor.

**6**. A method for managing operation of a computing apparatus, the computing apparatus including at least a microprocessor and a fan, the fan being operable to cool at least the microprocessor, said method comprising:

configuring the computing apparatus for one of a plurality of different power management configurations;

monitoring a temperature of the microprocessor;

controlling a speed of the fan based on the configured power management configuration for the computing apparatus and based on the monitored temperature of the microprocessor; and

controlling an operational performance of the microprocessor based on the configured power management configuration for the computing apparatus and based on the monitored temperature of the microprocessor,

wherein said controlling the speed of the fan comprises:

activating the fan to a first speed, and subsequently increasing the speed of the fan to a second speed based on the configured power management configuration in view of the monitored temperature, so as to provide a first thermal management, and

wherein said controlling the operational performance of the microprocessor comprises:

limiting operational performance of the microprocessor when at least one subsequent monitored temperature indicates that a second thermal management is required even after the fan has been activated at the first speed and increased to the second speed.

**7**. A method as recited in claim **6**, wherein the microprocessor can enter a reduced power mode, and

wherein said method further comprises deactivating the fan when the microprocessor enters the reduced power mode.

**8**. A method as recited in claim **6**,

wherein said method further comprises determining an activity indication of the microprocessor, and

wherein the operational performance of the microprocessor is also based on the activity indication of the microprocessor.

**9**. A method as recited in claim **6**, wherein the speed of the fan is controlled at least by pulse width modulation.

**10**. A method for managing operation of a portable computer, the portable computer including at least a processor and a fan, the fan being operable to cool at least the processor, said method comprising:

configuring the portable computer for one of a plurality of different power management configurations;

monitoring a temperature of the processor;

controlling a speed of the fan based on the configured power management configuration for the portable computer and based on the monitored temperature of the processor; and

controlling an operational performance of the processor based on the configured power management configuration for the portable computer and based on the monitored temperature of the processor,

wherein said method comprises:

monitoring activity of the processor;

wherein said controlling the speed of the fan comprises:

activating the fan when the monitored temperature and the monitored activity of the processor indicate that primary thermal management is required, and

wherein said controlling of the operational performance of the processor comprises:

reducing operational clock frequency of the processor when the monitored temperature and the monitored activity of the processor indicate that supplemental thermal management is required even after the fan has been activated for primary thermal management.

**11**. A method as recited in claim **10**, wherein after the fan is initially activated, the speed of the fan is increased in a gradual manner as additional primary thermal management is needed.

**12**. A method as recited in claim **10**, wherein said controlling the speed of the fan comprises:

increasing the speed of the fan in a gradual manner to provide different levels of the primary thermal management.

**13**. A method as recited in claim **10**, wherein said reducing the operational clock frequency of the processor reduces the

US 2013/0117594 A1

May 9, 2013

7

operational clock frequency by an amount dependent on the monitored temperature and the monitored activity of the processor.

**14**. A method as recited in claim **10**, wherein said reducing the operational clock frequency of the processor is performed in a gradual manner to provide different levels of the supplemental thermal management.

**15**. A method as recited in claim **10**, wherein the fan is a variable-speed fan, and

wherein said activating the fan causes the fan to operate at a speed that is dependent on the monitored temperature and the monitored activity of the processor.

**16**. A method as recited in claim **15**, wherein when the fan is initially activated, the speed of the fan is relatively slow and the speed of the fan thereafter increases in a gradual manner when the temperature of the processor increases.

**17**. A method as recited in claim **10**, wherein the fan is a variable-speed fan, and

wherein the primary thermal management operates the fan at successively greater speeds to provide a plurality of different levels of the primary thermal management.

**18**. A method as recited in claim **17**, wherein the level of the primary thermal management being performed is dependent on the monitored temperature and the monitored activity of the processor.

**19**. A method as recited in claim **10**, wherein the supplemental thermal management reduces the operational clock frequency of the processor by successively greater amounts to provide a plurality of different levels of the supplemental thermal management.

**20**. A method as recited in claim **19**, wherein the level of the supplemental thermal management being performed is dependent on the monitored temperature and the monitored activity of the processor.

**21**. A method for managing operation of a portable computer, the portable computer including at least a processor and a fan, the fan being operable to cool at least the processor, said method comprising:

configuring the portable computer for one of a plurality of different power management configurations;

monitoring a temperature of the processor;

setting a speed of the fan based on the configured power management configuration for the portable computer and based on the monitored temperature of the processor;

setting an operational performance of the processor based on the configured power management configuration for the portable computer and based on the monitored temperature of the processor; and

comparing the monitored temperature of the processor with at least a first predetermined temperature and a second predetermined temperature, the second predetermined temperature being higher than the first predetermined temperature,

wherein said setting the speed of the fan comprises:

activating the fan when the monitored temperature of the processor exceeds the first predetermined temperature, and

wherein said setting the operational performance of the processor comprises:

reducing operational clock frequency of the processor when the monitored temperature of the processor exceeds the second predetermined temperature.

**22**. A method as recited in claim **21**, wherein the fan provides primary thermal management and reduction in the operational clock frequency of the processor provides secondary thermal management.

**23**. A method as recited in claim **21**, wherein said method further comprises:

increasing the operational clock frequency of the processor when the monitored temperature of the processor drops substantially below the second predetermined temperature, provided that the operational clock frequency was previously reduced by said reducing.

**24**. A method as recited in claim **23**, wherein said method further comprises:

deactivating the fan when the monitored temperature of the processor drops below the first predetermined temperature, provided that the fan was previously activated by said activating.

\*    \*    \*    \*    \*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 21st day of July, 2015, I caused this Brief of

Appellants to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

William F. Lee
Mark C. Fleming
Eric Fletcher
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

*Counsel for Appellee*

| | |
|---|---|
| Brittany B. Amadi | William N. Hughet |
| William G. McElwain | Robert D. Huntington |
| WILMER CUTLER PICKERING | ROTHWELL, FIGG, ERNST |
|   HALE AND DORR LLP |   & MANBECK, P.C. |
| 1875 Pennsylvania Avenue, N.W. | 607 14th Street, N.W., Suite 800 |
| Washington, D.C.  20006 | Washington, D.C.  20005 |
| (202) 663-6000 | (202) 626-3534 |
| *Counsel for Appellee* | *Counsel for Appellee* |

Upon acceptance by the Clerk of the Court of the electronically filed

document, the required number of copies of the Brief of Appellants will be hand

filed at the Office of the Clerk, United States Court of Appeals for the Federal

Circuit in accordance with the Federal Circuit Rules.

/s/ C. Douglass Thomas
*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*13,971*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>July 21, 2015</u>            <u>/s/ C. Douglass Thomas         </u>
                                                        *Counsel for Appellants*