**2015-1575, -1577, -1578, -1579**
(Interference Nos. 105,956, 105,957, 105,958 and 105,959)

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

C. DOUGLASS THOMAS AND ALAN E. THOMAS,

*Appellants*,

*v.*

JACK D. PIPPIN,

*Appellee.*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board

### BRIEF FOR APPELLEE JACK D. PIPPIN

WILLIAM G. MCELWAIN
BRITTANY BLUEITT AMADI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006
(202) 663-6000

R. DANNY HUNTINGTON
WILLIAM N. HUGHET
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
607 14th Street, N.W., Suite 800
Washington, DC  20005

September 3, 2015

WILLIAM F. LEE
MARK C. FLEMING
ERIC F. FLETCHER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Counsel for Appellee Jack D. Pippin*

# CERTIFICATE OF INTEREST

Counsel for Appellee Jack D. Pippin certifies the following:

1.     The full name of every party or *amicus* represented by us is:

Jack D. Pippin

2.     The names of the real party in interest represented by us is:

Intel Corporation

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Intel Corporation

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  William F. Lee; William G. McElwain; Mark C. Fleming; Brittany Blueitt Amadi; Eric F. Fletcher

ROTHWELL, FIGG, ERNST & MANBECK, P.C.:  R. Danny Huntington; William N. Hughet

Dated:  September 3, 2015

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ...................................................................... v

STATEMENT OF RELATED CASES ...................................................... 1

INTRODUCTION ...................................................................................... 2

JURISDICTIONAL STATEMENT ........................................................... 4

STATEMENT OF ISSUES ON APPEAL ................................................. 4

STATEMENT OF FACTS ......................................................................... 5

    A.    Technology Background ................................................... 5

    B.    The Pippin '274 Application And The Thomas Patents
         And Applications ............................................................. 6

         1.    The Pippin '274 application ................................... 7

         2.    The Thomas patents and applications .................... 8

    C.    Declaration Of The Interferences ................................. 15

    D.    The Board's Order Authorizing Motions ..................... 16

    E.    The Board's Decisions On Thomas's Motions ............ 17

         1.    Thomas's motions for no interference-in-fact ..... 17

         2.    Thomas's motions to designate claims as not
             corresponding to the count ................................. 22

SUMMARY OF THE ARGUMENT ........................................................ 24

ARGUMENT ........................................................................................... 28

I.    STANDARD OF REVIEW ................................................................. 28

II.     THE BOARD PROPERLY REQUIRED THOMAS TO PROVE HIS
        ENTITLEMENT TO RELIEF BY A PREPONDERANCE OF THE
        EVIDENCE ...................................................................................28

III.    THE BOARD PROPERLY DENIED THOMAS'S MOTIONS FOR NO
        INTERFERENCE-IN-FACT .................................................................34

        A.     Thomas Failed To Establish That Pippin Claim 1's
               Programmable Thermal Sensor (Feature 2) Rendered
               Pippin Claim 1 Non-Obvious Over The Thomas Claims
               And Prior Art......................................................................35

               1.     Substantial evidence supports the Board's findings ................35

               2.     The Board properly interpreted Thomas claim 25
                      in light of Thomas's specification ............................................38

        B.     Thomas Failed To Establish That Pippin Claim 1's
               Interrupt Signal (Feature 3) Rendered Pippin Claim 1
               Non-Obvious Over The Thomas Claims And Prior Art ....................40

               1.     The Board properly considered motivation to
                      combine Thomas's claims with the prior art ............................40

               2.     Substantial evidence supports the Board's findings ................42

        C.     The Board Properly Considered The Claims As A Whole ................45

IV.     THE BOARD CORRECTLY DETERMINED THAT THOMAS FAILED
        TO MEET HIS BURDEN TO DESIGNATE CLAIMS AS NOT
        CORRESPONDING TO THE COUNT ....................................................49

        A.     Thomas Failed To Establish That The Use Of Fan Speed
               Control Based On A Power Management Policy
               Rendered His Claims Patentably Distinct From The
               Count 50

               1.     Thomas admitted that use of fan speed control to
                      manage processor temperature was well-known in
                      the art..........................................................................................50

       2.      Use of different power management policies based on whether a computer is powered by a battery was well-known in the art ........................................................ 53

B.     Thomas Failed To Establish That The Use Of Different Conditions Based On Processor Temperature Rendered His Claims Patentably Distinct From The Count ................................ 57

C.     The Board Correctly Determined That A Skilled Artisan Would Have Been Motivated To Modify The Count In Light Of The Teachings Of The Prior Art .......................................... 59

CONCLUSION .................................................................................................... 62

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014) ........................................................28

*Advance Transformer Co. v. Levinson*,
  837 F.2d 1081 (Fed. Cir. 1988) ........................................................38

*Agilent Technologies, Inc. v. Affymetrix, Inc.*,
  567 F.3d 1366 (Fed. Cir. 2009) ........................................................29

*Apotex USA, Inc. v. Merck & Co.*,
  254 F.3d 1031 (Fed. Cir. 2001) ...........................................25, 32, 33

*Bilstad v. Wakalopulos*,
  386 F.3d 1116 (Fed. Cir. 2004) .................................................25, 31

*Bruning v. Hirose*,
  161 F.3d 681 (Fed. Cir. 1998) ...................................................32, 33

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356 (Fed. Cir. 2006).............................................42

*Hyatt v. Boone*,
  146 F.3d 1348 (Fed. Cir. 1998) ..........................................................8

*In re Sullivan*,
  362 F.3d 1324 (Fed. Cir. 2004) .................................................28, 31

*In re Swanson*,
  540 F.3d 1368 (Fed. Cir. 2008) .................................................30, 56

*KSR International Co. v. Teleflex, Inc.*,
  550 U.S. 398 (2007)............................................38, 41, 42, 43, 60

*Lacavera v. Dudas*,
  441 F.3d 1380 (Fed. Cir. 2006) ........................................................30

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
  485 F.3d 1157 (Fed. Cir. 2007) ........................................................61

*Microsoft Corp. v. i4i Ltd. Partnership,*
    131 S. Ct. 2238 (2011) ........................................................................33

*Perfect Web Technologies, Inc. v. InfoUSA, Inc.,*
    587 F.3d 1324 (Fed. Cir. 2009) ........................................................42

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................38

*Price v. Symsek,*
    988 F.2d 1187 (Fed. Cir. 1993) ........................................................32

*Rambus Inc. v. Rea,*
    731 F.3d 1248 (Fed. Cir. 2013) ........................................................28

*Randall Manufacturing v. Rea,*
    733 F.3d 1355 (Fed. Cir. 2013) ........................................................52

*Shelcore, Inc. v. Durham Industries, Inc.,*
    745 F.2d 621 (Fed. Cir. 1984) ..........................................................56

*SmithKline Beecham Corp. v. Apotex Corp.,*
    439 F.3d 1312 (Fed. Cir. 2006) ........................................................44

*Stevenson v. Sears Roebuck & Co.,*
    713 F.2d 705 (Fed. Cir. 1983) ..........................................................56

*Sullivan v. Bingel,*
    Int. No. 104,818, 2003 WL 1202245 (B.P.A.I. 2003)........................31

*Thomas v. Pippin,*
    134 S. Ct. 1916 (2014)...................................................................1, 29

*Thomas v. Pippin,*
    534 F. App'x 992 (Fed. Cir. 2013) .....................................................1

*Thompson v. Thompson,*
    13 F. App'x 925 (Fed. Cir. 2001) .....................................................32

*Yorkey v. Diab,*
    605 F.3d 1297 (Fed. Cir. 2010) ........................................................17

# STATUTES, REGULATIONS AND RULES

28 U.S.C.
    § 1295(a)(4) ............................................................................4

35 U.S.C.
    § 103.............................................................................32, 34
    § 135(a) ..................................................................................4
    § 157......................................................................................8
    § 282..............................................................................passim

America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ............................4

37 C.F.R.
    § 41.120................................................................................16
    § 41.121................................................................................16
    § 41.121(b)..............................................................25, 29, 61
    § 41.203(a) ...............................................17, 18, 30, 34, 38
    § 41.203(b)............................................................................31
    § 41.204................................................................................16
    § 41.207................................................................................25
    § 41.207(b)(1) .........................................................22, 60, 61
    § 41.207(b)(2) ...............................................................22, 34
    § 41.208(b)..............................................................25, 29, 61

U.S. Patent & Trademark Office, Board of Patent Appeals &
    Interferences, Standing Order ............................................16

## STATEMENT OF RELATED CASES

No appeal in this case was previously before this Court or any other court.

However, the parties to this appeal were previously before the Court in *Thomas v.*

*Pippin* ("*Thomas I*"), Nos. 2013-1142, -1143, -1144, which were also appeals from

decisions in interference proceedings before the Patent Trial and Appeal Board

("the Board").  After Appellants C. Douglass Thomas and Alan E. Thomas

("Thomas"[1]) conceded priority to Appellee Jack D. Pippin's ("Pippin") U.S. Patent

Application No. 10/464,482 ("the Pippin '482 application"), the Board ruled that

all claims of seven Thomas patents corresponded to a single interference count,

and cancelled those claims.[2]  This Court affirmed in an unpublished disposition

under this Court's Rule 36.  *Thomas v. Pippin*, Nos. 2013-1142, -1143, -1144, 534

F. App'x 992 (Fed. Cir. Oct. 15, 2013) (Prost, Plager & Taranto, JJ.).  This Court

denied rehearing *en banc* on December 23, 2013, and the Supreme Court denied

certiorari on April 21, 2014.  *Thomas v. Pippin*, 134 S. Ct. 1916 (2014).

Pippin's U.S. Patent Application No. 13/786,274 at issue in this appeal ("the

Pippin '274 application") is a continuation of the Pippin '482 application at issue

in *Thomas I* (A2751(¶0001)), and the Thomas patents and applications at issue in

---

[1]    For ease of reference, and consistently with the practice below, we refer to Thomas in the singular.

[2]    The prior interference proceedings involved Thomas's U.S. Patent Nos. 5,752,011; 5,974,557; 6,216,235; 6,487,668; 7,167,993; 7,293,186; and 7,418,611. *See* A1254.

this appeal belong to the same patent family as the seven Thomas patents at issue

in *Thomas I* (*see* A990).  Additionally, the count in each of the interferences here is

claim 1 of the Pippin '274 application, which is identical to the count at issue in

*Thomas I* (claim 34 of the Pippin '482 application).

Two district court actions may be affected by the Court's decision in this

appeal.  In both *IpVenture Inc. v. Acer Inc., et al.*, No. 1:11-cv-00588-RGA (D.

Del.), and *IpVenture Inc. v. Lenovo Group, Ltd., et al.*, No. 3:12-cv-04143-JSW

(N.D. Cal.), Thomas (through IpVenture, the company he co-founded) asserts U.S.

Patent Nos. 7,506,190 and 7,937,599, which are involved in the interferences that

are the subject of this appeal.  Proceedings with respect to these two patents have

been stayed in Case No. 1:11-cv-00588-RGA pending the outcome of this appeal.

Case No. 3:12-cv-04143-JSW has been dismissed without prejudice pending the

outcome of this appeal.

Counsel for Appellee Pippin is not aware of any other case in this Court or

any other court that would directly affect or be directly affected by the Court's

decision in this appeal.

## INTRODUCTION

The Board has now adjudicated seven patent interferences involving nine

Thomas patents and two Thomas applications, all based on the same seven-column

disclosure.  All Thomas claims interfered with a single Pippin claim, which served

as the count in each interference.  In every proceeding, Thomas conceded priority to Pippin, and the Board cancelled all of Thomas's involved claims.  In the first three interferences, the Board cancelled all 262 involved claims in seven different Thomas patents, and this Court affirmed without opinion.  This case involves the four most recent interferences, in which the Board cancelled or refused an additional 102 claims in two Thomas patents and two Thomas applications that rely upon the same disclosure.  The Board properly concluded—once again—that Thomas was not entitled to the claims of the patents and applications at issue here because they are not patentably distinct from the count, which Thomas conceded Pippin was the first to invent.

On appeal, Thomas first seeks to set aside this Court's precedent and well-settled Board regulations by arguing that Pippin—the undisputed senior party—somehow bore the burden of proving during the interferences that there was an interference-in-fact and that the claims of the Thomas patents and applications corresponded to the count.  Not only is this argument legally incorrect, but the Board rejected an indistinguishable argument in *Thomas I*—an argument that Thomas also raised (without success) in this Court.

On the merits, Thomas urges a litany of purported "errors" in the Board's analysis.  But noticeably absent from Thomas's appeal brief is any explanation as to why his involved claims are actually non-obvious over the count (claim 1 of the

Pippin '274 application) in view of the prior art, or any explanation as to why the Pippin claim is non-obvious over Thomas's claims in view of the prior art. Moreover, Thomas consistently fails to explain how the Board's supposed "errors" affected its ultimate conclusions. Thomas's failure is unsurprising. The involved Thomas claims and the Pippin claim are very close to each other in a crowded field; when each is viewed in light of applicable prior art, the other is readily obvious.

Because Thomas has shown no error, and certainly no prejudicial error, the Board's decision should be affirmed.

## JURISDICTIONAL STATEMENT

The Board assumed jurisdiction over the interferences pursuant to 35 U.S.C. § 135(a).[3] This Court has jurisdiction under 28 U.S.C. § 1295(a)(4).

## STATEMENT OF ISSUES ON APPEAL

1. Whether the Board correctly ruled that Thomas, as movant, bore the burden of showing no interference-in-fact and that certain of his claims should be designated as not corresponding to the count.

2. Whether the Board correctly ruled that Thomas failed to carry his burden of proving no interference-in-fact.

---

[3] This brief refers to the Patent Act before its amendment by the America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011). The statutes and regulations in effect during the Board proceedings are reprinted in the addendum to this brief.

3.  Whether the Board correctly ruled that Thomas failed to carry his burden of proving that his claims did not correspond to the count.

## STATEMENT OF FACTS

These consolidated appeals arise from four interferences declared between, on the one hand, claim 1 of the Pippin '274 application and, on the other hand, all claims of two patents and two patent applications held by Thomas:  U.S. Patent Nos. 7,506,190 ("the Thomas '190 patent") and 7,937,599 ("the Thomas '599 patent") and U.S. Patent Application Nos. 12/321,798 ("the Thomas '798 application") and 13/727,433 ("the Thomas '433 application").

### A.    Technology Background

The claims at issue are generally directed to methods and systems for power and thermal management in computers.

Computers contain microprocessors that execute various instructions and commands.  A2751(¶0005).  A computer's microprocessor circuits can operate at an increased clock frequency or clock speed to execute more instructions per second, but increased clock speed means more power consumption.  *Id.*; *see* A1912-1913.  As power consumption increases, microprocessor circuits often generate a substantial amount of heat and generally require a cooling mechanism to prevent the system from overheating, which can cause the system to fail.  A2751(¶0005); A85(2:25-30).

Because increasing electrical power "always results in the dissipation of heat" and thus "a rise in the temperature of the system," "thermal management and power management are two intimately related design principles." A1749(¶26). In other words, overheating can be controlled by cooling the system and/or reducing the microprocessor's clock speed. A1749(¶26); *see also* A85(2:35-38).

One way to cool the system is to use a fan. A2751(¶0006); A85(2:35-42); A1913. Cooling fans have disadvantages, however, such as "introduc[ing] noise and vibration into the system" (A2752(¶0006)) and "consum[ing] battery energy" (A85(2:40-42)). *See* A423; A1913. Another power and thermal management technique involves reducing the microprocessor's clock speed. A85(2:35-40); A1914. This option has drawbacks too, as it reduces the system's processing power and efficiency. A85(2:35-40); *see* A423; A1914. Thus, in 1993 and 1994 (the time of the applications to which Pippin and Thomas respectively claim priority), there was a need to provide power and thermal management, while minimizing the drawbacks associated with cooling fans and interference with system processing speed. A85(2:24-45); A2751-2752(¶¶0006-0007).

## B. The Pippin '274 Application And The Thomas Patents And Applications

The Pippin '274 application and the Thomas patents and applications are directed to methods and systems for power and thermal management in computer systems having (1) a fan that is designed to respond to increased temperatures

- 6 -

within a processor and (2) clock circuitry that likewise adjusts clock speed to control processor temperature.

### 1.    The Pippin '274 application

The Pippin '274 application was filed on March 5, 2013 (A2742), and claims priority to U.S. Patent Application No. 08/124,980, filed on September 21, 1993 (A2751(¶0001); A7).  Thomas conceded that the Pippin '274 application is senior to the Thomas patents and applications.  A228.

The invention of the Pippin '274 application provided efficient cooling for computers at a time when speed and power demands were increasing, while computers were decreasing in size.  A2751-2752(¶¶0005-0007); A1912-1914; A423.  In particular, the invention includes "an integrated thermal sensor" that "track[s] the temperature" of the processor and provides rapid and accurate "feedback for an active cooling system" that consists of both an active cooling device and controllable clock circuitry, which in combination allow for "active cooling of the integrated circuit … through system control."  A2752(¶0007).

The single interference count is identical to the sole pending claim of the Pippin '274 application ("Pippin claim 1"), which recites:

1.      A computer system comprising:
        an active cooling device;
        a microprocessor comprising:
                a register storing a register value corresponding to a
        threshold temperature;

- 7 -

> a programmable thermal sensor receiving the register value, wherein the programmable thermal sensor generates a first interrupt signal if a microprocessor temperature exceeds the threshold temperature,
>
> wherein the active cooling device is activated in response to the interrupt signal, and
>
> wherein the active cooling device comprises a fan; and clock circuitry for providing a clock signal for the microprocessor,
>
> wherein a frequency of the clock signal is reduced in response to the first interrupt signal.

A928.[4]

## 2.    The Thomas patents and applications

The Thomas patents and applications each claim priority to U.S. Patent Application No. 08/262,754, which was filed on June 20, 1994 (after the 1993 priority date of the Pippin '274 application) and issued as U.S. Patent No. 5,752,011 on May 12, 1998.  A85(1:7-20); A103(1:7-19); A119(¶0001); A135(¶0001); A423.  The Board cancelled the '011 patent claims in one of the prior interferences, which this Court affirmed in *Thomas I*.

The claims in the Thomas patents and applications are directed to "providing thermal and power management for a computing device" through controlling a processor's clock frequency and use of a fan.  A85(2:49-54); A103(2:45-48);

---

[4]     On March 13, 2013, Pippin converted the Pippin '274 application to a statutory invention registration pursuant to 35 U.S.C. § 157.  A1004-1010. Although Pippin no longer seeks a patent on his application, these interferences may continue in order to confirm that ***Thomas*** may not patent the involved subject matter, as he was not the first to invent.  *See Hyatt v. Boone*, 146 F.3d 1348, 1356 (Fed. Cir. 1998).

A119(¶0018); A135(¶0018).  The underlying concept is straightforward and involves instituting two approaches ("policies" or "configurations") for power and thermal management, one when a computer is plugged in and thus has access to more electricity, and another when a computer is battery-operated and must be more mindful of electricity use.  In each scenario, the computer monitors the temperature of the processor and adjusts the speed of the cooling fan and/or the processor accordingly.  *See* A85(2:55-63) (claimed invention generally involves "utiliz[ing] a first power management policy when the computer is powered by a battery; … utiliz[ing] a second power management policy when the computer is not powered by a battery; and setting an operational speed of the processor based on the appropriate one of the first and second power management policies").  Thomas's claimed inventions use a thermal sensor that "monitors a processor's … temperature" and signals a corresponding change in the clock frequency.  A86(3:51-52).  The thermal sensor can also trigger an adjustment to the speed of the cooling fan.  A88(8:4-23) (noting that an embodiment of the invention includes "a temperature-activated, variable-speed fan").  The claims of each individual Thomas patent and application at issue are described in greater detail below.

***The Thomas '190 patent***.  Independent claims 1 and 11 and dependent claims 2-10, 12-17, 20, and 22-26 of the Thomas '190 patent are at issue.[5]  Claim 1 of the Thomas '190 patent recites:

> 1.    A method for managing operation of a computer, the computer including at least a processor and a fan for cooling at least the processor, said method comprising:
>
>> configuring the computer to utilize a first power management policy when the computer is powered by a battery;
>>
>> configuring the computer to utilize a second power management policy when the computer is not powered by a battery;
>>
>> setting an operational speed of the fan based on the appropriate one of the first and second power management policies;
>>
>> monitoring a temperature of the processor; and
>>
>> setting an operational speed of the processor based on the appropriate one of the first and second power management policies and based on the temperature of the processor.

A89(10:33-48).  Dependent claim 10 additionally requires "the first power management policy" to include "at least a first condition based on a temperature of the processor," and "the second power management policy" to include "at least a second condition based on the temperature of the processor" where "the second condition [is] different than the first condition."  A90(11:7-14).

---

[5]    Claims 18, 19, and 21 of the Thomas '190 patent were cancelled in a separate reexamination proceeding.  A3325.

Additionally relevant here, claim 25 of the Thomas '190 patent

depends from claim 18; together, they recite:

18.    A method for controlling an operational speed for a processor
of a computing device, said method comprising:

configuring the computing device to utilize a first power
management policy when the computing device is powered by a
battery;

configuring the computer to utilize a second power
management policy when the computing device is not powered
by a battery; and

controlling an operational speed of the processor based on the
appropriate one of the first and second power management policies
that have been configured,

wherein the first power management policy includes at least a
first condition based on a temperature of the processor, and

wherein the second power management policy includes at least
a second condition based on the temperature of the processor,
the second condition being different than the first condition.

25.    A method as recited in claim 18, wherein the computing device
further includes a fan for cooling at least the processor, and

wherein said method comprises:

monitoring a temperature of the processor; and

controlling an operational speed of the fan based on the
appropriate one of the first and second power management
policies and based on the temperature of the processor.

A90(11:59-12:55).

***The Thomas '599 patent.*** Independent claims 1, 13, and 18 and dependent claims 2-12, 14-17, and 19-28 of the Thomas '599 patent are at issue. Claim 1 of the Thomas '599 patent recites:

> 1.     An apparatus for thermally managing temperature of a microprocessor provided within a computer system, the microprocessor operates in accordance with a clock having a clock frequency, the computer system including a fan controllably operable to cool at least a portion of the computer system, said apparatus comprising:
>
>> a first electrical connection to a temperature sensor, the temperature sensor being provided within the microprocessor;
>>
>> a comparison circuit configured to compare a temperature indication provided at least in part by the temperature sensor via said first electrical connection with at least one of a plurality of temperature values to produce comparison data; and
>>
>> a second electrical connection configured to provide the comparison data for managing the temperature of the microprocessor based at least in part on the temperature indication provided at least in part by the temperature sensor,
>>
>> wherein the at least one of the plurality of temperature values to be utilized by the comparison circuit differs depending on an operational mode,
>>
>> wherein in one operational mode the fan is activated when needed to maintain high processing power, and
>>
>> wherein in another operational mode the fan is activated when necessary to maintain reasonable processing power, which is lower than the high processing power.

A107(10:20-45). Dependent claim 5 additionally requires that the apparatus include "a fan controller … wherein, via the second electrical connection, (i) the

clock frequency used by the microprocessor is controlled, and (ii) the fan is

controlled via the fan controller."  A107(10:55-59).

*__The Thomas '798 application.__*  Independent claims 1, 11, and 25 and

dependent claims 2-10, 12-24, and 26-27 of the Thomas '798 application are at

issue.  Claim 25 of the Thomas '798 application recites:

> 25.    A computing apparatus, comprising:
>
> a processing unit configured to operate at an operational speed;
>
> a temperature sensor configured to monitor a temperature of said processing unit;
>
> a fan for cooling at least said processing unit; and
>
> a power management apparatus operatively connected to said processing unit, said temperature sensor and said fan, said power management apparatus being configured to operate in accordance with at least one of a first power management configuration or a second power management configuration, and said power management apparatus being operable to (i) receive the temperature of the processing unit using said temperature sensor, (ii) control a speed of the fan based on the configured one of the first and second power management configurations and based on the temperature of the processing unit, and (iii) control a speed of the processing unit based on the configured one of the first and second power management configurations and based on the temperature of the processing unit.

A125.  Dependent claim 26 additionally requires "each of the first and second

power management configurations" to be "associated with at least one condition

concerning a speed of the processing unit and at least one condition concerning a

speed of the fan," both of which are "dependent on a temperature of the processing unit."  A125.

*__The Thomas '433 application.__*  Independent claims 1, 6, 10, and 21 and dependent claims 2-5, 7-9, 11-20, and 22-24 of the Thomas '433 application are at issue.  Claim 21 of the Thomas '433 application recites:

> 21.    A method for managing operation of a portable computer, the portable computer including at least a processor and a fan, the fan being operable to cool at least the processor, said method comprising:
>
> > configuring the portable computer for one of a plurality of different power management configurations;
> >
> > monitoring a temperature of the processor;
> >
> > setting a speed of the fan based on the configured power management configuration for the portable computer and based on the monitored temperature of the processor;
> >
> > setting an operational performance of the processor based on the configured power management configuration for the portable computer and based on the monitored temperature of the processor; and
> >
> > comparing the monitored temperature of the processor with at least a first predetermined temperature and a second predetermined temperature, the second predetermined temperature being higher than the first predetermined temperature,
> >
> > wherein said setting the speed of the fan comprises:
> >
> > > activating the fan when the monitored temperature of the processor exceeds the first predetermined temperature, and

> wherein said setting the operational performance of the processor comprises:
>
>> reducing operational clock frequency of the processor when the monitored temperature of the processor exceeds the second predetermined temperature.

A141.

## C.    Declaration Of The Interferences

On August 16, 2013, the Board declared four interferences between the Pippin '274 application and the four Thomas patents and applications.  The interferences were declared after Pippin filed a detailed submission requesting interferences and explaining why they were warranted.  A930-989.  The examiner then recommended that the interferences be declared.  A266-267; A278-279; A290-291; A302.  The four interferences were consolidated for purposes of briefing.  A211-212.  All claims of Thomas's patents and applications were designated as corresponding to a single interference count, defined as Pippin claim 1, which was identical to the count in *Thomas I.*  A262-263; A274-275; A286-287; A298-299.  The Board accorded the Pippin '274 application an earlier benefit date than any of the Thomas patents and applications.  A263; A275; A287; A299.  Thomas, represented by counsel at all times before the Board (A5001-5003), conceded that Pippin had priority over Thomas as to all claims corresponding to the count.  A216 ("Thomas is junior party and will not be putting on a priority case.").

### D.    The Board's Order Authorizing Motions

At the outset of the interferences, the Board required the parties to submit a list of proposed motions pursuant to 37 C.F.R. §§ 41.120, 41.204 and the Board's Standing Order ¶¶ 104.2.1, 120, 204. A258-260.

Thomas proposed twelve motions (A164-192; A213-215) and Pippin proposed three (A199-202). Following a conference call among the parties' attorneys and the managing administrative patent judge, the Board issued an order authorizing motions under 37 C.F.R. § 41.121. A211-212. The order authorized none of Pippin's proposed motions and four of Thomas's proposed motions. A213-215.

In relevant part, the Board authorized Thomas to file a separate motion for no interference-in-fact for each of his patents and applications, as well as two motions to designate claims in one patent and one application as not corresponding to the count. A214-215; *see also* A251-254.[6] The Board's order specifically instructed that Thomas's motions for no interference-in-fact "address points … which have already been addressed by Pippin in requesting this interference." A222; *see also* A254 (ordering Thomas to respond to "the prior art mentioned in" Pippin's list of proposed motions and request for declaration of the interferences).

---

[6]    Thomas was also authorized to file a motion arguing that Pippin claim 1 was unpatentable for lack of written description and indefiniteness. A217-218. The Board denied that motion (A10-22), and Thomas has not appealed that decision.

### E.    The Board's Decisions On Thomas's Motions

### 1.    Thomas's motions for no interference-in-fact

Thomas filed four motions for no interference-in-fact, numbered 5.1 through 5.4, each directed to a different one of the four Thomas patents and applications. A4.  In each motion, Thomas contended that the interference should never have been declared, because (he argued) no claim of the involved Thomas patents or applications would, if treated as prior art, render Pippin claim 1 obvious.  *See* 37 C.F.R. § 41.203(a) ("An interference exists if the subject matter of *a claim* of one party would, if prior art, have anticipated or rendered obvious the subject matter of a claim of the opposing party and vice versa."[7]); *see also Yorkey v. Diab*, 605 F.3d 1297, 1300 (Fed. Cir. 2010).  Specifically, Thomas contended that his claims did not teach three limitations of Pippin claim 1:

> (1) "a register storing a register value corresponding to a threshold temperature" ("Feature 1");
>
> (2) "a programmable thermal sensor receiving the register value" ("Feature 2"); and
>
> (3) "wherein the programmable thermal sensor generates a first interrupt signal if a microprocessor temperature exceeds the threshold temperature" ("Feature 3").[8]

---

[7]    Emphases have been added except where otherwise noted.

[8]    On appeal, Thomas has not briefed (and has thus abandoned) any challenge based on Feature 1.  He has also abandoned his prior argument that his claims did not teach "use of [the] interrupt [signal]… to activate an active cooling device (fan)

A24; *see also* A431-435; A456-458; A490-492; A516-518.[9]

The Board rejected Thomas's arguments. The Board initially noted that "[w]hen an interference is declared, an interference-in-fact is presumed to exist," and Thomas accordingly had the burden to show that none of the involved claims satisfied the "two-way" test—*i.e.*, that "a claim of one party would, if prior art, have anticipated or rendered obvious the subject matter of a claim of the opposing party and vice versa." A23; 37 C.F.R. § 41.203(a). Because Thomas had disputed only one half of the two-way test in Motions 5.1, 5.3, and 5.4—namely whether any of the involved Thomas claims would have rendered Pippin claim 1 obvious—the Board found that Thomas had waived any argument that Pippin claim 1 would not have rendered any Thomas claim obvious. A24. The Board then addressed each of the three features of Pippin claim 1 that Thomas contended were not disclosed in Thomas's claims, finding that Thomas had failed to meet his burden to establish that Pippin claim 1 was non-obvious over any of Thomas's claims and applicable prior art. *See* A27-34.

_____

and reduce the frequency of a clock signal for the microprocessor." A433; *see also* A24-25.

[9] While the Board numbered the three features as above (*see* A26-27), the Board went on to discuss the "programmable thermal sensor" feature as "feature 1" (A27) and the "register" feature as "feature 2" (A30). This brief follows Thomas in referring to the three features as numbered in text.

*First*, the Board determined that Pippin claim 1's use of a "programmable thermal sensor" would have been obvious to one skilled in the art in view of Thomas's claims.  A30.  The Board found that the subject matter of claim 25 of Thomas's '190 patent includes a temperature sensor that was "integrated with the microprocessor" and that "such '[t]emperature sensing circuitry is well known.'" A28; *see also* A30.  The Board also noted that Thomas's own expert, Dr. Jose Renau, agreed that a skilled artisan "would have understood that the processor temperature is monitored using threshold temperatures to carry out certain 'conditions'" in Thomas claim 25 and that "a logical way" to implement the temperature thresholds was by "programming them in[to]" the temperature sensor, which is what he "would do as an engineer."  A29; A3358.  The Board thus "agree[d] with Pippin that it would have been obvious to use a programmable thermal sensor (instead of a thermal sensor) to monitor a processor temperature in connection with the subject matter of Thomas claim 25."  A30.

*Second*, the Board found that Pippin claim 1's use of a "register [for] storing a register value" would have also been obvious in view of Thomas's claims and the prior art, as "registers" were "well-known" in the art for storing and comparing values in a microprocessor.  A30-31.

*Finally*, the Board concluded that Pippin claim 1's use of a "programmable thermal sensor [that] generates a first interrupt signal" that activates the cooling fan

and reduces clock frequency when "a microprocessor temperature exceeds the threshold temperature" would also have been obvious over Thomas's claims and the prior art. A32; A34. The Board considered four prior art references cited by Pippin, U.S. Patent Nos. 5,115,225 ("Dao"); 5,319,772 ("Hwang"); 5,230,074 ("Canova"); and 5,423,045 ("Kannan"), as well as U.S. Patent No. 5,526,289 ("Dinh") cited by Thomas. A32-33. Thomas conceded that Dinh "teaches a fan cooling subsystem for a computer system wherein the speed of the fan is adjusted based on the temperature within the housing." A32. Dao, the Board concluded, "describes generation of an interrupt signal … when the temperature of a disk drive exceeds a threshold." A33; *see also* A1622(1:49-65) ("If the temperature [is above a threshold], indicating an overheating problem, then the comparison logic asserts an interrupt signal …."). The Board also found that Canova and Kannan similarly disclosed generation of an interrupt signal when a computer's temperature exceeded a threshold. A33; *see also* A1167(5:6-11); A1666(11:20-23, 62-67). And the Board determined that Hwang disclosed lowering a computer's clock frequency in response to an interrupt signal. A33; *see also* A1631-1632(2:57-3:40) ("The CPU 12 responds to the interrupt signal 52 by executing instructions …. [T]he CPU 12 will function as if no interruption took place except that it now operates at a lower clock frequency."). The Board agreed with Pippin that it would have been obvious to modify Thomas's claims to include the known techniques

disclosed in Dao, Canova, Kannan, Hwang, and Dinh to produce the invention of Pippin claim 1.  A33-34.

The Board accordingly concluded that, because the Thomas claims (taken as prior art to Pippin claim 1) and other relevant prior art rendered Pippin claim 1 obvious, that aspect of the "two-way obviousness" test was satisfied as to each of Thomas's motions for no interference-in-fact.  Because that was the only aspect of the test challenged by Thomas as to the claims of the Thomas '190 patent and the Thomas '798 and '433 applications, the Board held that Thomas failed to establish no interference-in-fact between Pippin claim 1 and those claims.  A33-34; A39.

With respect to the Thomas '599 patent, Thomas pressed an additional argument, namely that Pippin claim 1 and the relevant prior art failed to render the Thomas '599 patent claims obvious because they did not teach four limitations. A35; A465-467.  The Board found that Thomas had failed to develop an argument that showed how the '599 patent claims were nonobvious over Pippin claim 1 and the other prior art references that Pippin cited (A36), despite the Board's clear instruction that Thomas should address the art "addressed by Pippin in requesting this interference" (A222; *see also* A254).  Instead, Thomas merely attacked perceived deficiencies in Pippin's original interference request.  A37.  The Board noted that, once the interference is declared, "an interference-in-fact is presumed to exist," and Thomas had the burden of proving the contrary.  A38.  The Board held

that Thomas failed to carry his burden and, additionally, stated that it "agree[d] with Pippin that the art cited by Pippin supports a holding of obviousness." A39. The Board also rejected Thomas's attempt to rely on the examiner's original reasons for allowing the '599 patent, noting that "[t]he Examiner's reasons for allowance are not dispositive of there being no interference-in-fact." A37-38.

### 2. Thomas's motions to designate claims as not corresponding to the count

Thomas also moved to designate claims in his '190 patent and '798 application as not corresponding to the count.[10] Specifically, in his Motion 6, Thomas argued that claims 10, 20, and 22-26 of his '190 patent should be de-designated because Pippin claim 1 and the prior art failed to teach limitations within those claims. A42-44; A368; A371; A375. In his Motion 7, Thomas made a similar argument regarding claims 26 and 27 of his '798 application. A49-52; A392-393. In particular, Thomas argued that the count failed to disclose the use of "two power management policies" that "respond[] to the same microprocessor temperature differently, depending upon whether or not the computer system is

---

[10]     When a party has more than one claim involved in an interference, "all claims of a party corresponding to the count are presumed to stand or fall together." 37 C.F.R. § 41.207(b)(1). A motion "to have a corresponding claim designated as not corresponding to the count" is the mechanism by which a party may argue that not all claims in an involved patent or application claim the same subject matter as the count. *Id.* The test for claim correspondence is whether "the subject matter of the count, treated as prior art to the claim, would have anticipated or rendered obvious the subject matter of the claim." *Id.* § 41.207(b)(2).

configured to run on battery power."  A371; *see also* A393 ("two power

management configurations" that differ "based upon their response to temperature

of the processing unit").

The Board denied these motions.  The Board first rejected Thomas's

contention that the presumption of patent validity in 35 U.S.C. § 282 meant that the

burden of proof should lie with Pippin—an argument that Thomas had

unsuccessfully raised before this Court in *Thomas I.  See* A1308-1311.  The Board

noted once again that "[t]he § 282 presumption of validity does not apply to

patents involved [in] interference proceedings."  A41.

On the merits, with respect to claims 10, 20, and 22-26 of the Thomas '190

patent (Motion 6), the Board noted that, although Thomas had identified features

that he believed were distinct from the count (Pippin claim 1), Thomas failed to

"substantively address how these features render the subject matter of [the Thomas

'190 patent claims] nonobvious."  A44.  Nonetheless, the Board addressed each of

the features raised by Thomas in light of the count, Thomas's admitted prior art

("APA"), and additional prior art references, ultimately concluding that Thomas

had failed to establish the non-obviousness of claims 10, 20, and 22-26 of the

Thomas '190 patent.  A44-47.  The Board reasoned that it would have been

obvious for a skilled artisan to configure a computer system to use different power

management policies depending on whether the computer was powered by a

battery, as taught by various prior art references, including Thomas's own APA. A47.

With regard to claims 26 and 27 of the Thomas '798 application (Motion 7), the Board reaffirmed that "[t]he burden of proof is always on Thomas, as the movant." A49. Noting that Thomas's identified distinguishing elements were the "two power management configurations" used to control the speed of the fan and the speed of the processing unit, the Board found that the subject matter of Thomas's claims "would have been obvious notwithstanding the distinguishing features" (A52), and that Thomas failed to establish that these features rendered claims 26 and 27 non-obvious over the count in view of the prior art (A53-54).

Because Thomas did not challenge Pippin's priority, the Board entered judgment of priority against Thomas and ordered cancellation of all remaining claims of the Thomas '190 and '599 patents and refusal of all pending claims of the Thomas '798 and '433 applications. A54; A69-71.

## SUMMARY OF THE ARGUMENT

Thomas fails to identify any infirmity in the Board's decision. The Board properly followed its own rules and this Court's precedent, thoroughly analyzed the arguments put forward in Thomas's motions, and carefully considered the prior art. In each case, the Board properly concluded that Thomas failed to meet his burden under the applicable standard. The Board's decision should be affirmed.

1.    Thomas first argues—for the second time before this Court—that the statutory presumption of patent validity, 35 U.S.C. § 282, should apply in interferences, even after the Board declared the interferences and Thomas conceded priority.  This Court's precedent and the Board's regulations are clear: the burden of proof in an interference rests with Thomas as the moving party seeking to change the status quo.  *See Bilstad v. Wakalopulos*, 386 F.3d 1116, 1121 (Fed. Cir. 2004); 37 C.F.R. § 41.208(b); *id.* § 41.121(b).  Once an interference is declared, all involved claims are presumed to correspond to the count, and the senior party (Pippin) is presumed to have first invented their subject matter.  37 C.F.R. § 41.207.  Thomas shows no error in the Board's application of established burdens and presumptions to Thomas's motions for no interference-in-fact and to designate claims as not corresponding to the count.  While not disputing these rules, Thomas resists their necessary result, namely that "[g]enerally speaking, the presumption of validity does not apply to patents involved in interference proceedings."  *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1037 n.1 (Fed. Cir. 2001).  Thomas has shown no reason to revisit that principle.

2.    Thomas's challenges to the Board's denial of his motions for no interference-in-fact fail.  With respect to the "programmable thermal sensor" (Feature 2) of Pippin claim 1, the Board correctly found that the subject matter of claim 25 of Thomas's '190 patent includes a temperature sensor.  And as for the

sensor's "programmability," Thomas's expert admitted that the patent refers to managing processor temperature using "different behavior based on different [temperature] threshold levels," and that "a logical way" to trigger these behaviors was to program temperature thresholds into the temperature sensor. A3358. Based on this record, the Board's findings regarding the programmable thermal sensor are supported by substantial evidence. And contrary to Thomas's assertion, there is nothing unusual or problematic about the Board's consideration of Thomas's specification in interpreting claim 25 of Thomas's '190 patent.

Thomas's contentions as to the interrupt signal in Pippin claim 1 (Feature 3) are equally unavailing. As the Board explained in detail, various prior art references taught the use of an interrupt signal in connection with a variety of power and thermal management techniques for computers, rendering it plainly obvious to combine those teachings with Thomas's claims to yield the invention of Pippin claim 1. A33-34. And contrary to Thomas's assertion, the Board did consider his claims "as a whole." Given the teachings of Thomas's claims and the prior art, the Board's finding that the "interrupt signal" of Pippin claim 1 would have been obvious to a skilled artisan in light of Thomas's claims and the prior art was more than supported by substantial evidence.

3.     Thomas's arguments regarding the Board's resolution of his motions to designate certain of his claims as not corresponding to the count suffer from

similar deficiencies.  While Thomas asserts that the count does not teach two features of his claims—"fan speed control" and use of different conditions based on temperature—Thomas's briefing on appeal (as before the Board) does not even attempt to "substantively address how these features render the subject matter of [his claims] nonobvious."  A44.  In fact, the Board properly relied on both Thomas's own admissions that the use of fan speed control to manage processor temperature was well-known and the teaching of power management policies in the prior art (including Thomas's admitted prior art) to conclude that Thomas had failed to meet his burden to show that the addition of those features would render his claims non-obvious over the count and applicable prior art.

Similarly, Thomas has shown no error in the Board's recognition that the use of different conditions based on the temperature of the processor was taught directly by the count in addition to other prior art.  The Board's conclusion that a skilled artisan "would have appreciated that these features would conserve battery life, reduce heat generation, and maximize performance speed of a computer system" was thus fully supported.  A48-49.

Because Thomas establishes no error—and certainly no prejudicial error—in the Board's decision, this Court should affirm.

# ARGUMENT

## I.   STANDARD OF REVIEW

An appeal of the Board's decision in an interference proceeding "is based solely on the agency record and [is] reviewed under the standard established by the Administrative Procedure Act." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1296 (Fed. Cir. 2014).  The Court "set[s] aside actions of the Board that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and set[s] aside factual findings that are unsupported by substantial evidence."  *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004) (citation omitted).  The Board's factual findings are reviewed for substantial evidence and its legal conclusions *de novo*.  *Rambus Inc. v. Rea*, 731 F.3d 1248, 1251 (Fed. Cir. 2013).

## II.   THE BOARD PROPERLY REQUIRED THOMAS TO PROVE HIS ENTITLEMENT TO RELIEF BY A PREPONDERANCE OF THE EVIDENCE

Thomas's lead argument is one he previously made and lost in *Thomas I*, namely that the statutory presumption of patent validity, 35 U.S.C. § 282, should have relieved him of any burden of proof on his motions for no interference-in-fact and for designation of his claims as not corresponding to the count.  Thomas made an indistinguishable argument in his previous appeal, in which this Court affirmed the Board's decisions.  *See* A1306-1311; A1608-1609.  Thomas then presented the argument in petitions for rehearing en banc and for certiorari, both of which were

denied without opinion.  A1826-1844; A1845-1848; A1849-1875; *Thomas v. Pippin*, 134 S. Ct. 1916 (2014).  The argument remains meritless.[11]

The Board's regulations clearly place the burden of proof on the movant seeking to change the status quo in an interference.  37 C.F.R. § 41.208(b) ("To be sufficient, a motion must provide a showing, supported with appropriate evidence, such that, if unrebutted, it would justify the relief sought.  The burden is on the movant."); *id.* § 41.121(b) ("The party filing the motion has the burden of proof to establish that it is entitled to the requested relief.").  The Board's decision in multiple places properly explained that "[a] moving party has the burden of proof to demonstrate entitlement to the relief requested."  A12 (citing 37 C.F.R. § 41.121(b)); A38 (same); A40 (same).

Thomas's motion for no interference-in-fact challenged the premise that the two-way obviousness test for interfering subject matter was met—namely, that "the subject matter of a claim of one party would, if prior art, have anticipated or

---

[11]    Thomas's argument about the burden of proof could only be relevant to his Motion 5.2 (alleging no interference-in-fact with the '599 patent) and Motion 6 (seeking to designate claims of the '190 patent as not corresponding to the count), both of which urged that Thomas's *issued patent claims* were not rendered obvious by Pippin claim 1 and the prior art.  Because the remaining motions did not involve issued patent claims, but claims in patent *applications* (Thomas's involved applications) or a statutory invention registration (Pippin claim 1), Thomas's Section 282 argument would not apply to those motions even were it legally proper.  *See Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1379 (Fed. Cir. 2009) ("Patent applications do not enjoy the statutory presumption of validity.").

rendered obvious the subject matter of a claim of the opposing party and vice versa." 37 C.F.R. § 41.203(a). A party seeking to show that there is no interference-in-fact "must show that the 'two-way' test is not satisfied." A23. Accordingly, the Board's explanation that Thomas, as the moving party, had the burden of proving that "the subject matter" of his claims "would not have been obvious in view of the subject matter of Pippin claim 1" (A38) was just a straightforward application to Thomas's motions of Board rules governing interferences. *See also* A40-41 (similar observation in reference to Thomas's Motion 6 to designate claims as not corresponding to the count).

On appeal, Thomas does not even attempt to address the relevant administrative law principles that provide deference to an agency's formal rulemaking and application of its own rules. *See, e.g.*, *Lacavera v. Dudas*, 441 F.3d 1380, 1383 (Fed. Cir. 2006) ("[T]he PTO has broad authority to govern the conduct of proceedings before it …. [W]e analyze a challenge to the statutory authority of its regulations under the *Chevron* framework."); *In re Swanson*, 540 F.3d 1368, 1374 n.3 (Fed. Cir. 2008) ("Deference is … given to the PTO's interpretations of its own procedural rules."). Thomas offers the Court no reason to think that the Board's straightforward application of its own rules was arbitrary or capricious under the appropriate legal standard.

In any event, the Board's rules and its application of those rules in this case are also consistent with this Court's precedent. Once Pippin "convinced the examiner that he was entitled to an interference, that decision was presumed to be correct, and [the opposing party] bore the burden of proving that it was incorrect by a preponderance of the evidence." *Bilstad*, 386 F.3d at 1121; *see also id.* ("The declaration of interference is an interlocutory order presumed to be correct."); A12 ("[D]eclaration of the interference[] is presumed correct and represents the status quo in the interference."). The declaration of an interference under 37 C.F.R. § 41.203(b) reflects the careful consideration of an examiner as to the patentability and correspondence of the claims to the count, as well as the Board's own review of the involved applications and patents. In effect, a junior party's claims that correspond to the count (even if patented) cannot be patentable, because whoever is deemed to have invented last is not entitled to patent the same invention. *See In re Sullivan*, 362 F.3d at 1325-1327 (affirming Board's decision to terminate interference and cancel all claims corresponding to the count after party conceded priority); *see also Sullivan v. Bingel*, Int. No. 104,818, 2003 WL 1202245 (B.P.A.I. 2003). The burden is placed on the moving party who wishes to change that status quo.

Thomas argues (Br. 17-20) that the statutory presumption of validity supports his contention that he should not bear the burden of proof when

challenging the existence and scope of an interference.  But this Court has explained that, "[g]enerally speaking, the presumption of validity does not apply to patents involved in interference proceedings."  *Apotex*, 254 F.3d at 1037 n.1.[12]

Thomas's attacks (Br. 21-22) on the Board's citation to *Bruning v. Hirose*, 161 F.3d 681 (Fed. Cir. 1998), are misguided.  In *Bruning*, this Court explained that, because the presumption of validity does not apply in an interference, a preponderance of the evidence standard applies to a patentability challenge to a patent that issued from an application that was co-pending with the interfering application.  *Id.* at 685-686.  Thomas tries (Br. 21) to distinguish this case by asserting that his two patents issued before Pippin's '274 application was filed and were, therefore, not "co-pending."  But Pippin's '274 application was "co-pending" within the meaning of *Bruning* because it is entitled to the benefit of an application that was co-pending with Thomas's.  *See* 161 F.3d at 683 (explaining that interfering claims were copied into continuation application filed after patent

---

[12]     The presumption of validity may apply when an interference involves a priority contest between an ***issued patent*** held by the presumptive ***senior*** party and an ***application*** filed after the patent's issuance by the presumptive ***junior*** party.  *Apotex*, 254 F.3d at 1037 n.1 (citing *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993)).  That was the case in the unpublished decision on which Thomas relies (Br. 19).  *See Thompson v. Thompson*, 13 F. App'x 925, 928-929 (Fed. Cir. 2001) (affirming Board's invalidation of senior party's issued claims under 35 U.S.C. § 103).  Here, Thomas ***is not*** the presumptive senior party and, indeed, ***conceded*** that Pippin has priority based on Pippin's application that pre-dates any Thomas application.  *Thompson* is additionally inapposite because it involved a direct obviousness challenge under § 103, which is not at issue here.

issued).  Indeed, Thomas conceded Pippin claim 1's priority date of September 21, 1993, which predates the earliest priority date of any Thomas claim.

Moreover, it is well-established that the presumption of validity does not apply in reissue and reexamination proceedings, which (like interferences) "can only be initiated by some showing of error, defect or problem with a patent." *Bruning*, 161 F.3d at 685; *see also Apotex*, 254 F.3d at 1037 n.1 (summarizing *Bruning*'s holding).  Notably, Thomas admitted below that his burden-of-proof argument was "contrary to" this Court's precedent.  A455 ("Thomas submits that Pippin should have the burden in showing why Thomas' claims should remain designated as corresponding to the count, and why there is interference-in-fact, **contrary to** *Kubota v. Shibuya*, 999 F.2d 517, 519 … (Fed. Cir. 1993)[.]").

*Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238 (2011), does not help Thomas.  That case involved district court litigation concerning an issued patent's validity, *id.* at 2243-2244, and the language that Thomas quotes at length (Br. 18) explains that in litigation "a challenger must overcome th[e] presumption to prevail on **an invalidity defense**."  *Id.* at 2245; *see also id.* at 2242 ("We consider whether § 282 requires **an invalidity defense** to be proved by clear and convincing evidence.").  *Microsoft* addressed the standard of proof for "a defendant in an infringement action," *id.* at 2244; it said nothing about the standard

of proof, let alone the burden of proof, to be used in Patent Office interference proceedings concerning the scope of the interfering subject matter.

Finally, Thomas is wrong to suggest (Br. 18) that his concession of priority affects the burden of proof. By conceding priority, Thomas effectively conceded that all of his claims corresponding to the count were unpatentable, because he was not the first inventor. The Board adjudicated Thomas's motions for no interference-in-fact and for de-designation in order to determine the *scope* of the priority determination. The resolution of both questions depends on an obviousness-type analysis, *see* 37 C.F.R. §§ 41.203(a), 41.207(b)(2), but the end result is a determination that claims are lost on priority grounds; it is not an invalidity ruling under 35 U.S.C. § 103.

Accordingly, Thomas's burden of proof argument is meritless and contrary to this Court's precedent and the governing regulations. The Board was right to reject it.

## III.   THE BOARD PROPERLY DENIED THOMAS'S MOTIONS FOR NO INTERFERENCE-IN-FACT

Thomas next challenges the Board's denial of Thomas's Motions 5.1-5.4, which sought a declaration of no interference-in-fact. The Board's decision on Motions 5.1-5.4 is amply supported by substantial evidence, and Thomas has not shown otherwise.

## A.    Thomas Failed To Establish That Pippin Claim 1's Programmable Thermal Sensor (Feature 2) Rendered Pippin Claim 1 Non-Obvious Over The Thomas Claims And Prior Art

### 1.    Substantial evidence supports the Board's findings

Thomas challenges the Board's finding that Thomas failed to prove that Pippin claim 1's use of a "programmable thermal sensor" was not obvious over claim 25 of Thomas's '190 patent and the prior art.  Br. 27-32.  The Board's finding was supported by substantial evidence, including the testimony of Thomas's own expert Dr. Renau.

To begin with, substantial evidence supports the Board's finding that the subject matter of Thomas claim 25 includes a temperature sensor.  The Board explained that Thomas claim 25's limitation of "monitoring a temperature of [a] processor" clearly referred to "accurate temperature monitoring of a microprocessor, via a *temperature sensor*," as explained in Thomas's disclosure. A28; *see also* A90(12:50); A86(3:67-4:11); A88(8:10-13) ("*[T]he invention* allows more accurate temperature monitoring of the microprocessor 2 because the temperature sensor 4 is integrated with the microprocessor 2.").  The Board also noted Thomas's statement that "such '[t]emperature sensing circuitry is well known and therefore not further described.'"  A28.

As for the limitation in Pippin claim 1 that the thermal sensor be "programmable," the Board found that limitation obvious because (1) the

monitoring of processor temperature in Thomas claim 25 is done using temperature thresholds (*i.e.*, specific temperature values), and (2) a skilled artisan would have known that such thresholds could be ***programmed*** into the temperature sensor. A29.  Both propositions are supported by substantial evidence.

*First*, the Board noted that, according to Dr. Renau, a skilled artisan would have understood that in Thomas claim 25, the "processor temperature is monitored using ***threshold temperatures***" at which certain behaviors or "'conditions'" are carried out, such as activating a fan or reducing clock speed.  A29; *see also* A27-28 (noting that claim 25 recites "controlling an operational speed of the processor based on [an] appropriate one of [a] ***first power management policy*** [including at least a ***first condition based on a temperature of the processor***], [and a] ***second power management policy*** [including at least a ***second condition based on a temperature of the processor***].");  A3325.  Dr. Renau confirmed that the Thomas patent refers to "different behavior based on different ***threshold levels***."  A3358.

*Second*, Dr. Renau also agreed on cross-examination that "a logical way" to implement the temperature thresholds for the claimed power management policies was by "***programming*** them in[to]" the temperature sensor, and that this would be what he "would do as an engineer."  A3358; *see also* A29 (quoting A3358).  Dr. Renau further agreed that the "well-known" temperature sensor within the subject matter of Thomas claim 25 would "compare different programmable thresholds

against a temperature reading," and that the thresholds could be "programmable, not programmable … potentially can be either way." A3360. That provides substantial evidence for the Board's finding that Dr. Renau's testimony "at least suggests use of a programmable sensor that can be programmed with thresholds." A30.[13]

The Board was well within its authority to conclude that a skilled artisan, faced with the Thomas claims, would have known to use a programmable thermal sensor to monitor processor temperature using thresholds in order to carry out the conditions for the power management policies in Thomas claim 25. A30 ("[W]e agree with Pippin that it would have been obvious to use a programmable thermal sensor (instead of a thermal sensor) to monitor a processor temperature in connection with the subject matter of Thomas claim 25."). Both before the Board and on appeal, Thomas has failed to provide "a convincing reason why a thermal sensor would not have been recognized by one skilled in the art to be programmed to respond to different temperature thresholds within a microprocessor"; programming a thermal sensor was a product not "'of innovation but of ordinary

---

[13] Thomas argues (Br. 31-32) that programming thresholds is not the same as a programmable thermal sensor, but Pippin's specification shows the contrary. *See* A2735 (programming of thresholds in elements 800 and 850), A2766-2767; A1755.

skill and common sense.'"  A30 (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007)).

### 2.    The Board properly interpreted Thomas claim 25 in light of Thomas's specification

Thomas complains (Br. 27-31) that the Board improperly relied on his specification (common to all involved Thomas patents and applications) when interpreting Thomas claim 25 in order to determine whether the "programmable thermal sensor" of Pippin claim 1 rendered that claim non-obvious over Thomas's claim and prior art.  But the Board referred to the specification to determine the subject matter of Thomas's claims as required by 37 C.F.R. § 41.203(a), and Thomas is incorrect to suggest that the Board could not refer to the specification for that purpose.  The case Thomas cites (at 29), *Advance Transformer Co. v. Levinson*, 837 F.2d 1081 (Fed. Cir. 1988), explains that, in a § 291 district court interference proceeding involving issued patents, one should "compare claims, not disclosures" in determining whether those patents actually interfere with each other.  *Id.* at 1083.  Nothing in *Advance Transformer* forecloses the Board from interpreting the involved claims in light of the specification.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) ("[C]laims must be read in view of the specification, of which they are a part." (internal quotation marks omitted)).

Thomas raises two instances where he believes the Board improperly relied on the specification. *First*, Thomas faults the Board's reference to the Thomas specification's statement that "temperature sensing circuitry is well-known and therefore [need] not [be] further described." A30 (quoting A86(4:10-11)) (second alteration added). But the Board used this language to interpret claim 25's limitation of "monitoring a temperature of [a] processor" and concluded that it involves use of a well-known temperature sensor. A28. Beyond that, Thomas conceded in his briefing to the Board that "[t]hermal sensors were known prior to Pippin's earliest claimed filing date." A435 (Thomas Motion 5.1). In light of this concession, Thomas's complaint about the Board's citation to the Thomas specification makes no sense. The concession also explains why Thomas does not (and could not) actually argue that thermal sensors were ***not*** obvious over Thomas claim 25 and the prior art.

*Second*, Thomas faults the Board (Br. 30-31) for relying on Dr. Renau's testimony showing that Thomas's well-known temperature sensor "at least suggests use of a programmable sensor that can be programmed with thresholds." A30. Again, however, this testimony describes a skilled artisan's understanding of the subject matter of Thomas claim 25. *See supra* pp. 36-37. Thomas also fails to address Dr. Renau's testimony that it would be "logical" for an engineer like Dr.

Renau to program thresholds into the temperature sensor within the subject matter

of Thomas claim 25.  A29 (quoting A3358); *see supra* p. 36.

Accordingly, the Board did not err by interpreting Thomas claim 25 in light

of the specification.

> **B.     Thomas Failed To Establish That Pippin Claim 1's Interrupt
> Signal (Feature 3) Rendered Pippin Claim 1 Non-Obvious Over
> The Thomas Claims And Prior Art**

> **1.     The Board properly considered motivation to combine
> Thomas's claims with the prior art**

Thomas accuses the Board of insufficiently articulating its rationale for

combining his claims with prior art references to produce the "interrupt signal" of

Pippin claim 1.  Br. 25-26.  But the Board's decision thoroughly demonstrates that

the use of interrupt signals to control clock speed and fan speed was already known

in the art.  Unsurprisingly, Thomas's argument regarding motivation to combine

(Br. 27) is not followed by any argument that the Board's conclusion was actually

incorrect or that a skilled artisan would have lacked a motivation to combine.

As the movant, it was Thomas's burden to show non-obviousness.  Before

the Board, Thomas offered only conclusory statements about the motivation to

combine and altogether failed to address the Kannan and Canova prior art

references relied upon by Pippin's Opposition 5.1 and the Board.  *See generally*

A695; A820-836.  On appeal, Thomas has not even tried to explain why a skilled

artisan would not have combined the claims of the Thomas '190 patent directed to

the power and thermal management of microprocessors with well-known prior art techniques that were also directed to power and thermal management of computer components.

The Board explained, with pinpoint citations, that Dao, Hwang, Canova, and Kannan all taught the use of an interrupt signal in connection with a variety of power and thermal management techniques for computers and computer components. A33; *see also supra* pp. 19-21. Thomas complains (at 26) that the Board did not expressly state that it was combining these references with his claim, but the Board was not required to make such a statement expressly; the Board left no doubt that it considered Thomas's claims in view of the prior art when it ruled, after discussing the references, that "Thomas has failed … to show that there is no interference-in-fact between Thomas['s] ***claims*** and Pippin's claim 1." A34. The Board also noted its "agree[ment] with Pippin" that these references could have been combined with Thomas's claims. *Id.* (citing A694-695). As the Board correctly reasoned, "using these techniques to improve a similar process in the same way would have been obvious." A33-34 (citing *KSR*, 550 U.S. at 417). As set forth in the passage of *KSR* relied upon by the Board: "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." 550

U.S. at 417.  Similarly, "[c]ommon sense teaches … that familiar items may have obvious uses beyond their primary purposes."  *Id.* at 420.  Here, the combination of "familiar items" was *for* "their primary purpose[]" as taught in the art.  *Id.*; *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328 (Fed. Cir. 2009) ("[C]ommon sense can be a source of reasons to combine or modify prior art references."); *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1367 (Fed. Cir. 2006) (obviousness test "not only permits, but *requires*, consideration of common knowledge and common sense").

### 2.    Substantial evidence supports the Board's findings

Substantial evidence supports the Board's conclusion that Thomas failed to prove Pippin claim 1 nonobvious due to the claimed interrupt signal.  Thomas's appeal quibbles with isolated statements by the Board and ignores the import of the Board's thorough analysis of the prior art's teachings.

The Board specifically found that Dao "describes generation of an interrupt signal to a microprocessor when the temperature of disk drives for a computer system exceeds a threshold," and that "Canova and Kannan also teach that it was known to generate an interrupt signal when a computer's temperature exceeds a threshold."  A33.  Thomas does not fault the accuracy of these descriptions of Dao,

Canova, and Kannan, which are more than supported by substantial evidence.[14]

Instead, Thomas asserts that references that teach generating interrupt signals when temperature thresholds are exceeded in *disk drives and computers* are not substantial evidence for the Board's finding that it would have been obvious to generate an interrupt signal when a temperature threshold is exceeded in a "*microprocessor*."  Br. 42-44.  But it is plain—and recited in Thomas's own claims—that microprocessors are essential components of computers.  *See, e.g.*, *supra* p. 10 ("the computer including at least a processor").  Thomas does not explain why a skilled artisan would not apply the references' teachings regarding computers and disk drives to microprocessors.  *KSR*, 550 U.S. at 417.  The Board also found that Hwang "describes a CPU [central processing unit] that executes instructions to lower its clock frequency in response to an interrupt signal."  A33.  Thomas says nothing about this indisputable description of Hwang, nor does he dispute the conclusion that Hwang teaches "the use of … an interrupt signal to control the operational speed (clock frequency) of *a processor*."  *Id.*[15]

---

[14]    Contrary to Thomas's assertion (Br. 44 n.26), Pippin did argue that Canova and Kannan "show that it was known at the time to generate an interrupt signal when a computer's temperature exceeds a threshold in order to invoke a power management routine."  A695.

[15]    Thomas's only discussion of Hwang is a short footnote (Br. 45 n.27) that does not dispute the Board's statements about Hwang's teachings.

Thomas challenges the Board's reliance on Dinh based on a misreading of the Board decision. Thomas suggests that the Board relied on Dinh to teach "an interrupt signal to control the speed of a fan." Br. 44. But the Board did not rely on Dinh to teach "an interrupt signal"—that was already well-established by the other references, notably Hwang. A33 ("the use of such an interrupt signal to control the operational speed (clock frequency) of a processor as described by Hwang"). The Board merely relied on Dinh for the use of "a fan" (A33), specifically a "fan cooling subsystem for a computer system wherein the speed of the fan is adjusted based on the temperature within the housing" (A32). Thomas conceded that Dinh teaches a fan with adjustable speeds—as it indisputably does. *Id.* There is more than substantial evidence for the Board's conclusion that a skilled artisan could easily have applied Hwang's interrupt signal to Dinh's adjustable fan.[16]

---

[16]    Thomas asserts in footnotes (Br. 24 n.8, 54 n.36) that the Board failed to consider arguments made in his reply briefs supporting his motions 5.2-5.4. An appellant does not preserve points made in footnotes. *See SmithKline Beecham Corp.* v. *Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). And Thomas has not shown prejudice, as he identifies no argument in those reply briefs that would change the result. Most of their points were already made in Thomas's principal motions or were cumulative of his reply supporting Motion 5.1, which the Board did consider. A4. While Thomas suggests that the Board "may have better appreciated" certain arguments made in his reply supporting Motion 5.2 (Br. 54 n.36), Thomas points to no argument in that reply that the Board failed to consider—and certainly no argument beyond the arguments presented in Thomas's briefing on Motions 6 and 7, which the Board considered and addressed.

### C.    The Board Properly Considered The Claims As A Whole

Thomas accuses the Board of failing to consider Pippin claim 1 "as a whole" (Br. 35)—a remarkable assertion given that it was *Thomas* who identified three so-called "features" that he claimed distinguished Pippin claim 1 from the involved Thomas claims.[17]  *See* Br. 37; A430 ("None of Thomas' claims, alone or in combination with any prior art *prima facie* available against Pippin's application, teach or suggest the foregoing **features** of Pippin's claim."); A25 ("According to Thomas, these Pippin features are the differences between the subject matter of the claims of Thomas '190 and the subject matter of Pippin '274 claim 1."); *see also, e.g.*, A431-432 (discussing the alleged differences between Pippin claim 1 and the Thomas claims).  In any event, the Board's decision makes clear that the Board did, in fact, direct its analysis to the obviousness of the "claims as a whole" rather than merely claim features in isolation.

At the outset of the Board's discussion of Thomas's Motions 5.1 to 5.4 for no interference-in-fact, the Board properly stated the applicable test:  "An interference exists if the subject matter of a claim of one party would, if prior art, have anticipated or rendered obvious **the subject matter of a claim** of the opposing party and vice versa.  37 C.F.R. § 41.203(a)."  A23.  The Board then quoted the

---

[17]    As discussed above (pp. 17-18 & n.8), Thomas identified three features as distinguishing Pippin claim 1 from the Thomas claims, and only alleges error as to Features 2 and 3.  *See* Br. 27-32, 41-46.

three distinguishing features identified by Thomas *and* explained that the claims additionally require that "[t]he first interrupt signal is then used to activate an active cooling device (*e.g.*, a fan), as well as to reduce the frequency of a clock signal for the microprocessor." A24. Thus, the Board's analysis was directed to the claims "as a whole," and the remaining claim features were not "conveniently 'lost,'" as Thomas erroneously contends. Br. 35, 37. This understanding is confirmed by the Board's conclusion that Thomas failed to meet his burden to establish that "the subject matter of Pippin claim 1, *as a whole*, would not have been obvious over the subject matter of the [Thomas claims] and other prior art." A26; *see also* A35-36; A39-40.

Nor did the Board "isolate[] and further abstract[]" the identified distinguishing features. Br. 37. Thomas is incorrect that the Board "neglected to consider" certain limitations of Feature 3 (the thermal sensor's location and generation of the interrupt signal) that would "render Pippin's sole claim nonobvious from Thomas' claims." Br. 37-38. As an initial matter, Thomas again fails to provide *any explanation* for why the location of the thermal sensor or the fact that it generates the interrupt signal would render Pippin claim 1 nonobvious over the Thomas claims in view of the prior art. But in any event, the Board fully considered all limitations of Feature 3, including that the interrupt signal is generated "by a programmable thermal sensor" and that "the location of both the

generation of the interrupt signal and the programmable thermal sensor" is internal to the processor.  The Board determined that each of these aspects of Pippin claim 1 was obvious in view of the Thomas claims when combined with applicable prior art, a determination that is supported by substantial evidence.[18]

*First*, as to the thermal sensor's location, the Board interpreted "the limitation 'monitoring a temperature of [a] processor'" in the Thomas '190 patent claims to require "accurate temperature monitoring … via a ***temperature sensor*** that is ***integrated with the microprocessor***."  A28 (first alteration in original) (citing A86(4:1-11), A88(8:11-13)); *see also* A83(fig. 9) (depicting the temperature sensor inside the microprocessor); A88(8:10-13) ("***[T]he invention*** allows more accurate temperature monitoring of the microprocessor 2 because ***the temperature sensor 4 is integrated with the microprocessor 2***.").  Indeed, the Thomas '599 patent claims expressly recite that "the temperature sensor [is] being provided ***within the microprocessor***."  A107(10:26-28).  Thus, the Board correctly determined that the location of the thermal sensor—internal to the processor—was directly taught by the Thomas claims (as presumed prior art).[19]

---

[18]    Notably, Thomas never sought authorization to present an argument based on the location of the thermal sensor, such that his argument of the point was improper.  A221; A253.

[19]    Thomas notes (Br. 28 n.10) that the Board referenced claim 25 of the '190 patent, while Pippin relied on claim 26.  But claim 26 depends from claim 25, and Thomas identifies no difference between them that is material to the issue.

*Second*, the Board's decision makes clear that the Thomas claims render obvious the generation of the interrupt signal by the thermal sensor. The Board interpreted the limitations in Thomas's claims requiring monitoring the temperature of the processor using a thermal sensor to require the use of "***threshold temperatures***." A29. The Board then explained that various prior art references, including Dao, Canova, and Kannan, taught "the generation of an interrupt signal when a microprocessor/computer's temperature exceeds a certain ***threshold***." A33. Accordingly, it would have been obvious for a skilled artisan to modify Thomas's thermal sensor, which is programmed to sense when the microprocessor's temperature exceeds particular thresholds, to generate the interrupt signal of Dao, Canova, Kannan, or Hwang in response to a high temperature. The Board's analysis thus makes clear that "Feature 3" of Pippin claim 1 (the generation of an interrupt signal)—including the location of the interrupt signal and its generation by the thermal sensor—is merely a combination of the involved Thomas claims with various well-known elements used in the prior art.[20]

---

[20]    Thomas also argues that Pippin claim 1 should be construed narrowly to capture only configurations where the thermal sensor is internal to the processor. Br. 40. The argument changes nothing, as Thomas's own claims (as presumed prior art) disclose "a temperature sensor that is integrated with the microprocessor." A28 (internal quotation marks omitted).

## IV. THE BOARD CORRECTLY DETERMINED THAT THOMAS FAILED TO MEET HIS BURDEN TO DESIGNATE CLAIMS AS NOT CORRESPONDING TO THE COUNT

Thomas fails to establish any error in the Board's resolution of his Motions 6 and 7, which sought to designate various of Thomas's involved claims as not corresponding to the count.[21]  Thomas does not dispute that the count and prior art disclose nearly all of the limitations of Thomas's claims.  The *only* two claim elements that Thomas contends are not disclosed are:  (1) "fan speed control and more particularly controlling fan speed based on [the] power management policy/configuration in use" and (2) "different power management policies[']/configurations['] use of different conditions based on temperature of a processor/processing unit."  Br. 13.[22]  But as before the Board, Thomas fails to "substantively address how these features render the subject matter of [Thomas's claims] nonobvious over the subject matter of the Count, alone or in combination

---

[21]    As discussed above (pp. 22-23), Thomas sought to designate claims 10, 20, and 22-26 of the Thomas '190 patent (Motion 6) and claims 26 and 27 of the Thomas '798 application (Motion 7) as not corresponding to the count.  *See* A40-44; A49-54; A368; A371; A375; A392-393.  As the Board acknowledged, Thomas "did not separately argue claims [20, 22-26 of the '190 patent] apart from claim 10" (A41 n.15) or "claim 27 [of the '798 application] apart from claim 26" (A50 n.17).  Thus, these claims "stand or fall" together.  *See* A41 n.15; A50 n.17.

[22]    Thomas also argues that the Board's resolution of Motion 5.2 (no interference-in-fact as to the claims of the Thomas '599 patent) under the second part of the two-way obviousness test "contains the same errors" as those identified by Thomas as to Motion 6.  Br. 54-55.  As Thomas does not make any separate arguments as to Motion 5.2, the discussion below applies equally to the Board's resolution of Motion 5.2.

[with] any other applicable prior art." A44. And even were Thomas to attempt to provide such explanation, neither of these allegedly distinguishing features renders Thomas's claims non-obvious, as each was either well-known in the art or expressly taught by the count (Pippin claim 1). Thus, the Board correctly determined that the Thomas claims were not patentably distinct from the count. A47-49; A52-54.[23]

### A. Thomas Failed To Establish That The Use Of Fan Speed Control Based On A Power Management Policy Rendered His Claims Patentably Distinct From The Count

#### 1. Thomas admitted that use of fan speed control to manage processor temperature was well-known in the art

Thomas criticizes the Board's discussion of Yamaki and Canova, contending that both references fail to disclose "fan speed control." Br. 50. But the Board never suggested otherwise. The Board discussed Yamaki and Canova not for disclosure of fan speed control, but for disclosure of "a computer system having two power management policies." *See* A43; *see also* A45-46; *infra* pp. 53-54. As for fan speed control, the Board correctly recognized that (as Thomas admitted) several *other* prior art references taught the use of fan speed control to manage processor temperature, including Dinh and U.S. Patent No. 5,623,594 ("Swamy").

---

[23]    Contrary to Thomas's assertion that Pippin's interference request "failed to consider that the different power management policies have different conditions based on the temperature of the processor" (Br. 53 n.35), Pippin's request explicitly addressed this limitation. *See* A952-953; A969.

*See* A26; *see also* A787 (Pippin Opposition 6) ("[I]t would have been obvious to one of ordinary skill in the art at the time, in view of either Dinh or Swamy, to incorporate in the computer system of the same Count a multi-speed fan to set or control fan speed dependent on temperature.").  The Board correctly found that Thomas "failed to meet its burden of proof" in this regard.  A49.

Indeed, as Thomas himself explained, Dinh "discloses a fan cooling subsystem for a personal computer wherein the ***speed of the fan is adjustable*** based on the temperature."  A443; *see also* A1174(1:65-2:1)(Dinh) ("A computer system according to the present invention ***changes the speed of its fan*** proportionally to the change in temperature inside the computer housing.").  Similarly, Swamy teaches power and thermal management through "instructing the fan [] to turn on or to ***increase its speed***."  A442; A1206(7:26-34)(Swamy) ("If the computer temperature exceeds a predetermined maximum allowed temperature, the overtemperature detection circuit [] sends a signal … [that] may instruct the fan [] to turn on or ***increase speed*** if already on.").  Moreover, the count (Pippin claim 1) itself teaches "***activat[ing] [a fan]***" where the "microprocessor temperature exceeds [a] threshold temperature" in order to cool the microprocessor.  A928. And even Thomas's APA makes clear that the prior art taught use of a fan for cooling.  *See* A85(2:35-38) ("[W]ith portable computers, manufacturers have to … provide a fan for cooling."); *see also* A45 ("Thomas admits in its Background

Section of the Invention … that it was known to control temperature of a microprocessor by using a fan.").

Thus, by Thomas's own admission, use of a fan to manage processor temperature was taught by the count and various other prior art references. "[T]he knowledge of [a skilled] artisan is part of the store of public knowledge that ***must*** be consulted when considering whether a claimed invention would have been obvious." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). The Board thus properly considered such evidence in concluding that a skilled artisan would have appreciated that adjusting a fan's speed would "reduce heat generation, and maximize performance speed of a computer system, as taught [by] … Swamy [and] Dinh." A48-49; A53; *see Randall*, 733 F.3d at 1362-1363 ("One form of evidence to provide … a foundation [about what a skilled artisan would have known], perhaps the most reliable because not litigation-generated, is documentary evidence consisting of prior art in the area … [which] constitute important evidence of the state of the art and the context in which the Examiner-cited combination should be evaluated.").

Since fan speed control was well-known, the Board did not (and did not need to) rely on Yamaki and Canova for that limitation. Thomas's argument is a misdirection that provides no basis for disturbing the Board's decision.

2.    **Use of different power management policies based on whether a computer is powered by a battery was well-known in the art**

Thomas apparently also argues that recitation of "fan speed control based on an appropriate power management policy[/configuration]" renders his claims non-obvious over the count.  Br. 50, 58.  But Thomas again fails to explain ***why*** this element would render his claims non-obvious.  Nor could Thomas make such a showing, as Thomas does not dispute that use of power management policies was also well-known in the art.

As noted above (p. 50) and explained in detail by the Board, Yamaki and Canova both disclose use of different power management policies based on whether or not the computer is powered by a battery.  *See* A45-46.  For example, Yamaki discloses a "sleep mode function" (which decreases processor speed) that is enabled when a computer is powered by a battery and disabled when the computer is powered by an external power supply.  *See* A45; *see also* A1145(1:12-16, 1:57-2:6, 2:43-46).  Similarly, Canova discloses a mode in which the processor is operated at lower speeds when the computer is powered by a battery to conserve battery life.  *See* A45-46; *see also* A1167-1168(5:41-67, 7:41-56) (when under AC power, the processor runs "at a rate preselected"; when under battery power, the processor can run in a "'long battery life' option" which conserves power by operating the processor at a "low speed").

Thomas does not dispute that both Yamaki and Canova disclose the use of different power management policies/configurations depending on whether the computer is powered by a battery. Indeed, Thomas's specification *admits* that Yamaki "discloses a sleep mode controller which lowers the CPU clock speed" but that the "sleep mode controller is disabled if the AC adapter is connected." A85(1:59-60, 2:1-2). In other words, the computer has a different power management policy depending on whether the computer is powered by a battery or by an "AC adapter" plugged into the wall. The Board's ruling is thus amply supported by substantial evidence.

Thomas asserts (Br. 48-49, 57) that the Board erred in referencing two additional references, U.S. Patent Nos. 6,014,611 ("Arai") and 6,029,119 ("Atkinson"). *See* A46-47. Thomas is correct that Pippin invoked these references conditionally, in the event that the Board agreed with Pippin's argument that the Thomas claims were not supported by the written description of the application to which Thomas claimed priority, and thus were not entitled to a June 1994 priority date. A792-796; A812-816. The Board ultimately found it unnecessary to address Pippin's written description argument on the merits. *See* A43 n.16; A51 n.18. However, Thomas does not demonstrate any actual prejudice from the Board's discussion of Arai or Atkinson, and the weakness of Thomas's arguments makes plain that any error was harmless. This is particularly true where Thomas does not

contest that Yamaki and Canova—both undisputedly prior art to Thomas's claims—each disclose use of power management policies, the very feature that the Board found disclosed by Arai and Atkinson. *See* A46 ("According to Arai, the computer uses (1) a performance mode when the main power supply is an external AC power supply and (2) a quiet mode when the main power supply is a battery."); A47 ("According to Atkinson, indirect inputs 20 include whether the computer is under AC power or battery power."); *see also* A47-48 (citing Yamaki, Canova, Arai, and Atkinson for disclosure of use of two power management policies based on whether the computer is powered by a battery).

Thomas also contends that neither Yamaki nor Canova discloses "fan speed control based on power management policy in use." Br. 50. But as discussed above (pp. 50-52), other prior art references (notably Dinh and Swamy) disclose adjusting fan speed. And although Thomas asserts a lack of motivation to combine the relevant features (Br. 47-48; *see infra* pp. 59-61), Thomas does not explain why it would have been beyond the abilities of a skilled artisan to adjust "fan speed control based on an appropriate power management policy." The Board thus correctly determined that "Thomas has not presented convincing evidence that an artisan would not have found these features obvious, in light of the Count, and other applicable art to manage operation of a computer system … with either a first or second management configuration and to control: (1) a speed of a fan, and (2) a

speed of a processing unit based on the configured power management configuration and a temperature of the processing unit." A53. This is particularly true given that Thomas's own APA acknowledged that a recognized problem associated with use of a cooling fan was that "it consumes battery energy." A85(2:40-42). Accordingly, the Board's determination that a skilled artisan would have understood that use of fan speed control based on an appropriate power management policy "would conserve battery life, reduce heat generation, and maximize performance speed of a computer system" is amply supported by substantial evidence. A48-49.

Finally, citing no authority, Thomas contends that "[t]he Board's dismissal of the examiner's and reexamination panel's opinions is also legal error." Br. 53. But the Board had no obligation to defer to a reexamination panel's findings on a different record; a patent is not "held valid for all purposes," but rather "not invalid" on the ***particular record*** before the adjudicator. *Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 627 (Fed. Cir. 1984). And "'a prior holding of validity is not necessarily inconsistent with a subsequent holding of invalidity,' and is not binding on subsequent litigation or PTO [proceedings]." *In re Swanson*, 540 F.3d at 1377 (quoting *Stevenson v. Sears Roebuck & Co.*, 713 F.2d 705, 710 (Fed. Cir. 1983)). Here, "the Examiner did not have the benefit of Pippin's additional evidence and explanations of obviousness." A44. Thus, as the Board correctly

concluded, "[t]he Examiner's reasons for allowance do not satisfy Thomas' burden of showing that the subject matter of [the Thomas claims] would not have been obvious in view of the subject matter of the Count."  A44.

### B.    Thomas Failed To Establish That The Use Of Different Conditions Based On Processor Temperature Rendered His Claims Patentably Distinct From The Count

Thomas also criticizes the Board for failing to consider that the Thomas claims require that "different power management policies use different conditions based on temperature of the processor."  Br. 53, 60.  But Thomas again fails to explain how the use of different conditions (*i.e.*, adjusting clock speed and/or activating the fan or increasing its speed (*see* A29)) based on processor temperature would render his claims non-obvious over the count.  Nor could he make such an argument, as implementing different conditions based on temperature is taught ***directly by the count*** (as well as Thomas's APA and other prior art).  The count teaches the generation of an "interrupt signal" when the processor temperature exceeds a threshold temperature.  A928; *see also* A2753(¶0009) ("The programmable thermal sensor … generates an interrupt when the temperature of the microprocessor reaches the threshold temperature.").  In response to the "interrupt signal," "the active cooling device [or fan] is activated" and the "frequency of the clock signal is reduced."  A928.  Thus, the count directly teaches use of different conditions in response to the temperature of the processor.

Various other prior art references similarly teach the use of different conditions

based on the temperature of the processor.  For example, as discussed above (pp.

50-52), both Dinh and Swamy each teach adjusting the speed of a cooling fan in

response to processor temperature.  *See* A1174(1:65-2:1)(Dinh); A1206(7:25-

34)(Swamy).  And Swamy additionally teaches using different combinations of

reducing clock speed and adjusting fan speed to control temperature.  *See*

A1203(2:39-51) ("The circuit may attempt to accomplish the temperature

reduction in one of several ways. …  [T]he circuit may send electronic instructions

to a fan … to turn on or speed up to thereby cool the component.  The circuit may

also send an electronic signal to the electronic component's clock source to reduce

the operating speed of the electronic component."); A1205-1206(6:64-7:1)

(power/thermal management mechanisms "can be programmed to occur in several

different combinations"); *see also* A1205(6:55-61); A1206(7:33-37).  And,

contrary to Thomas's contentions, the Board did not "rely only on … Arai for

teaching conditions based on temperature."  Br. 53.  Rather, the Board referenced

Arai only in connection with disclosure of two power management policies (A47-

48; *see supra* pp. 54-55), relying instead on indisputable prior art references—

including Swamy and Dinh—for disclosure of conditions based on temperature

(*see* A48-49; *see also* A26).

Accordingly, Thomas once again fails to demonstrate how his appellate argument would actually lead to reversal of the Board's decision. The Board's determination that the prior art and the count together disclosed "different power management policies [that] use different conditions based on temperature of the processor" is fully supported.

### C.     The Board Correctly Determined That A Skilled Artisan Would Have Been Motivated To Modify The Count In Light Of The Teachings Of The Prior Art

Thomas contends that the Board failed to articulate a reason "why or how prior art references would be used to modify the count" to yield Thomas's alleged inventions and instead offered only a "conclusory statement on obviousness." Br. 47, 56. Thomas is incorrect.

As the Board explained, it would have been obvious to a skilled artisan to modify the count's teachings—*i.e.*, providing power and thermal management through use of a cooling fan and adjusting the clock frequency in response to a threshold temperature—to arrive at Thomas's claimed inventions, which do the above in two different ways depending on the computer's power source. *See* A47-49; A52-54. As discussed above (pp. 53-54) and not disputed by Thomas, configurations where two different power management policies are implemented depending on whether the computer is powered by a battery were well-known in the art. A skilled artisan would have been motivated to modify the count by

configuring its computer to use two different power management policies.  A47;

*see also* A45 (noting that Yamaki teaches that "[w]hen enabled, the sleep mode

function decreases a processing speed of a CPU to prolong battery life by reducing

power consumption" but, when "disabled, the high-speed operation of the CPU can

be maintained").  As the Board explained, a skilled artisan "would have

appreciated that these features would conserve battery life, reduce heat generation,

and maximize performance speed of a computer system," as taught by various

prior art references.  A48-49.[24]  The Board thus correctly concluded that the

combination of power management policies with the subject matter of the count

was "nothing more than '[t]he combination of familiar elements according to

known methods' that do 'no more than yield predictable results.'"  A48 (quoting

*KSR*, 550 U.S. at 415-416).

Moreover, as discussed above (pp. 28-34), Thomas, as the movant, bore the

burden to establish that his claims did not correspond to the count.  *See* 37 C.F.R.

---

[24]    *See also, e.g.*, A1145(2:19-24)(Yamaki) ("It is an object of the present
invention to provide a personal computer which can disable a sleep mode function
when the personal computer which is battery driven is operated by externally
supplied power, and can fully exhibit its performance."); A1165(1:63-66)(Canova)
("A further object is to provide a battery operated computer in which various
power conservation measures can be used while the computer is turned on to
conserve battery energy."); A1174(1:44-48)(Dinh) ("Thus, there is a need for a fan
subsystem which can increase the fan speed proportionally to the increase in the
temperature of the computer's elements.  Such a fan subsystem would evenly
match the temperature inside the computer with the fan speed necessary to cool the
system.").

§ 41.207(b)(1); *id.* § 41.208(b); *see also id.* § 41.121(b); A40-41.  Before the

Board, as here, Thomas offered no explanation why a skilled artisan would not

have been motivated to modify the count in narrow, straightforward ways to arrive

at Thomas's claimed inventions.  As the Board aptly concluded, Thomas failed to

show "that the alleged distinguishing features of [the Thomas claims] would have

been 'uniquely challenging or difficult for one of ordinary skill in the art' or

otherwise beyond the level of an ordinarily skilled artisan."  A49 (quoting

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007));

A53-54 (same).

***

Because each of the allegedly distinguishing features that Thomas identifies

was either well-known in the art or directly disclosed by the count, the Board's

determination that Thomas's claims are not patentably distinct from the count in

light of the disclosures of the prior art is supported by substantial evidence.

# CONCLUSION

The Board's decision should be affirmed.

Respectfully submitted,

/s/ William F. Lee

WILLIAM G. MCELWAIN
BRITTANY BLUEITT AMADI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006
(202) 663-6000

R. DANNY HUNTINGTON
WILLIAM N. HUGHET
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
607 14th Street, N.W., Suite 800
Washington, DC  20005

September 3, 2015

WILLIAM F. LEE
MARK C. FLEMING
ERIC F. FLETCHER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Counsel for Appellee Jack D. Pippin*

# ADDENDUM

# **TABLE OF CONTENTS**

**Description**                                                      **Pages**

**I. STATUTES**

35 U.S.C. § 103.  Conditions for patentability; non-        ADD1
obvious subject matter

35 U.S.C. § 135.  Interferences                              ADD3

35 U.S.C. § 157.  Statutory invention registration          ADD5

35 U.S.C. § 282.  Presumption of validity; defenses         ADD6
(Effective: November 2, 2002 to September 15, 2011)

35 U.S.C. § 282.  Presumption of validity; defenses         ADD7
(Effective: September 16, 2011 to September 15,
2012)

**II. REGULATIONS**

37 C.F.R. § 41.120  Notice of basis for relief              ADD9

37 C.F.R. § 41.121  Motions                                 ADD9

37 C.F.R. § 41.203  Declaration                             ADD11

37 C.F.R. § 41.204  Notice of basis for relief             ADD11

37 C.F.R. § 41.207  Presumptions                            ADD12

37 C.F.R. § 41.208  Content of substantive and             ADD13
responsive motions

## I.  STATUTES

### 35 U.S.C. § 103.  Conditions for patentability; non-obvious subject matter

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

(b)(1) Notwithstanding subsection (a), and upon timely election by the applicant for patent to proceed under this subsection, a biotechnological process using or resulting in a composition of matter that is novel under section 102 and nonobvious under subsection (a) of this section shall be considered nonobvious if--

(A) claims to the process and the composition of matter are contained in either the same application for patent or in separate applications having the same effective filing date; and

(B) the composition of matter, and the process at the time it was invented, were owned by the same person or subject to an obligation of assignment to the same person.

(2) A patent issued on a process under paragraph (1)--

(A) shall also contain the claims to the composition of matter used in or made by that process, or

(B) shall, if such composition of matter is claimed in another patent, be set to expire on the same date as such other patent, notwithstanding section 154.

(3) For purposes of paragraph (1), the term "biotechnological process" means--

(A) a process of genetically altering or otherwise inducing a single- or multi-celled organism to--

**ADD1**

(i) express an exogenous nucleotide sequence,

(ii) inhibit, eliminate, augment, or alter expression of an endogenous nucleotide sequence, or

(iii) express a specific physiological characteristic not naturally associated with said organism;

(B) cell fusion procedures yielding a cell line that expresses a specific protein, such as a monoclonal antibody; and

(C) a method of using a product produced by a process defined by subparagraph (A) or (B), or a combination of subparagraphs (A) and (B).

(c)(1) Subject matter developed by another person, which qualifies as prior art only under one or more of subsections (e), (f), and (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person.

(2) For purposes of this subsection, subject matter developed by another person and a claimed invention shall be deemed to have been owned by the same person or subject to an obligation of assignment to the same person if--

(A) the claimed invention was made by or on behalf of parties to a joint research agreement that was in effect on or before the date the claimed invention was made;

(B) the claimed invention was made as a result of activities undertaken within the scope of the joint research agreement; and

(C) the application for patent for the claimed invention discloses or is amended to disclose the names of the parties to the joint research agreement.

(3) For purposes of paragraph (2), the term "joint research agreement" means a written contract, grant, or cooperative agreement

**ADD2**

entered into by two or more persons or entities for the performance of experimental, developmental, or research work in the field of the claimed invention.

## 35 U.S.C. § 135.  Interferences

(a) Whenever an application is made for a patent which, in the opinion of the Director, would interfere with any pending application, or with any unexpired patent, an interference may be declared and the Director shall give notice of such declaration to the applicants, or applicant and patentee, as the case may be.  The Board of Patent Appeals and Interferences shall determine questions of priority of the inventions and may determine questions of patentability.  Any final decision, if adverse to the claim of an applicant, shall constitute the final refusal by the Patent and Trademark Office of the claims involved, and the Director may issue a patent to the applicant who is adjudged the prior inventor.  A final judgment adverse to a patentee from which no appeal or other review has been or can be taken or had shall constitute cancellation of the claims involved in the patent, and notice of such cancellation shall be endorsed on copies of the patent distributed after such cancellation by the Patent and Trademark Office.

(b)(1) A claim which is the same as, or for the same or substantially the same subject matter as, a claim of an issued patent may not be made in any application unless such a claim is made prior to one year from the date on which the patent was granted.

(2) A claim which is the same as, or for the same or substantially the same subject matter as, a claim of an application published under section 122(b) may be made in an application filed after the application is published only if the claim is made before 1 year after the date on which the application is published.

(c) Any agreement or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection with or in contemplation of the termination of the interference, shall be in writing and a true copy thereof filed in the Patent and Trademark Office before the termination of the

interference as between the said parties to the agreement or understanding.  If any party filing the same so requests, the copy shall be kept separate from the file of the interference, and made available only to Government agencies on written request, or to any person on a showing of good cause.  Failure to file the copy of such agreement or understanding shall render permanently unenforceable such agreement or understanding and any patent of such parties involved in the interference or any patent subsequently issued on any application of such parties so involved.  The Director may, however, on a showing of good cause for failure to file within the time prescribed, permit the filing of the agreement or understanding during the six-month period subsequent to the termination of the interference as between the parties to the agreement or understanding.

The Director shall give notice to the parties or their attorneys of record, a reasonable time prior to said termination, of the filing requirement of this section.  If the Director gives such notice at a later time, irrespective of the right to file such agreement or understanding within the six-month period on a showing of good cause, the parties may file such agreement or understanding within sixty days of the receipt of such notice.

Any discretionary action of the Director under this subsection shall be reviewable under section 10 of the Administrative Procedure Act.

(d) Parties to a patent interference, within such time as may be specified by the Director by regulation, may determine such contest or any aspect thereof by arbitration.  Such arbitration shall be governed by the provisions of title 9 to the extent such title is not inconsistent with this section.  The parties shall give notice of any arbitration award to the Director, and such award shall, as between the parties to the arbitration, be dispositive of the issues to which it relates.  The arbitration award shall be unenforceable until such notice is given.  Nothing in this subsection shall preclude the Director from determining patentability of the invention involved in the interference.

**35 U.S.C. § 157.  Statutory invention registration**

(a) Notwithstanding any other provision of this title, the Director is authorized to publish a statutory invention registration containing the specification and drawings of a regularly filed application for a patent without examination if the applicant—

(1) meets the requirements of section 112 of this title;

(2) has complied with the requirements for printing, as set forth in regulations of the Director;

(3) waives the right to receive a patent on the invention within such period as may be prescribed by the Director; and

(4) pays application, publication, and other processing fees established by the Director.

If an interference is declared with respect to such an application, a statutory invention registration may not be published unless the issue of priority of invention is finally determined in favor of the applicant.

(b) The waiver under subsection (a)(3) of this section by an applicant shall take effect upon publication of the statutory invention registration.

(c) A statutory invention registration published pursuant to this section shall have all of the attributes specified for patents in this title except those specified in section 183 and sections 271 through 289 of this title. A statutory invention registration shall not have any of the attributes specified for patents in any other provision of law other than this title. A statutory invention registration published pursuant to this section shall give appropriate notice to the public, pursuant to regulations which the Director shall issue, of the preceding provisions of this subsection. The invention with respect to which a statutory invention certificate is published is not a patented invention for purposes of section 292 of this title.

(d) The Director shall report to the Congress annually on the use of statutory invention registrations. Such report shall include an assessment of the degree to which agencies of the Federal Government are making use of the statutory invention registration system, the degree to which it aids the management of federally developed technology, and an assessment of the cost savings to the Federal Government of the use of such procedures.

**35 U.S.C. § 282.  Presumption of validity; defenses**
(Effective: November 2, 2002 to September 15, 2011)

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.  Notwithstanding the preceding sentence, if a claim to a composition of matter is held invalid and that claim was the basis of a determination of nonobviousness under section 103(b)(1), the process shall no longer be considered nonobvious solely on the basis of section 103(b)(1). The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:

(1) Noninfringement, absence of liability for infringement or unenforceability,

(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,

(3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title,

(4) Any other fact or act made a defense by this title.

**ADD6**

In actions involving the validity or infringement of a patent the party asserting invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before the trial, of the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit or, except in actions in the United States Court of Federal Claims, as showing the state of the art, and the name and address of any person who may be relied upon as the prior inventor or as having prior knowledge of or as having previously used or offered for sale the invention of the patent in suit. In the absence of such notice proof of the said matters may not be made at the trial except on such terms as the court requires.  Invalidity of the extension of a patent term or any portion thereof under section 154(b) or 156 of this title because of the material failure—

> (1) by the applicant for the extension, or

> (2) by the Director,

to comply with the requirements of such section shall be a defense in any action involving the infringement of a patent during the period of the extension of its term and shall be pleaded. A due diligence determination under section 156(d)(2) is not subject to review in such an action.

### 35 U.S.C. § 282.  Presumption of validity; defenses
(Effective: September 16, 2011 to September 15, 2012)

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.  Notwithstanding the preceding sentence, if a claim to a composition of matter is held invalid and that claim was the basis of a determination of nonobviousness under section 103(b)(1), the process shall no longer be considered nonobvious solely on the basis of section 103(b)(1). The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

**ADD7**

The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:

      (1) Noninfringement, absence of liability for infringement or unenforceability,

      (2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,

      (3) Invalidity of the patent or any claim in suit for failure to comply with—

            (A) any requirement of section 112, except that the failure to disclose the best mode shall not be a basis on which any claim of a patent may be canceled or held invalid or otherwise unenforceable; or

            (B) any requirement of section 251.

      (4) Any other fact or act made a defense by this title.

In actions involving the validity or infringement of a patent the party asserting invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before the trial, of the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit or, except in actions in the United States Court of Federal Claims, as showing the state of the art, and the name and address of any person who may be relied upon as the prior inventor or as having prior knowledge of or as having previously used or offered for sale the invention of the patent in suit. In the absence of such notice proof of the said matters may not be made at the trial except on such terms as the court requires. Invalidity of the extension of a patent term or any portion thereof under section 154(b) or 156 of this title because of the material failure—

      (1) by the applicant for the extension, or

      (2) by the Director,

**ADD8**

to comply with the requirements of such section shall be a defense in any action involving the infringement of a patent during the period of the extension of its term and shall be pleaded.  A due diligence determination under section 156(d)(2) is not subject to review in such an action.

## II.    REGULATIONS

### 37 C.F.R. § 41.120  Notice of basis for relief.

(a) The Board may require a party to provide a notice stating the relief it requests and the basis for its entitlement to relief. The Board may provide for the notice to be maintained in confidence for a limited time.

(b) *Effect*. If a notice under paragraph (a) of this section is required, a party will be limited to filing substantive motions consistent with the notice. Ambiguities in the notice will be construed against the party. A notice is not evidence except as an admission by a party-opponent.

(c) *Correction*. A party may move to correct its notice. The motion should be filed promptly after the party becomes aware of the basis for the correction. A correction filed after the time set for filing notices will only be entered if entry would serve the interests of justice.

### 37 C.F.R. § 41.121  Motions.

(a) *Types of motions—*
(1) *Substantive motions*. Consistent with the notice of requested relief, if any, and to the extent the Board authorizes, a party may file a motion:
(i) To redefine the scope of the contested case,
(ii) To change benefit accorded for the contested subject matter, or
(iii) For judgment in the contested case.
(2) *Responsive motions*. The Board may authorize a party to file a motion to amend or add a claim, to change inventorship, or

**ADD9**

otherwise to cure a defect raised in a notice of requested relief or in a substantive motion.

(3) *Miscellaneous motions*. Any request for relief other than a substantive or responsive motion must be filed as a miscellaneous motion.

(b) *Burden of proof*. The party filing the motion has the burden of proof to establish that it is entitled to the requested relief.

(c) *Content of motions; oppositions and replies*.

(1) Each motion must be filed as a separate paper and must include:

(i) A statement of the precise relief requested,

(ii) A statement of material facts (see paragraph (d) of this section), and

(iii) A full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence and the governing law, rules, and precedent.

(2) *Compliance with rules*. Where a rule in part 1 of this title ordinarily governs the relief sought, the motion must make any showings required under that rule in addition to any showings required in this part.

(3) The Board may order additional showings or explanations as a condition for filing a motion.

(d) *Statement of material facts*.

(1) Each material fact shall be set forth as a separate numbered sentence with specific citations to the portions of the record that support the fact.

(2) The Board may require that the statement of material facts be submitted as a separate paper.

(e) *Claim charts*. Claim charts must be used in support of any paper requiring the comparison of a claim to something else, such as another claim, prior art, or a specification. Claim charts must accompany the paper as an appendix. Claim charts are not a substitute for appropriate argument and explanation in the paper.

(f) The Board may order briefing on any issue that could be raised by motion.

**37 C.F.R. § 41.203  Declaration.**

(a) *Interfering subject matter*. An interference exists if the subject matter of a claim of one party would, if prior art, have anticipated or rendered obvious the subject matter of a claim of the opposing party and vice versa.

(b) *Notice of declaration*. An administrative patent judge declares the patent interference on behalf of the Director. A notice declaring an interference identifies:

(1) The interfering subject matter;

(2) The involved applications, patents, and claims;

(3) The accorded benefit for each count; and

(4) The claims corresponding to each count.

(c) *Redeclaration*. An administrative patent judge may redeclare a patent interference on behalf of the Director to change the declaration made under paragraph (b) of this section.

(d) A party may suggest the addition of a patent or application to the interference or the declaration of an additional interference. The suggestion should make the showings required under § 41.202(a) of this part.

**37 C.F.R. § 41.204  Notice of basis for relief.**

(a) *Priority statement*.

(1) A party may not submit evidence of its priority in addition to its accorded benefit unless it files a statement setting forth all bases on which the party intends to establish its entitlement to judgment on priority.

(2) The priority statement must:

(i) State the date and location of the party's earliest corroborated conception,

(ii) State the date and location of the party's earliest corroborated actual reduction to practice,

(iii) State the earliest corroborated date on which the party's diligence began, and

(iv) Provide a copy of the earliest document upon which the party will rely to show conception.

**ADD11**

(3) If a junior party fails to file a priority statement overcoming a senior party's accorded benefit, judgment shall be entered against the junior party absent a showing of good cause.

(b) *Other substantive motions*. The Board may require a party to list the motions it intends to file, including sufficient detail to place the Board and the opponent on notice of the precise relief sought.

(c) *Filing and service*. The Board will set the times for filing and serving statements required under this section.

## 37 C.F.R. § 41.207  Presumptions.

(a) *Priority*—

(1) *Order of invention*. Parties are presumed to have invented interfering subject matter in the order of the dates of their accorded benefit for each count. If two parties are accorded the benefit of the same earliest date of constructive reduction to practice, then neither party is entitled to a presumption of priority with respect to the other such party.

(2) *Evidentiary standard*. Priority may be proved by a preponderance of the evidence except a party must prove priority by clear and convincing evidence if the date of its earliest constructive reduction to practice is after the issue date of an involved patent or the publication date under 35 U.S.C. 122(b) of an involved application or patent.

(b) *Claim correspondence*.

(1) For the purposes of determining priority and derivation, all claims of a party corresponding to the count are presumed to stand or fall together. To challenge this presumption, a party must file a timely substantive motion to have a corresponding claim designated as not corresponding to the count. No presumption based on claim correspondence regarding the grouping of claims exists for other grounds of unpatentability.

(2) A claim corresponds to a count if the subject matter of the count, treated as prior art to the claim, would have anticipated or rendered obvious the subject matter of the claim.

(c) *Cross-applicability of prior art*. When a motion for judgment of unpatentability against an opponent's claim on the basis of prior art is granted, each of the movant's claims corresponding to the same count as the opponent's claim will be presumed to be

unpatentable in view of the same prior art unless the movant in its motion rebuts this presumption.

## 37 C.F.R. § 41.208  Content of substantive and responsive motions.

The general requirements for motions in contested cases are stated at § 41.121(c).

(a) In an interference, substantive motions must:

(1) Raise a threshold issue,

(2) Seek to change the scope of the definition of the interfering subject matter or the correspondence of claims to the count,

(3) Seek to change the benefit accorded for the count, or

(4) Seek judgment on derivation or on priority.

(b) To be sufficient, a motion must provide a showing, supported with appropriate evidence, such that, if unrebutted, it would justify the relief sought. The burden of proof is on the movant.

(c) *Showing patentability*.

(1) A party moving to add or amend a claim must show the claim is patentable.

(2) A party moving to add or amend a count must show the count is patentable over prior art.

## CERTIFICATE OF SERVICE

I hereby certify that, on this 3rd day of September, 2015 I filed the foregoing Brief for Appellee Jack D. Pippin with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,950 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

September 3, 2015